UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
THOMAS ALLEGRA, YESENIA ARIZA,
MARIANA ELISE EMMERT, STUART
ROGOFF, GRACELYNN TENAGLIA, and
MELISSA VERRASTRO, individually and on
behalf of others similarly situated,

**MEMORANDUM & ORDER**
17-CV-5216 (PKC) (RLM)

Plaintiffs,

- against -

LUXOTTICA RETAIL NORTH AMERICA,
d/b/a LensCrafters,

Defendant.
-------------------------------------------------------x

**TABLE OF CONTENTS**

**BACKGROUND** ............................................................................................................ **4**

I.      FACTUAL BACKGROUND ................................................................................ 4

        A.      Eyeglasses Manufacturing .......................................................................... 4

        B.      AccuFit ........................................................................................................ 6

        C.      LensCrafters' Alleged Misrepresentations about AccuFit .......................... 7

II.     PROCEDURAL HISTORY .................................................................................. 8

**LEGAL STANDARDS** .................................................................................................. **9**

I.      CLASS CERTIFICATION .................................................................................... 9

II.     EXPERT TESTIMONY ...................................................................................... 12

III.    PLAINTIFFS' CLASS CLAIMS ....................................................................... 16

        A.      New York General Business Law ............................................................. 16

        B.      Florida Deceptive and Unfair Trade Practices Act ................................... 18

        C.      California Unfair Competition Law, False Advertising Law, and Consumer
                Legal Remedies Act .................................................................................. 19

        D.      Quasi-Contract / Unjust Enrichment ........................................................ 21

        E.      Fraudulent Omission ................................................................................. 22

**DISCUSSION** ............................................................................................................... **23**

I.      PLAINTIFFS' MOTION FOR CLASS CERTIFICATION .............................. 23

        A.      Rule 23 (a) ................................................................................................. 23

                1.      Numerosity ..................................................................................... 23

2.    Commonality ............................................................................ 24

3.    Typicality ................................................................................. 25

4.    Adequacy of Representation .................................................... 27

    a.    Class Representatives ................................................... 28

    b.    Class Counsel ............................................................... 31

5.    Ascertainability ....................................................................... 36

B.    Rule 23(b)(2) ....................................................................................... 37

C.    Rule 23(b)(3) – Predominance ........................................................... 39

1.    Uniform Exposure to a Consistent Misrepresentation ............. 41

    a.    FDUTPA and GBL ....................................................... 42

    b.    UCL, FAL, and CLRA ................................................. 47

    c.    Fraudulent Omission .................................................... 52

    d.    Plaintiffs' Evidence of Exposure ................................ 53

        (1)    Exposure during the AccuFit Customer Experience ......... 53

        (2)    Exposure Through Multi-Channel Marketing Campaign . 64

    e.    A Consistent Misrepresentation ................................... 82

2.    Common Elements of New York, California, and Florida Class Claims . 85

    a.    Deceptive Act ............................................................... 85

        (1)    Dan Riall ......................................................... 88

        (2)    Dr. Keith Walter ............................................. 97

        (3)    Plaintiff Has Demonstrated Common Proof of the Alleged Deceptive Acts ................................ 106

    b.    Materiality .................................................................. 108

    c.    Injury or Causation .................................................... 117

3.    Damages ................................................................................ 120

    a.    The Marketing Message Apportionment Methodology ............. 121

    b.    The Butler/Eichmann Model ...................................... 130

        (1)    The Butler Conjoint Analysis ......................... 130

        (2)    The Eichmann Market Simulation .................. 134

        (3)    LensCrafters' Critiques of the Butler/Eichmann Model . 136

    c.    *Comcast* .................................................................... 144

4.    Plaintiffs' Fraudulent Omissions Claim ................................ 148

5.    Unjust Enrichment Claim ..................................................... 150

6.    Rule 23(b)(3) – Superiority .................................................. 154

**CONCLUSION** ................................................................................................. **155**

PAMELA K. CHEN, United States District Judge:

Plaintiffs Thomas Allegra, Yesenia Ariza, Mariana Elise Emmert, Stuart Rogoff, Gracelynn Tenaglia, and Melissa Verrastro (collectively, "Plaintiffs") bring this putative class action against Defendant Luxottica Retail North America, doing business as LensCrafters ("LensCrafters") alleging false and misleading statements by LensCrafters about its AccuFit system, which induced customers to purchase and/or caused them to overpay for LensCrafters' prescription eyeglasses in violation of California, Florida, and New York law.  (*See generally* Second Amended Consolidated Complaint ("SACC"), Dkt. 50.)  Presently before the Court are (1) Plaintiffs' motion to certify three classes consisting of all residents of New York, Florida, and California "who purchased prescription eyeglasses from LensCrafters after being fitted with AccuFit from September 5, 2013 to present" (Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Class Cert. Mot."), Dkt. 238, at 25); (2) Defendant's motion to exclude in full five of Plaintiffs' experts (Defendant's Motion to Exclude Plaintiffs' Experts ("Def.'s Mot. to Exclude"), Dkt. 249, at 1); and (3) Plaintiffs' motion to exclude in part or in full the testimony by four of Defendant's experts (Memorandum of Law in Support of Plaintiffs' Motion to Exclude Expert Testimony ("Pl.'s Mot. to Exclude"), Dkt. 241, at 1).  For the reasons set forth below, the Court grants in part and denies in part the motion for class certification, grants in part and denies in part LensCrafters' motion to exclude, and defers ruling on Plaintiffs' motion to exclude.

**BACKGROUND**

## I.   FACTUAL BACKGROUND

LensCrafters is one of the largest retail optical brands in the country, with over 1,000 retail stores in North America.[1]  (Class Cert. Mot., Dkt. 238, at 3.)  Plaintiffs and putative class members purchased prescription eyeglasses from LensCrafters after being measured using the AccuFit Digital Measuring System ("AccuFit").  (SACC, Dkt. 50, ¶ 1.)  Plaintiffs do not bring a product-defect case.  (Class Cert. Mot., Dkt. 238, at 23.)  Rather, Plaintiffs claim that LensCrafters engaged in a deceptive marketing campaign that touted the superiority of AccuFit's measurements, thereby increasing consumer demand for LensCrafters' eyeglasses and consequently the market price for those eyeglasses.  (*Id.* at 1–2, 21–22.)  As a result, Plaintiffs contend that "*every* consumer who was fitted with AccuFit—even if that individual customer did not rely on LensCrafters' representations, was not deceived by them, or did not care about digital measurement"—paid an "overcharge" or "price premium" for their eyeglasses.  (*Id.* at 22.)

### A.   Eyeglasses Manufacturing

When eyeglasses are manufactured, oversized, semi-finished lens blanks are cut to match a customer's prescription.  (*Id.* at 3.)  The lenses are then transferred to a finishing lab where they are placed into the patient's frames.  (*Id.* at 3–4.)  Fitting measurements[2] are taken to determine the proper placement of the lens in the frame; these measurements include the horizontal distance between the customer's pupils, known as interpupillary distance ("PD") and the vertical distance from the bottom of the lens to the center of the pupil, known as ocular center height ("OC Height").

---

[1] LensCrafters was founded in 1983 and began to operate as a subsidiary of Luxottica Retail North America, Inc. in approximately 1995.  (SACC, Dkt. 50, ¶ 16.)

[2] "Fitting measurements" are different from an eyeglass prescription.  (Class Cert. Mot., Dkt. 238, at 3.)

(*Id.* at 3.)  "Fitting measurements ensure that the eye tracks through the proper channel of the lens to maximize the benefit of the lens design and avoid distortion."  (Defendant LensCrafters' Opposition to Plaintiffs' Motion for Class Certification ("Class Cert. Opp'n"), Dkt. 243, at 6.)  An optician uses both the fitting measurements and the frame dimensions to calculate the "finish layout" for the lenses.  (Class Cert. Mot., Dkt. 238, at 4.)  The finish layout includes a vertical and horizontal "centration" number for each lens, which is used to line up the center of the lens with the center of the customer's pupil.[3]  (*Id.*)  The centration number is used to position each lens in a machine[4] called a "finish blocker" so that the lens can be cut, polished, and beveled so that it fits snuggly in the eyeglass frame.  (*Id.*)

Plaintiffs contend that after eyeglasses are made, eyewear dispensers "test the final centration of the lenses to ensure that the company's manufacturing specifications—or 'release criteria,' *i.e.*, the criteria the glasses must meet in order to be released to the customer—are met."  (*Id.*)  Guidelines on these manufacturing specifications are provided by the American National Standards Institute ("ANSI"), which "requires 1mm accuracy for centration measurements (and much looser on many lenses)."  (*Id.*)  LensCrafters uses centration specifications that match those of the ANSI.  (*Id.*)  Critical to their class claims, Plaintiffs allege that to this day "LensCrafters

---

[3] In order to put the optical center of the lens in front of the patient's pupil, the optical center of the lens must be "decentered" with respect to the geometric center of the frame.  (Report of Dan Riall ("Riall Report"), Dkt. 239-7, ¶ 67.)  The "decentration" necessary to achieve "centration," *i.e.*, to line up the center to the lens with the center of the patient's pupil, is reflected in the finish layout calculation.  (*Id.*)

[4] Plaintiffs allege that most of the lenses manufactured by LensCrafters use a "physical block," meaning that each lens is bonded to a block that holds it in place while it is cut, polished, and beveled.  (Class Cert. Mot., Dkt. 238, at 4.)  Some machines used by LensCrafters do not use a physical block and instead use "computer-controlled mechanisms to perform both blocking and edging based on the centration measurements."  (*Id.*)  Either way, centration measurements are key to finish layout and the final manufacturing of the frames.

manufactures to 1mm centration—not to the 0.1mm measurements it advertised to its consumers." (*See id.* at 4–5, 9–10.)

## B. AccuFit

In general, there are three types of instruments used to take PD measurements: the "traditional methods" of (1) a millimeter ruler or (2) a pupilometer; and (3) a digital centration system like AccuFit. (Class Cert. Opp'n, Dkt. 243, at 6.) A millimeter ruler ("PD stick") and pupilometer typically take measurements in 0.5mm increment. (*Id.* at 4.) In September 2011, in response to the "inaccuracies and limitations" of the traditional methods, LensCrafters implemented AccuFit, a complimentary "state-of-the-art digital technology" system that not only "helps customers select frames with the MyLook/Virtual Mirror" and "enables customers to improve visual quality by understanding and selecting lens designs and enhancements through the Lens Simulator," but also, according to LensCrafters, "provides precise digital measurements." (*Id.* at 6–7.) After a customer has selected her frames, picked her lenses, and agreed to a price, AccuFit's digital measurement tool "captures ten unique measurements across five parameters relating to how eyeglasses rest on a customer's face with respect to the location of his or her eyes." (*Id.* at 7.)

LensCrafters contends that AccuFit "captures measurements down to 0.1mm (or, for some parameters, in angular degrees), whereas less sophisticated manual measurement methods can only capture one or two parameters, and measure (at best) down to 1.0mm or 0.5mm." (*Id.*) "Thus, AccuFit measures 'down to a tenth of a millimeter' and is, objectively, at least 'five times more precise' than traditional methods." (*Id.*) In addition, LensCrafters explains that AccuFit's measurement tool is "less intrusive" than other measurement methods because measurements are "taken digitally through an image, rather than a binocular-like device or ruler held up to the customer's face." (*Id.* at 8.)

### C.      LensCrafters' Alleged Misrepresentations about AccuFit

Plaintiffs claim that before developing AccuFit, in 2009, LensCrafters ran pilot tests of digital platforms to test the effect of automated measurement on sales—the results were positive, and, encouraged by this success, LensCrafters "decided to adopt an automated system nationwide, with the central goal of increasing sales." (Class Cert. Mot., Dkt. 238, at 5.)  Then, before implementing AccuFit in stores, in 2010 and 2011, LensCrafters conducted an "internal" study and commissioned an "independent" study, with the hope of demonstrating that AccuFit delivered 0.1mm measurements, but not testing whether glasses were in fact manufactured to 0.1mm centration. (*Id.* at 6.)  Plaintiffs contend that these studies were flawed and biased, and ultimately did not offer support for LensCrafters' AccuFit marketing campaign. (*Id.* at 6–8.)

Nevertheless, after it launched nationally in September 2011, AccuFit became a "central component of LensCrafters' marketing strategies." (*Id.* at 8; SACC, Dkt. 50, ¶ 32.)  Through the AccuFit system itself, LensCrafters' employee scripts, online marketing, television advertisements, in-store promotions, and print and direct mailing advertising, LensCrafters focused its marketing "on AccuFit's 0.1mm measurements and those measurements' superiority to traditional methods (which are usually in 0.5mm or 1mm increments)." (Class Cert. Mot., Dkt. 238, at 11.)  In particular, through a "years-long, multimillion-dollar marketing campaign," LensCrafters claimed that AccuFit is "'five times more precise' than traditional methods, measuring 'down to a tenth of a millimeter,' and that customers would have 'clearer, crisper vision' and 'see the world more clearly'" (the "Alleged Misrepresentations"). (*Id.* at 1; *see also* SACC, Dkt. 50, ¶ 1.)  However, Plaintiffs contend that LensCrafters never actually "updated its manufacturing process to account for 0.1mm measurements," prompting some employees to raise concerns that consumers were being tricked by the disconnect between measurements and manufacturing. (Class Cert. Mot., Dkt. 238, at 1, 8–10.)  Plaintiffs further contend that *even if*

LensCrafters had made such manufacturing updates "0.1mm measurements [nonetheless] provide no benefit in visual acuity." (*Id.* at 1.)

As a result of LensCrafters' "deceptive" marketing claims, Plaintiffs allege that "consumer demand for its eyeglasses" increased, which in turn "increased the market price of those glasses." (*Id.* at 22–23.) Plaintiffs contend that "[b]ecause the market price was higher than it would have been without LensCrafters' deceptive practices, *all* LensCrafters consumers paid more for their glasses than they otherwise would have" regardless of whether they relied upon or were deceived by misrepresentations about AccuFit. (*Id.* (emphasis added).) That said, Plaintiffs claim that they themselves "purchased their eyeglasses after seeing and relying on LensCrafters' representations about AccuFit" and that they "spent significant sums on their glasses, choosing to shop at LensCrafters in part because it marketed the superiority of AccuFit's 0.1mm centration measurements compared to traditional methods." (*Id.* at 24–25.) However, Plaintiffs do not seek to certify a class of LensCrafters customers who actually relied on or were in fact deceived by marketing or representations about AccuFit.

## II.   PROCEDURAL HISTORY

This action was initiated by a complaint filed on September 5, 2017. (Complaint, Dkt. 1.) The Court then granted a motion to consolidate this action with similar cases filed in California and Florida and for leave to file a consolidated complaint. (12/8/2017 Docket Order.) Plaintiffs filed a second amended consolidated complaint (the "SACC") on September 21, 2018, alleging nine causes of action, including violations of the California Business and Professions Code, the California Consumer Legal Remedies Act, the Florida Deceptive and Unfair Trade Practices Act, and the New York General Business Law, as well as unjust enrichment, fraudulent misrepresentation, and fraudulent omission. (SACC, Dkt. 50, at 20–31.) Defendant filed an Answer to the SACC on October 30, 2018. (Answer, Dkt. 66.)

Thereafter, the parties engaged in extensive, contentious, and protracted discovery, including expert discovery, which involved numerous motions to compel and motions to strike. (*See generally* Docket Entries from 12/4/2018 to 2/6/2020; *see also* 9/4/2019 Docket Order ("Regrettably, the parties' bickering continues unabated, burdening this Court with detailed recitations of their protracted negotiations over extending the deadlines for expert disclosures.").)[5] On May 18, 2020, the Court held a pre-motion conference by telephone regarding Plaintiffs' proposed motion for class certification and the parties' respective *Daubert* challenges, and ordered a briefing schedule. (5/18/2020 Minute Entry.) The Court granted the parties leave to file their completed briefing under seal, but directed the parties to "meet and confer promptly thereafter on redactions"[6] and "file redacted versions of the completed briefing by November 13, 2020." (10/27/2020 Docket Order.) The parties filed their unredacted briefs, under seal, on October 29, 2020. (*See generally* Dkts. 237–53.)

## LEGAL STANDARDS

### I.   CLASS CERTIFICATION

"[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with [Federal Rule of Civil Procedure ("Rule")] 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). This requires the party to "not only 'be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of

---

[5] Consistent with this district's standing order regarding pretrial supervision of civil cases, the Honorable Roanne L. Mann, Magistrate Judge, oversaw discovery in this matter, including resolving numerous contentious discovery disputes.

[6] Throughout this litigation, the parties have sought to file under seal and/or redact information that they considered "confidential." (*See*, *e.g.*, Dkts. 52, 71–72, 100, 102–03, 107, 125, 149, 151.)

representation, as required by Rule 23(a)[,] . . . [but] must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* (quoting *Wal-Mart*, 564 U.S. at 351); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."), *decision clarified on denial of reh'g*, 483 F.3d 70 (2d Cir. 2007).

Rule 23(a) "provides that a class may be certified only if four prerequisites have been met: numerosity, commonality, typicality, and adequacy of representation." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015). In particular, these require showing that: (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law and fact common to the class"; (3) "the claims or defenses of the representative parties are typical" of those of the class; and (4) "the representative parties will fairly and adequately protect the interests of the class." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting Fed. R. Civ. P. 23(a)). In addition to these prerequisites, the Second Circuit also recognizes an "implied requirement of ascertainability." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 407 (S.D.N.Y. 2015) (quoting *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d at 30); *accord Hughes v. The Ester C Co.*, 317 F.R.D. 333, 348 (E.D.N.Y. 2016).

Rule 23(b)(2) permits class treatment where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Rule 23(b)(3) allows for class certification "if both (1) 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and (2) 'a

class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Roach*, 778 F.3d at 405 (quoting Fed. R. Civ. P. 23(b)(3)).

Before certifying a class, a court must engage in a "rigorous analysis" to determine whether the Rule 23(a) prerequisites have been satisfied, which "will frequently entail overlap with the merits of the plaintiff's underlying claim" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast*, 569 U.S. at 33–34 (quotation marks and citation omitted). That said, Rule 23 does not grant courts "license to engage in free-ranging merits inquiries at the certification stage" and such inquiries may be considered "only to the extent . . . they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). The "same analytical principles" that govern Rule 23(a) also govern Rule 23(b), and "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34.

A court must "make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, must resolve material factual disputes relevant to each Rule 23 requirement, and must find that each requirement is established by at least a preponderance of the evidence." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (quotation marks, alteration, and citation omitted); *see Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met."). However, "[t]he Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239,

254 (E.D.N.Y. 2019) (quoting *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011)); *accord Merryman v. Citigroup, Inc.*, No. 15-CV-9185 (CM), 2018 WL 1621495, at *13 (S.D.N.Y. Mar. 22, 2018).  "Accordingly, 'if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.'"  *In re Kind LLC "Healthy & All Natural" Litig. ("In re Kind LLC")*, 337 F.R.D. 581, 593 (S.D.N.Y. 2021) (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968)); *accord In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 340 (S.D.N.Y. 2015) (quoting *Green*, 406 F.2d at 298).

## II.     EXPERT TESTIMONY

"While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of [Federal Rule of Evidence ("FRE")] 702 are satisfied, the district court is the ultimate 'gatekeeper.'"  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal citation omitted).  FRE 702 provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In its role as "gatekeeper," the district court must determine whether an expert's testimony "rests on a reliable foundation and is relevant to the task at hand."  *Williams*, 506 F.3d at 160 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)); *In re Pfizer Inc. Sec. Litig. ("Pfizer I")*, 819 F.3d 642, 658 (2d Cir. 2016) ("The gatekeeping function under *Daubert* is fundamentally about ensuring the reliability and relevancy of expert testimony, and district courts may not stray from those goals." (alteration, quotation marks, and citation omitted)). The objective of this "gatekeeping requirement . . . is to make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  In carrying out its "gatekeeping function" the district court "has broad discretion" and "[i]ts inquiry is necessarily a flexible one" in which the factors considered "depend upon the particular circumstances of the particular case at issue." *Pfizer I*, 819 F.3d at 658 (alteration omitted) (first quoting *Daubert*, 509 U.S. at 594, then quoting *Kumho Tire Co.*, 526 U.S. at 150 (1999)).

As a threshold matter, a proffered expert must have "sufficient qualifications to testify." *Hughes*, 317 F.R.D. at 341 (citation omitted).  To make this determination, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004); *accord In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020).  Courts in the Second Circuit "have liberally construed expert qualification requirements when determining if a witness can be considered an expert" and "have noted that an expert should not be required to satisfy an overly narrow test of his own qualifications." *Sec. & Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) (quotation marks and citations omitted); *see Hughes*, 317 F.R.D. at 342 ("In determining whether an expert is qualified, a court should look at the totality of the witness's qualifications in making this assessment." (alteration, quotation marks, and citation omitted)).

After determining that an expert is qualified, "the next question is whether the proffered testimony has a sufficiently reliable foundation." *Hughes*, 317 F.R.D. at 342 (quoting *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 127 (S.D.N.Y. 2014)).  In evaluating reliability, district courts "must 'undertake a rigorous examination of the facts on which

the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).  Additionally, district courts may consider several other non-exhaustive factors bearing on reliability, such as "whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 593–94).  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Amorgianos*, 303 F.3d at 267.  Rather, evidence should only be excluded "if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* (citation omitted).  This limitation on the exclusion of expert evidence is consistent with "the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.*

Even after determining that a witness is "qualified" to testify as an expert on a particular matter and "that the[ir] opinion is based upon reliable data and methodology," the district court must also determine that the expert's testimony will "assist the trier of fact." *Nimely*, 414 F.3d at 397.  This determination "goes primarily to relevance" because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted).  District courts "should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence." *Amorgianos*, 303 F.3d at 265 (alteration, quotation marks, and citation omitted).

Although the Supreme Court and Second Circuit have not "definitively decided whether the *Daubert* standard governs the admissibility of expert evidence submitted at the class certification stage," numerous courts within the Circuit have concluded that it is proper to apply a *Daubert* analysis to motions to exclude expert evidence at the class certification stage. *Hughes*, 317 F.R.D. at 340 (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 114 (S.D.N.Y. 2015)); *accord In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 29–30 (collecting cases) (applying *Daubert* analysis to a motion to exclude expert testimony relevant to a pending class certification motion); *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, No. 14-CV-09764 (KPF) (SN), 2018 WL 739580, at *4 (S.D.N.Y. Jan. 10, 2018) (same). In doing so, however, "the scope of the *Daubert* analysis is cabined by its purpose" and "the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Hughes*, 317 F.R.D. at 340 (quoting *Chen-Oster*, 114 F. Supp. 3d at 115); *see Fort Worth Employees' Ret. Fund*, 301 F.R.D. at 126 ("When a motion to exclude expert testimony is made at the class certification stage, the *Daubert* standard applies, but the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." (citation omitted)). Once evidence is deemed admissible, "its persuasiveness is, in general, a matter for the jury." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016). Class certification should only be denied if a court concludes "that *no reasonable juror*" could agree that the evidence provides class-wide proof. *See id.* (emphasis added)

### III.     PLAINTIFFS' CLASS CLAIMS

#### A.     New York General Business Law

New York General Business Law ("GBL") § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  N.Y. Gen. Bus. Law § 349(a).  GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  *Id.* § 350.  "To successfully assert a claim under either section, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'"  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.,* 967 N.E.2d 675 (N.Y. 2012)).

An "objective" standard is applied to the question of "materiality," such that plaintiff must show that the alleged act is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Orlander*, 802 F.3d at 300 (quotation marks and citation omitted); *see Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) ("Deceptive acts are defined objectively as acts likely to mislead a reasonable consumer acting reasonably under the circumstances." (quotation marks and brackets omitted)); *In re Kind LLC*, 337 F.R.D. at 598 ("Materiality under § 349 [and § 350] of the GBL is an objective inquiry; a deceptive act is defined as one 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).

Reliance on the alleged deception is *not* required by either Section 349 or Section 350.  *See In re Scotts EZ Seed Litig.*, 304 F.R.D. at 409 (citing *Koch*, 967 N.E.2d at 676 ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law §§ 349 and

350 claims, it was error.")); *see also Hasemann*, 331 F.R.D. at 257.  However, causation is.[7]  *See Stutman v. Chem. Bank*, 731 N.E.2d 608, 613 (N.Y. 2000) ("[P]laintiffs allege that defendant's material deception caused them to suffer a $275 loss.  This allegation satisfies the causation requirement.  A Plaintiff need not additionally allege that they would not otherwise have entered into the transaction.").  To demonstrate causation, a plaintiff "must allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase."  *Orlander*, 802 F.3d at 302.  A "price premium" theory may suffice if the plaintiff alleges that he or she "paid more than they would have for the good but for the deceptive practices of the defendant-sellers."  *Id.* at 302; *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) ("A plaintiff adequately alleges injury under GBL § 349 by claiming that he paid a premium for a product based on the allegedly misleading representations.").  Additionally, once an injury is established under GBL § 349, statutory damages can be calculated because the statute provides for damages of $50 to each class member.  *See Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017); N.Y. Gen. Bus. Law § 349(h) ("[A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.").

---

[7] At first glance, it is difficult to see the difference between reliance and causation.  However, Plaintiffs' theory in this case illustrates how there might be a difference.  Plaintiffs allege that LensCrafters' false claims about AccuFit resulted in a higher market price for their glasses, thereby *causing* Plaintiffs and other class members to suffer loss, *i.e.*, overpaying for their purchase.  At the same time, putative class members need not have relied on LensCrafters' false claims about AccuFit in order to have been injured by them because the price premium caused by the false claims applied across the board to all of LensCrafters' glasses.

### B.      Florida Deceptive and Unfair Trade Practices Act

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204.  A consumer claim under FDUTPA requires "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton,* 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008)).

As with GBL §§ 349 and 350, a party asserting a FDUTPA claim need "not show actual reliance on the representation or omission at issue." *Id.* at 984 (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000)).  Rather, all three elements are assessed under an *objective* standard under the FDUTPA.  *Id.* at 985–86.  A party asserting a FDUTPA claim must show that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Id.* at 983–84 (quoting *State Office of the Att'y Gen. v. Commerce Comm. Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. Dist. Ct. App. 2007)); *see also Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) ("[A] plaintiff need not prove reliance on the allegedly false statement to recover damages under the FDUTPA, but rather a plaintiff must simply prove that an objective reasonable person would have been deceived.").

"FDUTPA damages are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Carriuolo*, 823 F.3d at 986 (quotation marks and citations omitted).  Such damages may be recovered where "the plaintiff 'paid a price premium' for the allegedly deceptive product." *Hasemann*, 331 F.R.D. at 257 (quoting *Carriuolo*, 823 F.3d at 986); *see Fitzpatrick*, 635 F.3d at 1283 ("[S]hould the class

18

prevail on the liability issue, each putative class member would only need to show that he or she paid a premium for [the product] to be entitled to damages under the FDUTPA.").

### C.     California Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act

California's Unfair Competition Law (the "UCL") "prohibits any 'unlawful, unfair or fraudulent business act or practice.'"  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quoting Cal. Bus. and Prof. Code § 17200).  California's False Advertising Law (the "FAL") "prohibits any 'unfair, deceptive, untrue, or misleading advertising.'"  *Id.*  (quoting Cal. Bus. and Prof. Code § 17500).  California's Consumer Legal Remedies Act (the "CLRA") "prohibits 'unfair methods of competition and unfair or deceptive acts or practices.'"  *Id.*  (quoting Cal. Civ. Code § 1770).

The UCL and FAL do not require individualized proof of "reliance and injury" to obtain relief, "so long as the named plaintiffs demonstrate injury and causation."  *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 410 (quoting *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 482 (C.D. Cal. 2012).  "A presumption, or at least an inference, of reliance arises . . . whenever there is a showing that a misrepresentation was material."  *Id.* (quoting *McCrary v. Elations Co., LLC ("McCrary I")*, No. 13-CV-242, 2014 WL 1779243, at *14 (C.D. Cal. Jan. 13, 2014)).  "Likewise, '[t]he causation required by the CLRA does not make plaintiffs' claims unsuitable for class treatment because causation as to each class member is commonly proved more likely than not by materiality.'"  *Id.* (quoting *Guido*, 284 F.R.D. at 482).  "In other words, in false advertising actions in California, a showing of materiality gives rise to an inference of reliance and causation."  *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1043 (C.D. Cal. 2018).

Claims under each of these statutes are thus "governed by the 'reasonable consumer' test," which requires the plaintiff to "show that members of the public are likely to be deceived."  *In re*

*Kind LLC*, 337 F.R.D. at 598 (quoting *Williams*, 552 F.3d at 938); *accord Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016); *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 342 (S.D.N.Y. 2021); *see also Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) ("California's UCL, FAL and CLRA rely on the same objective test, that is, whether members of the public are likely to be deceived." (quotation marks and citation omitted)).  Because "[e]ach statute allows Plaintiff to establish the required elements of reliance, causation, and damages by proving that Defendants made what a reasonable person would consider a material misrepresentation," the UCL, FAL, and CLRA are "materially indistinguishable" "[f]or purposes of class certification."  *Townsend*, 303 F. Supp. 3d at 1043; *see de Lacour*, 338 F.R.D. at 342 (addressing "in tandem" the UCL, FAL, and CLRA because "[f]or purposes of class certification, [these statutes] are materially indistinguishable").  Thus, "[t]he objective test for materiality and thus reliance 'renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product.'"  *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 410 (quoting *Tait*, 289 F.R.D. at 480).

The FAL, UCL, and CLRA provide for restitutionary damages that should be interpreted in the same manner and may be measured as a "price premium" or the "difference between the price paid for a mislabeled product and the value of that product."  *Zakaria v. Gerber Prods. Co.* *("Zakaria I")*, No. 15-CV-200 (JAK) (EX), 2017 WL 9512587, at *17–18 (C.D. Cal. Aug. 9, 2017) (collecting cases), *aff'd,* 755 F. App'x 623 (9th Cir. 2018); *see also Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr. 3d 36, 58 (2006), ("There is nothing to suggest that the restitution remedy provided under the CLRA should be treated differently than the restitution remedies provided under the [FAL] or [UCL].”), *as modified on denial of reh'g* (Jan. 31, 2006).

### D.      Quasi-Contract / Unjust Enrichment

"Under New York law, an unjust enrichment claim requires a plaintiff to prove that '(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.'" *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011) (quoting *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011)).

Under Florida law, "[t]he elements of an unjust enrichment claim are a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1242 (Fla. 2004) (quotation marks and citation omitted); *see also In re Amla Litig.*, 282 F. Supp. 3d 751, 766 (S.D.N.Y. 2017) ("In Florida, to succeed on an unjust enrichment claim, a plaintiff must show that '(1) the plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) the defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.'" (quoting *James D. Hinson Elec. Contracting Co. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 646 (M.D. Fla. 2011)).

Under California law, the elements for a claim of unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another." *Lectrodryer v. SeoulBank*, 91 Cal. Rptr. 2d 881, 883 (2000), *accord In re Scotts EZ Seed Litig.*, 304 F.R.D. at 412 (quoting *Cartwright v. Viking Indus., Inc.*, No. 07-CV-02159 (FCD) (EFB) 2009 WL 2982887, at *13 (E.D. Cal. Sept. 14, 2009))

### E.    Fraudulent Omission[8]

Under New York law, to state a cause of action based on fraudulent omission, a plaintiff must allege "a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1163 (N.Y. 2017) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996)).

Under Florida law, to state a cause of action based on fraud, a plaintiff must allege "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Gutter v. Wunker*, 631 So. 2d 1117, 1118 (Fla. Dist. Ct. App.), *cause dismissed,* 637 So. 2d 235 (Fla. 1994).  The concealment or omission of a "material fact" may support an action for fraud "where there is a duty to disclose." *Id.*

Under California law, the elements of fraud are (1) "misrepresentation (false representation, concealment, or nondisclosure)"; (2) "knowledge of falsity"; (3) "intent to defraud, i.e., to induce reliance"; (4) "justifiable reliance"; and (5) "resulting damage." *Small v. Fritz Companies*, *Inc.*, 65 P.3d 1255, 1258 (Cal. 2003) (quoting *Lazar v. Superior Ct.*, 909 P.2d 981, 984 (Cal. 1996)).

---

[8] Plaintiffs do not seek certification for their common-law fraudulent misrepresentation claim in Count VIII of the SACC.  (Class Cert. Mot., Dkt. 238, at 34 n.25.)

## DISCUSSION

### I.   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

#### A.   Rule 23 (a)

For the reasons explained below, Plaintiffs have satisfied the prerequisites of numerosity, commonality, typicality, adequacy, and ascertainability under Rule 23(a) and (g) by a preponderance of the evidence.

##### 1.   Numerosity

Rule23(a)(1) requires a finding that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'[I]mpracticable' does not mean 'impossible,' and a precise enumeration or identification of class members is not required." *In re Kind LLC,* 337 F.R.D. at 594 (quoting *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)). Courts in the Second Circuit presume numerosity "at a level of 40 members." *Hughes*, 317 F.R.D. at 344 (quoting *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)); *accord In re Kind LLC*, 337 F.R.D. at 594. Plaintiffs allege that there are over three million members in the proposed classes combined. (Class Cert. Mot., Dkt. 238, at 26.) This allegation is supported by LensCrafters' disclosure of the total number of unique customers who were fitted with AccuFit and purchased prescription eyeglasses or lenses in California, New York, and Florida for the period of January 1, 2013 through August 22, 2019. (Ex. 6 to Class Cert. Mot., Dkt. 239-6, at ECF 25.[9]) LensCrafters does not contest numerosity. Therefore, Plaintiffs have demonstrated that joinder among millions of members would be impracticable and the numerosity requirement is satisfied by a preponderance of the evidence.

---

[9] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

2.     Commonality

Rule 23(a)(2) requires a finding that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Even a single common question" will suffice. *Wal-Mart*, 564 U.S. at 359 (alteration and citation omitted). This requirement is satisfied if the question of law or fact is "capable of classwide resolution—which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Johnson*, 780 F.3d at 137 (quoting *Wal-Mart*, 564 U.S. at 350). Thus, "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation" is key to this analysis. *Wal-Mart*, 564 U.S. at 350 (citation omitted). Commonality does not "mean merely that [plaintiffs] have all suffered a violation of the same provision of law," but rather requires plaintiffs "to demonstrate that the class members have suffered the same injury." (*Id.* (quotation marks and citation omitted).

Plaintiffs claim that all class members overpaid for LensCrafters eyeglasses because LensCrafters' representations and omissions about AccuFit—that it is "five times more precise" than traditional methods, measuring "down to a tenth of a millimeter," and that customers would have "clearer, crisper vision" and "see the world more clearly"—allowed LensCrafters to command "a higher market price for its products than it otherwise could have." (Class Cert. Mot., Dkt. 238, at 1–2.) Accordingly, to determine liability, the trier of fact will, at a minimum, need to determine whether LensCrafters' representations and omissions about AccuFit were in fact misleading or false, and whether, as a result, class members paid a price premium for their LensCrafters eyeglasses. These are common questions, the answers to which are "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (citation omitted); *see, e.g.*, *In re Kind LLC*, 337 F.R.D. at 594 (finding commonality where the court needed to determine whether plaintiffs paid a price premium on products "under the allegedly mistaken belief" those products

were "All Natural" and "Non-GMO"); *Bowling v. Johnson & Johnson*, No. 17-CV-3982 (AJN), 2019 WL 1760162, at *4 (S.D.N.Y. Apr. 22, 2019) (finding commonality where the court needed "to determine whether the 'No Trans Fat' label was false or misleading, and whether the class members paid a higher price for the product because of this label"); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 62 (E.D.N.Y. 2015) (finding commonality where common questions included whether representation that wipes were "flushable" was materially misleading and whether (and to what extent) class members paid a price premium as a result of the "flushable" representation); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 405 (finding commonality where common questions included "whether the 50% thicker claim is false and/or misleading").

LensCrafters does not challenge commonality nor dispute the existence of common questions, but rather argues that Plaintiffs cannot satisfy the demands of Rule 23(b)(3) because these common questions do not *predominate* over individual issues.  (Class Cert. Opp'n, Dkt. 243, at 13.)  The Court addresses these arguments below, but for the reasons stated here, finds that commonality under Rule 23(a)(2) is satisfied by a preponderance of the evidence.

### 3.  Typicality

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality "ensure[s] that class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions."  *Hasemann*, 331 F.R.D. at 268 (E.D.N.Y. 2019) (quoting *Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2012)).  Typicality is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *Price v. L'Oreal USA, Inc. ("Price I")*, No. 17-CV-614 (LGS), 2018 WL 3869896, at *3 (S.D.N.Y. Aug. 15, 2018) (quoting *In re Flag Telecom Holdings, Ltd. Secs. Litig.*

25

("*Flag Telecom*"), 574 F.3d 29, 35 (2d Cir. 2009)).  "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."  *Id.* (quoting *Robidoux*, 987 F.2d at 936).  "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding."  *In re Kind LLC*, 337 F.R.D. at 595 (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002)); *accord Hughes*, 317 F.R.D. at 346.

Although Plaintiffs allege that they purchased their glasses "after seeing and relying on LensCrafters' representations about AccuFit" (Class Cert. Mot., Dkt. 238, at 24), Plaintiffs argue that "*every* consumer" who purchased eyeglasses after being fitted with AccuFit paid a "price premium" *regardless* of whether they relied on, were deceived by, or even cared about LensCrafters representations about AccuFit (*id.* at 22).  Therefore, Plaintiffs contend that they and class members had an "almost identical experience" of "going to a LensCrafters store, being fit with AccuFit, and purchasing eyeglasses," and that all class members will make the same arguments: "LensCrafters did not manufacture glasses to 0.1mm, nor was there any clinical benefit to 0.1mm specifications[;] LensCrafters' representations and omissions to the contrary were false and misleading[;] and customers overpaid as a result."  (*Id.* at 27–28.)  Because Plaintiffs "allege a common pattern of wrongdoing" related to LensCrafters' representations and omissions about AccuFit, and "will present the same evidence" based on the same legal theories to support the claims of Plaintiffs and all class members, "[t]his is sufficient to establish typicality."  *Hughes*, 317 F.R.D. at 346; *see Hasemann*, 331 F.R.D. at 269 (finding typicality even where "Plaintiffs may have been exposed to different advertisements or labels, and purchased different amounts of

different [] products" because "Plaintiffs are arguing that the same course of events—the unlawful conduct of false labeling and marketing—resulted in price premiums for an entire product line" and "[t]hese arguments will be typical for the entire class of consumers that purchased anything from that product line"); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014) (finding typicality where "the lead plaintiffs' and other class members' claims arise out of the same course of conduct by the defendant and are based on the same legal theories"). LensCrafters does not challenge typicality. Accordingly, for the reasons stated here, typicality under Rule 23(a)(2) is satisfied by a preponderance of the evidence.

### 4.   Adequacy of Representation

Rule 23(a)(4) requires finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In general, this requirement "entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Flag Telecom*, 574 F.3d at 35 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). The inquiry is focused on uncovering "conflicts of interest between named parties and the class they seek to represent," and certification will not be defeated unless a conflict is "fundamental." *Id.* (citations omitted).

Class counsel must be appointed when a class is certified. *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 254 (2d Cir. 2021). Historically, the adequacy of counsel was analyzed under Rule 23(a)(4), however, Rule 23(g) was enacted by Congress to govern the appointment of class counsel, thereby "taking a step towards the fuller acknowledgment that it is class counsel, not the class representatives, who are truly litigating the class's claims." *Id.* at 263 (quotation marks and citation omitted); *Kulig v. Midland Funding, LLC*, No. 13-CV-4175 (PKC), 2014 WL 5017817, at *2 (S.D.N.Y. Sept. 26, 2014) ("As a result of the 2003 amendments to the Federal Rules of Civil

Procedure, however, the issue of class counsel's adequacy is now guided by Rule 23(g).").  Under Rule 23(g), the court "must consider"

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A); *Jin*, 990 F.3d at 255 ("Rule 23(g) requires courts to consider several criteria, including counsel's efforts investigating the claims, experience with class actions, knowledge of the area of law, and resources.").  In addition, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B); *see Kulig*, 2014 WL 5017817, at *2 ("Regardless of whether the inquiry falls under Rule 23(a)(4) or Rule 23(g), the contours of the Court's analysis remain the same.").  LensCrafters challenges the adequacy of representation by both Plaintiffs and their counsel.

### a.   Class Representatives

LensCrafters argues that Plaintiffs have "abdicated their duties as class representatives to their counsel" as evidenced by their lack of "personal knowledge of the facts alleged on their behalf" and testimony that they "did not review or receive from counsel any of the key legal documents in the case," other than discovery requests specifically directed to them by LensCrafters, such as LensCrafters' answer and affirmative defenses, LensCrafters' discovery responses, numerous motions, deposition and court conference transcripts, and court orders. (Class Cert. Opp'n, Dkt. 243, at 4, 42–43 (emphasis omitted).)

These arguments amount to attacks "based on the representative's ignorance," which are generally disfavored. *Flag Telecom*, 574 F.3d at 42 (quoting *Baffa*, 222 F.3d at 61.  To be sure, "[t]here are cases where the named plaintiff is so ignorant of his or her claims and so detached

from the litigation that the plaintiff cannot adequately represent the interests of the class." *Vergara v. Apple REIT Nine, Inc.*, No. 19-CV- 2027 (DLI) (RML), 2021 WL 1103348, at *3 (E.D.N.Y. Feb. 5, 2021) (collecting cases); *see, e.g.*, *Russell v. Forster & Garbus, LLP*, No. 17-CV-4274 (JS) (AYS), 2020 WL 1244804, at *4–5 (E.D.N.Y. Mar. 16, 2020) (finding that Plaintiff who did not speak with his attorney before the action was initiated, never saw the complaint before his deposition, did not know the class he purported to represent, and could barely articulate only one of four bases for the action, had "virtually no familiarity with th[e] action and no understanding of his role as class representative"); *Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004) (finding that plaintiffs' "alarming lack of familiarity with the suit, as well as little or nonexistent knowledge of their role as class representatives [was] manifest" and precluded certifying them as class representative).   However, disqualifying "deficiencies in knowledge . . . must either pertain to issues central to the plaintiffs' case or must be so substantial that they threaten to undermine plaintiffs' case as a whole." *Vergara*, 2021 WL 1103348, at *3 (alteration omitted) (quoting *Scott*, 224 F.R.D. at 355–56).   LensCrafters fails to identify any such deficiencies here.

Plaintiffs' deposition testimony demonstrates that each of the named Plaintiffs has a baseline familiarity with the complaint, has been in contact with counsel, possesses a general understanding of the basis for this lawsuit and of their roles as a class representative, and has demonstrated and professed a willingness to prosecute this case.[10]   (*See* Declaration of Geoffrey

---

[10] *See* Ex. 85 to Class Cert. Mot. (Allegra Dep.), Dkt. 239-20, at Tr. 25:13–21, 63:12–64:3; Ex. 3 to Class Cert. Opp'n (Allegra Dep.), Dkt. 243-5, at Tr. 52:16–53:24, 89:5–22; Ex. 86 to Class Cert. Mot. (Ariza Dep.), Dkt. 239-20, at Tr. 14:11–15:7, 17:10–14, 23:15–24:15, 108:2–109:21; Ex. 4 to Class Cert. Opp'n (Ariza Dep.), Dkt. 243-6, at Tr. 137:3–139:5; Ex. 71 to Class Cert. Mot. (Emmert Dep.). Dkt. 239-20, at Tr. 22:11–24:7, 48:25–50:16; Ex. 5 to Class Cert. Opp'n (Emmert Dep.), Dkt. 243-7, at Tr. 57:3–58:21, 62:2–66:1; Ex. 65 to Class Cert. Mot. (Rogoff Dep.), Dkt. 239-17, at Tr. 262:11–22, 265:24–267:22, 283:25–285:7, 310:1–16; Ex. 6 to Class Cert Opp'n

Graber in Support of Plaintiffs' Motion for Class Certification ("Graber Decl."), Dkt. 239, ¶¶ 93–95.)  LensCrafters makes much of the fact that five of six Plaintiffs joined this lawsuit after responding to an inquiry by Plaintiffs' counsel on Facebook about their LensCrafters experience and that all Plaintiffs testified that they relied on counsel for, and did not verify, many of the factual allegations not pertaining to them.  (Class Cert. Opp'n, Dkt. 243, at 4, 42–43; Declaration of Frank A. Dante, ("Dante Decl."), Dkt. 243-1, ¶¶ 2, 5–10.)  However, given the informational asymmetry between consumer and company in cases such as this, it is not surprising or meaningful that Plaintiffs did not know that they may have paid a price premium for eyeglasses until counsel brought this allegation to light, or that Plaintiffs are unable to provide or verify allegations about LensCrafters' alleged misrepresentations and omissions about AccuFit's measuring and manufacturing capabilities.  Indeed, on its face, LensCrafters' contention that Plaintiffs had to rely on their counsel for factual allegations *not pertaining to them* hardly supports the argument that Plaintiffs lack knowledge about, or interest in, their claims or this case.

Ultimately, Plaintiffs meet the "modest" requirement of being "aware of the basic facts underlying the lawsuit" and are unlikely "to abdicate [their] obligations to fellow class members." *Vergara*, 2021 WL 1103348, at *3 (citations omitted); *see Russell*, 2020 WL 1244804, at *5 ("Most courts determine a plaintiff is an adequate class representative where, in addition to complying with discovery, she submits an affidavit outlining her understanding of a class representatives' responsibilities, her willingness to prosecute the case, and her routine communications with counsel." (collecting cases)); *cf. In re Pfizer Inc. Sec. Litig. ("Pfizer II")*,

---

(Rogoff Dep.), Dkt. 243-8, at Tr. 300:12–307:18; Ex. 72 to Class Cert. Mot. (Tenaglia Dep.), Dkt. 239-20, at Tr. 19:8–25, 38:18–41:1; Ex. 8 to Class Cert. Opp'n (Tenaglia Dep.), Dkt. 243-10, at Tr. 46:3–51:20, 55:9–60:8; Ex. 87 to Class Cert. Mot. (Verrastro Dep.), Dkt. 239-20, at Tr. 8:13–9:17, 25:21–28:23, Ex. 7 to Class Cert. Opp'n (Verrastro Dep.), Dkt. 243-9, at Tr. 40:6–41:19, 43:9–44:9, 45:6–24.

282 F.R.D. 38, 51 (S.D.N.Y. 2012) ("Courts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." (quotation marks and citation omitted)).   Moreover, Plaintiffs interests are not "antagonistic" to the interests of the other class members. *Flag Telecom*, 574 F.3d at 35.   Thus, the Court finds that Plaintiffs have proven that they are adequate class representatives by a preponderance of the evidence.

b.   Class Counsel

LensCrafters does not dispute counsel's efforts, experience, knowledge, or resources. Indeed, counsel has expended extensive efforts and resources in the prosecution of this case to date (Graber Decl., Dkt. 239, ¶¶ 97–100), and has been recognized as a leading class action law firm and appointed class and lead counsel in many large consumer protection cases. *See, e.g.*, Joyce Hanson, *Consumer Protection Group of the Year: Cohen Milstein*, LAW360 (Jan. 17, 2020), https://www.law360.com/articles/1233361/consumer-protection-group-of-the-year-cohen-milstein; *Consumer Protection*, COHENMILSTEIN, https://www.cohenmilstein.com/practice-area/consumer-protection (last visited Oct. 7, 2021) (noting that Consumer Protection practice includes "False Advertising and Deceptive Marketing" and listing cases in which the firm was appointed Lead or Co-lead Class Counsel).   Although counsel has not demonstrated extensive experience litigating the particular theory of false advertising and price premium advanced in this case, the Court nonetheless finds that counsel has demonstrated experience and success in other complex consumer protection class actions.   Therefore, the Court finds that counsel satisfies the requirements of Fed. R. Civ. P. 23(g)(1)(A).

However, in determining the adequacy of counsel, "the court looks beyond reputation built upon past practice and examines counsel's competence displayed by present performance." *Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261 (PKC), 2016 WL 7009062, at *7 (S.D.N.Y. Nov. 30, 2016) (citation omitted); *accord Kulig,* 2014 WL 5017817, at *2. Here, LensCrafters argues that counsel's "failure to keep [P]laintiffs informed of material developments forecloses a finding that counsel has the ability to fairly and adequately represent the interests of the class." (Class Cert. Opp'n, Dkt. 243, at 43.) LensCrafters contends that Plaintiffs' counsel attended a court-ordered mediation on February 7, 2019 without consulting their clients, where Plaintiffs' counsel extended a formal settlement demand on behalf of their clients, and then "intentionally decided" not to convey a formal settlement offer by LensCrafters for months. (*Id.* at 43–44; Dante Decl., Dkt. 243-1, ¶¶ 12–24.) Indeed, Plaintiff Emmert, the first Plaintiff to be deposed in this matter, testified on April 9, 2019—two months after the mediation—that she was not sure whether a mediation had occurred in this case, and was not aware of a settlement demand made on behalf of Plaintiffs or of a settlement offer by LensCrafters. (Ex. 5 to Class Cert. Opp'n (Emmert Dep.), Dkt. 243-7, at Tr. 72:9–74:7.) Four other Plaintiffs, who were deposed after Plaintiff Emmert, all testified that they did not learn about the mediation, offer, or demand until the day before their respective depositions.[11] (Ex. 3 to Class Cert. Opp. (Allegra Dep.), Dkt. 243-

---

[11] The remaining Plaintiff provided conflicting deposition testimony about when she learned of the court-ordered mediation and settlement offers. (Ex. 4 to Class Cert. Opp'n (Ariza Dep.), Dkt. 243-6, at Tr. 196:8–12 (testifying that she could not recall whether there was a court-ordered mediation), 380:12–381:5 (testifying that she first became aware of the court-ordered mediation and the settlement offer a "[f]ew months ago")). Following Plaintiff Ariza's deposition, Judge Mann ordered Plaintiff Ariza to supplement her deposition testimony "with a sworn statement as to whether she was aware of the mediation before it took place." (Order, Dkt. 136.) Plaintiff Ariza submitted a sworn statement stating that she "remember[s] discussing the subject of mediation over the phone with my counsel's office while I was at work," but "did not make a record of when this conversation occurred" and did "not recall whether the phone conversation took place before or after" the February 7, 2019 mediation. (Ex. 67 to Class Cert. Opp'n

5, at Tr. 107:5–111:22; Ex. 6 to Class Cert. Opp. (Rogoff Dep.), Dkt. 243-8, at Tr. 310:18–314:1; Ex. 7 to Class Cert. Opp. (Verrastro Dep.), Dkt 243-9, at Tr. 45:25–46:25; Ex. 8 to Class Cert. Opp. (Tenaglia Dep.), Dkt. 243-10, at Tr. 69:21–72:3.)  In response, Plaintiffs' counsel admits to the "belated[]" notification to Plaintiffs explaining that the Court had ordered mediation before necessary discovery related to damages had occurred, and that in the absence of this "pertinent information," counsel made the "only . . . ethical[]" settlement demand it could, which was "effectively equivalent to full recovery."  (Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Class Cert. Reply"), Dkt. 244, at 17 & n.24.)  Plaintiffs' counsel further explained that during the February 7, 2019 mediation session, LensCrafters extended a "nominal offer" to a *nationwide class*—not the individual Plaintiffs—that "every Plaintiff rejected."  (*Id.* at 17; Class Cert. Mot., Dkt. 238, at 29 n.20.)  In essence, Plaintiffs' counsel argues that the delay in notice to Plaintiffs was justified because the court-ordered mediation, offer, and demand were premature and not serious.

LensCrafters also points to other conduct that "calls into question [counsel's] adequacy," including counsel's reliance on statements by "confidential witnesses," who took confidential documents from LensCrafters in violation of their employment agreements; failure to verify the complaint with these confidential witnesses or explain the purpose of their declarations, which were appended to the complaint; service of three "unauthorized" sur-rebuttal expert reports that were subsequently struck by the Court; failure to provide their expert with relevant, requested materials; and proffer of a new opinion by that expert during a deposition that was subsequently

---

(Supplemental Sworn Statement of Yesenia Ariza to her Deposition Testimony), Dkt. 243-79, ¶¶ 5–8.)

struck by the Court.  (Class Cert. Opp'n, Dkt. 243, at 45 n.191; Dante Decl., Dkt. 243-1, ¶¶ 25–35.)

LensCrafters rely heavily on *Kulig*, a case in which counsel was deemed inadequate based on "misconduct" that "creat[ed] a serious doubt that counsel will represent the class loyally." 2014 WL 5017817, at *3.  The misconduct included failing to convey to the plaintiff a "not [] insubstantial" individual settlement offer and classwide settlement offer, as well as making a settlement offer on the plaintiff's behalf without prior notice.  *Id.* at *4 (citing N.Y. Comp. Codes R. & Regs. Tit. 22, § 1200.0, Rule 1.4(a) ("A lawyer shall . . . promptly inform the client of . . . material developments in the matter including settlement or plea offers.")).  Noting that Rule 1.4 "goes to the core of whether counsel will adequately represent the class," the court found that counsel's explanation that he did not relay the settlement offer because discovery deficiencies prevented him from completely evaluating and advising the plaintiff on the offer, revealed "a fundamental misunderstanding regarding a bedrock, mandatory professional duty applicable to any attorney-client relationship."  *Id.* at *6.  The court also was troubled by the terms of plaintiff's retainer agreement with counsel, "which strongly implie[d] that a class representative accepting an individual settlement instead of a classwide settlement is a wrongful act," and observed that this was "not the first time a court has taken notice of troubling conduct by plaintiff's counsel in connection with individual settlement offers in the context of another FDCPA class action suit." *Id.* at *5–6.  The court concluded that, "[t]aken as a whole, counsel's conduct forecloses a finding by this Court that he has the 'ability to fairly and adequately represent the interests of the class.'" *Id.* at *6 (quoting Rule 2[3](g)(1)(B)).

Here, counsel's admitted failure to promptly inform Plaintiffs of LensCrafters' classwide settlement offer and conveyance of a settlement demand without prior notice to Plaintiffs, as well

as counsel's explanation that discovery deficiencies partially justified this dereliction, overlaps somewhat with the facts in *Kulig*.  However, "not every misstep by counsel warrants denial of class certification," and it is "necessary to evaluate the seriousness of the conduct and the possibility of prejudice to the class."  *Id.*  The Court does not minimize the seriousness of counsel's conduct.  Counsel should know that "[t]he discussion and evaluation of settlement offers is perhaps the single most significant point of contact between class counsel and a class representative throughout the pendency of the action," *id.* at *6, and the evaluation of a settlement offer is *Plaintiffs'* "decision to make, not [their] counsel's," *id.* at *4.  Further, it is troubling that counsel's dereliction pertained to a court-ordered mediation and involved settlement discussions in a matter that has already consumed significant judicial resources.  That said, the Court finds that, "[t]aken as a whole," counsel's conduct does not rise to the level of the misconduct that occurred in *Kulig*, where there appeared to be a course of conduct by counsel to prevent plaintiffs from evaluating settlement offers.  By contrast, Plaintiffs' counsel, on two occasions over the course of a lengthy and highly contentious lawsuit, belatedly disclosed to Plaintiffs a "nominal" classwide settlement offer by LensCrafters (which Plaintiffs subsequently rejected) and a hastily proposed settlement offer for "effectively . . . full recovery" by Plaintiffs' counsel.  Counsel's other conduct related to confidential witnesses and experts may be shoddy, vexatious, or even contempt-worthy, but there are other vehicles for accountability, and such behavior does not demonstrate disloyalty to the class.  In sum, LensCrafters fails to "create[] a serious doubt that counsel will represent the class loyally."  *Kulig*, 2014 WL 5017817, at *3.  Thus, the Court finds that Plaintiffs have demonstrated the adequacy of representation by a preponderance of the evidence, and appoints the law firm of Cohen Milstein Sellers & Toll PLLC as class counsel.

5.      Ascertainability

In the Second Circuit, "the touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (quotation marks and citation omitted). This "modest threshold requirement" "asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). Certification will only be precluded "if a proposed class definition is indeterminate in some fundamental way." *Id.*; *see Ebin*, 297 F.R.D. at 567 ("The standard for ascertainability is not demanding and is designed only to prevent the certification of a class whose membership is truly indeterminable." (quotation marks and citation omitted).)

Here, the proposed classes consist of "all residents of [New York, Florida, and California] who purchased prescription eyeglasses from LensCrafters after being fitted with AccuFit from September 5, 2013 to present." (Class Cert. Mot., Dkt. 238, at 25.) LensCrafters has already identified and disclosed "[t]he total number of unique customers who were fitted with AccuFit and purchased prescription eyeglasses or lenses in California, New York, and Florida for the period of January 1, 2013 through August 22, 2019." (*Id.* at 30 (citing Ex. 6 to Class Cert Mot., Dkt. 239-6, at ECF 25).) Although LensCrafters states in its disclosure that calculating the total number of unique customers was "unduly burdensome" and required retention of an "outside consultant" to reconcile two different databases and de-duplicate customer and transaction records (Ex. 6 to Class Cert Mot., Dkt. 239-6, at ECF 24), LensCrafters does not dispute ascertainability in its opposition to class certification.[12] That determining the members of the proposed classes may have been

---

[12] Although Plaintiffs note that LensCrafters "briefly contests" ascertainability in a footnote (Class Cert. Reply, Dkt. 244, at 3 n.2), the Court has not identified such a footnote in its review of

burdensome does not undermine any of relevant conclusions the Court needs to reach with respect to ascertainability, namely, that the proposed classes are "defined using objective criteria," class membership has "definite boundaries," and LensCrafters' own records make an individuals' class membership ascertainable. *See In re Petrobras Sec.*, 862 F.3d at 257. Therefore, Plaintiffs have satisfied the requirement of ascertainability by a preponderance of the evidence.

**B.      Rule 23(b)(2)**

Plaintiffs fail to demonstrate that a class should be certified pursuant to Rule 23(b)(2), which "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. Put differently, "a class may *not* be certified under Rule 23(b)(2) if *any* class member's injury is not remediable by the injunctive or declaratory relief sought." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 146 (2d Cir. 2020).

Neither party devotes more than a few sentences to their arguments with respect to Rule 23(b)(2). Plaintiffs argue only that "an injunction requiring LensCrafters to cease its deceptive practices would benefit every class member by eliminating the price premium for LensCrafters' glasses." (Class Cert. Mot., Dkt. 238, at 30.) LensCrafters responds that Plaintiffs cannot certify an injunctive class because the extensive monetary damages sought here are clearly not "incidental" to the requested injunctive relief, *see Gale v. Chicago Title Ins. Co.*, 929 F.3d 74, 76 (2d Cir. 2019) (citing *Wal-Mart*, 564 U.S. at 360), and moreover, Plaintiffs do not have Article III standing to seek a forward-looking injunction as they are "past purchasers." (Class Cert. Opp'n, Dkt. 243, at 42.)

---

LensCrafters' briefs and therefore finds that LensCrafters does not in any meaningful sense (or even at all) challenge ascertainability here.

"Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016). The threat of future injury must be "actual and imminent, not conjectural or hypothetical." *Berni*, 964 F.3d at 147 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009)). The Second Circuit recently found that "past purchasers of a consumer product who claim to be deceived by that product's packaging . . . have, at most, alleged a past harm" "that is commonly redressable at law through the award of damages," but "are not likely to encounter future harm of the kind that makes injunctive relief appropriate." *Id.* The Circuit reasoned, in part, that once past purchasers "become aware they have been deceived, that will often be the last time they will buy that item." *Id.*

Here, Plaintiffs, who are all "past purchasers" of LensCrafters eyeglasses, have not alleged or argued that they intend to purchase LensCrafters eyeglasses or lenses again in the future. In fact, all Plaintiffs allege in the SACC that they "would not have purchased [their] prescription glasses from LensCrafters and/or would not have paid as much as [they] did had [they] known that its claims that AccuFit is 'five times more accurate' was not translated into the manufacture of [their] lenses." (SACC, Dkt. 50, ¶¶ 55, 60, 63, 66, 70, 74.) If Plaintiffs would not have purchased LensCrafters eyeglasses had they known about the alleged deception regarding AccuFit, then it is highly unlikely they will purchase LensCrafters' eyeglasses again and incur overpayment in the future. Therefore, Plaintiffs have failed to plead an injury that is "actual and imminent, not conjectural or hypothetical," and lack standing to seek injunctive relief. *See, e.g.*, *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 60 (2d Cir. 2020) (summary order) (quoting *Summers*, 555 U.S. at 493); *id.* at 61 ("[Plaintiff] makes no assertion that he intends to purchase additional

flushable wipes products. . . [and] [a]bsent any stated intention to buy additional flushable wipes products in the future, [Plaintiff] has not pleaded an injury that is 'actual and imminent, not conjectural or hypothetical.'" (citation omitted)); *Kommer v. Bayer Consumer Health, a Division of Bayer AG,* 710 F. App'x 43, 44 (2d Cir. 2018) (summary order) ("As [Plaintiff] concedes, 'now [that he] knows of Defendants' [alleged] deception and false advertising, . . . he is no longer likely to purchase another pair of Dr. Scholl's Custom Fit Orthotics Inserts ever again.'  Accordingly, he has no standing under Article III to enjoin the defendants' sales practices, and the court properly deemed him precluded from seeking that relief." (record citation omitted)).

Importantly, the Second Circuit has made clear that there is no equitable or policy exception to the Article III standing requirements that would allow past purchasers like Plaintiffs to nonetheless maintain an injunctive class under Rule 23(b)(2).  *Berni*, 964 F.3d at 148–49 & n.36 ("[C]ourts cannot permit injunctive relief through class settlement when plaintiffs would otherwise lack standing to seek such relief under Article III" (collecting cases)); *Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453, 460 (S.D.N.Y. 2020) ("Because Plaintiff does not individually have standing to seek injunctive relief, he also lacks standing to seek injunctive relief on behalf of the class."); *Lee v. Canada Goose US, Inc.*, No. 20-CV-9809 (VM), 2021 WL 2665955, at *10 (S.D.N.Y. June 29, 2021) ("Contrary to Plaintiff's suggestion, [t]here is no exception to demonstrating future injury when the plaintiff is pursuing a class action." (quotation marks and citation omitted)).  Thus, Plaintiffs' half-hearted request for class certification under Rule 23(b)(2) is denied.

## C.    Rule 23(b)(3) – Predominance

The Court now reaches the most contentious issue between the parties—whether Plaintiffs' proposed classes can be certified under Rule 23(b)(3).  A class may be certified under this rule "if 'questions of law or fact common to class members predominate over any questions affecting only

individual members,' and 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting Fed. R. Civ. P. 23(b)(3)).

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.* (quoting *Roach*, 778 F.3d at 405).  Thus, the predominance inquiry requires courts to scrutinize the relationship between individual questions, *i.e.*, questions where "members of a proposed class will need to present evidence that varies from member to member," and common questions, *i.e.*, questions where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).  Certification may be proper when "one or more of the central issues in the action are common to the class and can be said to predominate, . . . even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (citation omitted).  Importantly, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013); *accord Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015).

Plaintiffs argue that the "major inquiries" susceptible to classwide proof in this case are "how a reasonable consumer would interpret LensCrafters' marketing, whether LensCrafters could manufacture glasses to 0.1mm, whether 0.1mm measurements were clinically significant, and what price premium Class members paid."  (Class Cert. Mot., Dkt. 238, at 32.)  Specifically, Plaintiffs

argue that there are two questions that are common to their causes of action that support a finding of predominance: (1) deception under the reasonable person standard, and (2) causation and damages based on a price premium or overcharge. (*Id.* at 32–33.)  LensCrafters' strategy in response is to try to explode Plaintiffs' predominance theory into as many fractured, individualized issues as it can conceive.  In sum, LensCrafters argues that common issues do not predominate for the following reasons:

> (1) Plaintiffs cannot establish that there was a common uniform alleged misrepresentation made to all putative class members; (2) Plaintiffs fail to offer class-wide evidence that a "reasonable consumer" would take away the alleged implied misleading meanings from the Challenged Statements; (3) even if Plaintiffs could show that a reasonable consumer took away the alleged implied meanings, individualized proof would be required to determine whether each class member received glasses manufactured to 0.1 mm or whether each class member was able to "see the world more clearly" or had "crisper, clearer vision;" (4) Plaintiffs fail to present class-wide evidence that the Challenged Statements were material to class members; (5) Plaintiffs' flawed and unreliable price premium model cannot show class-wide injury or causation; (6) Plaintiffs do not have a viable model for damages let alone one that is consistent with their theories as required by *Comcast*; and (7) individualized issue[s] predominate on Plaintiffs' unjust enrichment claim.

(Class Cert. Opp'n, Dkt. 243, at 13–14.)  In addressing the parties' arguments below, the Court will also address their respective motions to exclude expert testimony.

### 1.   Uniform Exposure to a Consistent Misrepresentation

A central dispute between the parties is whether and to what extent Plaintiffs must show that all class members were exposed to the same misrepresentation.  LensCrafters argues that "[i]t is fundamental that Plaintiffs must show that there was a consistent misrepresentation by LensCrafters and, at a minimum, the entire class was *exposed* to the consistent misrepresentation about AccuFit."  (Class Cert. Opp'n, Dkt. 243, at 14 (footnote omitted).)  Plaintiffs disagree that exposure is required, and argue that, in any event, they have satisfied any exposure requirement because "all Class members received the 'AccuFit Customer Experience' centered around 0.1mm measurements" and LensCrafters ran a "multichannel, multi-million-dollar marketing campaign"

throughout the class period that "tout[ed] the superiority of AccuFit measurements."  (Class Cert. Mot., Dkt. 238, at 36.)  For the reasons explained below, the Court concludes that Plaintiffs have satisfied any exposure requirement.

a.    <u>FDUTPA and GBL</u>

To start, LensCrafters does not explain *why* the FDUTPA and GBL require Plaintiffs to show that all class members were exposed to a consistent misrepresentation about AccuFit.  This omission is notable given Plaintiffs' theory that all class members paid a price premium *regardless* of whether they relied on, were deceived by, or even cared about LensCrafters' representations about AccuFit's measurement capabilities.  Instead, LensCrafters advances a *res ipsa dixit* argument by citing, without analysis, various cases for the proposition that exposure simply is required.  (Class Cert. Opp'n, Dkt. 243, at 14–15, 14 n.67–68; Sur-Reply, Dkt. 253, at 5–7, 5 n.8, 6 n.9.)  Upon closer consideration of these and other cases, the Court finds that proof of class-wide exposure to a consistent misrepresentation or evidence is not as strict a requirement of the FDUTPA and GBL as LensCrafters would suggest, principally because reliance is not a requirement of either statute.

LensCrafters cites several cases that do not squarely grapple with the issue of classwide exposure.  For example, LensCrafters cites *PB Prop. Mgmt., Inc. v. Goodman Mfg. Co., L.P.*, No. 12-CV-1366 (HES) (JBT), 2016 WL 7666179, at *27 (M.D. Fla. May 12, 2016), as denying class certification of an FDUTPA claim where "[i]t would require individual inquiry to determine the various statements any particular plaintiff was exposed to."  (Class Cert. Opp'n, Dkt. 243, at 14 n.67.)  However, LensCrafters omits the court's explanation immediately following the quoted language, that individual issues predominated with respect to "the element of deception" because "the test [for that element] asks whether the conduct was likely to mislead a consumer acting reasonably *in the circumstances*," *PB Prop. Mgmt., Inc.*, 2016 WL 7666179, at *27 (quotation

42

marks and citation omitted), and there, the circumstances varied substantially because the named plaintiffs were exposed to different representations about defendant's product made by third-party contractors or dealers, *id.* at *25; *see id.* at *27 ("Individual circumstances in which each putative class member was subject to different representations could affect whether a reasonable consumer would have been misled by Defendants' conduct in the same circumstances.").  In other words, the issue in *PB Prop. Mgmt.* was the inconsistency of the actual message conveyed to putative class members, not exposure itself.  Likewise, LensCrafters' asserts that *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016) stands for the proposition that class-wide exposure is required under the FDUTPA.  (*See* Class Cert. Opp'n, Dkt. 243, at 15.)  However, exposure was not discussed and was essentially a non-issue in that case because the class was defined as individuals who purchased or leased the same model vehicle with the same sticker containing the alleged misrepresentation, *i.e.*, individuals who were necessarily exposed to the misrepresentation. *Carriuolo*, 823 F.3d at 986.  The court rejected the defendant's argument that the plaintiffs must prove that "every class member *saw* the sticker and was *subjectively deceived* by it," which it found "simply seek[s] a reliance inquiry by another name," and emphasized that for purposes of the element of deception, the plaintiff must demonstrate that the sticker "would deceive an objectively reasonable observer."  *Carriuolo*, 823 F.3d at 985–86 (emphasis added).  Thus, contrary to LensCrafters' contention, *PB Prop. Mgmt.* and *Carriuolo* do not bluntly hold that proof of class-wide exposure is a requirement for predominance, but rather that a plaintiff must identify a common misrepresentation that can be scrutinized under the reasonable consumer standard.  This is consistent with the well-reasoned analysis set forth in *Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239 (E.D.N.Y. 2019).

In *Hasemann*, the court examined "case law under [the GBL and FDUTPA] to determine whether the deception of a reasonable consumer requirement necessarily incorporates a *requirement that each putative class member must have been directly exposed* to the misrepresentation." 331 F.R.D. at 258 (emphasis added). With respect to the FDUTPA, the court determined that "[i]n light of the lack of individualized reliance required by the FDUTPA," the court would not "restrict the concept of exposure to as narrow a definition as Defendant recommends," much like LensCrafters does here, "i.e., total uniformity and guaranteed exposure among customers." *Id.* at 264. To do so, the court reasoned, "would re-read a reliance and *seeing* requirement into the statute that does not exist—requiring consumers essentially to confirm that they in fact *saw* the misrepresentation at issue." *Id.* Moreover, cases interpreting the FDUTPA "emphasize the importance not of detailed scrutiny into the issue of exposure, but instead into the issue of deception, and whether an act was likely to deceive a reasonable consumer operating under the same circumstances as the plaintiff." *Id.* The court likewise concluded that "[r]equiring one hundred percent certainty that each and every customer has been exposed to the representations at issue," as LensCrafters advocates here, "would impermissibly depart from the objective standards of sections 349 and 350 of the GBL, and would impermissibly read a seeing and a reliance requirement into the statute." *Id.* at 267.

In concluding that neither the FDUTPA nor the GBL require proof that every class member was exposed to the at-issue representations, the *Hasemann* court noted that it was important to not conflate reliance—which is not a requirement of either statute—with causation because it is possible for a deceptive practice to cause an economic harm to a consumer, such as a price premium, even where the consumer did not rely on the deceptive practice. *Id.* at 263 ("[A] deceptive practice can cause a consumer damages even if the consumer does not rely on the

deceptive practice when purchasing a particular product." (quoting *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 692 n.2 (S.D. Fla. 2010))); *id.* at 267 ("[T]here is a difference between reliance and causation, . . . plaintiffs allege that defendant's material deception caused them to suffer a $275 loss. This allegation satisfies the causation requirement. Plaintiffs need not additionally allege that they would not otherwise have entered into the transaction." (quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 613 (N.Y. 2000)).

The Court agrees with the analysis in *Hasemann*, particularly because here, as there, the "theory of the case" is not that only specific misrepresentations about AccuFit made in a particular setting harmed consumers by persuading them to purchase a product, "but instead, that the advertising and labeling practice allowed a price premium to be charged across" all LensCrafters eyeglasses. *See id.* at 264. Under this theory, a consumer paid more for a pair of LensCrafters' glasses even if the consumer did not rely on the misrepresentation, and the misrepresentation was still likely to deceive a reasonable consumer even if not every class member was exposed to it. *See id.* (citing *Nelson*, 270 F.R.D. at 692 n.2). That said, the Court also finds that *some* degree of exposure is required to ground the case in reality, rather than mere hypotheticals, *see id.* at 264 ("exposure is an important part of the FDUTPA claim analysis, [but] does not require the heightened and uniform standard" advocated by the defendant), *id.* at 266 (finding that "some amount of exposure is necessary" under the GBL). The question is *how much* exposure.

The *Hasemann* court concluded that although the same label may not have appeared on every single product in that case, the deceptive act still could have been *likely* to deceive a consumer, "given that the labels were both abundant, accompanied by advertising campaigns, and appeared prominently on shelves where consumers shopped." *Id.* at 264; *see id.* at 267 ("[I]n the current case exposure was sufficiently uniform to conclude that it is likely that a reasonable

consumer could have been misled and encouraged to purchase [the product].").  Furthermore, although the *Hasemann* court based its finding that "generalized exposure c[ould] be inferred" on the alleged misrepresentation being "a consistent and prominent theme among [the defendant]'s various marketing campaigns for [the product]" and a "near certainty that every consumer was exposed to the alleged misrepresentations," *id.* at 264 (quotation marks and citations omitted), the Court does not interpret *Hasemann* as requiring total uniformity in the product's marketing or "near-certain" exposure to the alleged misrepresentations, as LensCrafters contends, *id.* at 274 (rejecting the defendant's "uniform exposure" argument based on the conclusion that "the FDUTPA and sections 349 and 350 of the GBL do not contain a viewing requirement or a reliance requirement, nor do they require individual determination of how a particular advertisement affected each putative class member").

Accordingly, the Court finds that neither the FDUTPA[13] or GBL[14] requires Plaintiffs to show that "the entire class was *exposed* to the consistent misrepresentation about AccuFit."[15] (Class Cert. Opp'n, Dkt. 243, at 14.)

        b.      <u>UCL, FAL, and CLRA</u>

By contrast, cases interpreting the UCL, FAL, and CLRA are much more explicit about requiring that a plaintiff demonstrate that all class members have been or should be presumed to have been exposed to the misleading or deceptive statement at issue. *See Hasemann*, 331 F.R.D. at 262 ("[U]nlike in the FDUTPA context where the issue of exposure is ambiguous, courts have

---

[13] The Court is unpersuaded by LensCrafters' citation to *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 448 (N.D. Cal. 2014) (*see* Class Cert. Opp'n, Dkt. 243, at 14 n. 68) regarding an exposure requirement under the FDUTPA. *See In re Clorox Consumer Litig.*, 301 F.R.D. at 445 ("If a class member never *saw* Clorox's superiority message, it is impossible that he suffered damages as a result of Clorox's conduct." (emphasis added)). The Court finds that this case "re-read[s] a reliance and *seeing* requirement into the [FDUTPA] that does not exist—requiring consumers essentially to confirm that they in fact *saw* the misrepresentation at issue." *See Hasemann*, 331 F.R.D. at 264. The Court is also unpersuaded by LensCrafters' citations to *Donoff v. Delta Air Lines, Inc.*, No. 18-CV-81258 (DMM), 2020 WL 3268272, at *6 (S.D. Fla. Jan. 24, 2020) and *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 643 (S.D. Fla. 2008) (*see* Class Cert. Opp'n, Dkt. 243, at 15 n.71), both of which also appear to import a seeing requirement and to focus on predominance issues raised by varying, inconsistent misrepresentations.

[14] The Court does not find LensCrafters' reliance on *In re Clorox Consumer Litig.*, 301 F.R.D. at 445, with respect to the GBL, any more persuasive than with respect to the FDUTPA. (*See* Class Cert. Opp'n, Dkt. 243, at 14 n.68.) *In re Clorox Consumer Litig.*, along with the other case cited by LensCrafters, *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 389 (S.D.N.Y. 2016), both rely on *Solomon v. Bell Atl. Corp.*, 777 N.Y.S.2d 50 (N.Y. App. Div. 2004), which *Hasemann* rightfully found "inappropriately read[] a *seeing* requirement into the GBL," *see Hasemann*, 331 F.R.D. at 267. The Court is also unpersuaded by LensCrafters' citations to *Marotto v. Kellogg Co.* (*see* Class Cert. Opp'n, Dkt. 243, at 15 n.70; Sur-Reply, Dkt. 253, at 6 & n.9), which incorrectly distinguishes *Hasemann* as applying only Florida law, offers no analysis of the exposure requirement issue, and relies on *Goldemberg*. *Marotto*, 415 F. Supp. 3d 476, 477 (S.D.N.Y. 2020).

[15] LensCrafters does not dispute *Hasemann*'s reasoning, but instead ignores *Hasemann*'s rejection of the defendants' argument there that the FDUTPA and GBL require "guaranteed" or "one hundred percent certainty" with respect to exposure. *Hasemann*, 331 F.R.D. at 264, 267; (Sur-Reply, Dkt. 253, at 6 (arguing that the "unique facts of *Hasemann* are inapposite")).

made clear that to succeed on claims under the UCL, the misrepresentation must have been exposed to all class members." (citing *Zakaria v. Gerber Prods. Co. ("Zakaria II")*, No. 15-CV-00200 (JAK) (EX), 2016 WL 6662723, at *8 (C.D. Cal. Mar. 23, 2016)).

> The relevant [predominance] analysis under [the UCL, FAL, and CLRA] does not consider whether each class member saw and relied on each of the [challenged statements at issue] and in what combination, but instead whether [those statements] were used consistently through the Class Period, *supporting an inference of classwide exposure*, and whether the [those statements] would be material to a reasonable consumer.

*Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 563–64 (N.D. Cal. 2020) (emphasis added); *see e.g.*, *Cabral v. Supple LLC*, 608 F. App'x 482, 483 (9th Cir. 2015) ("In a case . . . alleg[ing] misrepresentations in advertising and the like [in violation of the UCL, FAL, and CLRA], it is critical that the misrepresentation in question be made to all of the class members."); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) ("[T]he relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading."); *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 895 (N.D. Cal. 2015) ("Both the Ninth Circuit and California courts have expressly found that class certification of UCL claims is available only to those class members who were *actually exposed* to the business practice at issue." (quotation marks and citation omitted)); *Davis-Miller v. Auto. Club of S. Cal.*, 134 Cal. Rptr. 3d 551, 562 (Ct. App. 2011) ("Specifically, when the class action is based on alleged misrepresentations, a class certification denial will be upheld when individual evidence will be required to determine whether the representations at issue were actually made to each member of the class."), *as modified* (Nov. 22, 2011); *id.* at 565 ("With respect to the plaintiffs' false advertising theory of recovery, both [the UCL and the CLRA] require, at a minimum, that the class be exposed to the allegedly false advertising at issue . . . ."); *see also Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1097 (N.D. Cal. 2018) (finding that Plaintiff avoided a "lack of uniform and

consistent exposure problem" under the UCL, FAL, and CLRA by ensuring "that all Raisin Bran

Subclass members were *by definition* exposed to a 'heart healthy' statement, and [] thereby

eliminat[ing] all 'factual differences regarding . . . exposure' to that statement that could give rise

to predominance issues." (quotation marks and citations omitted)).

　　　　Under the UCL, CLRA, and FAL, class-wide exposure to the alleged misrepresentation is

required to justify a class-wide presumption of reliance and causation.  *See Mazza*, 666 F.3d at 595

("[T]he misrepresentations at issue here do not justify a presumption of reliance . . . primarily

because it is likely that many class members were never exposed to the allegedly misleading

advertisements . . . ."); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011)

("[c]ausation, on a classwide basis, may be established by *materiality*.  If the trial court finds that

material misrepresentations have been made to the entire class, an inference of reliance arises as

to the class." (quoting *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 95 (Ct. App. 2009))).  The

reasoning for such a requirement is that "an individual plaintiff must establish 'actual reliance' to

recover on a [sic] misrepresentation-based UCL, CLRA or FAL claims."  *Rodman v. Safeway,*

*Inc.*, No. 11-CV-3003 (JST), 2014 WL 988992, at *11 (N.D. Cal. Mar. 10, 2014), *aff'd,* 694

F. App'x 612 (9th Cir. 2017).

> Class action plaintiffs can avoid the need to show each class member's individual
> reliance by resorting to California law's presumption of common reliance, but that
> presumption is only available where the entire class saw the misrepresentations or
> was exposed to a pervasive long-term advertising campaign.   Where the
> presumption of common reliance is unavailable, individual questions concerning
> each class members' [sic] actual reliance will undoubtedly predominate over
> common questions because each class member must demonstrate her own
> individualized reliance by some method other than the presumption of common
> reliance provided by California law.

*Id.*; *see also Davis-Miller*, 134 Cal. Rptr. 3d at 563 ("If the trial court finds that material

misrepresentations have been made to the entire class, an inference of reliance arises as to the

class."); *id.* at 565 ("An inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class."); *Ehret*, 148 F. Supp. 3d at 895 ("While individualized proof of deception, reliance, and injury is not required to seek relief under the UCL, 'the question of likely deception does not automatically translate into a class-wide problem,' such as when there is variation in whether class members were actually exposed to the challenged business practices." (quoting *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014))).  Thus, "[w]hile Plaintiffs need not prove individualized reliance, this alone does not entitle them to class certification.  Separate from reliance, Plaintiffs must also prove that the class members were *exposed* to the alleged misrepresentations in the first place."  *Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-CV-4984 (JST), 2016 WL 5746364, at *8 (N.D. Cal. Sept. 30, 2016).  In other words, "it means little if an objective, reasonable consumer would have found the alleged misrepresentations material if none of the class members saw, read, or were otherwise exposed to those misrepresentations."  *Id.*

Where proof of classwide exposure is not certain, courts have generally recognized that an inference of such exposure may be available in two circumstances.

First, "[w]here the alleged misrepresentation appears on the label or packaging of each item being sold, class-wide exposure to it may be inferred."  *Hadley*, 324 F. Supp. 3d at 1099 (quoting *Zakaria II*, 2016 WL 6662723, at *8 (collecting cases)); *McCrary I*, 2014 WL 1779243, at *13 ("[A] presumption of exposure is inferred where, as here, the alleged misrepresentations were on the outside of the packaging of every unit [of the product] for an extended period.").  "[E]xposure on a classwide basis may be deemed sufficient" in this circumstance "given the inherently high likelihood that in the process of buying the product, the consumer would have seen the misleading statement on the product and thus been exposed to it."  *Ehret*, 148 F. Supp. 3d at 895.

Second, a presumption of classwide exposure also may arise where there is evidence that the alleged misrepresentation was "broadly disseminated," including in the context of an "extensive and long-term fraudulent advertising campaign" that leaves little doubt that "almost every class member had been exposed to defendants' misleading statements." *Mazza*, 666 F.3d at 596 (brackets, quotation marks, and citations omitted); *accord Zakaria*, 2016 WL 6662723, at *9; *cf. Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 540 (N.D. Cal. 2018) ("This case does not involve the type of massive advertising campaign that gives rise to a presumption of exposure to all class members."); *In re NJOY, Inc. Consumer Class Action Litig. ("In re NJOY")*, 120 F. Supp. 3d 1050, 1111 (C.D. Cal. 2015) (declining to certify a class under the UCL and CLRA to the extent based on misrepresentations in advertising because the "advertising was [not] sufficiently pervasive to warrant a presumption that all members of the class saw advertisements with the [misrepresentations], [and therefore the plaintiffs] have not shown that materiality can be proved on a classwide basis").

The exposure requirement and the circumstances under which exposure may be inferred apply to omissions-based claims as well as claims based on affirmative misrepresentations. *See, e.g.*, *Mazza*, 666 F.3d at 596 ("For everyone in the class to have been exposed to the omissions, . . . it is necessary for everyone in the class to have viewed the allegedly misleading advertising."); *In re NJOY*, 120 F. Supp. 3d at 1105 (finding that class members were necessarily exposed to omissions that relate to the packaging of the product); *Guido v. L'Oreal, USA, Inc.*, No. 11-CV-1067 (CAS) (JCX), 2013 WL 3353857, at *11 (C.D. Cal. July 1, 2013) ("[T]he alleged omissions in this case relate to the packaging of [the product] itself, which has not materially changed over the course of the Class Period.  Accordingly, the class members—who are defined, *inter alia,* as

purchasers and users of [the product]—were necessarily 'exposed' to defendants' alleged misleading packaging of [the product] . . . .").

Thus, under the UCL, FAL, and CLRA, Plaintiffs must demonstrate that all class members were exposed to the alleged misrepresentations about AccuFit (*i.e.*, that LensCrafters' measurements are five times more precise, down to 0.1mm, for clearer vision) and omissions (*i.e.*, that LensCrafters' glasses are not manufactured to 0.1mm centration and 0.1mm glasses have no clinical benefit), or that a presumption of such exposure is justified.

c.   Fraudulent Omission

Finally, it appears that the parties agree that to state a fraudulent-omission claim, Plaintiffs must demonstrate that all class members were in fact exposed to the statement or representation from which the material information was allegedly omitted.  (*See* Class Cert. Mot., Dkt. 238, at 42–43 ("[A]ll Class members – who were all fitted with AccuFit and received the 'AccuFit Customer Experience' – were exposed to the omissions at issue."); Class Cert. Opp'n, Dkt. 243, at 15 ("[E]xposure to the Challenged Statements is also necessarily required to state a claim for fraudulent omission.").)  The Court agrees with the parties, particularly given the nature of the alleged omission here—"that LensCrafters should have disclosed that it did not manufacture glasses to 0.1mm and that 0.1mm glasses have no clinical benefit" (Class Cert. Mot., Dkt. 238, at 41–42)—which necessarily relates to the alleged misrepresentations about 0.1mm measurements. *See, e.g.*, *Waggoner*, 875 F.3d at 95 ("[I]n many instances, an omission to state a material fact relates back to an earlier statement." (quotation marks and citation omitted)); *Mazza*, 666 F.3d at 596 ("For everyone in the class to have been exposed to the omissions, . . . it is necessary for everyone in the class to have viewed the allegedly misleading advertising.").

d.     Plaintiffs' Evidence of Exposure

(1)     Exposure during the AccuFit Customer Experience

The proposed class in this case is defined as all residents of New York, Florida, and California "who purchased prescription eyeglasses from LensCrafters *after being fitted with AccuFit* from September 5, 2013 to present." (Class Cert. Mot., Dkt. 238, at 25.) Accordingly, the centerpiece of Plaintiffs' exposure theory is that "[e]very class member was exposed to the misrepresentations and omissions at issue when *fitted with AccuFit*" because (1) "[t]he AccuFit system displayed both the '5X MORE PRECISE THAN MANUAL MEASUREMENTS' representation and the customer's 0.1mm measurements," and (2) "during [the] fitting process[,] class members received a scripted sales pitch regarding the benefits of 0.1mm measurements." (Class Cert. Reply, Dkt. 244, at 3 (emphasis added); *see also* Class Cert. Mot., Dkt. 238, at 11–14, 36.)

In support of the first argument, Plaintiffs allege that customers saw a screen background when they were fitted with AccuFit that displayed the phrase "5X MORE PRECISE THAN MANUAL MEASUREMENTS" (Class Cert. Mot., Dkt. 238, at 12), and cite[16] various examples of the screen background included in Plaintiffs' "Compendium"[17] (*see* Class Cert. Reply, Dkt. 244, at 5; Compendium, Dkt. 239-1, at 3–4 (depicting screen background with "5X" language), 7–

---

[16] Plaintiffs also cite Exhibit 62 (Class Cert. Mot., Dkt. 238, at 12), a document called "AccuFit 2.0 Upgrade" that does not contain any evidence of a screen background with the "five times more precise" language. (*See* Ex. 62 to Class Cert. Mot., Dkt. 239-16, at ECF 42–47; Sur-Reply, Dkt. 253, at 2–3 (addressing confusion over Plaintiffs' Exhibit 62); Ex. 3 to Sur-Reply, Dkt. 252-4 (providing clear, color image of screen that appears in Exhibit 62 and that does not include the "five times more precise" language).) As Plaintiffs failed to address the confusion over Exhibit 62 in their Reply, the Court assumes this citation was in error.

[17] Plaintiffs describe the "Compendium" as "a compendium of sample representations made by LensCrafters during the class period." (Class Cert. Mot., Dkt. 238, at 1 n.1.)

8 (same), 12 (same)), and an "AccuFit iPad App User Manual"[18] (Class Cert. Mot., Dkt. 238, at

12). Plaintiffs also cite an image of the screen background that Plaintiff Rogoff pulled from a

Google image search for "AccuFit," which he testified was "very consistent" with what he saw "in

the store" and "in some of the marketing." (*Id.* (citing Ex. 65 to Class Cert. Mot. (Rogoff Dep.),

Dkt. 239-17, at Tr. 342:23–344:20).) In response, LensCrafters contends that the examples cited

by Plaintiffs either pre-date the class period or are from beta versions[19] of AccuFit, while the

version of AccuFit for iPad that launched in stores after May 2018 did not include the "5X"

representation. (Sur-Reply, Dkt. 253, at 2.) On balance, aside from Plaintiff Rogoff's testimony

about the "5X" representation he recalled seeing at LensCrafters,[20] the Court does not find

Plaintiffs' evidence that customers were exposed to the misrepresentations about AccuFit on a

background screen during their AccuFit fitting to be particularly persuasive with respect to finding

or presuming class-wide exposure.

However, Plaintiffs offer much more compelling proof in support of their second argument

that customers received a scripted sales pitch regarding the benefits of AccuFit's 0.1mm

measurements. In particular, Plaintiffs cite a LensCrafters' 2018 training module ("Module 4")

---

[18] In 2018, LensCrafters "shift[ed] away from desktop-based AccuFit equipment" to AccuFit on the iPad. (Class Cert. Opp'n, Dkt. 243, at 25.)

[19] "Beta" version refers to a pre-launch version of software (here "AccuFit on the Tablet") that is used for testing before general release. (Sur-Reply, Dkt. 253, at 3 n.3); *see* "Beta version," PCMAG.COM, https://www.pcmag.com/encyclopedia/term/beta-version (last visited Sept. 15, 2021).

[20] The Court is not convinced that it should wholly disregard Plaintiff Rogoff's testimony based on LensCrafters' argument that the image he pulled appears to have been taken from a January 30, 2013 Yelp review for a LensCrafters store in Las Vegas, Nevada, *i.e.*, before the class period and not in New York, California, or Florida. (*See* Class Cert. Opp'n, Dkt. 243, at 26; Sur-Reply, Dkt. 253, at 2 n.2 (describing and linking to the Yelp review).) Plaintiff Rogoff testified merely that the image was "very consistent" with what he recalled seeing when he himself visited the LensCrafters store in 2015, not that it was in fact what he saw. (*See* Ex. 6 to Class Cert. Opp'n (Rogoff Dep.), Dkt. 243-8, at Tr. 343:1–344:20.)

titled "Delivering the AccuFit Customer Experience" that, among other things, covers what associates should "SAY" and "DO" at each step of the experience. (*See generally* Ex. 59 to Class Cert. Mot., Dkt. 239-16; *id.* at ECF 4 ("Next we are going to walk through what it should sound like when speaking with a customer about their digital measurements."); *id.* ("Tap on the 'SAY' and 'DO' boxes for what it should sound like through each point of the AccuFit Experience").) Of relevance here, after adjusting the eyeglass frames on the customer's face, sales associates are instructed to "SAY": "This is the FitSensor. It works with the AccuFit Digital Measurement System to help capture measurements that are 5x more precise than manual measurements. AccuFit is exclusive to LensCrafters, and will help you see and look your best!" (*Id.* at ECF 4–5.) Then, after ensuring that the FitSensor is correctly positioned, sales associates are instructed to "SAY": "Relax and hold your head in a natural position. This will help ensure that we position the prescription in your lens to help you see your best." (*Id.* at ECF 6–8.) Next, after checking the customer's posture, sales associates are instructed to "SAY": "I'm going to capture your image to get your digital measurements. . . . I am making sure the sensors are lined up correctly. This allows me to get personalized measurements." (*Id.* at ECF 8.) Finally, after capturing the image, employees are instructed to "SAY": "We've got your personalized AccuFit Digital Measurements now." (*Id.* at ECF 9.) The employee is also instructed to "[s]hare the image on the tablet when [] aligning the personalized measurements to instill confidence and value to the AccuFit Digital Measurement Experience for the customer," right before "transfer[ing] the customer's personalized AccuFit digital measurements directly to the customer's order in Ciao![21] Optical." (*Id.* at ECF 10.) The "key takeaways" for Module 4 include: "It is extremely important you share

---

[21] Ciao! is the point-of-sale system used by LensCrafters. (*See* Class Cert. Opp., Dkt. 243, at 21 n.100).

the benefits of AccuFit Digital Measurements during the experience with your customer.  Showing and explaining the benefits will help your customer value the advantages of AccuFit."  (*Id.*)

Plaintiffs also cite a 2014 "AccuFit Top 10 Tips for Success" reference guide that recommends elevating the "Benefits of AccuFit by Sharing the Signature Phrases With Every Customer," which means "[m]ak[ing] sure every customer knows that AccuFit is 'exclusive to LensCrafters' and that it is '5 times more precise than manual measurements.'"  (Ex. 48 to Class Cert. Mot., Dkt. 239-12, at ECF 350; *see also* Ex. 47 to Class Cert Mot., Dkt. 239-2, at ECF 15– 16 (indicating "Top 10 Tips" were circulated on March 31, 2014).)  Additionally, Plaintiffs cite testimony by two former LensCrafters' employees[22] whom they argue "confirmed that the company required employees to deliver its messaging to all customers" (Class Cert. Mot., Dkt. 238, at 13), as well as testimony by Plaintiffs, all of whom recalled receiving the "AccuFit Customer Experience" sales pitch, including some who recalled they were told by a sales associate that AccuFit is "five times" more precise or accurate (*see* Class Cert. Reply, Dkt. 244, at 6 & n.5; *see, e.g.*, Ex. 85 to Class Cert. Mot. (Allegra Dep.), Dkt. 239-20, at Tr. 321:18–322:12 ("I guess just before I started getting my eyes measured by AccuFit.  She told me it was, you know, a lot better than other machines, it's more accurate."); Ex. 86 to Class Cert. Mot. (Ariza Dep.), Dkt. 239-20, at Tr. 36:5–10 (testifying that a LensCrafters employee told her that "[t]he way they do the measurements" is more accurate and "better"); Ex. 71 to Class Cert Mot. (Emmert Dep.), Dkt.

---

[22] The Court notes that the two former employees are the "confidential witnesses" cited in the SACC.  (*See* SACC, Dkt. 50, ¶¶ 28 n.13.)  The confidential witnesses are a married couple.  (Ex. 1 to Class Cert. Opp'n, Dkt. 243-3, at Tr. 104:7–11.)  LensCrafters notes that one of the witnesses previously sued Luxottica for sexual discrimination and wrongful termination, and has since settled.  (*Id.* at Tr. 43:1–15.)  LensCrafters' suggestion that this is a sham lawsuit created by two disgruntled former employees with an obvious ax to grind (*see* Class Cert. Opp'n, Dkt. 243, at 3) is best reserved for cross-examination of these former employees before the finder of fact and is largely irrelevant to the Court on class certification.

239-20, at Tr. 203:17–204:6 ("[S]he explained, you know, that it was digital, so it was more accurate and precise . . . ."); Ex. 87 to Class Cert. Mot. (Verrastro Dep.), Dkt. 239-20, at Tr. 101:14–20 ("They just told me that it was five times more accurate than the paper ruler and marker."); Ex. 5 to Class Cert. Reply (Rogoff Dep.), Dkt. 244-6, at Tr. 205:20–207:12 ("He was sharing over and over again about the 5x – even though there were signs in the store with that[.] . . . He stressed the way in which the glasses were measured and fitted and created.  That the finished product . . . would be glasses that would be more accurate and would be improving my vision. . . . I would be able to see a real visible difference."); Ex. 6 to Class Cert. Reply (Tenaglia Dep.), Dkt. 244-7, at Tr. 157:14–158:19 (explaining that a LensCrafters associate explained "how good the technology [of AccuFit] was and that it was five times more accurate at measuring the distance between the pupils"), 238:21–239:18 ("When we went to the store to purchase our glasses, they gave us more information on the AccuF[it] . . . .  The precision of five times more accurate where you can see clearly"), 241:8–12 ("Five times better he told me.  Five times better.")).

LensCrafters attacks this evidence with various responses, including that Module 4 does not mention "[a] tenth of a millimeter measurements" nor require sales associates to deliver a script.  (Class Cert. Opp'n, Dkt. 243, at 24.)  As further evidence of the latter, LensCrafters cites an AccuFit training that encouraged participants to practice their "own spin" on a dialogue during a role play exercise and to "integrate some new dialogue into [their] own selling approach."  (*Id.*)  LensCrafters also points to a 2018 training conducted in response to employees' failure to execute the AccuFit Experience "well or consistently," noting that it was recently reported in stores that "associates were saying 'nothing at all' concerning AccuFit and making 'no mention' of what AccuFit is or why it is being used."  (*Id.* at 25 (emphasis omitted) (quoting Ex. 57 to Class Cert. Opp'n., Dkt. 243-65, at LC_031979).)  LensCrafters argues that even with these performance

problems, the 2018 training still did not require a script, but only suggested what "Associate Verbiage" "could sound like." (*Id.* (emphasis omitted) (quoting Ex. 57 at Class Cert. Opp'n., Dkt. 243-65, at LC_032009).)  LensCrafters also contends that testimony from former employees only confirms that training varied from store to store and that each customer was treated individually. (*Id.*)  In sum, LensCrafters argues that Plaintiffs "would have this Court believe that thousands of LensCrafters' employees in more than 200 stores made consistent and uniform oral misrepresentations concerning AccuFit to millions of customers over a seven-year period," but that this "position is belied by both the record and common sense" and "demonstrates that individual inquiries would predominate rendering class treatment inappropriate."  (Class Cert. Opp'n, Dkt. 243, at 23.)

The Court disagrees with LensCrafters that Plaintiffs' theory of classwide exposure based on statements made during the LensCrafters experience is untenable as a matter of fact or law. The cases cited by LensCrafters are distinguishable and unpersuasive based on the evidence here. For example, LensCrafters cites *Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 53 (S.D.N.Y. 2019), for the proposition that oral representations made at the time of purchase are "precisely the sort of claims that have repeatedly been held not to raise common questions[] because they are not susceptible of classwide proof."  (Class Cert. Opp'n, Dkt. 243, at 23 n.112.)  However, in that case, the plaintiff sought certification under the GBL based on alleged oral misrepresentations or omissions by "different representatives [] of 89 individual, authorized, third-party dealers" of the defendant, and notably, "[d]espite years of discovery, [the plaintiffs] point[ed] to no evidence that [the defendant] *instructed or encouraged dealers*" to make the misrepresentations.  *Marshall*, 334 F.R.D. at 53.  Likewise, in *English v. Apple Inc.*, the plaintiff's evidence "d[id] not establish the level of uniformity required for class treatment" under the CLRA, FAL, and UCL, in part because

testimony by former employees revealed "significant and material variations between the oral representations made by [the defendant's] employees" and because "[t]here [wa]s no evidence that any of [the defendant's] training materials instruct[ed] or insinuate[d] that" the misrepresentation should be made. *See* No. 14-CV-01619 (WHO), 2016 WL 1188200, at *10 (N.D. Cal. Jan. 5, 2016).

The evidence presented in *Marshall* and *English* is vastly different from what Plaintiffs have presented here. Plaintiffs' evidence demonstrates that LensCrafters associates received a clear, consistent directive regarding the specific representations to make to customers about AccuFit, and the importance of doing so repeatedly. As recounted above, LensCrafters associates were trained what to "SAY" to customers and were provided with "signature phrases" and "Associate Verbiage" that "could sound" like the following phrases: "AccuFit is exclusive to LensCrafters, and will help you see and look your best!"; "AccuFit is 5x more precise than manual measurements. Your measurements are customized to the frame you chose."; and "Your measurements are digitally optimized to see your best." (*See* Ex. 59 at Class Cert. Mot., Dkt. 239-16, at ECF 5 (Module 4); Ex. 48 to Class Cert. Mot., Dkt. 239-12, at ECF 350 ("AccuFit Top 10 Tips for Success"); Ex. 57 to Class Cert. Mot., Dkt. 243-65, at LC_032009.) Each of these phrases emphasizes that AccuFit's more precise measurements allow for clearer, better vision.

Even the 2018 training cited by LensCrafters in its defense states: "*Every customer* should understand why we use AccuFit and what the benefit is for them *every time* they are measured, *even if they are a repeat customer*." (Ex. 57 to Class Cert. Opp'n., Dkt. 243-65, at LC_031979 (emphasis added)); *cf. Marshall*, 334 F.R.D. at 53 (finding no evidence that the defendant "instructed or encouraged" making the misrepresentations); *English*, 2016 WL 1188200, at *10 (finding no evidence that the defendant's training materials "instruct[ed] or insinuate[d] that" the

misrepresentation should be made).  That LensCrafters intended its employees to follow these specific instructions to tout AccuFit is corroborated by the testimony of a former LensCrafters employee that "corporate" had "certain verbiage they wanted you to use," including that "your glasses would be more accurate if you used the AccuFit Digital measuring system."  (Ex. 54 to Class Cert. Mot. (C. Sherwood Dep.), Dkt. 239-13, at Tr. 207:3–11.)  The 2018 training also echoes the specificity with which the "Module 4" training directed associates what to "SAY" and "DO" at each step of the AccuFit Customer Experience, emphasizing as a takeaway that "[i]t is *extremely important* you share the benefits of AccuFit Digital Measurements during the experience with your customer.  Showing and explaining the benefits will help your customer value the advantages of AccuFit."  (Ex. 59 to Class Cert. Mot., Dkt. 239-16, at ECF 10 (emphasis added); *see generally id.*)  The "[e]very customer . . . every time" directive in the 2018 training is likewise reflected in the "Top 10 Tips" for success, which includes "[m]ak[ing] sure *every customer* knows that AccuFit is 'exclusive to LensCrafters' and that it is '5 times more precise than manual measurements.'" (Ex. 48 to Class Cert. Mot., Dkt. 239-12, at ECF 350 (emphasis added).)  Indeed, LensCrafters' concerted and consistent efforts to ensure that its associates conveyed the benefits of AccuFit's "5 times more precise measurements" was borne out by the fact that all Plaintiffs recall receiving the "AccuFit Customer Experience" sales pitch and four of six Plaintiffs recall being told that AccuFit is "five times" more precise or accurate.  (Class Cert. Reply, Dkt. 244, at 6 & n.5 (citing Plaintiffs' deposition testimony)).  This evidence readily distinguishes this case from all of the cases cited by LensCrafters, including *Todd v. Tempur-Sealy Int'l, Inc.*, where the court found that the plaintiff had not proven that the defendant was "sufficiently uniform in its use of the alleged misrepresentations" because, *inter alia*, the plaintiffs did "not attempt to show" that the defendant's retailers made use of the defendant's trainings or suggestions for selling.  2016 WL

60

5746364, at *12.  Through the evidence presented here, Plaintiffs have shown that LensCrafters associates were directly and emphatically instructed to convey to customers the benefits of AccuFits' "five times more precise" measurements, and to do so repeatedly.

The Court is not persuaded by LensCrafters' argument that customers did not hear consistent messaging about AccuFit while they were being measured with AccuFit simply because sales associates were not given "scripts" and were encouraged to "personalize" their sales pitches. To start, LensCrafters strains credulity when it argues that its trainings were not tantamount to scripts.  As discussed, Module 4 repeatedly tells associates precisely what to "SAY" to customers and what to "DO" during the "AccuFit Customer Experience."  (Ex. 59 to Class Cert. Mot., Dkt. 239-16, at ECF 4 ("Next we are going to walk through what it should sound like when speaking with a customer about their digital measurements."); *id.* ("Tap on the 'SAY' and 'DO' boxes for what it should sound like through each point of the AccuFit Experience."); *see generally id.*)  In any event, the Court's inquiry is focused on whether Plaintiffs have demonstrated that the oral misrepresentations were *materially uniform*, such that they may be demonstrated through generalized proof.  *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1249 (2d Cir. 2002) (holding that "class certification of fraud claims based on oral misrepresentations is appropriate only where the misrepresentations relied upon were materially uniform, allowing such misrepresentations to be demonstrated using generalized rather than individualized proof"); *see also Marshall*, 334 F.R.D. at 53 (citing *Moore* in analyzing sufficiency of oral misrepresentations alleged under GBL); *English*, 2016 WL 1188200, at *10 (denying certification of class under the CLRA, FAL, and UCL, where there was no "standardized protocol" for misrepresentations and the evidence revealed "significant and material variations between the oral representations").  "While training and the existence of scripts are relevant factors, the inquiry should remain focused on whether

material variations in the misrepresentations existed." *Moore*, 306 F.3d at 1255. Likewise, "[t]he absence of uniform written sales scripts and training informs the determination whether material variations existed; it does not mandate a particular result." *Id.* For example, in *Moore*, the Circuit affirmed denial of class certification of RICO and fraud claims, finding that the evidence did not demonstrate that the defendant's brokers adopted a materially uniform approach in their individual sales presentations regarding a particular life insurance policy (the "Provider"). *Id.* at 1256. For example, customer complaints revealed that brokers used substantively different language to describe the "Provider" (*e.g.*, "retirement program with insurance benefits" versus an "IRA," or never mentioning that the Provider was a life insurance policy), and telephone scripts varied significantly (*e.g.*, one stated that the Provider "features" a life insurance policy, another did not mention life insurance, and a third disclosed that the Provider was a life insurance policy). *Id.*

Here, by contrast, the evidence shows that LensCrafters associates provided customers with a consistent AccuFit Customer Experience, during which materially uniform representations (and omissions) were made about AccuFit, based on a script given to all LensCrafters employees. The key representation the employees were instructed to make was that AccuFit's "five times more precise measurements" would deliver better vision for the customer. The employees were also specifically instructed to show the customers an image of their "personalized," *i.e.*, 0.1mm, measurements[23] before they purchased their eyeglasses. (Ex. 59 to Class Cert. Mot., Dkt. 239-16,

---

[23] Plaintiffs cite a screen in the "AccuFit iPad App User Manual" that they allege shows the 0.1mm measurements to customers while they are being measured with AccuFit. (Class Cert. Mot., Dkt. 238, at 12 (citing Ex. 63 to Class Cert. Mot., Dkt. 239-17, at ECF 2–3).) LensCrafters questions how merely showing customers a screen with their AccuFit measurements is actionable, and notes that Plaintiffs did not plead such an allegation in the SACC. (Class Cert. Opp'n, Dkt. 243, at 26.) The Court views the act of showing LensCrafters customers their 0.1mm measurements to constitute part of the alleged deception, in that it conveyed to customers not only that their five-times-more-precise measurements were in fact down to the 0.1mm, but, more importantly, that these precise measurements would actually be used to manufacture the eyeglasses

at ECF 10 (instructing associates to share "the image on the tablet when [] aligning the personalized measurements to instill confidence and value to the AccuFit Digital Measurement Experience for the customer," right before "transfer[ing] the customer's personalized AccuFit digital measurements directly to the customer's order in Ciao! Optical.").)  That AccuFit's precision may have been conveyed to customers as "five times more precise," rather than as "0.1mm," does not alter this conclusion because, as LensCrafters concedes, these statements mean the same thing about AccuFit's more precise measuring capabilities.  (*See* Class. Cert. Opp'n, Dkt. 243, at 7 ("AccuFit measures 'down to a tenth of a millimeter' and is, objectively, at least 'five time more precise' than traditional methods.").)

Additionally, this conclusion is not undermined by LensCrafters' argument that associates were not delivering the message consistently or at all.  LensCrafters does not provide any detail about the location, duration, or scope of the performance problems reported in stores other than indicating that they have existed since AccuFit was implemented in 2011.  (*Id.* at 25 (claiming that the "AccuFit Experience" was not "executed consistently from 2011-2018").)   In addition, Plaintiffs offered evidence that LensCrafters responded to those problems by doubling-down with a training that not only emphasized that "*[e]very customer* should understand why [LensCrafters] use[s] AccuFit and what the benefit is for them *every time* they are measured, even if they are repeat customers" (Ex. 57 to Class Cert. Opp'n, Dkt. 243-65, at LC_031979 (emphasis added)), but also coached associates that the "correct" way to speak to customers was to say "AccuFit Measurements are exclusive to LensCrafters and are 5x more precise than manual measurements. Let me show you what I am doing" (*id.* at LC_032007; *see id.* (instructing that it was not correct

---

they were purchasing, which relates to one of the alleged omissions.  (*See* Ex. 59 to Class Cert. Mot., Dkt. 239-16, at ECF 10.)

for associates to merely say, "Now I am going to set your measurements.  This is important to making your glasses correctly")).  LensCrafters' response to the performance issues they cite only bolsters the conclusion that LensCrafters delivered consistent and materially uniform AccuFit Customer Experience messaging to its customers that included: (1) the representation that AccuFit delivered measurements that were "5X more precise," allowing customers better vision; (2) showing customers their "more precise" 0.1mm AccuFit measurements;[24] and (3) failing to explain that LensCrafters did not manufacture glasses to 0.1mm centration and that 0.1mm glasses have no clinical benefit.

(2)    <u>Exposure Through Multi-Channel Marketing Campaign</u>

Buttressing the centerpiece of Plaintiffs' exposure theory that every class member was exposed to the misrepresentations and omissions when they were fitted with AccuFit, is the argument that LensCrafters also promoted AccuFit's 0.1mm, five times more precise measurements through a multi-channel marketing campaign.  (*See generally* Class Cert. Mot., Dkt. 238, at 14–20.)  In response, LensCrafters argues, that the Alleged Misrepresentations "were made sporadically with major temporal gaps to exposure" and "varied substantially" in "actual language (and context)," which are ultimately "fatal to certification."  (Class Cert. Opp'n, Dkt. 243, at 16–17.)

---

[24] LensCrafters suggests that there is an inconsistency in the AccuFit "experience" for those customers who were fitted with the desktop version of AccuFit versus those customers who were fitted with AccuFit on a tablet starting in 2018.  (Class Cert. Opp'n, Dkt. 243, 25 n.121.)  However, LensCrafters does not elaborate on what those inconsistencies might have been, and the Court notes that images on LensCrafters' website that pre-date 2018 depict an associate showing a customer his AccuFit measurements on a desktop screen.  (*See, e.g.*, Compendium, Dkt. 239-3, at ECF 8 (Sept. 8, 2017); *id.* at ECF 22 (June 19, 2017); *id.* at ECF 48 (Oct. 14, 2016); *id.* at ECF 64 (June 20, 2016); *id.* at ECF 86 (Jan. 8, 2016); *id.* at ECF 101 (Sept. 5, 2015); *id.* at ECF 126 (Nov. 26, 2014).)

(a)   <u>Online Marketing and Advertising</u>

To start, Plaintiffs argue that LensCrafters "touted AccuFit's Superior 0.1mm measurements online throughout the class period." (Class Cert. Mot., Dkt. 238, at 14–15.) Specifically, LensCrafters (1) "featured AccuFit and its supposedly superior 0.1mm measurements on its website nearly every month . . . from 2014 to 2017" and Plaintiffs Emmert and Tenaglia testified to seeing the marketing on LensCrafters' website (*id.*); (2) promoted AccuFit on its Facebook, Instagram, and the Twitter accounts of the company and of individual stores, including and through social media posts by "sponsored influencers" (*id.* at 15); and (3) used online press releases and sponsored blog posts to advertise AccuFit (*id.* at 16).

In response, LensCrafters contends that AccuFit has not been featured on its website homepage since March 29, 2014, and while AccuFit was "at times" discussed on "subpages," Plaintiffs provide no evidence that customers "regularly navigated to those [sub]pages or regularly visited the website at all prior to their purchases." (Class Cert. Opp'n, Dkt. 243, at 22.) LensCrafters also argues that, for the entire class period, "Plaintiffs identify only four 'tweets' and two Facebook posts from the official LensCrafters accounts," three Instagram posts from one store in Florida (with 50 followers), and one Instagram post from a store in Brooklyn, NY (with 75 followers).[25] (*Id.* at 20–21.)

Plaintiffs' evidence of misrepresentations about AccuFit made though social media, online press releases, and sponsored blog posts is scattershot. For example, regarding social media, and

---

[25] Additionally, LensCrafters contends that "sponsored influencers," blog posts, press releases, and google keyword searches, constitute "highly variable and inconsistent online marketing" that its expert, Dr. Hauser, explained was not reliable or consistent throughout the class period. (Class Cert. Opp'n, Dkt. 243, at 21 n.101.) Further, the other social media posts identified by Plaintiffs were from stores outside of the three states at issue in this case. (*Id.* at 21.) The Court agrees, for the reasons explained herein, that these forms of online marketing are not particularly compelling of an inference of class-wide exposure.

putting aside for the moment the varied and at times irrelevant content of the social media posts, Plaintiffs rely on the work of their expert Sarah Butler, who, as part of the background work for her report,[26] compiled: (1) LensCrafters' Facebook posts from January 22, 2013, October 17, 2013, February 24, 2014, and October 1, 2014 (Ex. D to Expert Report of Sarah Butler ("Butler Report"), Dkt. 239-15, at ECF 11–14); (2) Instagram posts from a LensCrafters' store in Jacksonville, Florida from January 31, February 8, February 9, and March 30, 2015 (*id.* at ECF 16–18, 21) and from apparent "sponsored influencers" from March 9, 2015, December 11, 2015, February 15, 2016, October 23, 2016, October 26, 2016, and February 8, 2017 (*id.* at ECF 20, 24, 27–30); and (3) assorted Twitter posts, the vast majority of which are by "sponsored influencers" on various dates (*see generally id.* at ECF 32–51), and only a handful of which are by LensCrafters on limited dates, *e.g.*, October 4, 2013, February 24, 2014, May 3, 2016, May 19, 2016 and May 20, 2016, (*id.* at ECF 38–39, 53–57). Ultimately, this and other evidence of LensCrafters' online advertising efforts fails to provide the Court with any real sense of the actual duration, frequency, scope, or reach of these efforts, and for that reason, the Court finds them to be unpersuasive on the issue of class-wide exposure.

By contrast, the Court finds Plaintiffs' evidence of representations about AccuFit on LensCrafters' website much more compelling. Plaintiffs again rely on Butler, who (1) reviewed LensCrafters' website and webpages appearing between 2013 and 2019, (2) "located pages from nearly every month during the putative class period describing the AccuFit digital measurement system" using the "same basic claims since AccuFit was released: '5X more precise,' 'down to a tenth of a millimeter,' and 'see the world more clearly'" (Butler Report, Dkt. 239-14, ¶ 17 & n.16); and (3) compiled images of those pages in a chart organized by year and month that indicates

---

[26] As will be explained below, the Court finds Butler's expert report to be admissible.

whether the image was found on the "AccuFit Page," "Home Page," or "Store Page."  (Ex. C to Butler Report, Dkt. 239-14, at ECF 101–11.)  Although the parties dispute the extent to which AccuFit was featured on LensCrafters' home page consistently throughout the class period, for the nearly six months that is not in dispute, *i.e.*, from September 5, 2013 (start of the class period) to March 29, 2014, AccuFit was prominently featured on LensCrafters' home page[27] using large, bolded, colorful font, eye-catching graphics, and conveying the following messages:

> ACCUFIT
> **5X MORE PRECISE**[28]
> FOR CLEARER VISION
> An accurate prescription is just the beginning.  Properly fitted frames and lenses are equally essential to helping you see your best.  That's the science of Accufit™, LensCrafters' exclusive Digital Measurement System.  Come experience it for yourself.

(*See* Compendium, Dkt. 239-3, at ECF 140 (Mar. 26, 2014); *id.* at ECF 141 (Feb. 14, 2014).)

> ACCUFIT
> **5X MORE PRECISE**
> FOR CLEARER VISION

(*Id.* at ECF 142 (Jan. 2, 2014).)

> ACCUFIT
> **5X MORE PRECISE**
> THAN MANUAL MEASUREMENT SYSTEMS

(*Id.* at ECF 145 (Dec. 11, 2013); *id.* at ECF 146 (Nov. 22, 2013).)

> ACCUFIT
> **ADVANCED TECHNOLOGY**
> **FOR A PRECISE FIT**
> Our exclusive digital measurement system is 5X more precise than traditional, manual measurements.  That means a better fit—and better vision—for you.

---

[27] The web address for the home page is http://www.lenscrafters.com.

[28] Unless otherwise indicated, bolding appears in the original of all statements quoted herein.

(*Id.* at ECF 149 (Oct. 14, 2013).)

Moreover, it is not disputed, and is clear to the Court, that AccuFit was featured on LensCrafters' website almost every month from 2014 to 2017.  As part of its "Compendium," LensCrafters provides examples of "Store" webpages,[29] all of which consistently include the following description of AccuFit below the heading "A MORE PRECISE FIT" and, in some months, next to a photo of an associate showing a customer an image of their AccuFit measurements on a computer screen:

> Next, your associate will take your facial measurements using our exclusive **AccuFit™ Digital Measuring System**.  Not found in any other eyewear store, AccuFit digitally measures the exact location of your pupil, the spacing of your eyes, and the shape of your glasses, all with 5x more precision than manual methods.  These measurements help us place your prescription in your glasses for the most accurate sight possible.

(*See e.g.*, Compendium, Dkt. 239-3 at ECF 8 (Sept. 18, 2017); *id.* at ECF 35 (Jan. 18, 2017); *id.* at ECF 60 (July 16, 2016); *id.* at ECF 78 (Feb. 2, 2016); *id.* at ECF 100 (Sept. 5, 2015); *id.* at ECF 112 (Apr. 4, 2015); *id.* at ECF 122 (Dec. 27, 2014).)  It appears that consumers could click on the "AccuFit™ Digital Measuring System" hyperlink, which was bolded and offset in colored font, and perhaps be re-directed to the "AccuFit Page,"[30] which, in turn, offered additional prominent statements about AccuFit's measuring capabilities, including the following:

> **UP TO FIVE TIMES MORE PRECISE**
> LensCrafters' exclusive AccuFit® Digital Measurement System measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter.  Meaning you get to see your world more clearly.

---

[29] The web address for these pages is http://www.lenscrafters.com/lc-us/eyecare/store.

[30] Examples of "AccuFit Page" webpages are also provided in the Compendium at the web address:  http://www.lenscrafters.com/lc-us/eyecare/accufit  and  http://www.lenscrafters.com/lc-us/accufit.  To the extent that these pages were not connected by a hyperlink, it appears that consumers could nevertheless visit the "AccuFit Page" from the LensCrafters home page.

(*See e.g.*, Compendium, Dkt. 239-3, at ECF 16 (Jul. 4, 2017); *id.* at ECF 40 (Dec. 8, 2016); *id.* at ECF 72 (Apr. 5, 2016).)

> **Find your perfect fit**
> We determine the ideal placement of your AccuFit lenses, down to a tenth of a millimeter, to make your glasses, and your vision, a perfect fit.

(*See e.g.*, *id.* at ECF 80 (Feb. 2, 2016); *id.* at ECF 87 (Dec. 12, 2015).)

> **ACCUFIT**
> **A TENTH OF A MILLIMETER IS MASSIVE**
> LensCrafters' exclusive AccuFit™ Digital Measurement System measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter.  Meaning you get to see your world more clearly.
>
> \*      \*      \*
>
> **Find your perfect fit**
> We determine the ideal placement of your AccuFit prescription, down to a tenth of a millimeter, to make your glasses, and your vision, a perfect fit.

(*See e.g.*, *id.* at ECF 96 (Oct. 20, 2015); ECF 104 (Jul. 2, 2015); *id.* at ECF 120 (Jan. 5, 2015); *id.* at ECF 134 (Jul. 24, 2014).)

LensCrafters argues that courts have "regularly declined to certify classes based on website representations" where the relevant product could not be purchased online, or where there was "insufficient evidence to presume that class members visited the website prior to their purchases" and, if they did, that "they were exposed to the relevant representations."  (Class Cert. Opp'n, Dkt. 243, at 22.)  However, the Court finds these cases distinguishable and unpersuasive based on the evidence presented in this case.

In *Gilbert v. MoneyMutual, LLC*, the court found the proffered evidence insufficient to support an inference of classwide exposure to representations made on a website that were "not set forth, let alone referenced, on the home page."  318 F.R.D. 614, 626 (N.D. Cal. 2016).  In *Ehret v. Uber Techs., Inc.*, the court held that the plaintiff did not "carry [her] burden" of proving

sufficient exposure to an advertisement that appeared on Uber's website and blog posts, allegedly misrepresenting a 20% charge as a gratuity.  148 F. Supp. 3d at 900.  There, the court found "no evidence that it was 'highly likely' all members of the proposed class saw the allegedly misleading statements," especially because class members could incur the 20% charge through Uber's app without ever visiting Uber's website and blog posts.  *Id.*  The court also rejected the plaintiff's proposal to certify a class of only individuals who visited Uber's website, explaining that "[j]ust because the information was available on the website does not necessarily imply that visitors would likely have seen it, especially when there was a good deal of other information on the website" and the misrepresentation was "not highlighted or especially set off to ensure that visitors would see it," and "because individuals had various reasons for visiting Uber's website."  *Id.* at 900–01.

The analysis in both *Gilbert* and *Ehret* demonstrates why the facts of this case warrant a different outcome.  To determine whether a presumption of classwide exposure to the alleged misrepresentations was justified, the courts in *Gilbert* and *Ehret* compared cases in which misrepresentations were made through advertising campaigns of varying duration, scope, and focus.  *See Gilbert*, 318 F.R.D. at 625–26; *Ehret*, 148 F. Supp. 3d at 895–901.  On the one hand, in *In re Tobacco II Cases*, the court concluded that, among other things, classwide reliance could be presumed where the alleged "misrepresentations and false statements were part of an extensive and long-term advertising campaign."[31]  207 P.3d 20, 40–41 (Cal. 2009).  And in *Makaeff v. Trump*

---

[31]  In *Tobacco II* "the California Supreme court reconfirmed that class members do not need to demonstrate individualized reliance" and that for purposes of standing, the reliance requirement applies "only on the named plaintiff, not unnamed class members."  *Mazza*, 666 F.3d at 595–96. Importantly, "*Tobacco II's* holding was in the context of a 'decades-long' tobacco advertising campaign where there was little doubt that almost every class member had been exposed to defendants' misleading statements, and defendants were not just denying the truth but representing

*Univ., LLC*, the court found it "highly likely that each member of the putative class was exposed to the same misrepresentations" in light of evidence that defendant's multi-media promotional campaign was "uniform, highly orchestrated, concentrated and focused on its intended audience." No. 10-CV-940 (GPC) (WVG), 2014 WL 688164, at *13 (S.D. Cal. Feb. 21, 2014). By contrast, on the other hand, the court in *Mazza v. Honda Motor Co.* found that the defendant's product brochures, which were available at car dealerships in 2007 and 2008, and television commercials, which aired for one week in November 2005 and from February to September in 2006, "f[e]ll short of the [kind of] extensive and long-term fraudulent advertising campaign" that justifies a presumption of exposure and therefore reliance. 666 F.3d at 591, 596. And in *In re Clorox Consumer Litig.*, the court held, in relevant part, that "a sixteen-month television advertising campaign combined with messages in small print on the back of a small minority of [the product's] packaging [did] not even approach the 'massive advertising campaign' at issue in *Tobacco II*" and thus did not entitle the plaintiffs to a presumption of class-wide exposure and reliance. 301 F.R.D. 436, 445 (N.D. Cal. 2014). Using these cases as points of comparison, the *Gilbert* and *Ehret* courts concluded that the websites at issue in those cases were more akin to the limited scope campaigns in *In re Clorox* and *Mazza*, and thus insufficient to establish the requisite consumer exposure that would demonstrate that common issues predominate. *Gilbert*, 318 F.R.D. at 625–26; *Ehret*, 148 F. Supp. 3d at 895–901.

---

the opposite." *Id.* at 596. Thus, while *Tobacco II* did not squarely address the issue of exposure, courts look to *Tobacco II* as the touchstone for when an advertising campaign is so extensive in scope and long-term in duration that classwide presumptions of exposure and reliance are justified. *See, e.g.*, *Zakaria II*, 2016 WL 6662723, at *9–11; *In re NJOY*, 120 F. Supp. 3d at 1104–11; *Ehret*, 148 F. Supp. 3d at 896.

Here, by contrast, the campaign promoting AccuFit on LensCrafters' website was far more substantial and persistent than the statements featured on the websites in *Gilbert* and *Ehret*. First, as described above, representations about AccuFit were prominently featured on LensCrafters' home page for approximately six months during the class period, *cf. Gilbert*, 318 F.R.D. at 626, and on other LensCrafters webpages for 48 months—nearly all of the months between September 2013 to September 2017—generally using some combination of all capitalized and bolded font, and often incorporated into or accompanied by colorful graphics or photographs. This is a far cry from the circumstances of *Ehret*, where the "[t]he 20% gratuity representation" at issue was inconspicuously placed "on the top right corner [of the webpage], and in the Frequently Asked Questions portion of the webpage, at the bottom left corner." *Ehret*, 148 F. Supp. 3d at 901. Here, LensCrafters' representations about AccuFit on its website were "highlighted [and] especially set off to ensure that visitors would see [them]" *cf. id.*; *Gilbert*, 318 F.R.D. at 626 ("[L]ike the website at issue in *Ehret*, the alleged misrepresentations are 'not highlighted or especially set off to ensure that visitors would see' them." (citation omitted)). That the representations about AccuFit were "highlighted" and "set off" on LensCrafters' website diminishes the potential distraction caused by "other information" about LensCrafters' products and services that may also have been present on its website. *Cf. Ehret*, 148 F. Supp. 3d at 901.

The Court also finds it relevant that customers could only be fitted with AccuFit in stores (Class Cert. Opp'n, Dkt. 243, at 22), and the webpage that customers would use to find a LensCrafters' store and learn about the in-store experience prominently and consistently featured AccuFit marketing (*see* descriptions of "Store Pages" *supra*). While this does not guarantee that all members of the class visited LensCrafters' website and saw the statements about AccuFit before purchasing their eyeglasses, it substantially increases the likelihood that they did both. (*See* Class

Cert. Mot., Dkt. 238, at 25 (defining class as individuals who "purchased prescription eyeglasses from LensCrafters after being fitted with AccuFit").)  This circumstance further distinguishes the instant case from *Ehret*, in which the court found that the availability of Uber's app obviated the need for class members to ever visit Uber's website or blog, where the alleged misrepresentation appeared.

Furthermore, here, there is direct evidence that LensCrafters' customers visited its website and saw the Accufit marketing there.  Plaintiff Emmert testified: "I went onto the LensCrafters website with the intention to see what, like, options for glasses and frames and services that they had, which is when I saw the initial ad for the AccuFit."  (Ex. 71 to Class Cert. Mot. (Emmert Dep.), Dkt. 239-20, at Tr. 160:18–22.)  Likewise, Plaintiff Tenaglia testified that she did research before visiting LensCrafters' store, explaining, "I saw [LensCrafters'] website, and I saw their ad that said . . . AccuF[it] was five times more accurate.  And that brought attention to me because we were looking for a good quality pair of eyeglasses, and wanted to make sure we were getting the best eyeglass."  (Ex. 72 to Class Cert. Mot. (Tenaglia Dep.), Dkt. 239-20, at Tr. 134:1–18; *see also id.* at Tr. 129:3–7 ("I conducted research online in search of glasses, and I saw [LensCrafters'] ad that said that their glasses were five times more accurate.  And that drove me to wanting to go to that place, that particular place.").)  Plaintiff Tenaglia also specifically recalled seeing "5X" and "accurate" on LensCrafters' website.  (*Id.* at 134:19–135:9.)  The other Plaintiffs also testified that they visited LensCrafters' website, even if they did not specially recall seeing representations about AccuFit.  (*See* Ex. 6 to Class Cert. Opp'n (Rogoff Dep.), Dkt. 243-8, at Tr. 197:11–199:16; Ex. 7 to Class Cert. Opp'n (Verrastro Dep.), Dkt. 243-9, at Tr. 88:21–89:4, 111:2–9; Ex. 4 to Class Cert. Opp'n (Ariza Dep.), Dkt. 243-6, at Tr. 102:21–103:5, 215:19–216:9; Ex. 3 to Class Cert. Opp'n (Allegra Dep.), Dkt. 243-5, at Tr. 292:14–18.)  The Court finds Plaintiffs' testimony to be

persuasive evidence that class members very likely both visited LensCrafters' website before going to a store and saw the misrepresentations about AccuFit on the website. *Cf. Ehret*, 148 F. Supp. 3d at 901 ("Plaintiff presents no evidence of the likelihood that someone visiting the website or blog would stay long enough to read the information or posts related to [the misrepresentation], instead requiring the Court to speculate on the likelihood of exposure.").

Finally, this case can also be distinguished from *Gilbert* because there, the plaintiffs alleged only that the website contained the misrepresentation and offered "no allegations to suggest that" defendants' "print, radio or television advertisements" also highlighted the misrepresentation. 318 F.R.D. at 626.  By contrast here, Plaintiffs have offered a litany of evidence documenting LensCrafters inclusion of consistent misrepresentations about AccuFit in its television advertisements, in-store advertising and marketing, and print advertising and direct mailing. While, for the reasons explained below, the Court questions the strength of the evidence for each of these channels when considered on its own, when considered in totality, and as supplementing the strong evidence of exposure based on the in-store customer experience and through LensCrafters' website, the Court ultimately finds that there is sufficient evidence to conclude that it is "highly likely that each member of the putative class was exposed to the same misrepresentations." *Makaeff*, 2014 WL 688164, at *13.

(b)     Television Advertisements

Plaintiffs argue that LensCrafters ran numerous television advertisements "during the class period," some of which ran exclusively online, each of which contained the phrase "five times more precise" or "down to a tenth of a millimeter," and all of which had "enormous reach, including that "[o]n several occasions these commercials obtained more than ██ target rate points (TPRs), meaning that over ███ of the target audience would have seen the commercial once on average."  (Class Cert. Mot., Dkt. 238, at 17–18.).  LensCrafters responds that only three AccuFit

commercials received "very limited" and irregular airing in 2013, 2014, and 2016, while no AccuFit commercials ran during 2015, 2017, 2018, or 2019—which amounted to AccuFit commercials airing in only "30 of the 360 weeks, or 8% of the total class period."[32]  (Class Cert. Opp'n, Dkt. 243, at 19 & n.90; *see* Ex. 43 to Class Cert Opp'n, Dkt. 243-45 (challenged statements chart).)

Notably, Plaintiffs do not specify when or to what extent "during the class period," *i.e.*, how many weeks, months, or years, these television advertisements aired, but instead emphasize the number of "TPRs" for these commercials, which represents the "total number of impressions divided by the target audience." (Class Cert. Mot., Dkt. 238, at 17–18, 18 n.14.)  The best evidence Plaintiffs offer in terms of the scope or duration of AccuFit television advertisements comes from their expert Sarah Butler who, based on her review of "[i]mpression information from iSpot.tv," found that the "More Precise" commercial, which ran from 1/2/2016 to 6/25/2016, ran 10,479 times and generated 1,478,976,061 impressions; the "AccuFit" commercial, which ran from 7/14/2012 to 2/1/2014, ran 5,866 times; and the "Exactly" commercial, which ran from 4/12/2014 to 6/28/2014, ran 1,524 times.  (Butler Report, Dkt. 239-14, ¶¶ 28–29 & n.28, n.29; Ex. D to Butler Report, Dkt. 239-15, at ECF 63 (Television Advertising Summary).)  In support of its assertion that AccuFit commercials aired only "30 of the 360 weeks, or 8% of the total class period,"

---

[32] LensCrafters also argues that the commercials used varied language to describe AccuFit—the 2013 commercial described AccuFit as "a digital scanning system five times more precise, helping you see perfectly" and did not mention "down to a tenth of a millimeter" (Ex. 47 to Class Cert. Opp'n, Dkt. 243-51, at 208); the 2014 commercial stated "our exclusive technology measures your eyes down to a tenth of a millimeter" and did not mention "five times more precise" (*id.* at 205); and the 2016 commercial stated "Why have your glasses fit manually when there's LensCrafters AccuFit system, replacing basic handheld measuring tools with a digital system that's five times more precise" and did not mention "down to a tenth of a millimeter" (*id.* at 202).  (Class Cert. Opp'n, Dkt. 243, at 19–20.)  For the reasons stated herein, the Court does not find the verbiage in these commercials to be so different that it disrupts the consistent message conveyed to consumers about AccuFit.

LensCrafters notes that the dates reflected on the "iSpot.TV" website are consistent with dates in LensCrafters own marketing calendars.  (Class Cert. Opp'n, Dkt. 243, at 19 & n.90.)  In its Reply, Plaintiffs do not challenge LensCrafters' assessment that AccuFit television commercials aired only 8% of the class period, but again emphasize the impressions data and that these commercials have been available online since they aired.  (Class Cert. Reply, Dkt. 244, at 7.)

The Court questions the persuasive value of data about "impressions" and run times to support class certification because although "1,478,976,061 impressions" and airing a commercial 5,866 times sound significant, they do not reveal in any meaningful way how many times potential class members were likely to be exposed to these television commercials.  *See Todd*, 2016 WL 5746364, at *11 (finding that the plaintiffs "most-touted statistic – that Defendants' advertising generated '4.3 billion consumer impressions per month'–in actuality offers little evidentiary support" because the plaintiffs gave little information to contextualize the meaning of those impressions in terms of class member exposure).  When focusing on the timeframes in which these television commercials aired, however, which LensCrafters' calculated to be 30 weeks or 8% of the class period, the duration of LensCrafters' AccuFit television advertising is somewhat greater than in other cases considering the issue.  For example, in *Zakaria II* the court found that a presumption of classwide exposure was not warranted where "most of the[] advertisements or promotions occurred for short periods of time," for example, "the television commercial ran for approximately five weeks of calendar years 2012 and 2013, which is approximately 5% of those two years, and the in-store shelf signage was used for only a two-week period in 2011, which is less than 4% of that year."  2016 WL 6662723, at *11.  In *In re NJOY, Inc.*, the court found that defendants' advertising was "not sufficiently pervasive to give rise to a presumption that all class members viewed advertisements" where the defendant ran television commercials for 193 days

(roughly equivalent to the 180-day period commercials ran in *Mazza*), print advertisements for 10 months (as compared to the roughly six months in *Mazza*), and radio advertisements for approximately seven months.  120 F. Supp. 3d at 1110.

Although LensCrafters' television advertising may exceed the scope and duration of advertising in some cases, the overall reach of these advertisements, which ultimately aired for fairly limited and irregular periods of time during the years 2013, 2014, and 2016, and not at all during 2015, 2017, 2018, or 2019, is unclear.  The Court notes Plaintiffs' arguments that all of these commercials, and others, were and remain visible online, but again the Court has no way of assessing how many times potential class members were exposed to internet-based commercials.

(c)    <u>In-Store Advertising and Marketing</u>

Plaintiffs also contend that LensCrafters used "in-store signage" and other "written materials" to emphasize the "central message of this case – that AccuFit delivered superior 0.1mm measurements."  (Class Cert. Mot., Dkt. 238, at 18–19.)  Plaintiffs cite (1) several publicly-available photographs depicting in-store signage and displays that primarily feature the verbiage "ACCUFIT DIGITAL MEASUREMENT SYSTEM 5X MORE PRECEISE FOR CLEARER, CRISPER VISION" (*id.* (citing Butler Report, Dkt. 239-14, ¶ 30 (Figs. 7a–7e)); (2) testimony by Plaintiffs Ariza, Rogoff, and Verrastro that they saw in-store signage and written materials (Class Cert. Reply, Dkt. 244, at 7 & n.9); and (3) LensCrafters' marketing calendars indicating in-store advertising in 2015 and 2017 (*id.* at 7 & n.10).  LensCrafters responds, without citation, that there were only two in-store marketing campaigns: one campaign in 2013 that lasted six weeks and did not use the phrase "down to a tenth of a millimeter" or "see the world more clearly," and another campaign in 2014 that lasted five weeks and did not include any of the Alleged Misrepresentations—thus, during the entire class period of 360 weeks there were only six weeks when the "5X MORE PRECISE" statement appeared in stores.  (Class Cert. Opp'n, Dkt. 243, at

77

18–19.)  Consistent with this assertion, LensCrafters notes that images of in-store marketing cited by Plaintiffs are in fact from October 2013, *i.e.*, during the limited 6-week campaign.  (*Id.* at 18 n. 84.)  LensCrafters further argues that none of the Plaintiffs claim to have purchased eyeglasses during the time-period of the 2013 in-store campaign, there is no evidence to corroborate their testimony about what they saw in store, and in fact, a September 2016 Google "Street View" image of the LensCrafters storefront on Columbus Circle in Manhattan does not reveal a "huge" "blue" "5X" sign as described by Plaintiff Ariza.  (*Id.* at 18–19.)  Finally, LensCrafters contends that the 2015 market calendars reflect the previous years' in-store marketing, and that the 2017 in-store campaign did not include the alleged misrepresentations in this case, but instead stated "AccuFit We Take Every Measure."  (Sur-Reply, Dkt. 253, at 4.)

Although Plaintiffs provide the Court with a smattering of photographs that purport to depict in-store advertising and marketing that contained the "5X MORE PRECISE" statement during the class period, ultimately these photographs offer only limited evidence that at some point in time LensCrafters deployed such in-store advertising and marketing, but no sense of the true scope, duration, location, or prominence of these in-store campaigns throughout the class period.

(d)  Print Advertising and Direct Mailing

Finally, Plaintiffs argue that LensCrafters ran a marketing campaign through print advertisements, including a full-page back cover of *Sports Illustrated* that contained the following language, "almost identical to that found on LensCrafters' website during the class period":

> WHY A TENTH OF A MILLIMETER IS MASSIVE
> AccuFit is an exclusive digital scanning system that measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter.  This means we can craft lenses more accurately and help you see the world more clearly.

(Class Cert. Mot., Dkt. 238, at 19 (citing Butler Report, Dkt. 239-14, at 29 (Figure 7f)).)  Plaintiffs also argue that LensCrafters "devoted over ███████ to direct mail advertising of AccuFit from

2013 to 2019." (*Id.* at 19). In response, LensCrafters argues that Plaintiffs identify only *three* print ads from 2014 and 2016, that LensCrafters marketing calendars confirm that *no* print ads were run from September 2013 through the end of 2013, 2015, 2017, 2018, or 2019, and that Plaintiffs identify only one mailing from August 2013—which pre-dates the class period and was mailed to Arizona and Florida customers. (Class Cert. Opp'n, Dkt. 243, at 21–22; *see* Ex. 43 to Class Cert Opp'n, Dkt. 243-45 (challenged statements chart).) Moreover, the 2016 print ads did not mention "down to a tenth of a millimeter." (*Id.* at 21 (emphasis omitted); *see* Ex. 47 to Class Cert. Opp'n, Dkt. 243-52, at 250–51 (print advertisement stating: "The old way will never measure up. Goodbye rulers, hello super hi-tech future machines. The LensCrafters **AccuFit®** system replaces basic handheld measuring tools with a state-of-the-art digital system that is 5 times more precise. It's time to see what you're missing.").)

As with Plaintiffs' other arguments about components of LensCrafters' multi-channel marketing campaign, Plaintiffs fail to proffer evidence that demonstrates that LensCrafters deployed print and/or direct mail advertising campaigns of any substantial duration, scope, or reach. Notably, on Reply, Plaintiffs do not dispute LensCrafters' assertions about the limited scope of print and mail advertising, but again emphasize the extent of LensCrafters' spending on direct mail advertising. (Class Cert. Reply, Dkt. 244, at 7–8.) While the Court recognizes that a full-page back cover in a well-known national publication like *Sports Illustrated* and multi-million dollar spending on a direct mail campaign may mean something, it is not clear how these metrics translate in terms of assessing the actual reach of these marketing efforts to class members. The vagueness of this evidence with respect to class member exposure is further undermined by its limited scope, *i.e.*, only three print ads from 2014 and 2016, *see In re NJOY, Inc.*, 120 F. Supp. 3d at 1107–08 (finding that running "a total of eight print advertisements for [the product]

intermittently over the course of a year—from December 2012 to December 2013 . . . was certainly not as widespread as the campaign at issue in *Tobacco II*"), and lack of concrete evidence of direct mail campaigns during the class period.

*  *  *

In sum, the evidence presented by LensCrafters does not demonstrate the kind of "decades-long" "extensive and long-term advertising campaign" in *Tobacco II*.  *See In re Tobacco II Cases*, 207 P.3d at 25, 40–41 (2009).  That said, the evidence here can be distinguished from other cases where class certification was denied upon a determination that the at-issue advertising campaigns fell short of the *Tobacco II* standard.  *See, e.g.*, *Mazza*, 666 F.3d at 596; *Zakaria II*, 2016 WL 6662723, at *11; *In re NJOY, Inc.*, 120 F. Supp. 3d at 1110; *In re Clorox Consumer Litig.*, 301 F.R.D. at 445.  Unlike in those cases, here, there is compelling evidence of class-wide exposure to the alleged misrepresentations and omissions when class members were being measured for AccuFit during the in-store AccuFit Customer Experience and through LensCrafters' website.  For that reason, *Makaeff v. Trump University, LLC* is instructive.  In that case, the plaintiffs brought a class action under, *inter alia*, the CLRA, FAL, UCL, GBL, and FDUTPA, on behalf of individuals who purchased Trump University, LLC ("TU") real estate seminars and alleged that material misrepresentations were made in advertisements, mailings, promotions, and during a free introductory preview.  *Makaeff*, 2014 WL 688164, at *2–4.  In evaluating exposure as part of its predominance analysis, the court reasoned:

> The critical question in this case, as posed in *Tobacco II,* is whether the putative class members were exposed to the same alleged misrepresentations.  On one hand, the advertising and promotional activities in the instant case were not part of a massive advertising campaign. On the other hand, unlike the limited advertising in *Mazza,* there is evidence that the TU multi-media promotional campaign was uniform, highly orchestrated, concentrated and focused on its intended audience. While it was not a long-term campaign as in *Tobacco II,* it was much more targeted, concentrated, and efficient than *Tobacco II.*  The effect of this campaign was to

80

> make it highly likely that each member of the putative class was exposed to the same misrepresentations.

*Makaeff*, 2014 WL 688164, at *13 (internal citation and footnote omitted).  In some respects, the evidence of a "uniform, highly orchestrated, concentrated and focused" promotional campaign by LensCrafters differs from *Makaeff, see id.* *13 n.13, but similarities between that case and this case are also significant.  The class members in *Makaeff* were exposed to misrepresentations, in part, during live events at which sales persons pitched TU products and services based on a "Playbook" that included tips, scripts, and talking points for up-selling students.  *See id.* at *5–6.  Likewise here, the putative class members were exposed to misrepresentations and omissions about AccuFit as a captive audience to LensCrafters' sales associates, who used a script to tout AccuFit's benefits while measuring customers for their eyeglasses.  Thus, considering the evidence and arguments presented by both sides on the issue of classwide exposure, the Court finds that the overall effect of LensCrafters' AccuFit "campaign was to make it highly likely that each member of the putative class was exposed to the same misrepresentations" and omissions about AccuFit's promise of five times more precise measurements, down to 0.1mm, for clearer, better vision.  *See Makaeff*, 2014 WL 688164, at *13.  This exposure occurred primarily through the AccuFit Customer Experience. Based on this finding, and because the putative class is defined as all residents of New York, Florida, and California "who purchased prescription eyeglasses from LensCrafters *after being fitted with AccuFit*" (Class Cert. Mot., Dkt. 238, at 25 (emphasis added)), *i.e.*, after receiving the AccuFit Customer Experience, the definition of the putative class is limited to those purchasers of LensCrafters eyeglasses who were highly likely to have been exposed to the misrepresentations and omissions about AccuFit.  *See Mazza*, 666 F.3d at 596 ("In the absence of the kind of massive advertising campaign at issue in *Tobacco II*, the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially

misleading.").  Beyond this primary point of exposure, exposure occurred secondarily through LensCrafters' website, which prominently featured the misrepresentations and omissions about AccuFit throughout the class period and which customers used to, among other things, learn about LensCrafters' services and locate LensCrafters' stores.  Finally, putative class members were potentially exposed to the misrepresentations and omissions about AccuFit through one of LensCrafters' less prominent marketing channels, *i.e.*, in-store displays and signs, television commercials, and print advertising.  The Court therefore finds that a presumption of classwide exposure is justified and supports a finding of predominance.

### e.  A Consistent Misrepresentation

Finally, having determined that it is highly likely that class members were exposed to representations and omissions about AccuFit while being measured for AccuFit in a LensCrafters store and visiting LensCrafters' website, the Court also concludes that the representations conveyed to class members in these forums were materially consistent.

Class certification is not defeated where the representations at issue present "minor deviations" or non-material differences.  *See Rogers v. Epson Am., Inc.*, 648 F. App'x 717, 719 (9th Cir. 2016); *Cabral*, 608 F. App'x at 483 ("[S]ome deviations from precise wording in the language of advertisements or representations might not be fatal to class certification . . . ."); *see, e.g.*, *In re Kind LLC*, 337 F.R.D. at 599 (finding that, while the labels "All Natural / Non-GMO," "Non-GMO," and "No Genetically Engineered Ingredients" varied, the differences made "little practical difference" or "were minute," so common questions predominated); *Schneider*, 328 F.R.D. at 540 (finding that representations including "[w]hen it comes to our food, genetically modified ingredients don't make the cut," "all of our food is non-GMO," and "only non-GMO ingredients," "are not so disparate as to preclude cohesion among class members"); *Makaeff*, 2014 WL 688164, at *6 ("While the presentations vary depending on the instructor and location of the

seminar, the presentations share common messages."); *cf. In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, No. 11-CV-7382 (WJM), 2019 WL 2521958, at *10 (D.N.J. June 18, 2019) (finding that variations in the alleged misrepresentations, which included "100% pure and natural orange juice," "100% pure," "100% natural," "100% juice" "fresh," "grove to glass," "squeezed from fresh oranges," and "straight-from-the-orange," were the "poster child for lack of predominance" under the UCL and CLRA). This is particularly so where the differences between the statements "are not so significant as to preclude a fact finder from evaluating whether [the defendant's] overarching theme" in the misrepresentation is deceptive. *Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687, 700 (S.D. Fla. 2010), *vacated on other grounds*, 635 F.3d 1279 (11th Cir. 2011); *see also Nelson*, 270 F.R.D. at 695 (finding typicality satisfied because "[a]lthough the precise wording of the representations is varied, the bedrock of Plaintiff's FDUTPA claim is consistent: Defendant deceptively led the consuming public to believe that [the product] provided infants with something that other infant formulas did not").

Although some of the specific wording LensCrafters used to explain and market AccuFit may have varied, LensCrafters nonetheless conveyed a common and consistent message to consumers about AccuFit's more precise measurements allowing consumers clearer, better vision. LensCrafters attempts to complicate and confuse the issue by arguing that Plaintiffs have advanced two separate theories of misrepresentation—one regarding "Manufacturing" (*i.e.*, "five times more precise" and "tenth of a millimeter" statements) and the other regarding "Better Vision" (*i.e.*, "see the world more clearly")—and have "resisted their obligation to identify the specific alleged misrepresentation at issue." (Class Cert. Opp'n, Dkt. 243, at 17, 28–30.) The Court disagrees. The statements "5x more precise" and "down to a tenth of a millimeter" are, at their core, two ways of conveying the same message and "overarching theme" about AccuFit—that AccuFit's

more precise measurements means customers will experience clearer, improved vision.  *See Fitzpatrick*, 263 F.R.D. at 700; *Nelson*, 270 F.R.D. at 695 ("Defendant devotes much attention to specific representations regarding the quality and contents of [the product] . . . [and] ignores the 'essential characteristics' of Plaintiff's claim.").  That is the simple message that LensCrafters consistently sought to convey to class members.  In fact, LensCrafters' own "Accufit Marketing Claim Support" documents reflect the material uniformity of these messages, noting "[i]t is inherently obvious that AccuFit measuring to 0.1mm is 5 times more precise than a PD ruler measuring to 1mm (with some opticians interpolating to 0.5mm)."  (Ex. 6 to Pl.'s Opp'n to Exclude, Dkt. 248-7, at ECF 6; Class Cert. Reply, Dkt. 244, at 9.)  The material uniformity of these messages is also reflected in an email from LensCrafters' Vice President of Marketing, deciding to keep in the "5X more precise" language while dropping "Best Fit.  Better Vision." if there were space constraints, explaining "Pretty universal feedback that 'Better Fit.  Better Vision.' [i]s generic & doesn't add as much to the communication as does 5x more precise.  The takeaway is still 'better vision'—but we don't need to tell them that directly."  (Ex. 7 to Pl.'s Opp'n to Exclude, Dkt. 248-8, at ECF 2.)

In sum, a review of LensCrafters' representations about AccuFit from its associate training materials, website, television commercials, and print advertising reveal that the representations used throughout the class period to which class members were very likely exposed are materially consistent and "not so disparate as to preclude cohesion among class members."  *Schneider*, 328 F.R.D. at 540.

\*     \*     \*

Thus, with respect to the predominance analysis for the UCL, FAL, and CLRA claims in this action, the Court finds that all class members were uniformly exposed to a consistent misrepresentation and omission.[33]

### 2. Common Elements of New York, California, and Florida Class Claims

"While there are nuances among the New York, California, and Florida consumer protection statutes, broadly speaking, they all contain the same three elements. Thus, in order to determine if common issues predominate, this Court must focus on (1) the deceptive act, (2) materiality, and (3) injury." *In re Kind LLC*, 337 F.R.D. at 599; *see also Makaeff*, 2014 WL 688164, at *14 (finding that "with small differences in wording, all three states [California, New York and Florida] appear to employ the same causation and reliance standard in their unfair trade and competition laws," and concluding that "[b]ased on the same showing of the UCL claims, the Court concludes common issues predominate for alleged violations of [the GBL] and the [FDUTPA]" (alterations in original and citation omitted)).

### a. Deceptive Act

LensCrafters argues that Plaintiffs cannot prove with common evidence that the alleged misrepresentations were in fact false or misleading because (1) each class member's eyeglasses will need to be examined to determine whether "they hit the 0.1mm target" and (2) each class member will need to be assessed as to whether they benefitted from AccuFit, *i.e.*, saw "the world more clearly" or experienced "crisper, clearer vision," which is a highly subjective and

---

[33] To the extent the FDUTPA and GBL require *some* degree of exposure to a materially uniform misrepresentation, *see Hasemann*, 331 F.R.D. at 264 ("exposure is an important part of the FDUTPA claim analysis, [but] does not require the heightened and uniform standard" advocated by the defendant), *id.* at 266 (finding that "some amount of exposure is necessary" under the GBL), the Court finds that Plaintiffs have also met that burden based on the representations about AccuFit made on LensCrafters' website, during the AccuFit Customer Experience, and to a lesser extent, through other marketing channels.

individualized inquiry.  (Class Cert. Opp'n, Dkt. 243, at 30–32.)  The Court rejects these arguments and finds that individualized inquiries over whether LensCrafters' representations and omissions about AccuFit are false or misleading do not predominate.

To start, LensCrafters misconstrues Plaintiffs' theory of deception and attempts to confuse the issue by reframing it around individualized injury.  Under Plaintiffs' theory, if they can demonstrate, *as a general matter*, that LensCrafters could not manufacture glasses to 0.1mm centration, or, even if it could, that, *as a general matter*, that level of precision was not clinically significant, then they will have shown that the representations about AccuFit were deceptive.  As Plaintiffs have presented it, the question of whether LensCrafters' statements about AccuFit are deceptive is not assessed on a class-member-by-class-member basis, but rather, through common proof and in a manner common to all class members.  *In re Kind LLC*, 337 F.R.D. at 600 (noting that "whether 'All Natural' and 'Non-GMO' labels on a product are accurate is a binary question[:] either it's true or it isn't" and the answer will be the same for all class members, thus "while there is variance in the labels at issue, common questions as to whether these labels are deceptive predominate" under the GBL §§ 349 and 350, UCL, FAL, CLRA, and FDUTPA); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 409 ("Generalized proof will determine whether the 50% thicker claim was false or misleading under [both GBL §§ 349 and 350] and [UCL, FAL, and CLRA].").

Although Plaintiffs argue that the deception they allege, as just described, does not require an individualized showing as to the actual centration of each class member's glasses, they nonetheless proffer the following common evidence to demonstrate that LensCrafters manufactured glasses to 1mm, not 0.1mm, centration: (1) evidence of rounding to the nearest half

millimeter (*see e.g.*, Ex. 49 to Class Cert. Mot. (McDonald[34] Dep.), Dkt. 239-12, at Tr. 115:15–116:3 ("There's raw data coming out of AccuFit, which is unrounded.  There's a final calculation used that is specifically set for the CS7[35] that is produced in near half-millimeter increments"), 118:15–119:24; Ex. 51 to Class Cert. Mot. ("AccuFit Module Two: Measurements"), Dkt. 239-13, at ECF 18 ("For all of your inside lab jobs processed completely in-store, your lab software will continue to round the drop and inset for finish layout to the nearest 1/2mm.  For orders that are processed outside of the store as uncut lenses we will still calculate vertical and horizontal decentration to the nearest 1/2mm, and this will mean rounding the customer measurements to the nearest 1/2mm before calculating the drop or inset for the lenses before edging.");[36] Ex. 52 to Class Cert. Mot., Dkt. 234-13, at ECF 23 ("The process used to calculate the decentration needed to properly position lenses for edging is slightly different in stores using Accufit . . .  Once you have completed the calculations, round the result off to the nearest 1/2mm."); Ex. 54 to Class. Cert.

---

[34] LensCrafters objects to Plaintiffs' purportedly "gross[] mischaracterization" of the testimony of Jay McDonald, LensCrafters' Director of In-Store Projects, asserting that McDonald "stated unequivocally that '[AccuFit measurements have] never been rounded." (*See* Class. Cert. Opp'n., Dkt. 243, at 10 & n.48.)  However, the Court has reviewed the testimony cited by both parties and finds that while McDonald testified that AccuFit measurements may not be rounded when they are entered into some machines, when it comes to the CS7 (*see infra* n.38), which is a manual machine, some amount of rounding happens.  (*See* Ex. 26 to Class Cert. Opp'n, Dkt. 243-28, Tr. 112:6–116:18; *id.* at Tr. 114:24–115:4 ("The CS7 actually is scaled in such a way that there is a 1 millimeter increment between hash marks.  The technician can then interpolate .5 or, in some cases, even a good operator can interpolate .25 millimeter increments on that unit.").)  Thus, while LensCrafters may disagree with Plaintiffs' characterization, it is clear that there is evidence of rounding that, at least at this stage, is sufficient proof for purposes of class certification.

[35] The "CS7" is a blocker machine used in LensCrafters stores, where McDonald estimated between 25-30% of LensCrafters glasses are processed.  (*See* Ex. 49 to Class Cert. Mot. (McDonald Dep.), Dkt. 239-12, at Tr. 41:15–22, 66:23–67:7).

[36] The Court again notes LensCrafters' objection that the portion of the Module Plaintiffs cite refers only to the CS7 machine (*see* Class. Cert. Opp'n., Dkt. 243, at 10 n.48), but finds that it is nonetheless evidence of rounding that, at least at this stage, is sufficient proof for purposes of class certification.

Mot. (C. Sherwood Dep.), Dkt. 239-13, at Tr. 278:21–279:7 (explaining that rounding was "done on every job so that you can use your equipment to manufacture eyeglasses")); (2) admissions by LensCrafters' expert Allyn Hummell that LensCrafters manufactures to 1mm centration (see Ex. 79 to Class Cert. Mot. (Hummel Dep.), Dkt. 239-20, at Tr. 55:9–56:1 (explaining that LensCrafters manufactures against Luxottica tolerances, which are generally 1mm at most)); (3) the analysis by Plaintiffs' manufacturing expert Dan Riall (described *supra*), and (4) the testimony of former LensCrafters employees who described efforts to conceal the truth about the limits of LensCrafters' manufacturing (Ex. 54 to Class Cert. Mot. (C. Sherwood Dep.), Dkt. 239-13, at Tr. 252:18–254:15 ("that's all a big lie"), 262:16–22 (regarding the "big lie," it's "not something I'm proud of")).  (Class Cert. Reply, Dkt. 244, at 11–12; *see also* Class Cert. Mot., Dkt. 238, at 9–10, 20–21.)  Plaintiffs will also offer the expert opinion of Dr. Keith Walter as common evidence that even if LensCrafters could manufacture to 0.1mm centration it would offer no clinical benefit (described *supra*).  (Class Cert. Mot., Dkt. 238, at 21.)

The parties cross-move to exclude in part or in whole, expert evidence related to the issue of whether LensCrafters' representations about the precision and benefits of AccuFit's measurements were misleading or deceptive.  As the burden is on Plaintiffs at this stage, the Court will examine LensCrafters' motion to exclude Plaintiffs' experts Dan Riall and Dr. Keith Walter.

### (1)   Dan Riall

Plaintiffs proffer the opinion of manufacturing expert Dan Riall.  Riall is the Director of Opto-Mechanical Engineering for Optical Systems Engineering Group, LLC ("OSEG"), a consulting firm focused on "optical design and solutions to problems arising in optical systems in the medical and defense industries."  (Expert Report of Dan Riall ("Riall Report"), Dkt. 239-7, ¶ 1.)  Riall has practiced as a Mechanical Engineer for the last 21 years working in the field of optical design or fabrication technologies at companies such as Eastman Kodak, Johnson &

Johnson, and The Spectacle Lens Group.  (*Id.* ¶ 2.)  Riall was retained to "evaluate whether LensCrafters' manufacturing process has the capability to utilize 0.1mm measurements to manufacture spectacle lenses to centration specification of 0.1mm or less."  (*Id.* ¶ 8.)  Riall's opinions are based on his "education, experience, and knowledge of the subjects discussed," as well as his consideration, review, and reliance upon documents produced in this case.  (*Id.* ¶ 9.)

Based on an examination of documents produced by LensCrafters and his own analyses, Riall concluded that "LensCrafters' manufacturing process is not capable of fabricating eyeglasses to a 0.1mm or less level of specification" because of deficiencies in key areas of the manufacturing process.  (*Id.* at ¶ 8.)  For example, Riall opined that,

- LensCrafters does not have a specification to position lenses to within 0.1mm; rather, the Luxottica Retail Quality Manufacturing Standards Optical and Methodological Tolerances for the U.S. and Canada, where such specification would be found if it exists, has positioning tolerances closely aligned with the ANSI standards with $\pm$1.0mm as their tightest positioning specification, and their loosest as "unlimited."  (*Id.* ¶¶ 91, 93.)

- LensCrafters also does not have an "error budget analysis" to ensure that lens positioning errors "do[] not add up to greater than the product specification," which would be "necessary for a manufacturing process to be capable of manufacturing prescription eyeglasses to 0.1mm."  (*Id.* ¶ 102.)

- LensCrafters has not purchased manufacturing equipment that is capable of placing blocks to within $\pm$0.1mm, nor is there evidence that LensCrafters "gathers performance data on their finish blocking equipment,[37] []or analyzes them to determine how 'capable' the process is against their specifications."  (*Id.* ¶¶ 103–04.)

- LensCrafters does not appear to train its employees on how to operate equipment to "achieve a specific level of lens positioning accuracy," which "would be required for a manufacturing process to be capable of manufacturing prescription eyeglasses to 0.1mm," or to measure and maintain blocking accuracy while operating the equipment.  (*Id.* ¶¶ 106–08.)

---

[37] "Finish blockers" are used to shape lenses for frames.  (Riall Report, Dkt. 239-7, ¶¶ 20–26.)  Each lens is bonded to a block by a blocking machine, which securely holds the lens in place for cutting and finishing.  (*Id.* ¶¶ 60–61, 83, 85.)

- LensCrafters fails to use Statistical Process Control tools to monitor quality by looking for sources of variability and the underlying causes of production or quality problems. (*Id.* ¶¶ 110–11.) LensCrafters' final inspection does not measure lens position to within $\pm$0.1mm of a target, but rather, final inspection release criteria "at best allows $\pm$1.0mm of decentration" and inspectors are trained to "interpolate readings using a ruler to a 0.5mm."[38]  (*Id.* ¶ 113.)

- Finally, there is no indication that LensCrafters adjusts its processes based on final inspection data.  (*Id.* ¶ 116.)

In sum, Riall opines that LensCrafters' "product specifications, processes, manufacturing equipment, training material, and measurement tools are incompatible with th[e] assertion" that it manufactures lenses positioned in frames to within $\pm$0.1mm.  (*Id.* ¶ 117; *id.* ("[N]one of the manufacturing steps in any way reflects a serious, controlled commitment to manufacture lenses positioned in frames to within $\pm$0.1mm.").)

With respect to LensCrafters' equipment, Riall opines that "[n]otwithstanding the capabilities of LensCrafters' manufacturing process, the specific machines responsible for utilizing the centration measurements taken by AccuFit—finish blocker machines—do not have the capability to manufacture to 0.1mm."  (*Id.* ¶ 8.)  Riall analyzed the "technical capabilities" of the 10 machines that LensCrafters claims are capable of finish-blocking accuracy to 0.1mm and concluded that, in his opinion, "none of them have the capability LensCrafters claims."  (*Id.* ¶ 118.) Riall reviewed various documents about each machine, including those produced by LensCrafters. (*See id.* ¶ 136 (installation guide, user's guide, applications guide, and maintenance manual), ¶ 157 (user's guide and sales brochure), ¶ 174 (user's manual), ¶ 197 (user's manual, calibration manual, maintenance and warranty manual),  ¶ 217 (manufacturer's operation manual),  ¶ 234

---

[38] Riall notes that "[i]ronically, one of the tools that is used in final inspection happens to be the same 1.0mm resolution ruler (also known as a 'PD stick') that LensCrafters deemed inadequate, with too low a resolution, to measure a customer's Pupillary Distance ('PD').  Yet they use it to measure Lens Center position."  (Riall Report, Dkt. 239-7, ¶ 114.)

(manufacturer's operator's manual), ¶ 253 (user's and maintenance manual), ¶ 262 (user's manual), ¶ 270 (instructions manual), ¶ 281 (user's manual and brochure).)  Riall then offered a "technical analysis" of each machine, describing in detail the functions and limitations of each machine, and concluding with a conservative estimate of the "true value" of each machine's accuracy.  (*See generally id.* ¶¶ 134–300.)

LensCrafters moves to exclude the opinions of Riall on several grounds, none of which justify exclusion.  LensCrafters argues that Riall is unqualified to opine as to LensCrafters' manufacturing capabilities because (1) "he has not worked in eyeglass manufacturing for 14 years," when the technology was quite different; (2) he has no experience with the machines at issue; and (3) "he simply reviewed documents in connection with this litigation to educate himself"—in other words, his "relevant 'experience' and purported 'expertise' were only formed for this litigation."  (Def.'s Mot. to Exclude, Dkt. 249, at 46.)  The Court disagrees.

Riall holds a Bachelor of Science in Mechanical Engineering from the University of Virginia.  (App'x A to Riall Report, Dkt. 239-7, at ECF 67.)  As described above, for more than two decades, Riall has practiced as a Mechanical Engineer in the field of optical design or fabrication technologies.  (Riall Report, Dkt. 239-7, ¶ 2.)  Though his more recent professional experience may relate to the engineering of contact lenses rather than spectacle lenses (App'x A to Riall Report, Dkt. 239-7, at ECF 65–66), he nonetheless worked for nearly six-and-a-half years (September 1999 to March 2006) in eyeglasses manufacturing at Johnson & Johnson's The Spectacle Lens Group,[39] where he "[l]ed the development and launch of equipment and process

---

[39] The Spectacle Lens Group was a subsidiary of Johnson & Johnson's vision care group that was sold in 2005.  *See Why Couldn't J&J Crack the Spectacle Lens Business*, Vision Monday, https://www.visionmonday.com/latest-news/article/why-couldnt-jj-crack-the-spectacle-lens-business (last visited Sept. 15, 2021).

design for the manufacture" for particular spectacle lenses and "[m]anaged all aspects of equipment specification, acceptance testing, installation, and qualification as well as the technical approach for key subsystems and machine layout." (*Id.* at ECF 66.) "The totality of an expert's qualifications should be considered in evaluating whether or not his or her testimony is admissible." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014). In the Court's view, the totality of Riall's education and professional experience qualify as "specialized knowledge" gained through "experience, training, or education," Fed. R. Evid. 702, and qualify him to opine as to whether LensCrafters' manufacturing process, as a general matter, is capable of fabricating eyeglasses to a 0.1mm or less level of specification.[40] That Riall attended a trade show after his retention in this matter to "get a lay of the current offering of the equipment that these manufacturers make, see how much its changed since I was in the industry" (Def.'s Mot. to Exclude, Dkt. 249, at 46), does not undercut his existing qualifications gained through relevant, real-world experience. While at Johnson & Johnson, Riall worked with two of the machines at issue here, the Briot Accura CX and the WECO CAD III, and was specifically responsible for analyzing the capability of the WECO CAD III. (Ex. 24 to Def.'s Mot. to Exclude (Riall Dep.), Dkt. 249-25, at Tr. 77:20–80:24.) Riall also worked with earlier, similar generations of other machines at issue. (*Id.* at Tr. 37:20–38:19 (explaining that at least some of LensCrafters' machines use "a lot of the same basic engines and technology" as the machines he was familiar with from

---

[40] LensCrafters also argues that Riall "attempts to opine" on visual acuity and the impact of manufacturing accuracy on vision, which he is not qualified to do. (Def.'s Mot. to Exclude, Dkt. 249, at 48.) The Court disagrees with LensCrafters' characterization of Riall's opinions. Riall does not "opine" on these issues, rather he touches on them in his "Key Technical Terms and Definitions" background section with citations to literature. As Plaintiffs confirm in their opposition, they "will rely on Dr. Walter, *not Riall*, to opine on the topic of whether 0.1mm-manufactured glasses result in improved visual acuity." (Pl.'s Opp'n to Exclude, Dkt. 248, at 49 n.55 (emphasis added).)

his work), 82:1–5 ("So some of the equipment such as the A&R robotics, I was involved in earlier versions of the machine that use the same technology, but not these exact models.").) Additionally, while at the trade show, which featured two more of the at-issue machines and derivatives of others, Riall inspected one of the at-issue machines. (*Id.* at Tr. 81:19–82:16, 88:4–91:17.) Thus, LensCrafters fails to demonstrate that Riall's familiarity and experience with the machines at issue in this case is so deficient as to disqualify him as an expert.

With respect to his opinions about the specific machines used by LensCrafters, the Court rejects LensCrafters' arguments that Riall is unqualified to offer these opinions, that these opinions are not based on sufficient facts or data, and that these opinions are not based on a reliable methodology. (Def.'s Mot. to Exclude, Dkt. 249, at 47–52.) LensCrafters' overarching arguments on these issues is that Riall has only limited experience with two of the machines at issue; that Riall did not visit any LensCrafters manufacturing facilities, inspect any of the 13 finish-blocking machines himself, nor perform or review any capability studies to test the output of the machines; and that the only basis for his opinions as to these machines is his review of documents, such as manuals, for this litigation—a methodology that courts and Riall himself have criticized. (*Id.*) While the Court finds these may well be valid criticisms of Riall's opinions that are ripe for use on cross-examination, they ultimately go to the weight, not the admissibility, of Riall's opinions.

Riall does not purport to be an expert on the specific machines at issue in this case, nor does he suggest that he relied on any of his previous experience with these machines (however limited that may be) to form his current opinion about their capabilities. However, "[i]f [an] expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Deutsch v. Novartis Pharms.*

*Corp.*, 768 F. Supp. 2d 420, 425 (E.D.N.Y. 2011) (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)); *SEC v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) ("[A]n expert should not be required to satisfy an overly narrow test of his own qualifications." (quotation marks and citation omitted)).  And moreover, "courts have found that a lack of specific familiarity with a product, machine or specific field does not, in itself, render an expert unqualified to proffer their opinion."  *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 732 (E.D.N.Y. 2016) (collecting cases) (noting, however, that other courts "have found an expert unqualified to render an opinion where that expert did not have direct experience with the particular product, machine or specific field at issue in the litigation").

Here, Riall—whose qualification as a mechanical engineer with industry experience manufacturing spectacle lenses the Court has already approved—reviewed documents related to each of LensCrafters' finish-blocking machines to analyze whether each one is capable of manufacturing to 0.1mm accuracy.  In the Court's view, this is what experts are expected to do: they apply their relevant expertise and specialized knowledge to the particulars of the case, *i.e.*, the relevant machines.[41]  The cases cited by LensCrafters are thus distinguishable because they involve experts who were utterly unqualified due to their lack of any relevant training, knowledge, or experience.  (Def.'s Mot. to Exclude, Dkt. 249, at 47 n.91); *see cf. Mancuso v. Consol. Edison Co. of N.Y.*, 967 F. Supp. 1437, 1443 (S.D.N.Y. 1997) ("While Dr. Schwartz need not be a specialist in environmental medicine in order to testify as an expert, he must have some specialized knowledge regarding the effects of PCBs on living creatures, either as a result of training or experience.  He appears to have neither."); *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 437

---

[41] The Court therefore disagrees with LensCrafters' cynical characterization of this as Riall "educat[ing] himself for this litigation" (Def.'s Mot. to Exclude, Dkt. 249, at 47), which, in a sense, is expected of all expert witnesses.

(W.D.N.Y. 2001) ("The record reflects that Dr. Austin lacks both practical and formal training, experience, and knowledge in the area of spinal fusion surgery as well as in the area of spinal fixation devices.  Because of his dearth of knowledge in these areas, the court finds he is unqualified to render an expert opinion on causation."); *Quintanilla v. Komori Am. Corp.*, No. 04-CV-5227 (ETB), 2007 WL 1309539, at *4 (E.D.N.Y. May 4, 2007) ("Mr. Stehlik lacks the requisite qualifications to testify in this action.  In an almost parallel case involving expert testimony with respect to a laundry pressing machine, and where the proposed expert similarly lacked any qualifications with respect to the field of expertise at issue, the court precluded the expert's testimony, finding that . . . the expert had never designed a machine of any kind and had never worked with laundry machines . . . ."), *aff'd*, 2009 WL 320186 (2d Cir. Feb. 10, 2009).

Moreover, LensCrafters' arguments about myriad ways Riall should have conducted his analysis of machine capability other than solely reviewing documents do not compel the conclusion that Riall's methodology was inherently unreliable.  "[T]he law grants a district court . . . broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Deutsch*, 768 F. Supp. 2d at 426 (quoting *Kumho Tire Co.*, 526 U.S. at 142).  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.  However, that is not the situation here.  Riall based his analysis and opinion on his evaluation of various documents, including the Luxottica Retail Quality Manufacturing Standards Optical and Methodological Tolerances for the U.S. and Canada, training documents, as well as manuals and guides detailing the specific operations of each relevant machine.  LensCrafters argues that this methodology and Riall's resulting opinions are unreliable because he failed to conduct additional tests, but the cases

cited by LensCrafters are from the design defect context in which courts have made clear that such tests are the "touchstone of what an engineering expert in a design defect case should do." *Lara*, 174 F. Supp. 3d at 737 (quoting *Barban v. Rheem Textile Sys. Inc.*, No. 01-CV-8475 (ILG), 2005 WL 387660, at *6 (E.D.N.Y. Feb. 11, 2005)); *Quintanilla*, 2007 WL 1309539, at *5. This is not a design defect case and the same "touchstone" does not apply here. That Riall, in forming his opinions, relied on different data sources than those LensCrafters and their experts view as essential does not render his opinion inherently unreliable; it merely provides fodder for cross-examination.

Ultimately, LensCrafters' arguments that Riall's opinions are based on conclusory and speculative assumptions (*see* Def.'s Mot. to Exclude, Dkt. 249, at 50–52) amount to disagreements with Riall's process and conclusions, not reasons to doubt his methodology to the point of exclusion. As one example, LensCrafters argues that Riall "dismissed out of hand" the WECO CAD III manual's claim of blocking accuracy of <0.1mm and that "[s]uch conclusory reasoning is unreliable." (Def.'s Mot. to Exclude, Dkt. 249, at 52.) However, Riall's report offers an enumerated explanation of why he believes the value listed in the manual does not actually "represent the [0.1mm] 'accuracy' described by LensCrafters." (*See* Riall Report, Dkt. 239-7, ¶¶ 217–18.) That LensCrafters may disagree with this explanation does not make it unreliable. In sum, the Court concludes that Riall's data and methodology are sufficiently reliable.

Finally, the Court finds that Riall's opinion is relevant and will "assist the trier of fact," *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 702), because it goes directly to a key issue in this case—whether or not LensCrafters' representations and omissions about AccuFit's 0.1mm measurements were deceptive—which Plaintiffs claim they will prove in the affirmative, in part, by showing that LensCrafters continued to manufacture glasses to a 1mm decentration

96

specification rather than a 0.1mm specification.  Riall's testimony is critical proof on that issue.

LensCrafters' motion to exclude the opinion of Riall is denied.  Plaintiffs may offer Riall's opinion

as common proof of LensCrafters' deceptive acts.  Whether or not the factfinder accepts that

opinion as persuasive is a question for a later day.

(2)    Dr. Keith Walter

Dr. Walter is a Professor in the Department of Ophthalmology at the Wake Forest

University Eye Center, where he also practices as an ophthalmologist specializing in corneal and

refractive surgery.  (Expert Report of Dr. Keith Walter ("Walter Report"), Dkt. 249-18, ¶ 1.)  He

earned his M.D. from Duke University School of Medicine in 1991, and completed an internship

in internal medicine at the New Hanover Regional Medical Center from 1991 to 1992, a residency

in ophthalmology at Emery University from 1992 to 1995, and a fellowship in cornea and

refractive surgery at Emory University from 1995 to 1996.  (Id. ¶ 2.)  Since 1996, Dr. Walter has

been licensed to practice in North Carolina, and since 2013 in West Virginia.  (Id. ¶ 3.)  He is a

founding member of the American College of Ophthalmic Surgeons, a fellow of the American

Academy of Ophthalmology, a member of several professional opthalmic-focused societies, and

is certified by the American Board of Ophthalmology.  (Id.)  Dr. Walter has authored or co-

authored dozens of peer-reviewed and non-peer reviewed publications, has six issued and three

pending patents related to his work, has consulted for several pharmaceutical companies, and in

the last four years, has testified as an expert in two trials and been deposed in eight other matters.

(Id. ¶¶ 4–6, 8.)

Dr. Walter was retained by Plaintiffs to, in part,[42] "evaluate whether there is any benefit to

visual acuity associated with achieving a pupillary distance measurement to within 0.1mm."  (Id.

---

[42] Dr. Walter was also asked to evaluate the "measurement error study" ("MES") conducted by LensCrafters with respect to AccuFit to determine whether it is acceptable under basic scientific

¶ 10.)  Dr. Walter opines "that achieving a pupillary distance measurement of 0.1mm accuracy is clinically irrelevant because there is no benefit to visual acuity nor comfort in achieving such a minute measurement."[43]  (*Id.* ¶ 10(B).)  This opinion is based on several findings.

First, Dr. Walter explains that PD measurement for prescription eyeglasses is "generally governed," though not as a matter of law, by Standard Z80.1, which is promulgated by the ANSI and couches the standard for lens placement in frames "in terms of permissible un-prescribed prism that would be introduced into the patient's vision," *i.e.*, "tolerance on prismatic imbalance."  (*Id.* ¶¶ 27–28, 30.)  ANSI tolerances for higher power prescriptions and progressive lenses are "at most, 1mm," while for certain, relatively lower prescriptions, the acceptable tolerance is "unlimited" because of "Prentice's Rule" (explained below).  (*Id.* ¶ 29.)  In general, measurements that are more accurate than the ANSI standards do "not result in better visual acuity."  (*Id.* ¶ 31.)  As evidence of this, many online retailers, such as Warby Parker, have success with patients

_____

principles."  (Walter Report, Dkt. 249-18, ¶ 10.)  LensCrafters did not address this portion of Dr. Walter's opinion in its motion to exclude because it is not relevant to the pending motion for class certification.  (Def.'s Mot. to Exclude, Dkt. 249, at 34 n.69.)  However, LensCrafters reserves its right to seek to preclude Dr. Walter's opinion on this issue at a later time, if necessary.  (*Id.*)

[43] LensCrafters does not dispute the relevance of Dr. Walter's opinion that "achieving a pupillary distance measurement of within 0.1mm . . . would be clinically irrelevant because there is no benefit to visual acuity nor comfort in achieving such a minute measurement" (Walter Report, Dkt. 249-18, ¶ 5), but rather argues that Dr. Walter's opinion is unhelpful because it only considers PD, which is but one of several measurements taken by AccuFit.  (Def.'s Mot. to Exclude, Dkt. 249, at 44–45.)  However, the statements and omissions at issue in this case, and that form the basis of Plaintiffs' claims, tout the greater accuracy of AccuFit's measurements compared to traditional PD measurements, not AccuFit's other measurements or attributes.  (*See* Ex. 6 to Pl.'s Opp'n to Exclude, Dkt. 248-7, at ECF 6 ("It is inherently obvious that AccuFit measuring to 0.1mm is 5 times more precise than a PD ruler measuring to 1mm (with some opticians interpolating to 0.5mm).").  The Court finds that Dr. Walter's opinion is undoubtedly relevant and helpful to the trier of fact as it makes more or less probable a fact of great consequence to this this action, namely, whether manufacturing to 0.1mm has a benefit to a customer, which in turn proves or disproves, in part, that LensCrafters' marketing is misleading.

measuring their own PD at home using a ruler, noting that the ANSI standard of 1mm "is quite easy to achieve with this seasoned method." (*Id.* ¶ 32.)

Next, Dr. Walter explains that the "purpose of keeping the optical lens near the center of the pupil," which is "determined by measuring PD," "is to eliminate the prismatic effect of lenses." (*Id.* ¶ 33.) A formula, known as "Prentice's Rule," is used to determine how much decentration,[44] measured in centimeters, induces a "significant amount of prism." (*Id.* ¶¶ 34–35.) Under this Rule, "[f]or every centimeter (CM) from center of the lens 1 diopter (D)[45] of prism is induced for a 1 D lens," which is represented in the formula "xx CM [multiplied by] xx Diopters of lens power." (*Id.* ¶ 35.) For example, "if a patient has a 5-diopter lens over one eye, and it is decentered by 0.5 mm (i.e., 0.05 cm), then only 0.25 D of prism (5 x 0.05 cm) has been induced," which Dr. Walter opines is "not noticeable since it is nearly zero." (*Id.* ¶ 36.) Dr. Walter then applies LensCrafters' assertion that it can achieve 0.1mm PD measurements to this example, which would translate the .25 D of prism to 0.05 D of prism. (*Id.*) Ultimately, Dr. Walter explains, this change "does not matter since both [prism measurements] are very tiny amounts." (*Id.*) Even in the example of "extreme" 10-D prescriptions, a decentration of "1mm (0.1 cm aka ANSI standard)" yields only 1 D of prism, and "zero to 1 D prism induced in typical situations are entirely negligible and cause no ill-effects to the patient or visual acuity." (*Id.* ¶ 37.) PD therefore can be "off by

---

[44] The Court understands decentration, as it is used here, to describe to how far off the optical center of the lens is from the center of the pupil.

[45] A diopter is "a unit of measurement of the refractive power of [a] lens[] equal to the reciprocal of the focal length in meters." *See Diopeter*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/diopter (last visited Oct. 10, 2021). As illustrated by the examples provided by Dr. Walter, the prism introduced into a patient's vision by decentration of prescriptions with higher diopter, *i.e.*, higher refractive power, such as 10-D or "coke bottle glasses," is greater than the prism introduced by decentration of prescriptions with lower diopter or lower refractive power. (Walter Report, Dkt. 249-18, ¶¶ 36–37.)

large amounts but still have no effect on visual acuity or comfort because it does not induce sufficient prism to be noticeable." (*Id.* ¶ 38.)  This helps explain "why the ANSI has unlimited tolerance for certain relatively lower power prescriptions and only 1mm at extremely high-power lenses." (*Id.*)

Dr. Walter then explains that the "human eye can tolerate up to 38 D of induced horizontal prism without blurred or double vision." (*Id.* ¶ 39.)  The "human optical system" can compensate for the prismatic effect of lenses through "fusional vergence," which involves the brain stimulating the extraocular muscles around the eye to bring the images together. (*Id.*)  Dr. Walter opines that "for a healthy patient to see double based on a poorly measured PD, the error would have to be centimeters (1 or more), and the power of the lens would have to be 20 D or more," a scenario which is "very difficult to achieve" given that the pupil is less than a centimeter and the most extreme prescriptions are rarely above 12 D. (*Id.* ¶ 40.)

Finally, Dr. Walter offers several "real world examples" to demonstrate that "there is no benefit to visual acuity in measuring PD to more accurate than 0.5mm and especially not 0.1mm." (*Id.* ¶ 41.)  The first example is cataract micro-surgery, in which surgeons try to center intraocular lens implants ("IOL"), which typically have extremely high prescriptions, in patients' eyes, "but because of healing and other factors these lenses often are displaced by a millimeter or more horizontally with no ill effects to the patients." (*Id.* ¶¶ 42–43.)  The second example is ready-made, over-the-counter reading glasses, which despite having a typical pre-set PD of 60 to 63mm, cause consumers no ill effects. (*Id.* ¶ 45 (noting that a recent study concluded that for ready-made reading glasses, "the 'adoption of a standard optical centration distance of 61mm would be universally appropriate' without any adverse effects" (citation omitted).)  The third example is a recent study of 379 Chinese school children wearing adjustable glasses versus standard and ready-

made spectacles that found no difference in satisfaction, quality of life, or visual acuity, even though the ready-made and adjustable glasses were set at four different inter-pupillary distances (50, 55, 60, and 65mm).  (*Id.* ¶¶ 46–47.)  Dr. Walter noted that "[s]ome of these children could have been off as much as 2.5 mm but evidently it did not make a difference in visual acuity or satisfaction compared to a more accurate measured PD."  (*Id.* ¶ 47.)

In sum, Dr. Walter opined that even "assuming LensCrafters could in fact achieve [] a 0.1mm degree of measurement accuracy and consistency, it would have absolutely no clinical bearing on patient satisfaction or visual acuity, for the simple reason that the minimal improvements would not contribute to [the] already established miniscule prismatic effect of off-center lenses."  (*Id.* ¶ 48.)

LensCrafters seeks to exclude Dr. Walters' opinions on three basic grounds: (1) they are unsupported by and often contradicted by the references cited in his report; (2) they are incomplete and incorrect as a matter of fundamental principles of optics; and (3) they are of extremely limited relevance with respect to AccuFit because they are limited to PD and "ignore all other measurement parameters captured by AccuFit."[46]  (Def.'s Mot. to Exclude, Dkt. 249, at 34.)

With respect to its first argument, LensCrafters contends that Dr. Walter erroneously "endorses using only a ruler to measure PD" as the "standard method," and otherwise overstates the reliability of this method.  (*Id.* at 35 (citing "Walter Report ¶ 32").)  However, LensCrafters overstates and misrepresents Dr. Walter's opinion on this issue.  Dr. Walter does not "endorse"

---

[46] Aside from his qualification to opine as to the ANSI standards, which the Court addresses *infra*, LensCrafters does not challenge Dr. Walter's qualifications generally.  Given Dr. Walter's substantial, relevant educational and professional experience, described *supra*, the Court finds that he is qualified to offer the opinions discussed herein because he has "superior knowledge, education, experience, or skill with the subject matter of [his] proffered testimony."  *Tin Yat Chin*, 371 F.3d at 40.

any method for measuring PD, nor does he opine as to the ruler method's accuracy generally or in comparison to digital systems. (*See* Walter Report, Dkt. 249-18, ¶ 32.) Rather, Dr. Walter explains that the ruler method is sufficient (not superior or error-free) to obtain PD measurements within the 1mm ANSI standard. (*Id.*) LensCrafters does not appear to dispute this sufficiency argument, nor does the Court find a basis to do so. Furthermore, even if Dr. Walter endorsed the ruler as the best method for measuring PD that would not undermine his opinions about the absence of any benefit from measuring to 0.1mm centration.

Next, LensCrafters criticizes Dr. Walter's reliance on ANSI standards, which it notes are manufacturing tolerances—not clinical guidelines for prescribing or fitting prescription eyewear— and contends that Dr. Walter is unqualified to opine as to these standards. (Def.'s Mot. to Exclude, Dkt. 249, at 35–37.) Again, LensCrafters overstates and misrepresents Dr. Walter's opinion on this issue. Dr. Walter does not, as LensCrafters suggests, hide the fact that ANSI standards relate to manufacturing, nor does Dr. Walter rely on them as clinical guidelines. Rather, Dr. Walter explains: "The measurement of pupilary distance *with respect to prescription eyeglasses* is generally governed by . . . the ANSI Standard. The ANSI standard *for lens placement into frames* is couched in terms of permissible un-prescribed prism that would be introduced into the patient's vision." (*See* Walter Report, Dkt. 249-18, ¶¶ 27–28 (emphasis added).) As Dr. Walter's report makes clear, he understands that the ANSI standards apply to manufacturing. As far as Dr. Walter's qualifications to opine on the ANSI standards as "recognized as establishing the acceptable tolerances for prescription and fitting measurements," he does so based on his own practice and experience in the field of ophthalmology (*id.* ¶ 30), which the Court finds sufficient to qualify him to so opine. Moreover, the Court disagrees with LensCrafters' characterization of Dr. Walter as claiming that "when taking fitting measurements, practitioners simply try to get a

measurement good enough to fall within the range of the ANSI manufacturing tolerances." (Def.'s Mot. to Exclude, Dkt. 249, at 36.) Dr. Walter does not suggest that the ANSI standards are clinical guidelines or best practices, but that as a general matter they "establish acceptable tolerances" for deviations from such measurements. (*See* Walter Report, Dkt. 249-18, ¶ 30.) In addition, the Court rejects LensCrafters' argument that Dr. Walter's opinion is "contradicted by his own references" in his report (Def.'s Mot. to Exclude, Dkt. 249, at 37), because the article from which LensCrafters' selectively quotes also states, "[t]he accuracy of eyewear is benchmarked by checking compliance with current ANSI standards. And when the eyewear in question is found to be in compliance with these standards, it is generally branded as correct, accurate and properly made." Barry Santini, *Do Eyewear Standards Still Matter in the Online Age*, 20/20 MAG (Apr. 2017), https://www.2020mag.com/article/do-eyewear-standards-still-matter-in-the-online-age. The article further explains how ANSI standards have evolved over time to keep up with "real world experience." *Id.* That the authors of that article suggest that opticians consider patient-specific history "to judge whether or not any deviations from compliance with standards will impact the efficacy of the new eyewear," *id.*, does not clearly contradict Dr. Walter's opinion that "[i]n general, additional accuracy in measurements beyond the ANSI standards does not result in better visual acuity." (*See* Walter Report, Dkt. 249-18, ¶ 31.)

Likewise, the Court rejects LensCrafters' attacks on Dr. Walter's opinions that "PD can be off by large amounts but still have no effect on visual acuity or comfort because it does not induce sufficient prism to be noticeable," and specifically that "zero to 1 D prism induced in typical situations are entirely negligible and cause no ill-effects to the patient or visual acuity" (*id.* ¶¶ 37–38; *see* Def.'s Mot. to Exclude, Dkt. 249, at 37–38), which the Court finds are supported by Dr. Walter's explanation and application of Prentice's Rule and are not squarely contradicted by his

sources.  LensCrafters' experts may disagree with Dr. Walter's application of the rule and the conclusions that follow, but the relevant formula is not in dispute.  Similarly, LensCrafters' view that Dr. Walter's statement that the human eye can tolerate 38 D of induced horizontal prism without blurred vision or double vision is "misleading" (Def.'s Mot. to Exclude, Dkt. 249, at 38) amounts to a difference of opinion that does not ultimately undermine the reliability of Dr. Walter's report.

With respect to Dr. Walter's "real world" examples, LensCrafters again overstates and misrepresents Dr. Walter's opinions.  While LensCrafters argues that Dr. Walter offers an "inapposite" and "extreme analogy" about the implanting of IOLs during cataract micro-surgery (Def.'s Mot. to Exclude, Dkt. 249, at 39–40), he in fact offers this reference point as a "good example of how well the human eye tolerates induced prism," noting that the FDA recently approved an IOL that was tested to be decentered as much as 0.75mm without ill effects in either distance or reading vision (Walter Report, Dkt. 249-18, ¶ 43).  And regardless of whether a study from 1998 should properly be characterized as "recent," Dr. Walter only cites this study for the proposition, which LensCrafters does not dispute, that "the average displacement of an IO[L] lens implant by a group of experienced surgeons from Columbia University in New York City was 0.7 mm from pupil center" (*id.*), and not to claim—as LensCrafters suggests—that the study itself demonstrated anything about the clinical implication of such decentration (Def.'s Mot. to Exclude, Dkt. 249, at 39–40).

Likewise with the over-the-counter-reading-glasses study, LensCrafters points out a litany of qualifiers from the study that Dr. Walter does not mention in his brief discussion (*id.* at 40), yet does not dispute the core conclusion of that study, which supports Dr. Walter's reference to it as "[a]nother example showing the lack of clinical significance of possible induced prism" (Walter

Report, Dkt. 249-18, ¶ 45).  Similarly, LensCrafters argues that the Chinese school children study does not support Dr. Walter's opinion because it was "not measuring the effect of the variation of pupillary distance and does not contain a relevant discussion of such principles."  (Def.'s Mot. to Exclude, Dkt. 249, at 40.)  However, it is undisputed that the study compared adjustable glasses with standard and ready-made glasses, and yielded findings about the levels of satisfaction and value between the groups.  (Walter Report, Dkt. 249-18, ¶¶ 46–48).  Again, that LensCrafters' experts disagree with Dr. Walter's interpretation of that study does not undermine the reliability of Dr. Walter's opinions nor make his reliance on this study as "another example demonstrating the lack of clinical significance of possible induced prism" unreasonable.  (*Id.* ¶ 46.)

The Court further disagrees that Dr. Walter's opinions are "demonstrably false and incomplete" or unhelpful to the trier of fact because he focuses on the prismatic effect of decentration rather than Vernier Acuity, *i.e.*, the human eye's ability to detect small shifts in a visual image, and on PD measurements rather than other measurements that LensCrafters argues are "critical" for proper fitting of certain advanced lenses.  (*See* Def.'s Mot. to Exclude, Dkt. 249, at 41–45.)  That LensCrafters believes *other* acuity considerations or measurements may be relevant or even, in its view, decisive to the issue of whether measurements down to 0.1mm offer clinical significance, does not alter the Court's conclusion that Dr. Walter's opinion is reliable, even if it differs from LensCrafters' expert opinions.  As previously discussed, Dr. Walter's opinions are rooted in his significant relevant experience and based on generally accepted literature and principles in the field.  Obviously, mere disagreement between experts does not render either expert's opinion unreliable.  Here, LensCrafters has not convinced the Court that there is some "flaw [] large enough that [Dr. Walter] lacks 'good grounds' for his . . . conclusions." *Amorgianos*, 303 F.3d at 267 (quotation marks and citation omitted).  "This limitation on when evidence should

be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony," *id.*, and LensCrafters will have the opportunity to challenge that debatable expert testimony.  "The Court must balance its gatekeeping role under *Daubert* with the Second Circuit's admonition that 'trial courts should not arrogate the jury's role in "evaluating the evidence and the credibility of expert witnesses" by "simply choosing sides in the battle of the experts."'"  *In re Vitamin C Antitrust Litig.*, No. 05-CV-453, 2012 WL 6675117 (BMC) (JO), at *4 (E.D.N.Y. Dec. 21, 2012) (brackets omitted) (quoting *In re Joint S. & E. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995)).  LensCrafters' *Daubert* arguments seek to draw the Court into prematurely choosing sides in this battle, which instead should play out before, and be resolved by, the finder of fact.  Accordingly, LensCrafters' motion to exclude the opinion of Dr. Walter is denied.  Plaintiffs may offer Dr. Walter's opinion as common proof of LensCrafters' deceptive act.  As with Riall's opinion, whether the fact finder accepts that opinion as persuasive is a question for a later day.

### (3)   Plaintiff Has Demonstrated Common Proof of the Alleged Deceptive Acts

Having determined that the expert opinions of Riall and Dr. Walter are admissible, the Court considers these opinions together with the other evidence, discussed *supra*, that Plaintiffs will proffer to demonstrate that LensCrafters' statements about AccuFit were, in fact, deceptive, and concludes that Plaintiffs have met their burden of showing that there exists common, classwide proof on this element of the state law claims.[47]   The Court is not convinced otherwise by

---

[47] Given this ruling, the Court finds it unnecessary to rule on Plaintiffs' *Daubert* motions seeking to exclude the testimony LensCrafters' four rebuttal experts.  (*See generally* Pl.'s Mot. to Exclude, Dkt. 241.)  The Court, however, notes that one of those rebuttal experts, Allyn Hummel, a Senior Manager of Manufacturing Engineering at Luxottica Retail North America, concluded that "approximately 20% of [LensCrafters'] lenses hit the 0.1mm target for pupillary distance."

LensCrafters' arguments that individual issues predominate because the question of clearer, crisper vision is "subjective" and requires determination of each individual's "visual needs; preferences; length of wear; prescription strength; lens design; and individual tolerances." (Class Cert. Opp'n, Dkt. 243, at 32.)  None of these "highly individualized" considerations are referenced in the statements about AccuFit that are the subject of this lawsuit.  Rather, LensCrafters conveyed— without qualification based on an eyeglass wearers' unique needs—that AccuFit's five times more precise measurements would mean clearer, better vision.  LensCrafters' argument that "highly individualized" considerations must be determined to test whether this message is deceptive is a red herring.  Dr. Walter's opinion attacks LensCrafters' blanket promise that all class members would, quite literally, see the difference with 0.1mm measurements, and thus constitutes common proof of the alleged deceptive acts.  With respect to LensCrafters' argument that Plaintiffs cannot show predominance because it cannot prove that LensCrafters' statements were actually false or misleading (Class Cert. Opp'n, Dkt. 243, at 30–32), that argument goes to the merits of Plaintiffs' claims and does not need to be resolved for purposes of class certification.  *See In re Kind LLC*, 337 F.R.D. at 602 (finding that the defendant's argument that the plaintiffs have "not identified the GMO ingredients that are included in KIND bars [that are labeled 'Non-GMO'] and why they are GMOs" "does not address class certification, but goes to the merits"); *Kimberly -Clark Corp.*,

---

(Class Cert. Opp'n, Dkt. 243, at 10–11; *see* Ex. 30 to Class Cert. Opp'n (Hummell Decl.), Dkt. 243-32, at ¶¶ 1, 7–16).  Ultimately Hummell's opinion, even if deemed admissible at this time, would not alter the Court's conclusion that Plaintiffs have proffered common evidence of LensCrafters' deceptive act that will rise or fall for the class.  That there are competing opinions on this issue does not mean that individual issues predominate, but that the finder of fact will ultimately need to determine whose opinion will prevail.  Further rulings on the admissibility and scope of LensCrafters' rebuttal expert opinions, therefore, are not relevant at the class certification stage nor necessary to determine whether Plaintiffs have met their burden on a Rule 23 requirement.  *See cf. In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 42.  Plaintiffs may renew their motion to exclude when the time for a "battle of the experts" is appropriate and necessary.

321 F.R.D. at 549 ("The question of whether the products do not disintegrate [*i.e.*, are not flushable] 'for some individuals goes solely to the merits; it has no relevance to the class certification issue.'" (quoting *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 519 (6th Cir. 2015)); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 408 ("Any argument that challenges the merits of plaintiffs' allegations 'about the uniform inefficacy of [EZ Seed] has no bearing on the Rule 23 predominance inquiry.'" (quoting *Forcellati v. Hyland's, Inc.*, No. 12-CV-1983 (GHK) (MRWX), 2014 WL 1410264, at *12 (C.D. Cal. Apr. 9, 2014)). For now, it suffices that Plaintiffs have shown that there exists common proof that, if accepted by the finder of fact, would demonstrate that, as a general matter, LensCrafters could not manufacture down to 0.1mm centration, and that even if it could, such precision would not, as a general matter, be clinically relevant. In sum, Plaintiffs have met their burden of demonstrating that individual issues do not predominate with respect to whether LensCrafters' representations and omissions about AccuFit were actually false or misleading.

   b. <u>Materiality</u>

With respect to materiality, LensCrafters argues that Plaintiffs lack classwide evidence that the reasonable consumer would interpret, and therefore be deceived by, the Alleged Misrepresentations in a manner consistent with their claims. LensCrafters specifically argues that Plaintiffs lack classwide evidence that a significant portion of consumers (1) would interpret the statements concerning AccuFit's measurement capabilities (*i.e.*, "up to five times more precise" or "down to a tenth of a millimeter") to "impliedly mean that their finished eyeglasses would be manufactured to 0.1mm precision," and (2) would have a "common interpretation of vague statements such as 'see the world more clearly' and 'crisper, clearer vision.'" (Class Cert. Opp'n, Dkt. 243, at 26–30 (emphasis omitted).) LensCrafters also argues "[e]ven if a 'reasonable consumer standard' applies to the issue of materiality, Plaintiffs must still show that materiality

can be proven with class-wide evidence," but cannot because of the inadequacy of Plaintiff's expert evidence on this issue.  (*Id.* at 32–34.)  The Court disagrees and rejects LensCrafters' effort to inject individual questions where there are none and to have the Court prematurely and improperly resolve merits questions at the class certification stage.

As the Court has already explained, there is but a single, common deceptive message at issue here—that AccuFit's more precise measurements, whether conveyed as "five times more precise" or "down to 0.1mm," mean that consumers will experience clearer, better vision.  The distinction LensCrafters seeks to create between *measurements* and *manufacturing* with respect to a consumer's understanding of LensCrafters' representations about AccuFit is artificial and nonsensical.  The whole point of the AccuFit marketing campaign was to make customers believe that AccuFit's "five times more precise" measurements would deliver clearer, better vision, and the only way that could happen is if the more precise measurements were used to manufacture the customer's glasses.  Of course a consumer would automatically assume that the measurements being taken for their glasses would then be used to manufacture those glasses.  As Plaintiffs' expert Sarah Butler put it, the suggestion that consumers might not interpret statements about AccuFit's measurement capabilities as being implemented in the final product "border[s] on the ridiculous." (Butler Response Report, Dkt. 249-10, ¶ 17.)  And, as Butler further observes, "LensCrafters . . . was advertising the measurement as a *part of* its glasses; in other words, a consumer could not walk into LensCrafters and be measured with AccuFit and then purchase glasses elsewhere. . . . [I]t would not make sense to offer digital measurement that could not be implemented."  (*Id.*; *see also* ¶ 49 ("In the context of lens manufacturing, measuring the [PD] is akin to a tailor taking body measurements before making a custom suit.  In both cases, the measurements step is only valuable insofar as it can benefit the production of the ultimate good, whether it be a lens or a suit; in such

a setting, measurements, precise or not, have no intrinsic value.").)  Indeed, LensCrafters' own documents demonstrate this: the culmination of the AccuFit Customer Experience was the LensCrafters associate showing the customer their "five times more precise" measurements on a tablet "to instill confidence and value to the AccuFit Digital Measurement Experience" just before transferring those measurements to the customer's eyeglasses order in LensCrafters' point of sale system.  (*See* Ex. 59 to Class Cert. Mot., Dkt. 239-16, at ECF 10.)  Arguing that Plaintiffs have to prove that each class member believed that the AccuFit measurement representations meant that their glasses would be manufactured using those measurements is a transparent attempt to inject an individualized question where there is none.

Relatedly, the Court rejects LensCrafters' assertion that a reasonable consumer could not interpret LensCrafters' statements regarding measurements "down to" 0.1mm as meaning that their eyeglasses would in fact be manufactured to 0.1mm with no variation.  (Class Cert. Opp'n, Dkt. 243, at 28.)  As has been explained, customers were shown a tablet reflecting their 0.1mm measurements before purchasing their eyeglasses.  LensCrafters' reliance on *Fink v. Time Warner Cable*, 714 F.3d 739 (2d. Cir. 2013) is misplaced.[48]  (*Id.*)  In that case the Second Circuit affirmed

---

[48] The Court also notes that the Second Circuit's decision in *Fink*, which involved a motion to dismiss and not a class-certification motion, was driven, in significant part, by the plaintiffs' mischaracterization of the allegedly false advertising in the complaint:

A plaintiff who alleges that he was deceived by an advertisement may not misquote or misleadingly excerpt the language of the advertisement in his pleadings and expect his action to survive a motion to dismiss or, indeed, to escape admonishment.  Here, the allegations of the Complaint are materially inconsistent with the sole advertisement Plaintiffs have submitted.  We therefore easily conclude that Plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss.

*Fink*, 714 F.3d at 742.  Then, in what is arguably dicta, the panel added in a footnote: "Further, we note that the one description the proffered advertisement does contain—'up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up'—cannot support the claims asserted here because, as the District Court unassailably concluded, the phrase 'up to' would 'lead

the district court's conclusion that the phrase "up to" in the defendant's advertisement promising "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up" would "lead a reasonable consumer to expect that speeds could be less than the advertised '3x faster' and '100x faster' speeds." *Fink*, 714 F.3d at 742 n.3.  However, internet speeds fluctuate greatly and are inherently variable, thus supporting the conclusion in *Fink* that a reasonable consumer would expect speeds to, at times, be less than advertised.  By contrast, eyeglasses are manufactured based on fixed micro-measurements, such that a reasonable consumer would be led to believe the statement "down to 0.1mm" means that his or her eyeglasses would be manufactured to the very precise measurement of 0.1mm.  *Id*. ("[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial. For example, under certain circumstances, the presence of a disclaimer or similar clarifying language may defeat a claim of deception.").  Furthermore, in contrast to the specific "down to" 0.1mm reference at issue here, the "up to" phrase in *Fink* was not even used to specify an amount or quantity, rather, it was used to qualify a multiplier of undefined and substantially varying internet speed, *i.e.*, "up to three times the speed of most DSL packages" or "up to 100x faster than dial-up."  The absence of any reference to a concrete quantity in *Fink* further differentiates that case from this one in terms of how a reasonable consumer would interpret the statement.[49]  Thus, the Court finds that individualized

---

a reasonable consumer to expect that speeds could be less than the advertised "3x faster" and "100x faster" speeds.'  Indeed, Plaintiffs themselves concede that 'a promise to provide "up to" a certain speed is not a guarantee that that speed will be achieved.'"  *Id*. n.3. (citation omitted).

[49] LensCrafters' argument that this case is analogous to *Fink* because "up to" often preceded the words "five time more precise" (*see* Class Cert. Opp'n, Dkt. 243, at 18, 28) is belied by the record.  Although, on occasion, the "up to" qualifier may have preceded "five times more precise" (*see, e.g.*, Compendium, Dkt. 239-3, at ECF 16 (Jul. 4, 2017); *id.* at ECF 40 (Dec. 8, 2016); *id.* at ECF 72 (Apr. 5, 2016)), a review of the Compendium reveals that this is by far the exception and not the rule.  As recounted above, LensCrafters directed its associates to tell

questions as to how each class member interpreted LensCrafters' "down to 0.1mm" statements will not predominate in this case.

Invoking one of this Court's prior decisions, *Hughes v. Ester C Co.*, 317 F.R.D. 333 (E.D.N.Y. 2016), LensCrafters also argues that Plaintiffs cannot prove deception via common evidence because the terms "clearly," "clearer," or even "better" constitute vague, non-actionable puffery.  (Class Cert. Opp'n, Dkt. 243, at 27, 29.)  The Court again disagrees.  This case is unlike *Hughes*, where the court rejected the plaintiffs' damages model as unable to quantify the price premium attributable to "a word as amorphous as 'better.'"  *Hughes*, 317 F.R.D. at 356.  In reaching that conclusion, the court noted that the term "'better' is not an objective term that carries a single definition or refers to a specific product feature," distinguished it from other representations that had "discernable meaning[s]" (*e.g.*, "flushable" wipes, "50% thicker" fertilizer product, and "100% Pure Olive Oil"), and found that it was susceptible to different consumer interpretations when in the context of various other "rotating representations."  *Id.* at 355 & n.32.  By contrast, the terms "clearly," "clearer," and "better," are susceptible to discernable meanings *in this case* because they are used in the context of, and in conjunction with, other representations about precise measurements related to eyeglasses and vision.  *See Hadley*, 324 F. Supp. 3d at 1116 (rejecting the defendant's argument that predominance cannot be established because the evidence does not demonstrate that consumers had "common understanding" of the challenged statements and explaining that "[b]ecause deception and materiality are objective questions, Plaintiff has no burden to establish that there is a uniform understanding among putative class members as to the

---

customers that AccuFit measurements were "five times more precise" without qualification, and consistently conveyed this unqualified message on its website throughout the class period.

meaning of the challenged health statements, or that all or nearly all of the class members shared any specific belief." (alterations, internal quotation marks, and citations omitted)).[50]

Under the relevant state consumer protection statutes, materiality is measured by the objective "reasonable consumer" standard, susceptible to common, classwide proof, and well-suited to class certification. *See, e.g.*, *Amgen Inc.*, 568 U.S. at 467 ("The question of materiality is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor, materiality can be proved through evidence common to the class. Consequently, materiality is a common question for purposes of Rule 23(b)(3)." (alterations, quotation marks, and citation omitted)); *In re Kind*, 337 F.R.D. at 600 ("[C]ommon questions as to whether these labels are deceptive predominate [and] [t]his same reasoning extends to materiality as well."); *Hasemann*, 331 F.R.D. at 274 ("Because neither [the GBL or FDUTPA] contains a reliance requirement and in light of the absence of individualized standards, class members will be able to use generalized proof to make out their claims, including proof of deception, falsity, and pricing decisions. The objective standards—including whether the representations would likely have misled a reasonable customer—underlying the elements of the statutes render them particularly well-suited to generating common questions."); *Hadley*, 324 F. Supp. 3d at 1115 ("[B]ecause deception and materiality under the FAL, CLRA, and UCL are objective questions, they are ideal for class certification because they will not require the court to investigate class members'

---

[50] The Court notes, as it did in *Hughes*, that LensCrafters' argument that the statements are "too vague to be susceptible to a single interpretation also goes to the merits of Plaintiffs' claims, *i.e.*, Plaintiffs could never *prove* that a reasonable consumer would be misled by something that has no specific meaning, which is an issue that could be addressed by summary judgment once a class is certified." *Hughes*, 317 F.R.D. at 346 n.13 (emphasis added). However, the Court has considered this argument here to the extent LensCrafters argues it as a basis for finding that there is no common evidence showing that class members would view LensCrafters' representations about "clearer" and "better" vision as deceptive.

individual interaction with the challenged products." (alterations, quotation marks, and citation omitted)).

Here, Plaintiffs contend they will proffer common, classwide evidence at the merits stage to demonstrate the deceptive nature of the statements about AccuFit, including (1) LensCrafters' facially false and misleading representations; (2) Plaintiffs' reliance on those representations;[51] (3) LensCrafters' employees concerns that the company was lying to customers (*see* Ex. 4 to Class Cert. Mot., Dkt. 239-6, at ECF 12 (6/28/2010 DeZenzo email stating "Lab Assoc, my Accu-fit beliefs are that we may be 'tricking' the customer by saying that Accufit measures to the 1/10th while we manufacture to the 1/2mm."),[52] Ex. 54 to Class Cert. Mot. (C. Sherwood Dep.), Dkt.

---

[51] *See, e.g.*, Ex. 85 to Class Cert. Mot. (Allegra Dep.), Dkt. 239-20, at Tr. 63:12–64:3, 201:4–207:12, 212:8–18, 219:14–21, 321:18–322:12, 398:9–14, 399:15–400:6 ("[T]hrough its advertising where it's saying five times more accurate than other ways of measuring your eyes for prescription glasses, I don't know how it works, I'm just taking the word of that advertising, that it's true"); Ex. 86 to Class Cert. Mot. (Ariza Dep.), Dkt. 239-20, at Tr. 18:8–19:10, 20:6–21:7, 36:5–10, 37:11–38:20 ("All I know is these words like better and accurate, stood out to me because of – it was just new to me as well . . . I was used to the traditional form."), 40:3–41:24, 114:5–13 ("What stood out to me was the 5X.  That was huge."), 161:23–162:20, 381:15–382:22, 385:10–386:10; Ex. 71 to Class Cert. Mot. (Emmert Dep.), Dkt. 239-20, at Tr. 203:17–204:6, 290:21–291:7, 315:21–316:3 ("And another [factor in deciding to shop at LensCrafters] was that I had seen the advertisement that they were five times more accurate with the technology that they had. And since I had such a high prescription I thought it would be beneficial for me to see clearer and be able to use them longer.  I thought they would be better glasses than if I purchased them anywhere else."), 319:9–14; Ex. 65 to Class Cert. Mot. (Rogoff Dep.), Dkt. 239-17, at Tr. 152:19–153:12, 190:21–196:16, 206:20–207:12, 210:5–211:6 ("And I have to admire people who are enthusiastic about [their] product and about [their] company, and AccuFit definitely had their complete – and this 5x thing completely had won them over and they shared that exuberance with me that I said, 'Wow.'  I mean, I'd like to have super[]vision, I'd like to have good glasses. . . . And so that was it – it was like, 'Okay, let's do it.'"); Ex. 72 to Class Cert. Mot. (Tenaglia Dep.), Dkt. 239-20, at Tr. 128:23–136:16 ("I conducted research online in search of glasses, and I saw their ad that said that their glasses were five times more accurate.  And that drove me to wanting to go to that place, that particular place."), 157:14–158:19; Ex. 87 to Class Cert. Mot. (Verrastrao Dep.), Dkt. 239-20, at Tr. 28:17–23 ("And I've had other options to go to other eye places, but I chose to keep going back to LensCrafters due to their advertisement that they were five times more accurate."), 101:14–102:2, 105:5–107:8, 117:4–118:9.

[52] Notably, in response to this concern, DeZenzo, a former LensCrafters executive, noted "We will have a total digital platform 1 day that allows us to take advantage of the 1/10th in the

239-13, at Tr. 252:18–254:15 ("that's all a big lie"), 262:16–22 (regarding the "big lie," it's "not something I'm proud of")); and (4) that former employees were instructed to "cover it up" (Ex. 55 of Class Cert. Mot. (T. Sherwood Dep.), Dkt. 239-13, at Tr. 370:8–375:20 ("overcom[e] the objections that a customer would have"), Ex. 54 to Class Cert. Mot. (C. Sherwood Dep.), Dkt. 239-13, at Tr. 280:24–281:14 ("Don't ever talk about the equipment in the lab")).  (Class Cert. Reply, Dkt. 244, at 10–11.)  Plaintiffs will attempt to demonstrate materiality through (1) Plaintiffs' own reliance on the representations; (2) LensCrafters' internal documents acknowledging the importance of AccuFit measurements; and (3) the analysis of Plaintiffs' damages expert, Sarah Butler, which found that customers are willing to pay more for supposedly superior 0.1mm measurements.  (*Id.* at 12; *see also* Butler Report, Dkt. 239-14, ¶ 52 ("After viewing the AccuFit advertisement, respondents commented on the importance of precision and how precision and accuracy in the measurement process leads to an improved pair of eyeglasses.").)

Upon review and consideration of this evidence, the Court finds it to be sufficient at class certification to demonstrate that common proof could answer the question of whether a reasonable consumer would be deceived by LensCrafters' representations that AccuFit's "five times more precise" and "down to 0.1mm" measurements would result in "clearer" vision for its customers, and that individual issues do not predominate.  *See Fink*, 714 F.3d at 742 ("The primary evidence

---

future.  We also have an error study that will prove that the measurements that are taken with digital is more accurate over time." (Ex. 4 to Class Cert. Mot., Dkt. 239-6, at ECF 12.)  Plaintiffs claim that "1 day" in the future never came and that LensCrafters never implemented such a platform.  (Class Cert Mot., Dkt. 238, at 9.)  LensCrafters challenges the admissibility of and foundation for this email, which they describe as "quadruple hearsay" paraphrasing the comments of one unidentified person (Sur-Reply, Dkt. 253, at 9 & n.14), however the email was authored and received by a former LensCrafters executive who was deposed in this matter (*see* Ex. 13 to Class Cert. Mot., Dkt. 239-12 (DeZenzo Dep.)) and the statements contained therein may be admissible as a statement made by an opposing party's employee, *see* Fed. R. Evid. 801(d)(2)(D). Thus, the Court finds there to be an adequate basis for authenticity and admissibility of this email as part of the common proof proffered by Plaintiffs.

in a consumer-fraud case arising out of allegedly false advertising is, of course, the advertising itself."); *Hasemann*, 331 F.R.D. at 274 n.20 (finding that the plaintiffs had "sufficiently raised the issue of materiality" by reference to the defendant's internal documents and the plaintiffs' own reliance, and "caution[ing] against conducting such a detailed analysis into [materiality] at [the class certification] stage, which seems better suited to a merits analysis"); *Makaeff*, 2014 WL 688164, at *11 ("In determining whether a statement is misleading under the [FAL], the primary evidence in a false advertising case is the advertising itself." (citation omitted)).  LensCrafters' attacks on this evidence, including on the strength or adequacy of Butler's opinion to proving materiality, do not undermine the Court's conclusion.  *See Hadley*, 324 F. Supp. 3d at 1115 (rejecting the defendant's argument that the plaintiff's expert evidence on materiality was weak or inadequate because "California courts have explicitly rejected the view that a plaintiff must produce extrinsic evidence such as expert testimony or consumer surveys in order to prevail on a claim that the public is likely to be misled by a representation under the FAL, CLRA, or UCL," and moreover, "even if [the defendant] is correct in its assertion that Plaintiff has failed to provide sufficient evidence of deception and materiality, that failure has no bearing on whether common questions will predominate over individual questions in the instant case" (quotation marks and citations omitted)); *In re Kind LLC*, 337 F.R.D. at 600 ("Both [parties'] experts . . . posit diametrically opposite conclusions over the materiality of the labels.  However, materiality [is] not the question for class certification.  The question here is whether materiality can be determined on a classwide basis.  The answer is obviously yes." (record citations omitted)).

Accordingly, Plaintiffs have demonstrated that common questions predominate over materiality and have identified adequate evidence to serve as common proof on this issue.  If this evidence fails to prove materiality, it will not result in individual questions predominating; rather,

it will end the case because materiality is a requirement of Plaintiffs' consumer protection claims. *See Amgen Inc.*, 568 U.S. at 460 ("[T]he class is entirely cohesive: It will prevail or fail in unison.") But that, again, is an issue for a later day.

c.    Injury or Causation

Plaintiffs argue they will demonstrate causation and injury in the form of "an overcharge" by showing that "LensCrafters' deceptive practices caused the market price of LensCrafters' glasses to be higher than it otherwise would have been, and as a result all Class members overpaid for [their LensCrafters] glasses." (Class Cert. Mot., Dkt. 238, at 33.)  There is no dispute that price premium or "overcharge" is a viable theory of classwide injury.  *See, e.g., Hasemann*, 331 F.R.D. at 257 ("A plaintiff may recover damages under the FDUTPA by alleging that the plaintiff 'paid a price premium' for the allegedly deceptive product.  Similarly, the injury prong of sections 349 and 350 of the GBL may be satisfied through an allegation that a plaintiff overpaid for the product, or, stated differently, 'by a claim that a plaintiff paid a premium for a product based on [the] defendants' inaccurate representations.'" (first quoting *Carriuolo*, 823 F.3d at 986, then quoting *Ackerman v. Coca-Cola Co.*, No. 09-CV-395 (JG), 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010)); *Hadley*, 324 F. Supp. 3d at 1104 ("It is well-established that the price premium attributable to an alleged misrepresentation on product labeling or packaging is a valid measure of damages in a mislabeling case under the FAL, CLRA, and UCL." (quotation marks and citation omitted)); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 393 (S.D.N.Y. 2016) ("Payment of a price premium serves as proof of injury under the laws of [New York, Florida, and California]." (collecting cases)).

LensCrafters challenges Plaintiffs' price premium theory based on principles established in securities-fraud class actions, arguing that "[i]n stark contrast to Plaintiffs' hypothetical survey/equilibria model, LensCrafters offers a preponderance of direct, salient, record evidence

that there, *in fact*, was no market price impact as a result of AccuFit."  (Class Cert. Opp'n, Dkt.

243, at 34–36.)  In securities-fraud class actions, a plaintiff seeking to establish predominance with

respect to the reliance element of their securities fraud claim may rely on the so-called "*Basic*"

presumption:

> [where] defendants' misstatements were publicly known, their shares traded in an
> efficient market,[53] and plaintiffs purchased the shares at the market price after the
> misstatements were made but before the truth was revealed—the court presumes
> the market price reflected the misstatements and that all class members relied on
> that price when they chose to buy or sell shares.

*Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc. ("Goldman")*, 879 F.3d 474, 481 (2d Cir.

2018) (explaining presumption derived from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)).  "Under

the *Basic* presumption, individual class members need not prove they actually relied upon (or even

knew about) the misstatement giving rise to their claim; 'anyone who buys or sells the stock at the

market price may be considered to have relied on the misstatement.'"  *Id.* at 483 (alteration

omitted) (quoting *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258,

263 (2014)).   A defendant may rebut the *Basic* presumption of reliance, and "doom[] the

predominance of class-wide issue under Rule 23(b)(3)," *id.* at 484, by severing the link between

the  alleged  misrepresentation  and  the  market  price,  including  by  showing  that  "the

---

[53] An "efficient market" refers to the theory that "certain well developed markets are efficient processors of public information, meaning that the market price of shares will reflect all publicly available information."  *In re Petrobras Sec.*, 862 F.3d at 276 (quotation marks and citations omitted).  In the context of securities, an efficient market may be characterized by the following non-exhaustive factors: "(1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases."  *In re Glob. Brokerage, Inc.*, No. 17-CV-916 (RA) (BCM), 2021 WL 1160056, at *12 (S.D.N.Y. Mar. 18, 2021) (quoting *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014)), *report and recommendation adopted*, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021).

misrepresentation in fact did not lead to a distortion of price," *id.* at 483 (quotation marks and citation omitted).

Here, LensCrafters attempts to insert the *Basic*-reliance-presumption rebuttal into the context of this consumer class action by referring to real world market price data purportedly showing that there was no market price premium as a result of AccuFit.  The Court finds LensCrafters' argument wholly inapt and unpersuasive.

First, LensCrafters does not cite a single case where a defendant in a non-securities consumer class action relied on this argument to defeat class certification.  In the absence of any clear authority or compelling rationale to support the application of the *Basic*-presumption-rebuttal—a creature unique to securities fraud jurisprudence—the Court rejects LensCrafters' attempt to use evidence that it argues shows no market price impact to defeat class certification.

Second, the *Basic* presumption of reliance, arises in a context unique to securities trading, *i.e.*, that "shares [are] traded in an efficient market."  *Goldman*, 879 F.3d at 481; *id.* at 484 ("The parties agree that plaintiffs established the preliminary elements to invoke the *Basic* presumption of reliance: defendants' misrepresentations were public, [the defendants'] shares traded *in an efficient market*, and the putative class members purchased [the defendants'] stock at the relevant time (after the misstatements were made but before the truth was revealed." (emphasis added))).  The concept of an efficient market simply does not apply to the ordinary consumer situation. Unlike purchasers of securities, purchasers of products such as eyeglasses do not do so in a "well developed market" that is understood to be an "efficient processor[] of public information," such that the "market price . . . reflect[s] all publicly available information."  *Cf. In re Petrobras Sec.*, 862 F.3d at 276 (quotation marks and citations omitted).  Thus, a *Basic* presumption of reliance

or, correspondingly, the possibility of rebutting that presumption here is inapplicable.  The Court

thus rejects LensCrafters' attempt to defeat a straw argument of its own creation.

Third, the *Basic* presumption and rebuttal are contrary to the well-established principle in

consumer fraud, price premium cases such as this, that "[a] price premium may exist even though,

at some point, [the product] with and without the [misleading] claim was sold at the same price."

*McCrary v. Elations Co. LLC ("McCrary II")*, No. 13-CV-242 (JGB) (SPX), 2014 WL 12589137,

at *9 (C.D. Cal. Dec. 2, 2014) (rejecting the defendant's argument that there was no price premium

because a product was sold at the same price with or without the claim); *see Schneider*, 328 F.R.D.

at 531 ("The fact that the price of the product did not change after the representation does not

establish that there is no triable issue as to whether Plaintiffs paid a price premium.").   A

defendant's "own pricing behavior" does not necessarily provide a "perfect before-and-after

scenario for observing whether consumers did, in fact, pay a price premium" because "[s]uch a

test does not take into account economic harm or the potential benefit to a defendant in increased

market share caused by a misrepresentation that induces consumers to purchase a product they

otherwise would not have purchased."  *Schneider*, 328 F.R.D. at 533.

In sum, the Court rejects LensCrafters' argument that Plaintiffs' price premium theory

cannot be pursued classwide because of principles related to the *Basic* presumption that applies in

securities fraud class actions.  Of course, however, LensCrafters may offer its "direct, salient,

record evidence" about the purported lack of market price impact to the factfinder, who "may

ultimately agree [that there is no price premium].  But if that is the case, then the class claims will

fail as a unit."  *See Costco Wholesale Corp.*, 818 F. App'x at 62.

> 3.   Damages

To satisfy predominance under Rule 23(b), Plaintiffs must put forth a damages model that

measures "only those damages attributable to [their] theory" of liability.  *Comcast*, 569 U.S. at 35.

Plaintiffs offer two models for measuring the alleged price premium attributable to LensCrafters'

misrepresentations—one model by expert Michael Wagner and the second by experts Sarah Butler

and Richard Eichmann.  (Class Cert. Mot., Dkt. 238, at 22–24.)  LensCrafters argues that neither

model satisfies the requirements of *Comcast* because neither measure the damages attributable to

Plaintiffs' theories of liability.  (Class Cert. Opp'n, Dkt. 243, at 37–41.)  Before deciding this issue,

the Court will address LensCrafters' *Daubert* motion to exclude both models.  *See Hadley*, 324 F.

Supp. 3d at 1106 ("[W]hether [an expert's analysis] is sufficiently reliable from a methodological

standpoint—and therefore admissible under *Daubert*—is a different issue from whether the

[opinion] satisfies *Comcast*.").

a.    The Marketing Message Apportionment Methodology

Plaintiffs retained Michael Wagner, a Senior Advisor at a financial and economic

consulting firm, to identify methodologies, if any, for calculating damages suffered by class

members using data common to the class, and to calculate damages based on that methodology.

Wagner devised a "Marketing Message Apportionment Methodology" to estimate the price

premium "based on the premise that companies will advertise features that consumers value, so

the percentage of advertising devoted to a particular feature (like AccuFit digital measurement) is

a useful proxy for the revenue the company gained from customers as a result of that feature."

(Class Cert. Mot., Dkt. 238, at 24.)  Wagner's report summarizes his opinions as follows: (1)

damages can be reliably measured using data common to the class by applying a Marketing

Message Apportionment Methodology, and (2) the Marketing Method Apportionment

Methodology that can be used to measure damages calculates the average sales price per class unit

of LensCrafters' eyeglasses to be $325.53, with 8.3% of the price attributable to AccuFit marketing

messaging, resulting in $27.02 in damages per class unit due to AccuFit or $159,859,993 total

damages due to AccuFit.  (Wagner Report, Dkt. 249-2, ¶ 10.)

Wagner developed a framework for measuring damages attributable to the AccuFit Marketing Message that focused on the revenue that LensCrafters generated from increased prices customers paid for prescription eyeglasses fitted using AccuFit that they would not have paid but-for the AccuFit Marketing Message, *i.e.*, the claim that AccuFit Digital Measurement System provided measurements that were "five times more precise" than traditional methods and resulted in better prescription eyeglasses that allowed customers to see more clearly.  (*Id.* ¶¶ 20, 25–26.) Given this framework, Wagner used the following formula to calculate the increased price per unit that all class members paid:

**Figure 3:   Equation to Calculate Damages Per Unit Due to the AccuFit Marketing Message**



(*Id.* ¶ 27.)  To determine the percentage of revenue attributable to the AccuFit Marketing Message, Wagner used what he calls a "Marketing Message Apportionment Methodology," which relies in part on the assumption that "[a]s a general proposition, a firm will advertise more of those features that consumers value more.  Thus, there is a positive correlation between what consumers value and what a firm advertises."  (*Id.* ¶¶ 30–32.)  Wagner further explained, "[d]ue to the positive correlation between what consumers value and what a firm advertises, the economic value of the benefits LensCrafters misleadingly claimed its customers would receive can be reliably measured by apportioning LensCrafters' advertising."  (*Id.* ¶ 33.)

"Marketing Message Apportionment Methodology" refers to "the use of advertising data as a basis for apportioning the purchase price to a particular [product] feature."  (*Id.*)  Wagner

explained that, generally speaking, "experts and courts" have considered advertising and marketing expenditures when apportioning revenue or profits attributable to a product or feature (or false ad).  (*Id.* ¶ 34.)  To calculate the portion of LensCrafters' revenue during the class period that is attributable to the AccuFit Marketing Measurement, Wagner "rel[ied] on the portion of LensCrafters' advertising and marketing bandwidth related to AccuFit relative to LensCrafters' total advertising and marketing bandwidth" as expressed in the following formula:

**Figure 4:   Equation to Calculate the Portion of LensCrafters' Revenue Attributable to AccuFit**

| (1) | | (2) | | |
|---|---|---|---|---|
| LensCrafters' Marketing Bandwidth | X | % of Marketing Bandwidth Related to AccuFit | = | Portion of LensCrafters' Revenue Attributable to the AccuFit Marketing Message |

(*Id.* ¶ 36.)

To determine LensCrafters' marketing bandwidth, Wagner analyzed LensCrafters' documents and data to estimate its U.S. marketing expenditures for the years 2013 through 2019 by "marketing channel" (*e.g.*, television, direct mail, website marketing, in-store window marketing, etc.).  (*Id.* ¶ 38.)  Then, Wagner measured LensCrafters' marketing bandwidth related to the AccuFit Marketing Message by relying on LensCrafters' yearly "Marketing Calendars" summarizing the ads that LensCrafters ran in all types of media for a given year.  (*Id.* ¶ 39; *see id.* ¶¶ 40–54.)  Next, applying the percentage of advertising spending, or "ad spend," related to AccuFit to the ad-spend dollars per marketing channel, Wagner determined that the percentage of LensCrafters' marketing bandwidth attributable to the AccuFit Marketing Message is ███.[54] (*Id.* ¶¶ 57–58.)  Wagner noted that his Marketing Message Apportionment analysis was limited to

---

[54] Because the class period is defined as September 2013 to the present, Wagner's opinions are expressed in the present tense and as ongoing.

those marketing channels for which LensCrafters produced sufficient dollar ad-spend data to enable a reasonable estimate of the proportion of the channel bandwidth that relates to AccuFit. (*Id.* ¶ 59; *see id.* ¶ 60 (noting, for example, that the marketing calendars did not quantify the AccuFit Marketing Message communicated by LensCrafters' in-store personnel).)

To then calculate the percent of revenue due to customer growth "from deploying AccuFit," Wagner relied on LensCrafters' ███████ growth rate estimate (reflected in a 2012 LensCrafters presentation titled "AccuFit Digital Systems Results – Executive Steering Committee Review") and assumed, based on the prominence of the Digital Measurement feature in AccuFit advertising relative to the LensSimulator and MyLook, "that all of the ███████ growth estimate is attributable to Digital Measurement and, hence, the AccuFit Marketing Message." (*Id.* ¶¶ 61–63.) Next, in the absence of revenue or average selling price data from LensCrafters, Wagner calculated the average selling price of prescription eyeglasses for 2015 through 2019 based on other sales data produced by LensCrafters. (*Id.* ¶¶ 64–66.) Finally, plugging these various inputs into his equation for calculating damages, Wagner determined that the damages per pair of prescription eyeglasses due to AccuFit is $27.02, and then, multiplying this figure by the estimated number of prescription eyeglasses sold during the class period, determined that the total damages due to AccuFit is $159,859,993. (*Id.* ¶¶ 67–69.)

LensCrafters challenges Wagner's opinions on multiple grounds. First, LensCrafters argues that Wagner does not have sufficient qualifications to testify because he "has been precluded from testifying as an expert multiple times, is neither an economist nor a marketing expert," and, although he has been "accepted many times as a damages expert, he lacks the expertise necessary to provide his core opinion on the impact of marketing on revenue." (Def.'s Mot. to Exclude, Dkt. 249, at 5–6.) As discussed, Wagner was retained to identify methodologies,

if any, for calculating damages suffered by class members using data common to the class, and calculate damages based on that methodology.  (Wagner Report, Dkt. 249-2, ¶ 1.)  For the last 42 years, Wagner has specialized in the computation of commercial damages.  (*Id.* ¶ 4.)  Wagner received a B.S. in Engineering from the University of Santa Clara in 1969, an M.B.A. from U.C.L.A. in 1971, and a J.D. from Loyola University School of Law in Los Angeles in 1975.  (*Id.* ¶ 3.)  Wagner was a Partner at PriceWaterhouse; a Managing Director at Putnam, Hayes & Bartlett; a Senior Advisor at CRA International (a publicly-traded management consulting firm); and is currently a Senior Advisor at LitiNomics, Inc., a financial and economic consulting firm that specializes in "the analysis of economic issues that arise in commercial disputes."  (*Id*. ¶¶ 2–3.) Wagner has been qualified and testified as an expert at trial 144 times "principally [on] commercial damages," and has 33 professional publications, the majority of which deal with the computation of commercial damages.  (*Id.* ¶¶ 4–5.)  "In determining whether an expert is qualified, a court should look at the totality of the witness's qualifications in making this assessment."  *Hughes*, 317 F.R.D. at 342 (alteration, quotation marks, and citation omitted).  LensCrafters objects that Wagner lacks expertise in marketing; however, Wagner is not offering an expert opinion about marketing; he is offering an opinion about calculating damages, which is squarely within his well-established expertise.  *Cf. Nimely*, 414 F.3d at 399 n.13 ("[B]ecause a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields.").  Given the totality of Wagner's qualifications and experience, the Court finds that he is qualified to proffer the very kind of opinion for which he was retained—identifying and applying a common methodology for proving damages in this matter.

Next, LensCrafters argues that Wagner's methodology is unreliable because it is based on the "unfounded assumption that the percentage of revenue attributable to the allegedly false or

misleading representations is equal to the advertising spending related to the AccuFit Digital Measurement System." (Def.'s Mot. to Exclude, Dkt. 249, at 6 (emphasis omitted).) In his report, Wagner describes, without citation to any sources, the following assumptions underlying his methodology:

> As a general proposition, a firm will advertise more of those features that consumers value more. Thus, there is a positive correlation between what consumers value and what a firm advertises. Due to the positive correlation between what consumers value and what a firm advertises, the economic value of the benefits LensCrafters misleadingly claimed its customers would receive can be reliably measured by apportioning LensCrafters' advertising. I refer to the use of advertising data as a basis for apportioning the purchase price to a particular feature as the "Marketing Message Apportionment Methodology."

(Wagner Report, Dkt. 249-2, ¶¶ 32–33.) At deposition, Wagner acknowledged that he has never made that type of assumption—*i.e.*, that the percentage of revenue due to a product feature is *equal to* the percentage of advertising spending on that product feature—in any other case. (Ex. 3 to Def.'s Mot. to Exclude (Wagner Dep.), Dkt. 249-4, at Tr. 82:21–83:7.) He also testified that although the formula he used suggests a perfect correlation between advertising spending and revenue generated, he does not "personally believe it's perfect" (*id.* at Tr. 87:6–16) and conceded that he did not evaluate the actual correlation in this case, nor did he have any evidence that the correlation was large enough to support his assumption (*see id.* at Tr. 124:9–125:2; *see also id.* at Tr. 111:9–15 (testifying that he has not seen any evidence of how LensCrafters sets its marketing budget)). Moreover, Wagner conceded the possibility that the impact of advertising could have a heterogeneous or varied effect (*i.e.*, both increasing and decreasing) on demand (*id.* at Tr. 89:18–91:17, 94:18–95:18), that he did not have any "hard evidence" to support his assumption that LensCrafters' average advertising spending is related to profit maximization (*id.* at Tr. 122:17–123:7), and that advertising spending could very well focus on a feature that is a "smaller driver of retail choice," but that requires greater explanation (*id.* at Tr. 123:8–22). Notably, LensCrafters'

126

rebuttal expert, Dr. John R. Hauser, the Kirin Professor of Marketing at the Massachusetts Institute of Technology Sloan School of Management, whose opinion Plaintiffs have not moved to exclude or challenge, opines that Wagner's "Marketing Message Apportionment Methodology" is "not supported by marketing academic literature" and that the articles cited by Wagner do not "validate [his] proportionality assumption." (Hauser Report, Dkt. 249-5, ¶ 26; *see also id.* ¶ 156 ("A literature review of research published from 1976 to 2005 concludes that 'a firm's current advertising is associated with an increase in sales, but this is usually short lived . . . the overall effect of advertising on primary demand is difficult to determine and appears to vary across industries.' I am not aware of any academic literature showing that advertising of various products or product features translates proportionally into sales of those products or features.").

In response, Plaintiffs argue that Wagner's Marketing Message Apportionment Methodology uses a "yardstick approach," which relies on "fair comparator[s]" not "correlation analysis," and which Courts have repeatedly accepted as reliable. (Plaintiffs' Opposition to Defendant's Motion to Exclude ("Pl.'s Opp'n to Exclude"), Dkt. 248, at 13.) However, in his initial report, Wagner did not describe his methodology as a yardstick approach (*see generally* Wagner Report, Dkt. 249-2), and only recast it as "a *variation* of the 'Yardstick' approach" in response to criticism by LensCrafters' experts (*see* Wagner Response Report, Dkt. 249-3, ¶¶ 45–46 (emphasis added)). Wagner also did not refer to advertising spending and revenue as "comparators" in his initial report, but instead asserted a "positive correlation" between the two. (*See* Wagner Report, Dkt. 249-2, ¶¶ 32–33.) Whatever Plaintiffs and Wagner wish to call his methodology (and the Court is skeptical that it is, in fact, a "yardstick approach"[55]), it remains that

---

[55] Wagner explained that a "yardstick" can be "anything," "so long as it can enable the evaluator to reasonably estimate or predict what the performance . . . would have been, absent the legal violation," and examples include "the profits of another business," "the performance of

Wagner was not aware of any academic or peer-reviewed literature on using his "marketing message apportionment methodology" or "yardstick approach" to compute damages in a false advertising case.[56]   (Ex. 3 to Def.'s Mot. to Exclude (Wagner Dep.), Dkt, 249-4, at Tr. 82:21–84:9.)  Wagner also acknowledged that to validate his conclusion that 8.3% of the average selling price of LensCrafters' prescription eyeglasses is attributable to the alleged misleading marketing, someone would need to understand his methodology, find it reasonable based on the facts, and then check his math.  (*Id.* at Tr. 128:8–25.)  Finally, it does not appear that Wagner's proposed methodology has ever been evaluated or accepted by another court.[57]

---

another product," or the relevant industry.  (Wagner Response Report, Dkt. 249-3, ¶ 45.)  Although Wagner argues that his methodology uses the "percentage of ad spend on a feature as a 'yardstick' to estimate the market value associated with that feature" (*id.*), the Court does not find that this definition of "yardstick" comports with Wagner's own explanation of the concept.  Moreover, where courts have considered a "yardstick" or "comparator" model to determine price premium damages in a false advertising case, the proposed comparison has been between the product with the misrepresentation and a similar product without the misrepresentation.  *See Weiner v. Snapple Beverage Corp.*, No. 07-CV-8742 (DLC), 2010 WL 3119452, at *6–7 (S.D.N.Y. Aug. 5, 2010) (rejecting expert's "yardstick approach" "compar[ing] the price of products labeled 'All Natural' to similar products which do not have 'All Natural' labeling" as unreliable because, *inter alia*, the expert did "not explain how his approach would isolate the impact of the 'All Natural' labeling from the other factors that purportedly affect the price of Snapple and its competitors"); *see also Singleton v. Fifth Generation, Inc.*, No. 15-CV-474 (BKS) (TWD), 2017 WL 5001444, at *21 (N.D.N.Y. Sept. 27, 2017) (citing *Weiner* and rejecting comparator model where expert failed to identify an "appropriate benchmark product" that allows the premium associated with the misrepresentation to be isolated); *Goldemberg*, 317 F.R.D. at 394 ("Calculating a price premium can be as simple as computing the difference between the cost of the second best product in the product class (without a deceiving label) and the cost of the product at issue (with the label).").

[56] Although Wagner notes that "experts and courts" have considered marketing expenditure data when considering the commercial success of a product or feature and when apportioning revenue or profits attributable to a product or feature (or false ad) (Wagner Report, Dkt. 249-2, ¶ 34 n.40, n.41), none of the cases cited by Wagner involve false advertising claims or the computation of price premium damages based on a methodology similar to the one deployed by Wagner here.

[57] Although Wagner claimed in his response report that the Northern District of California previously accepted a similar methodology in *TVIIM, LLC v. McAfee, Inc.*, No. 13-CV-4545 (N.D. Cal. 2015) (Wagner Response Report, Dkt. 249-3, ¶ 16), he then conceded at deposition that the reliability of the expert opinion in that case had *not* been challenged under *Daubert* or otherwise,

LensCrafters further argues that Wagner's opinion was based on insufficient or overlooked data, and that he "often simply assumed expenditures in marketing channels where there were none." (Def.'s Mot. to Exclude, Dkt. 249, at 8.)  For example, Wagner explained that he determined the percentage of revenue due to the AccuFit marketing message—one of the key inputs to his damages formula (Wagner Report, Dkt. 249-2, ¶ 27)—through an "extensive review of the record to determine if [he] had sufficient information to make a calculation," but conceded that in terms of collecting all of the information he needed, "it's not perfect and it's not 100 percent, but it's a reasonable effort based on the record available to me." (Ex. 3 to Def.'s Mot. to Exclude (Wagner Dep.), Dkt. 249-4, at Tr. 80:3–22.)  In fact, Wagner agreed that for 2013 he was missing 62% of the information he needed.  (*Id.* at Tr. 81:4–13.)  Then, for 2018, based on the mistaken impression that LensCrafters did not produce a marketing calendar for that year, Wagner made broad assumptions about marketing spending.  (Def.'s Mot. to Exclude, Dkt. 249, at 8; *see* Wagner Response Report, Dkt. 249-3, ¶ 34 (explaining that he estimated 2018 ad spending as the average of 2017 and 2019); Ex. 3 to Def.'s Mot. to Exclude (Wagner Dep.), Dkt, 249-4, at Tr. 159:8–160:14 (acknowledging that he overlooked the 2018 marketing calendar in preparing his report, that that calendar had limited information, but that he had no other evidence of paid advertising from 2018.)

For all of these reasons, the Court finds that Wagner's opinion is not the "product of reliable principles and methods" and does not rely on "sufficient facts or data."  *Nimely*, 414 F.3d at 395 (quoting Fed. R. Evid. 702).  Wagner's core assumption that the percentage of revenue attributable

---

that he had not done any independent review of the methodology used in that case to confirm whether it was similar, and ultimately agreed that because the expert in that case was measuring unjust enrichment, "it's different from what [he's] done in this case." (Ex. 3 to Def's Mot. to Exclude (Wagner Dep.), Dkt. 249-4, at Tr. 74:18–25, 183:10–17, 264:24–268:11.)

to the alleged misrepresentations is equal or proportional to the advertising spending on AccuFit is not well-founded, and a "trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (quotation marks and citation omitted).  In light of this, and given the apparent limitations of the marketing data upon which Wagner relied, the Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (quotation marks and citation omitted).  Moreover, as Wagner seems to concede himself, his methodology is not a theory or technique that has been "tested" or "subjected to peer review," it lacks an "error rate," and it does not appear to be governed by existing scientific standards. *Nimely*, 414 F.3d at 396 (citing *Daubert*, 509 U.S. at 593–94.)

In sum, the Court finds that Wagner's chosen methodology and the resulting conclusions lack key "indicia of scientific reliability" that justify its admission. *Id.*  The Court therefore grants LensCrafters' motion to exclude Wagner's opinion and will not consider it in its decision on the issue of predominance.

### b.      The Butler/Eichmann Model

Next, LensCrafters argues that the expert testimony of Plaintiffs' experts Sarah Butler and Richard Eichmann, including the model they propose for calculating the damages attributable to the AccuFit representations ("Butler/Eichmann Model"), should be excluded.

### (1)      The Butler Conjoint Analysis

Sarah Butler[58] conducted a study that provides a "statistical estimate of the impact of the claims that Accufit 'measures your eyes five times more precisely than traditional methods, down

---

[58] Butler is a Managing Director at NERA Economic Consulting ("NERA"), where she is the Chair of the Survey and Sampling Practice and a member of the Mass Torts / Product Liability,

to a tenth of a millimeter. Meaning you get to see your world more clearly.'" (Butler Report, Dkt. 249-9, ¶ 8.) To start, Butler reviewed a wide range of LensCrafters' advertising and marketing materials related to AccuFit to "understand and evaluate how LensCrafters advertised and promoted the AccuFit system," and found that "increased measurement precision and improved vision clarity were the essential features of Accu[F]it advertised throughout the putative class period [and that] . . . AccuFit and its digital measurement system was often juxtaposed with traditional, ruler-based measurement." (*Id.* ¶¶ 14, 36; *see generally id.* ¶¶ 14–37.) Next, Butler designed and implemented a "choice-based survey," also known as a "conjoint or discrete choice experiment," to measure the impact of AccuFit claims on consumers' purchasing behavior. (*Id.* ¶ 38.) In such a survey, respondents are presented with a series of questions and asked to select "the most preferred product among several available options with different attributes." (*Id.*) As background research to designing her survey, Butler commissioned two focus groups of past purchasers of prescription eyeglasses to understand what attributes are important to consumers when making a purchase and how participants interpreted AccuFit advertising claims. (*Id.* ¶¶ 47–54.) Then Butler identified the relevant population for her survey as individuals who wear prescription eyeglasses and have purchased prescription eyeglasses from LensCrafters in the past five years or are considering purchasing prescription eyeglasses from LensCrafters in the next

---

Intellectual Property, Antitrust, and Labor Practices group. (Butler Report, Dkt. 249-9, ¶ 1.) In her work, Butler conducts survey research, market research, and designs and implements statistical samples for matters involving "business and consumer decision making, consumer choice, and consumer behavior," and her work has been included in numerous lawsuits, including involving false advertising. (*Id.* ¶¶ 2, 5 (noting that she has submitted expert reports, been deposed, and testified at trial in the last five years).) Butler has been at NERA for nearly 19 years, and prior to that, worked as a market research consultant. (*See* Ex. A to Butler Report, Dkt. 239-14, at ECF 75–76.) Butler has a B.A. and M.A. in Sociology, and completed coursework, exams, and a dissertation proposal in Applied Sociology. (*Id.* at ECF 76.)

year.  (*Id.* ¶¶ 55–56.)  This population was "over-sample[d]"[59] from California, New York, and Florida, and half carried some form of vision insurance.  (*Id.*; *see also id.* ¶ 61 (a total of 791 respondents qualified and completed the survey).)  To ensure the reliability of the data, various quality control measures, pre-tests, and screening questionnaires were conducted.  (*Id.* ¶¶ 62–67, 86–90.)  The survey tested eight eyeglass attributes or variables, including retail store brand, eye and lens measurement, frame style, lens type, lens enhancements, virtual mirror, lens simulator, and price.  (*Id.* ¶ 69–85.)  The attribute "eye and lens measurement" was used to test the AccuFit claims and featured two options—(1) "Traditional Measurement," described as "[t]he person measuring you for your glasses will start by lining up the zero end of a ruler at one pupil and will measure the distance from your right to your left pupil," and (2) "Digital measurement," described as "The Digital scanning system measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter.  Meaning you get to see your world more clearly."  (*Id.* ¶ 72.)  The "Virtual Mirror" and "Lens Simulator" attributes were included to account for other AccuFit features that LensCrafters has asserted were "the primary benefits of the AccuFit system."  (*Id.* ¶ 73.)

Butler analyzed the results of the survey with a type of statistical modeling called "logit modeling" to determine how each attribute affects the probability or likelihood that a particular preference selection will be made.  (*Id.* ¶¶ 41, 95–98.)  Butler determined that consumers prefer digital measurement compared to manual measurement with an estimated willingness to pay ("WTP") of $30.63 for digital measurement, thereby indicating "a strong, positive preference for

---

[59] "Oversampling is the practice of selecting respondents so that some groups make up a larger share of the survey sample than they do in the population."  *See Oversampling is used to study small groups, not bias poll results*, PEW RESEARCH CTR., https://www.pewresearch.org/fact-tank/2016/10/25/oversampling-is-used-to-study-small-groups-not-bias-poll-results  (last visited Oct. 10, 2021).

a digital measurement system described as having the benefits LensCrafters advertised as central to its AccuFit system." (*Id.* ¶ 97.)  Butler conducted "a number of sensitivity tests to evaluate the reliability" of the WTP estimates for the digital measurement feature and the results generally did not differ.  (*Id.* ¶ 99.)  Butler also ran an additional logit model, called a "mixed logit model," to test whether a key assumption of the original "conditional" logit model—"that all respondents are willing to trade off different features at the same rate"—impacted the estimated WTP, and found that in the "mixed"-model-consumers estimate, WTP for the digital measurement compared to the manual measurement is even higher at $37.91.  (*Id.* ¶¶ 100–03.)

Based on the results of her survey and analysis, Butler made the following findings: (1) "[c]onsumers have a strong, statistically significant preference for the digital measurement attribute, regardless of other glasses features selected, [] suggest[ing] that the claims made by LensCrafters about AccuFit have an impact on consumer preference"; (2) on average, consumers would be willing to pay an estimated $30.63 for the AccuFit attribute using the "conditional logit model" and $37.91 using the "mixed logit model"; and (3) the preference for the "AccuFit attribute remains at approximately the same dollar amount and is statistically significant," even when the data is limited to particular types of consumers (*e.g.*, based on state of residence, type of insurance/no insurance).  (*Id.* ¶ 9.)  In sum, Butler concluded that "[r]egardless of the particular eyeglass package selected, the claim that Accu[F]it, 'measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter[, m]eaning you get to see your world more clearly' has an impact on consumer preferences and willingness to pay."  (*Id.*)

(2)    The Eichmann Market Simulation

Richard J. Eichmann[60] was retained by Plaintiffs to determine the total damages sustained by class members because of LensCrafters' alleged misrepresentations about AccuFit that induced consumers to purchase prescription eyeglasses from LensCrafters when they otherwise would not have and/or to overpay for those eyeglasses.  (Eichmann Report, Dkt. 249-11, ¶ 3.)  Eichmann began by reviewing data to identify LensCrafters as competing in the "mid-to-premium" segment of the prescription eyeglasses market, and then undertaking an analysis to determine the market share and prices for LensCrafters' competitors in that market.  (*Id.* ¶¶ 10–11.)  Following LensCrafters' practice of reviewing competitor prices "in the field," Eichmann conducted a "similar but more rigorous procedure" of reviewing prices on LensCrafters' website and websites for a variety of major competitors.  (*Id.* ¶ 11.)  Eichmann then evaluated the stability of the eyeglasses industry based on his review and analysis of industry data and reports, finding that "the economic market for prescription eyeglasses was relatively stable over the class period."  (*Id.* ¶ 21 (relying on his "analysis of data on industry prices, sales revenue, sales volumes, costs, and market shares"); *id.* ¶¶ 13–21 (describing his analysis).)  Thus, Eichmann concluded that this finding of market stability supported his use of a single market simulation for the entire class period.  (*Id.* ¶ 21.)

---

[60] Eichmann is a Director for NERA and is a master's level economist, a Certified Valuation Analyst, a Master Analyst in Financial Forensics, and has over 20 years of experience as an economic consultant.  (Eichmann Report, Dkt. 249-11, ¶ 1.)  In the course of his career, Eichmann has conducted numerous quantitative forecasts, econometric models, valuations, and statistical and damages models analyses.  (*Id.*)  Eichmann has also been qualified as an expert economist in federal and state courts and in arbitrations to provide testimony on statistical methods, sampling, survey design, business valuation, and econometrics as they pertain to the calculation of damages and lost profits.  (*Id.*)

Next, Eichmann created an economic model that relied on Butler's mixed logit calculations of the change in demand for eyeglasses due to representations about the digital measurement system. (*Id.* ¶¶ 22–26.) Eichmann cited "extensive academic literature that focuses on combining the consumer demand side of the market"—represented through Butler's report—"with the supply side of the market to determine the market equilibrium, that is, where a profit-maximizing-seller will price its product, taking into account the manufacturers' cost of production as well as consumers' demand for the product, both with and without the defect." (*Id.* ¶ 27; *see id.* ¶¶ 28–30.) Eichmann explained that

> [a]bsent the misleading claims about digital measurement, the demand for LensCrafters' eyeglasses would decline, and both LensCrafters and competing retailers selling eyeglasses would adjust their prices in response, leading to a different market equilibrium than the one we currently observe. The difference between the prices LensCrafters currently charges and the prices LensCrafters would charge in this but-for world is the amount of the overcharge. Importantly, the equilibrium market price in the but-for world represents the true market value of the product that class members received. Thus, the amount that consumers were overcharged is calculated as the difference between the price paid and the value of the product they received.

(*Id.* ¶ 31.) Eichmann used the results of Butler's conjoint analysis, as well as other data on the retail market for eyeglasses, to evaluate the amount of the overcharge to consumers for LensCrafters glasses. (*Id.* ¶ 32.) The "market simulation" considered the "market share, market price, and marginal cost of producing a pair of eyeglasses for LensCrafters and its competitors" in the current world and "calculate[d] how market prices would adjust in the but-for world where the misleading AccuFit claims surrounding digital measurement were not made." (*Id.*) Of note, the calculations in Eichmann's market simulation for the whole class period are based on market share and price data from 2014 because this is the first full calendar year (and among the only years) for which LensCrafters produced data on actual prices paid by consumers and because Eichmann's analysis found that "the economic market was relatively stable during the class period." (*Id.* ¶ 36.)

Based on this 2014 price data, Eichmann estimated that the overcharge to consumers was $23.28 for the average pair of LensCrafters eyeglasses, or 7.24% of the retail price—this represents the difference between the price consumers actually paid in 2014 and the price they would have paid but-for LensCrafters' allegedly misleading claims about digital measurement, *i.e.*, value of the product received. (*Id.* ¶ 37.)

Eichmann emphasized that "given the relatively stable supply and demand conditions during the class period it is reasonable to apply this overcharge percentage based on 2014 data to sales throughout the class period." (*Id.*) Eichmann calculated a 95% confidence interval on his overcharge and concluded that his overcharge estimate is "statistically significant." (*Id.* ¶ 38.) Eichmann then conservatively calculated the number of AccuFit-measured eyeglasses sold from September 5, 2013, the start of the class period, through August 22, 2019, using data provided by LensCrafters and assuming that eyeglasses were sold evenly throughout the period. (*Id.* ¶ 39.) Applying the per unit overcharge of $23.28 to the number of eyeglasses sold (5,916,358), Eichmann calculated damages totaling $137,732,810, which he characterized as conservative because it does not include harm to customers who were not measured with AccuFit, but still purchased LensCrafters eyeglasses at a premium. (*Id.* ¶ 40.)

(3)  LensCrafters' Critiques of the Butler/Eichmann Model

LensCrafters argues that several "glaring problems" justify the exclusion of the Butler/Eichmann Model. (Def.'s Mot. to Exclude, Dkt. 249, at 10.) As discussed below, the Court does not find that any of these problems justify the exclusion of the Butler/Eichmann Model or their expert testimony; rather, each criticism goes to the weight of the model and is an argument that LensCrafters will be free to make to the factfinder later in this litigation.[61]

---

[61] LensCrafters does not challenge Butler's or Eichmann's qualifications. Based on a review of Butler's and Eichmann's backgrounds and their substantial relevant professional

First, LensCrafters argues that the Butler/Eichmann Model fails to isolate the measure of damages attributable to the Alleged Misrepresentation and is thus "irrelevant and unhelpful." (Def.'s Mot. to Exclude, Dkt. 249, at 10.) Specifically, LensCrafters argues that Butler measured relative preferences between a "traditional measurement" and a generic "digital measurement," but did not specifically test the impact of *the misrepresentation* about AccuFit. (*Id.*) As a result, LensCrafters argues, Eichmann's simulation fails to "isolate the alleged 'price premium' associated with the specific allegedly false or misleading statements about AccuFit, rather than the existence of the measurement tool itself." (*Id.* at 11 (emphasis omitted).) LensCrafters also criticizes Butler for using a "composite" claim that she crafted after reviewing various AccuFit advertisements rather than an "actual marketing claim," and argues that this "composite" claim conflates and fails to test the isolated impact of the "five times more precise," "down to a tenth of a millimeter," and "you get to see your world more clearly" statements. (*Id.* at 11–13.) These arguments are unavailing.

Contrary to LensCrafters' assertion that Butler's survey—and by consequence, Eichmann's simulation—tested only the preference for digital measurement over traditional measurement, the survey, in fact, tested for a preference between "traditional measurement" and "digital measurement" that was described using statements that are materially indistinguishable

---

experience, including offering expert opinions in their areas of expertise in other litigations (*see supra* notes 58, 60), the Court finds that both Butler and Eichmann satisfy the threshold requirement of "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Tin Yat Chin*, 371 F.3d at 40 (citation omitted). Further, the Court notes that Butler and Eichmann were recently deemed qualified by another court where they proffered a virtually identical damages model. *See Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 971 (D. Minn. 2020). LensCrafters argues that the population of Butler's survey in *Johannessohn* is materially different from the population surveyed here. (Def.'s Mot. to Exclude, Dkt. 249, at 17–18 & n.50.) The Court, however, finds the population surveyed by Butler to be sufficiently reliable and appropriate for the Butler/Eichmann Model in this case for purposes of *Daubert* review. (*See infra* note 63.)

from the alleged misrepresentations at issue here: "the Digital scanning system *measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter. Meaning you get to see your world more clearly.*" (Butler Report, Dkt. 249-9, ¶ 72 (emphasis added); *id.* ¶ 8 ("My study provides a reliable statistical estimate of the *impact of the claims* that Accu[F]it 'measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter. Meaning you get to see your world more clearly." (emphasis added)).) LensCrafters' representations about AccuFit's more precise measurements and the positive effect on vision thus were incorporated into and tested by the Butler/Eichmann Model. Further, the language of Butler's "composite" claim, and her decision to test preferences between traditional measurement and digital measurement (as opposed to digital measurement with or without the statements) were directly informed by the language LensCrafters used to describe and promote AccuFit throughout the class period, which Butler thoroughly analyzed in developing the survey. (*Id.* ¶¶ 14–37; *see id.* ¶ 36 ("My review [of the advertising and marketing materials] demonstrates that the increased measurement precision and improved vision clarity were the essential features of Accu[F]it advertised throughout the putative class period[] [and] . . . that Accu[F]it and its digital measurement system was often juxtaposed with traditional, ruler-based measurement.").) The claims about the digital measurement system that Butler tested in her survey reflected the "consistent and prominent theme" of LensCrafters' marketing campaign for AccuFit—that measurements more precise than traditional methods mean clearer vision. *See Hasemann*, 331 F.R.D. at 264, 278 (finding that proposed expert models that attempted to calculate a price premium were consistent with the theory of liability and injury in a case involving non-uniform misrepresentations that presented a "consistent and prominent theme"). To the extent the survey claim may not match all of LensCrafters' AccuFit messaging verbatim, any inconsistency is

immaterial and does not undermine the relevance or reliability of Butler's survey.  *See Schneider*, 328 F.R.D. at 543 (finding that the defendant's argument that an expert survey did not test "messaging verbatim" went to the weight of expert opinions, rather than to admissibility); *cf. Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1021–24 (C.D. Cal. 2018) (finding expert's unjustifiable abbreviation, alteration, and embellishment of statements "render[ed] his survey as it relates to these statements irrelevant and any conclusions drawn from it and extrapolated to the actual alleged misrepresentations unreliable").  Therefore, the Court finds that the Butler survey is both relevant and helpful to the trier of fact because, by design, it tests the impact of LensCrafters' claims about AccuFit's digital measurement system on consumer WTP and, by incorporation into Eichmann's simulation, on the payment of a price premium and the determination of damages.

Next, LensCrafters argues that the "conjoint/price equilibrium" model is an "extremely sensitive economic theory that requires state-of-the-art craft in designing the survey component," "substantial, precise external data inputs," and is "simply not currently reliable enough to be appropriately used in litigation."  (Def.'s Mot. to Exclude, Dkt. 249, at 10.)  LensCrafters contends that the model should be excluded because "law must 'lag science'" and an article by its rebuttal expert, Dr. Hauser, tested a "version of" the Butler/Eichmann Model and found it "virtually impossible" to construct such a model accurately.  (Defendant's Reply Brief in Support of its Motion to Exclude Expert Testimony ("Def.'s Reply ISO Mot. to Exclude"), Dkt. 250, at 7–8.)  However, LensCrafters' argument reveals that the "conjoint/price equilibrium" model proffered by Plaintiffs can be tested—in fact, Dr. Hauser has himself tested and criticized such models.  That the model is especially sensitive or prone to inaccuracies is an argument LensCrafters can make to the finder of fact, but it is not one that has convinced the Court to exclude the model or to find it

any less supportive of Plaintiffs' motion for class certification.  Moreover, another court recently determined that a model proffered by Butler and Eichmann that relied on virtually identical methodology to measure price premium damages was scientifically valid and reliable.  *See Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 972 (D. Minn. 2020) (though "a close question," finding that Butler's survey methodology was sufficiently similar to approaches that had been tested and subject to peer review, and, given that "[t]here is no question that a market simulation is a scientifically valid method to determine the market equilibrium price in a counterfactual world," challenges to Eichmann's methodology go to weight not admissibility).[62] LensCrafters' arguments about the alleged unreliability of the Butler/Eichmann model and its "improperly-constructed and extremely-flawed" design may succeed in persuading the trier of fact to disregard the model, but they do not convince the Court to exclude the Butler/Eichmann Model from such consideration.

LensCrafters also argues that Butler's WTP Survey and Eichmann's market price equilibrium Simulation "lack any external indicia of reliability" because they are incorrectly designed, riddled with errors, and based on unreliable assumptions.  (Def.'s Mot. to Exclude, Dkt. 249, at 10.)  Specifically, LensCrafters argues that Butler's survey overlooks the "widely-used pupillometer" to suggest that the ruler method is the only "traditional method" (*id.* at 20–21), and did not accurately reflect how consumers purchase eyeglasses because it omitted significant factors that impact consumer preference such as the availability of an on-site eye doctor, store location, brand name, and insurance coverage (*id.* at 21–23).  However, these arguments, which essentially

---

[62] LensCrafters attempts to undermine Plaintiffs' reliance on *Johannessohn* by arguing that, there, the defendant did not challenge the reliability of the methodology itself.  (Def.'s Reply ISO Mot. to Exclude, Dkt. 250, at 8.)  However, it is clear from the court's thorough and explicit analysis of the scientific validity of the Butler/Eichmann Model in the decision that the reliability of that model was considered and accepted.

attack the Butler/Eichmann Model for failing to consider certain variables or attributes relevant to consumer preference and the eyeglasses market again go to the weight and not admissibility of the model. *See Costco Wholesale Corp.*, 818 F. App'x at 62 ("We acknowledge that [the expert]'s model fails to consider some arguably significant variables [that consumers value most], but, normally, failure to include variables will affect the analysis' probativeness, not its admissibility." (brackets, quotation marks, and citation omitted)); *Hadley*, 324 F. Supp. 3d at 1107–09 (finding that defendant's argument that a conjoint survey failed to "mimic real-life shopping experiences" or to include "critical attributes that consumers consider" went to weight and not admissibility). Likewise, criticism of the "mismatch" between survey population[63] and retail store brands used in

---

[63] LensCrafters notes that Butler surveyed only current and prospective LensCrafters customers while Eichmann's analysis purported to simulate the entire eyeglass market, and argues that this "mismatch" is a "'major' error." (Def.'s Mot. to Exclude, Dkt. 249, at 16–18 (emphasis omitted).) That argument is unavailing. As a preliminary matter, the purpose of Butler's survey was, of course, to determine how much money LensCrafters customers overpaid for LensCrafters eyeglasses, and thus it was entirely appropriate for Butler's survey to focus on how much past and potential LensCrafters customers—as opposed to people who categorically refuse to purchase LensCrafters eyeglasses—were willing to pay for digital measurement. Perhaps for that reason, LensCrafters does not argue that Butler's sampling of only past and potential LensCrafters customers inflated her WTP. Instead, one of LensCrafters' experts argues that, since current and potential LensCrafters customers may place a higher premium on digital measurement than non-LensCrafters customers, Eichmann's use of Butler's survey may have skewed his analysis of the market as a whole. (Hauser Report, Dkt. 249-5, ¶ 137.) Butler notes, however, that her survey did, in fact, include people "who have not purchased from LensCrafters in the past," but would consider doing so in the future. (Butler Reply Report, Dkt. 249-10, ¶ 3.) In addition, Eichmann's analysis considered numerous inputs, not just Butler's survey, including market share, market price, and marginal cost of producing a pair of eyeglasses for LensCrafters and its competitors. (Eichmann Report, Dkt. 249-11, ¶ 32.) Eichmann argues that, in his model, Butler's survey was an entirely appropriate input for the WTP for digital measurement because only LensCrafters offered digital measurements, and his model separately accounted for people who would never consider purchasing their eyeglasses from LensCrafters. (Eichmann Rebuttal Report, Dkt. 249-12, ¶¶ 89–90.) To the extent that LensCrafters still wishes to argue that consideration of a survey of a broader population would make Eichmann's analysis more accurate, it may do so before the jury on cross-examination. The Court does not find, however, that such an argument renders the Butler/Eichmann Model unreliable, such that it may not be presented to the factfinder. *See Williams*, 506 F.3d at 160 (reiterating that, in its role as "gatekeeper," the district court must

Butler's survey and Eichmann's simulation (*see* Def.'s Mot. to Exclude, Dkt. 249, at 16–19), "ultimately go[es] to the weight, not the admissibility, of [the Butler/Eichmann Model] and [is] fodder for cross-examination, not exclusion." *In re Scotts EZ Seed Litig.*, No. 12-CV-4727 (VB), 2017 WL 3396433, at *8 (S.D.N.Y. Aug. 8, 2017) (finding that arguments to exclude an expert's consumer survey because, *inter alia*, "he failed to survey the proper universe" of consumers went to weight (quoting *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-8317, 2017 WL 2664199, at *2 (S.D.N.Y. June 20, 2017))). Similarly, the argument that Eichmann's simulation relies on unreliable, flawed inputs—including Butler's WTP estimates and estimated prices and market shares for LensCrafters' competitors—is proper fodder for cross-examination and does not justify the exclusion of the Butler/Eichmann model. So too, LensCrafters' attacks on Butler's survey methodology are premature as such "errors . . . generally bear upon the probative weight to be afforded to the survey, rather than its admissibility." *Kimberly-Clark Corp.*, 321 F.R.D. at 551 (quoting *U.S. v. Am. Exp. Co.*, No. 10-CV-4496 (NGG) (RER), 2014 WL 2879811, at *10 (E.D.N.Y. June 24, 2014)). Moreover, that LensCrafters' rebuttal experts disagree with Eichmann's determination of inputs, including price and market share estimates, is not a basis for exclusion, particularly where "soft sciences like economics" are concerned, because "these disciplines require the use of professional judgment" and ultimately "reasonable experts may differ." *Hughes*, 317 F.R.D. at 341 (citation omitted).

Finally, LensCrafters argues that the Model is based on "unfounded assumptions designed to reach a predetermined conclusion that is refuted by the actual real world evidence" that prices did not, in fact, increase, and points to its expert Dr. Ugone's analysis, finding "substantial

---

determine whether an expert's testimony "rests on a reliable foundation and is relevant to the task at hand." (quoting *Daubert*, 509 U.S. at 597)).

evidence that AccuFit marketing had no impact on prices, including contemporaneous studies and actual point of sale pricing data."  (Def.'s Mot. to Exclude, Dkt. 249, at 10, 30.)  The Court is unpersuaded that this is a basis upon which to exclude the Butler/Eichmann Model.  As discussed, the fact that the price of eyeglasses may not have changed "during the Class Period does not by itself demonstrate as a matter of law that Plaintiffs cannot prove economic harm caused by the misrepresentations."  *See Schneider*, 328 F.R.D. at 533 (denying the defendant's summary judgment motion, finding that "[a] reasonable jury could find that, despite no change in price during the Class Period, Plaintiffs suffered economic harm as a result of Defendant's alleged misrepresentations").  As already explained, reliance on LensCrafters' own pricing behavior before and after the introduction of AccuFit to determine whether a price premium existed "does not take into account economic harm or the potential benefit to a defendant in increased market share caused by a misrepresentation that induces consumers to purchase a product they otherwise would not have purchased."  *Id.*  Thus, LensCrafters' criticism of the Butler/Eichmann Model for failing to consider certain, external real world data regarding sales and prices before and after the introduction of AccuFit may well be ripe for cross-examination, but it ultimately goes to the weight to be given that expert evidence and not its admissibility.

*     *     *

In sum, the Court is not persuaded by LensCrafters' arguments to exclude the Butler/Eichmann Model.  Putting aside LensCrafters' various criticisms of Butler's survey, all of which go to weight not admissibility, LensCrafters does not appear to dispute that a conjoint analysis of the type performed by Butler "is a well-accepted economic methodology."  *Hadley*, 324 F. Supp. 3d at 1107 (citations omitted) (collecting cases); *see also Price I*, 2018 WL 3869896, at *9 ("Conjoint Analysis" is a "well-established damages model" (citation omitted)); *Kimberly-*

143

*Clark Corp.*, 321 F.R.D. at 551 (stating that conjoint analyses "have previously been approved in consumer class actions as reliable methodologies available for calculating the price premium attributable to a product characteristic"). In addition, despite LensCrafters' multi-pronged attacks on Eichmann's simulation, which focus in large part on his reliance on Butler's survey and WTP estimate as key inputs, the Court is not convinced that Eichmann's opinion "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *See Pfizer II*, 819 F.3d at 662 (quotation marks and citation omitted). Finally, and importantly, the Butler/Eichmann Model is relevant because it will "assist the trier of fact" in determining damages in this matter, *Nimely*, 414 F.3d at 397 (citation omitted), and "has [the] tendency to make the existence of [a fact] of consequence"—a price premium attributable to LensCrafters' misrepresentations about AccuFit—"more (or less) probable than it would be without the evidence," *Amorgianos*, 303 F.3d at 265 (alteration, quotation marks, and citation omitted). Thus, the Court denies LensCrafters' motion to exclude the Butler/Eichmann Model and the testimony of those experts.

### c.   *Comcast*

Having determined that the Butler/Eichmann Model is admissible, the Court considers whether it survives scrutiny under *Comcast Corporation v. Behrend*, in which the Supreme Court explained that to satisfy predominance under Rule 23(b), Plaintiffs must put forth a damages model that measures "only those damages attributable to [their] theory" of liability. 569 U.S. at 35–37. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35. Importantly, "[c]alculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Id.* (quotation marks and citations omitted).

144

LensCrafters argues that the Butler/Eichmann Model fails to satisfy the predominance requirement under *Comcast* because (1) the Butler survey tested respondents' preferences for a digital measurement method over traditional measurement rather than the value of the specific alleged false or deceptive statement, and (2) the "composite claim" that Butler tested improperly combines all of the various at-issue representations, so that it is impossible to determine which claims have an impact and which do not.  (Class Cert. Opp'n, Dkt. 243, at 38–40.)  In support of its first argument, LensCrafters relies on *Herron v. Best Buy Stores, LP*, in which the court denied class certification after finding a hedonic regression damages analysis to be "fundamentally flawed because it conflate[d] 'battery life' and 'battery life representations'" by comparing two different laptops with different battery lives.  No. 12-CV-2103 (TLN) (CKD), 2018 WL 1960659, at *5 (E.D. Cal. Apr. 26, 2018).  LensCrafters contends that the Butler/Eichmann Model likewise conflates "digital measurement" with "digital measurement representations" by testing the difference between "hypothetical eyeglasses measured with two different methods and described in two different ways," and therefore fails to measure the impact of *the representations* about AccuFit or to account for the reasons a consumer might prefer digital measurement over ruler measurement that have nothing to do with those representations, such as valuing a "less-intrusive" measurement method.  (Class Cert. Opp'n, Dkt. 243, at 39.)  The Court has already considered and rejected this argument in its analysis above.  Butler's composite survey question about the "eye and lens measurement" attribute incorporated the consistent misrepresentation about AccuFit (including some of the exact language) featured during the AccuFit Customer Experience on AccuFit's website and throughout LensCrafters' marketing of AccuFit.  (Butler Report, Dkt. 249-9, ¶ 72 ("The Digital scanning system measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter.  Meaning you get to see your world more

clearly.").) Therefore, Butler's survey, in fact, tested the impact of the allegedly false and misleading statements.

The Court finds that the Butler/Eichmann Model satisfies the predominance standard established in *Comcast*. There, the issue was that the District Court accepted only one theory of antitrust injury for class-action treatment, yet the proffered damages model assumed the validity of four different theories of antitrust injury and "did not attribute damages to any one particular theory of anticompetitive impact." *Comcast*, 569 U.S. at 35–37. The Supreme Court concluded that "[i]n light of the model's inability to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the [accepted theory of antitrust injury], Rule 23(b)(3) cannot authorize" class treatment. *Id.* at 38. Here, by contrast, Plaintiffs allege a single theory of injury—that LensCrafters' statements about AccuFit increased demand for its eyeglasses, which increased the market price for those eyeglasses and caused consumers to pay more for their eyeglasses than they otherwise would have—and Plaintiffs proffer the Butler/Eichmann Model to measure the price premium associated with that theory of injury. (*See* Class Cert. Mot., Dkt. 238, at 22–24); *see Hasemann*, 331 F.R.D. at 277 ("The present action is distinguishable from *Comcast*. Here, there is a single overarching theory of liability: the misrepresentations misled consumers, causing them to pay an unwarranted premium for the products on which it appeared." (brackets, quotation marks, and citation omitted)). Unconvincing as LensCrafters may ultimately prove that model to be, it does purport to measure damages attributable to Plaintiffs' theory of liability.[64] *See In re U.S. Foodservice Inc. Pricing Litig.*, 729

---

[64] The Court thus rejects LensCrafters' argument that the Butler/Eichmann Model "does not even attempt" to measure only those damages attributable to Plaintiffs' theory of liability, *Comcast*, 569 U.S. at 35, because Butler failed to account for and isolate other variables and possible sources of increased WTP—an argument the Court has already dismissed. While courts have "routinely reject[ed] price premium methodologies under *Comcast* when the proposed

F.3d 108, 123 n.8 (2d Cir. 2013) (explaining that, at the class certification stage, the court must determine that the proffered damages model "is consistent with the classwide theory of liability and capable of measurement on a classwide basis.").

Thus, the Court finds that Plaintiffs have demonstrated predominance under Rule 23(b)(3) with respect to measuring class-wide damages under New York, California, and Florida statutes based on a price premium theory.

*       *       *

In sum, the Court finds that Plaintiffs have met their burden of demonstrating that common issues predominate over the core elements of their statutory consumer protection claims and have identified a preponderance of class-wide evidence upon which each of these elements—a deceptive act, materiality, and injury—may rise or fall on the merits. *See In re Kind LLC*, 337 F.R.D. at 599–602.

---

methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement," *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 413; *see Brazil v. Dole Packaged Foods*, LLC, No. 12-CV-1831 (LHK), 2014 WL 5794873, at *11–13 (N.D. Cal. Nov. 6, 2014) (finding that hedonic damages model could not "survive *Comcast*" because it could not "isolate the price premium attributable to [the defendant's] 'All Natural Fruit' label claim" given that it failed to account for variables such as multiple labels and differences in packaging), that is not the case here, because Plaintiffs have sufficiently demonstrated that the Butler/Eichmann Model isolates the price premium due to the alleged misrepresentations about AccuFit, *see Hasemann*, 331 F.R.D. at 277–78 (finding that proposed damages models were "sufficient to meet the Comcast test" because the plaintiff's theory of liability was that "false misrepresentations permitted a [particular] claim-based pre premium to attach to [a product and the] models all attempt to capture this theory and calculate a price premium based on the representations at issue," while also accounting for "alternative causes of the price increase"). Further, as the Second Circuit recently explained, "[t]he fact that [the Butler/Eichmann] model may," as LensCrafters suggests, "fail to account for other possible sources of a price premium simply means that [t]his model may not ultimately prove Plaintiff's claim. But it still serves as common evidence of plaintiffs' theory of injury and does not run afoul of Comcast." *Costco Wholesale Corp.*, 818 F. App'x at 62.

147

4.    Plaintiffs' Fraudulent Omissions Claim

Common law fraudulent omission claims under New York, Florida, and California law are substantially similar and, in sum, require proof of a (1) material omission, (2) known to be false, (3) made for the purpose of inducing reliance, (4) reliance, and (5) resulting damage. *See, e.g.*, *Connaughton*, 75 N.E.3d at 1163; *Gutter*, 631 So. 2d at 1118; *Small*, 65 P.3d at 1258.  Plaintiffs argue that their fraudulent omission claim—that LensCrafters should have disclosed that it did not manufacture eyeglasses to 0.1mm and that 0.1mm eyeglasses have no clinical benefit—is susceptible to the following classwide proof: the same material facts were omitted as to all class members; evidence of LensCrafters' "deliberations and actions" will demonstrate the second and third elements and is not individual to class members; the fourth element, reliance, is a question of materiality common to all class members; and resulting damages will be demonstrated by evidence of a price premium paid by all class members.  (Class Cert. Mot., Dkt. 238, at 42.) LensCrafters opposes certification of Plaintiffs' fraudulent omissions claim on the following grounds: (1) as with their claims based on misrepresentations, Plaintiffs must also demonstrate uniform exposure to the alleged fraudulent omission; (2) Plaintiffs' claim is not truly an "omissions" claim because the focus is really on the misrepresentations themselves; (3) Plaintiffs' California claims fail because the alleged omission does not involve a "safety hazard or a physical defect affecting the central function of a product or service," and (4) Plaintiffs' damages model does not attempt to measure the price premium associated with the alleged omission.  (Class Cert. Opp'n, Dkt. 243, at 14–16, 16 n.72, 40–41.)

The Court agrees with LensCrafters that Plaintiffs fail to carry their burden with respect to their fraudulent omissions claim because the Butler/Eichmann Model proffered by Plaintiffs fails to analyze, or account for, any price premium associated with LensCrafters' alleged omissions, *i.e.*, that LensCrafters did not manufacture glasses to 0.1mm and that 0.1mm glasses have no

148

clinical benefit.  Butler's report expressly states that her study "provides a reliable statistical estimate of the impact of the *claims* that AccuFit 'measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter.  Meaning you get to see your world more clearly.'" (Butler Report, Dkt. 239-14, ¶ 8 (emphasis added).)  Butler found that the "*claims* made by LensCrafters about AccuFit have had an impact on consumer preferences," measured "the potential impact of the AccuFit *claims*" by estimating consumers' "willingness to pay for the digital measurement attribute" (as described by those claims), and concluded that "the *claim* that Accu[F]it, 'measures your eyes five times more precisely than traditional methods, down to a tenth of a millimeter[, m]eaning you get to see your world more clearly' has an impact on consumer preferences and willingness to pay." (*Id.* ¶ 9 (emphasis added).)  Nowhere in her or Eichmann's report or their model is there any discussion or analysis of the impact of LensCrafters' alleged fraudulent omissions on price, or a calculation of damages attributable to these omissions.

Moreover, Plaintiffs' characterization of the price premium theory in its motion for class certification, as "paid by *every* consumer who was fitted with AccuFit—even if that individual customer did not rely on LensCrafters' representations, was not deceived by them, or did not care about digital measurement" (Class Cert. Mot., Dkt. 238, at 22), and Plaintiffs' description of the Butler/Eichmann Model (*id.* at 23–24), do not convey that either contemplated or incorporated Plaintiffs' omissions theory; rather, the focus is entirely on the *affirmative* representations about AccuFit.  Plaintiffs' only response on this issue seems to be that "Plaintiffs' conjoint accurately depicted LensCrafters' own marketing to measure the impact of the misrepresentations on willingness to pay.  For similar reasons, Butler's conjoint reliably measures damages as a result of LensCrafters' omission." (Class Cert. Reply, Dkt. 244, at 14.)  Plaintiffs, however, fail to explain those "similar reasons," and the Court is not at all convinced that a damages model developed to

test consumers' responses to, and WTP based on, specific representations is suited to test the impact of related omissions.

Therefore, while the Court finds that the Butler/Eichman Model satisfies the *Comcast* test for predominance with respect to Plaintiffs' theory of liability as to the allegedly deceptive statements about AccuFit, the Court finds that it does not satisfy *Comcast* with respect to Plaintiffs' fraudulent omission theory of liability. *See Comcast*, 569 U.S. at 35 ("[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case . . . ."). For this reason, the Court finds that common issues do not predominate over Plaintiffs' common law fraudulent omission claims and that class certification over these claims would not be proper.

### 5.  Unjust Enrichment Claim

Common law unjust enrichment claims under New York, Florida, and California law are substantially similar and require, in essence, proof of a benefit conferred from one party to another, and circumstances that make the retention of that benefit unjust. *See, e.g.*, *Ashland Inc.*, 652 F.3d at 339; *Fla. Power Corp.*, 887 So. 2d at 1241 n.4; *Lectrodryer*, 91 Cal. Rptr. 2d at 883. Here, neither party devotes more than a few sentences to Plaintiffs' unjust enrichment claim. Plaintiffs allege that they will prove a common law cause of action for unjust enrichment by demonstrating "a benefit conferred," *i.e.*, the class-wide price premium concerning the market price, and "unjust circumstances," *i.e.*, that it would be unjust for LensCrafters to profit from its deceptive practices, both of which will "succeed or fail classwide." (Class Cert. Mot., Dkt. 238, at 41.) LensCrafters responds that Plaintiffs unjust enrichment claim should not be certified for all of the reasons already stated, and because "where the product purchased is not worthless, unsafe or defective, determining whether a particular benefit is conferred 'unjustly' is not subject to generalized proof." (Class Cert. Opp'n, Dkt. 243, at 41–42.)

Plaintiffs' theory is that it would be unjust for LensCrafters to retain the profits it earned through the price premium it obtained for its eyeglasses based on the alleged misrepresentations and omissions about AccuFit.  "Class certification of unjust enrichment claims is appropriate when . . . 'the crux of plaintiffs' claims is that defendant unjustly retained the benefits of its sale of . . . products to consumers after it failed to disclose material facts about the defective nature of those products.'"  *Famular v. Whirlpool Corp.*, No. 16-CV-944 (VB), 2019 WL 1254882, at *10 (S.D.N.Y. Mar. 19, 2019) (finding unjust enrichment claim under New York common law suitable for class treatment because "[w]hether defendant was unjustly enriched at the proposed class members' expense by selling the allegedly mislabeled washing machines [at a price premium] can succeed or fail on common evidence"), *leave to appeal denied*, No. 19-838, 2019 WL 4839990 (2d Cir. Aug. 6, 2019); *Smith v. Keurig Green Mountain, Inc.*, No. 18-CV-6690 (HSG), 2020 WL 5630051, at *5 (N.D. Cal. Sept. 21, 2020) (finding predominance satisfied for an unjust enrichment claim under California law because "whether [the defendant] was unjustly enriched by the proposed class members' purchase of the Products given its allegedly false representations . . . raises the same legal issues as to all class members"); *In re Amla Litig.*, 282 F. Supp. 3d 751, 766 (S.D.N.Y. 2017) (finding that common issues predominate with respect to unjust enrichment claims under New York and Florida common law, which are "very similar," where the plaintiffs alleged that the defendants "knew the product was dangerous and worthless but chose to misleadingly suggest that it was gentle and safe" because "[t]he truth of those allegations does not vary between plaintiffs" and a "jury need only decide once whether equity requires restitution").

LensCrafters misconstrues Plaintiffs' theory of unjust enrichment by arguing that generalized proof cannot be offered to show that the benefit conferred was "unjust" where the product itself is not worthless, unsafe, or defective.  (Class Cert. Opp'n, Dkt. 243, at 41–42.)

However, Plaintiffs' theory is that it would be unjust for LensCrafters to retain the overpayment that resulted from the company's allegedly deceptive practices *regardless* of the condition or suitability of their eyeglasses.  The Court finds persuasive the reasoning of the Honorable Jed S. Rakoff of the Southern District of New York who, in a case alleging deceptive labeling of hair relaxers in violation of New York and Florida law, explained that in the context of an unjust enrichment claim, restitution may still be available, even when a product confers some benefit on purchasers, because

> [i]f a product is so dangerous [or worthless] that no informed, reasonable person would purchase it, then even if an actual purchaser from whom the danger [or worthlessness] was concealed went ahead and purchased it and received some incidental benefit thereby, the purchaser may still be entitled to [restitution] on the product she never would have purchased but for defendant's concealment, *since the defendant was unjustly enriched by the very act of plaintiff's purchase.*

*In re Amla Litig.*, 282 F. Supp. 3d at 767 (emphasis added) (noting that "[i]n an analogous context, several circuit courts have held that an economic, point-of-sale injury is not erased just because the purchaser was lucky enough to avoid the effects of the alleged misrepresentations or omissions").  Similarly, here, Plaintiffs allege that LensCrafters was "unjustly enriched by the very act of [class members'] purchase" of LensCrafters eyeglasses at a price premium commanded by LensCrafters due to its allegedly deceptive practices.

Therefore, for the same reasons it found Plaintiffs' statutory consumer protection claims suitable for class treatment, the Court finds Plaintiffs' unjust enrichment claims suitable for class treatment.  *See Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 436 (S.D.N.Y. 2009) ("[F]or the same reasons articulated for the section 349 claim, the Court believes that common questions of law and fact will continue to predominate [with respect to the unjust enrichment claim] because it does not appear that any such individual issues would be unique to each plaintiff." (quotation

marks, brackets, and citation omitted)).  Plaintiffs' proof as to LensCrafters' deceptive practices and the resulting price premium will rise or fall together for all class members.

Finally, LensCrafters is correct that under New York law, an unjust enrichment claim fails when "it simply duplicates, or replaces, a conventional contract or tort claim."  *Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 876 (E.D.N.Y. 2018) (finding that unjust enrichment claim under New York common law cannot survive summary judgment because it duplicates false-advertising claims governed by consumer protection statutes (quoting *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)); *see also Campbell v. Whole Foods Mkt. Grp., Inc.*, 516 F. Supp. 3d 370, 394 (S.D.N.Y. 2021) (dismissing unjust enrichment claim that "is a mere repackaging of [the plaintiff's] other claims based on the alleged misrepresentations on the Product's packaging"); *Price v. L'Oreal USA, Inc. ("Price II")*, No. 17-CV-0614 (LGS), 2017 WL 4480887, at *5 (S.D.N.Y. Oct. 5, 2017) (dismissing unjust enrichment claim under New York common law "as duplicative" of other contract and tort claims "based on the same alleged misrepresentation" by the defendants in the labeling and advertising of shampoo).  However, LensCrafters raised this point, without argument or elaboration, in a footnote.  (Class Cert. Opp'n, Dkt. 243, at 42 n.181.) An argument for dismissing Plaintiffs' unjust enrichment claim as duplicative is suited for a motion to dismiss or motion for summary judgment, *see, e.g.*, *Hughes*, 330 F. Supp. 3d at 876; *Campbell*, 516 F. Supp. 3d at 394; *Price II*, 2017 WL 4480887, at *5, and not at the class certification stage—particularly where Plaintiffs have demonstrated that common issues predominate with respect to their New York unjust enrichment claim.  *See cf. Kimberly-Clark Corp.*, 321 F.R.D. at 554 (dismissing "Plaintiff's unjust enrichment claim [a]s duplicative of his claims under the [GBL]" after finding it not to be susceptible to class certification); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1010 n.222 (C.D. Cal. 2015) (same), *aff'd sub nom. Briseno v.*

*ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir.), and *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).

Thus, the Court finds that common issues predominate with respect to Plaintiffs' unjust enrichment claims under New York, California, and Florida law.

      6.    Rule 23(b)(3) – Superiority

In addition to predominance, Rule 23(b)(3) also requires that a "class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23. Courts are to consider the following factors in determining the superiority of the class mechanism:

> [1] the class members' interests in individually controlling the prosecution or defense of separate actions; [2] the extent and nature of any litigation concerning the controversy already begun by or against class members; [3] the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and [4] the likely difficulties in managing a class action.

*Id.*

Here, all four factors counsel in favor of class certification. First, given the low amount at stake for an individual relying on Plaintiff's price premium theory and for eyeglasses generally, as well as "the relative simplicity of consumer protection actions . . . , the possibility of individual interests controlling the prosecution of this action is remote." *In re Kind LLC*, 337 F.R.D. at 608 (citation omitted). Second, this case represents the consolidation of three cases, and the Court is not aware of any other litigation concerning the controversy at issue here. Third, the low amount at stake for individual plaintiffs and the fact that Plaintiffs have already been pursuing this case for approximately four years make the concentration of the litigation of these claims in this forum highly desirable. Fourth, "any concerns about manageability rely, almost entirely, on a premise the Court has already rejected—namely, that innumerable individualized inquiries will swallow common ones." *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 415 (quotation marks and alteration

omitted).  "Consumer class actions of this variety, designed to recover relatively small price premiums in comparison to the expense and burden of litigation, are clearly superior to the alternative of forcing consumers to litigate on principle."  *Price I*, 2018 WL 3869896, at *11.

LensCrafters argues in a footnote that "a class action is not a superior method for adjudicating the controversy because it would be unmanageable" for the same reasons common issues do not predominate.  (Class Cert. Opp'n, Dkt. 243, at 14 n.66.)  For all of the reasons already stated herein, the Court rejects this argument.

The Court concludes that a class action is superior to any other method of adjudicating this case.

## CONCLUSION

For all the reasons stated above, the Court grants in part and denies in part Plaintiffs' motion for class certification.  The Court denies Plaintiffs' request for class certification under Rule 23(b)(2).  The Court grants Plaintiffs' request for class certification under Rule 23(b)(3) with respect to claims under New York General Business Law §§ 349, 350; the Florida Deceptive and Unfair Trade Practices Act; California's Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act; and for Unjust Enrichment; however, the Court denies Plaintiffs' request for class certification under Rule 23(b)(3) with respect to the fraudulent omissions claim. The Court grants in part and denies in part LensCrafters' motion to exclude.  The Court defers ruling on Plaintiffs' motion to exclude.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: December 13, 2021
       Brooklyn, New York