# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK
# BROOKLYN DIVISION

| | |
|---|---|
| **THOMAS ALLEGRA, YESENIA ARIZA, MARIANA ELISE EMMERT, STUART ROGOFF, GRACELYNN TENAGLIA**, and **MELISSA VERRASTRO** individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**LUXOTTICA RETAIL NORTH AMERICA**, an Ohio corporation d/b/a LensCrafters,<br><br>Defendant. | **CLASS ACTION**<br><br>**DECLARATION OF GEOFFREY GRABER IN SUPPORT OF (1) MOTION FOR FINAL APPROVAL; (2) CLASS COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES, COSTS, EXPENSES, AND (3) SERVICE AWARDS TO CLASS REPRESENTATIVES**<br><br>CASE NO. 1:17-cv-05216-PKC-LB |

I, Geoffrey Graber, declare:

1. I am a Partner at the law firm of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"). I am admitted *pro hac vice* in the above-captioned lawsuit against Luxottica of America d/b/a LensCrafters ("LensCrafters" or "Defendant"). I make this declaration in support of Plaintiffs' Motion for Final Approval; and Class Counsel's Application for an Award of Attorneys' Fees, Costs, Expenses, and Service Awards to Class Representatives.

2. Cohen Milstein in this case acted as lead counsel, with assistance from Gordon & Partners and Christopher J. Rush & Associates, P.A., to whom Cohen Milstein assigned work to expedite prosecution of Plaintiffs' claims and to avoid duplication of efforts.

3. To assist in the Court's assessment of the request for final approval, I provide an overview of the settlement and Plaintiffs' efforts throughout this litigation.

4. To assist in the Court's assessment of reasonable attorneys' fees, below I provide a detailed summary of Plaintiffs' counsels' efforts devoted to litigating this action and delivering this settlement. I will also provide support for our firms' billing rates, litigation-cost contributions, and other information that may be relevant to the Court's consideration of final

approval or to attorneys' fees, cost reimbursement, and class representative service awards. We advanced all costs of the litigation and have yet to receive any reimbursement.

5. Below, to assist in the Court's understanding of the nature and quantity of the work that our firms undertook to investigate, litigate, and ultimately resolve this case on behalf of the nationwide class, I provide (i) the total number of hours billed by our lawyers and legal-staff members; (ii) each of those individuals' hourly billing rates; (iii) the resulting lodestar; and (iv) a summary of the work performed by counsel at each stage of this litigation.

6. To assist the Court in understanding Plaintiffs' expenses, I have also provided a breakdown of expenses by type.

7. Finally, in support of class representative service awards, I have provided a summary of each named plaintiffs' efforts and hours dedicated on behalf of the class.

## I. An Overview of the Settlement Terms

8. The Settlement Class consists of all U.S. residents who, from September 5, 2013 to September 20, 2023, purchased prescription eyeglasses in the United States from LensCrafters after being fitted with LensCrafters' AccuFit Digital Measuring System. The Settlement Agreement is attached hereto as **Exhibit 1**.

9. The Settlement Agreement is the only extant agreement between the parties.

10. The Settlement establishes a $39 million non-reversionary, common fund.

11. The Settlement contemplates that all class members who submit a claim will receive a pro-rata share of the Net Settlement Fund. Each member who submits a claim is eligible to receive up to $50 for each pair of eyeglasses purchased from LensCrafters, subject to a pro rata reduction.

12. Based on the number of claims received to date, each class member who submitted a claim would receive approximately $50 per pair of eyeglasses, a substantial portion of, or more than, what they would be entitled to had the case gone to trial.

13. Plaintiffs' damage expert estimated $23.28 in damages per pair of eyeglasses.

14. The fund will also cover all settlement-administration and class-notice costs, attorneys' fees and litigation-cost reimbursements, as well as Named Plaintiffs' service awards.

15. As a nationwide class, the Settlement Class benefits more individuals than if Plaintiffs had prevailed at trial. This Court only certified three states, California, New York, and Florida. If the case were to go to trial, only class members from California, New York, and

2

Florida would be entitled to recover damages, leaving Settlement Class members from the remaining 47 states without compensation.

**II.     Summary of Plaintiffs' Counsel's Efforts Throughout the Litigation**

16.     The following tables list the total hours and lodestar for Cohen Milstein, Gordon & Partners, and Christopher J. Rush & Associates attorneys and professional staff who prosecuted this action, followed by a detailed description of counsel's efforts at different points throughout the litigation. As the table reflects, our firms collectively devoted 15,015.65 hours to the litigation over the past six-plus years. In my experience, having litigated and successfully resolved several complex class actions in recent years, and given the nature of this case and the aggressive defense LensCrafters mounted, the number of hours devoted to litigating this case on behalf of the class was reasonable and indeed necessary to achieving the results obtained.

17.     I have exercised billing discretion in the course of reviewing Plaintiffs' counsels' time for the purposes of this motion, and voluntarily reduced the number of hours billed to the litigation. I have removed all attorney and staff hours who worked less than a total of fifty hours on the litigation. In addition, I have not included any time spent on drafting the attorney fee motion in the lodestar calculation.

| Timekeeper | Firm | Title | Bar Date | Rate | Hours | Lodestar |
|---|---|---|---|---|---|---|
| Friedman, Andrew, N. | Cohen Milstein | Partner | 1983 | $1,230 | 95.5 | $117,465.00 |
| Graber, Geoffrey | Cohen Milstein | Partner | 2000 | $1,050 | 2,808.8 | $2,949,240.00 |
| Hamdan, Shireen | Cohen Milstein | Paralegal | N/A | $365 | 2,861.5 | $1,044,447.50 |
| Handmaker-Guido, Sally Mae | Cohen Milstein | Associate | 2011 | $570 | 1,622.75 | $924,967.50 |
| Hartnett, Margaret | Cohen Milstein | Paralegal | N/A | $370 | 80.25 | $29,692.50 |
| Holland, Max | Cohen Milstein | Discovery Attorney | 1995 | $300 | 195.5 | $58,650 |
| Horwitz, Julia | Cohen Milstein | Associate | 2012 | $625 | 90.75 | $56,718.75 |

| Timekeeper | Firm | Title | Bar Date | Rate | Hours | Lodestar |
|---|---|---|---|---|---|---|
| Johnson, Brian | Cohen Milstein | Associate | 2012 | $740 | 2,476.25 | $1,832,425 |
| Kafka, Eric | Cohen Milstein | Partner | 2015 | $825 | 613 | $505,725 |
| Lee, Jihoon | Cohen Milstein | Paralegal | N/A | $390 | 57.5 | $22,425 |
| Leopold, Theodore | Cohen Milstein | Partner | 1988 | $1,230 | 830.25 | $1,021,207.50 |
| Nugent, Victoria, S. | Cohen Milstein | Partner | 1999 | $980 | 53 | $51,940 |
| Pierre, Allison C. | Cohen Milstein | Discovery Attorney | 2000 | $400 | 567 | $226,800 |
| Stephan, Paul | Cohen Milstein | Associate | 2018 | $525 | 1,733.25 | $909,956.25 |
| Toll, Steven, J. | Cohen Milstein | Partner | 1976 | $1,300 | 85.25 | $110,825 |
| Torchiana, Claire | Cohen Milstein | Associate | 2020 | $600 | 363 | $217,800 |
| Wood, Tanya | Cohen Milstein | Paralegal | N/A | $300 | 75.5 | $22,650 |
| Calamusa, Steven | Gordon & Partners | Partner | 1993 | $795 | 172.3 | $136,978.50 |
| Colunga, Tania | Gordon & Partners | Paralegal | N/A | $250 | 49.5 | $12,375 |
| Galucci, Jamie | Gordon & Partners | Paralegal | N/A | $250 | 120.1 | $30,025 |
| Rush, Christopher J. | Christopher J. Rush & Associates, P.A. | Partner | 1986 | $500 | 64.7 | $32,350.00 |
| **Totals** | | | | | **15,015.65** | **$10,314,663.50** |

18.     Cohen Milstein efficiently litigated this case. Although several attorneys worked on the case during the more than six years of litigation, prior to trial preparation the case was almost always staffed with a single partner (myself, Geoffrey Graber), and one or two associates

at any given time (Sally Handmaker-Guido, Paul Stephan, or Brian Johnson).[1] Gordon & Partners staffed the case at all times with a single partner, as did Christopher Rush & Associates.

19. Our firms have submitted fee petitions in other cases that have reported hourly rates at amounts comparable to those sought herein (or their historical equivalents), and courts have approved an award of attorney's fees in such cases. *See e.g., In re Wells Fargo & Co. Sec. Litig.*, Case No. 1:20-cv-04494-JLR-SN (S.D.N.Y. Sept. 8, 2023), ECF No. 206 (Cohen Milstein fees) (Attached hereto as **Exhibit 2**); *Cosby v. KPMG LLP*, 2022 WL 4129703, at *2 (E.D. Tenn. July 12, 2022) (Cohen Milstein fees) (Attached hereto as **Exhibit 3**); *Weiner v. Tivity Health, Inc.*, No. 17-cv-1469, ECF No. 177 at 4 (M.D. Tenn. Oct. 7, 2021) (confirming the "reasonableness" of Cohen Milstein's hourly fees and explaining that the "[t]he use of current (2021) rates is appropriate to 'compensate for the delay in payment during the pendency of the litigation'") (Attached hereto as **Exhibit 4**); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-cv-03591-GHW, (S.D.N.Y. Nov. 21, 2022), ECF No. 303 at 3 (Cohen Milstein fees) (Attached hereto as **Exhibit 5**); *In re ITT Educ. Servs., Inc. Sec. Litig.*, No. 1:13-CV-01620, slip op. at 2 (S.D.N.Y. Mar. 8, 2016), ECF No. 94 at 2. (Cohen Milstein fees) (Attached hereto as **Exhibit 6**); *In re: Animation Workers Antitrust Litig.*; Case No. 5:14-cv-04062-LHK (N.D. Cal. June 5, 2017), ECF No. 402 at 16 (Cohen Milstein fees) (Attached hereto as **Exhibit 7**); *Hankinson v. R.T.G. Furniture Corp., d/b/a Rooms to Go, et al.*, Case No. 9:15-cv-81139 (S.D. Fla. December 15, 2017), ECF No. 213 at 6 (Gordon & Partners fees) (Attached hereto as **Exhibit 8**).

20. Due to the significant time and resources it required, litigating this action over the last six-plus years precluded our firm from accepting additional employment.

21. The attorneys at Cohen Milstein and Gordon & Partners have had considerable success over the course of many years prosecuting complex class actions, including claims similar to those brought here under California, New York, and Florida consumer protection and common law. Additional information about Cohen Milstein and its attorneys can be found in our firm resume, attached as **Exhibit 9**. Additional information about Gordon & Partners and its attorneys can be found in its firm resume, attached as **Exhibit 10**.

---

[1] Mrs. Handmaker-Guido left Cohen Milstein in 2019, and Mr. Stephan left Cohen Milstein in 2022.

22.     Next, to help the Court contextualize the above totals in light of the considerable efforts undertaken in this case, below we segment the litigation into seven time periods. Then, for each time period, we describe what was happening in the litigation, list the major tasks we devoted our time towards, and provide the hours and lodestar figures for each of the attorneys and paralegals who worked on the case during that time period.

A.     **Factual investigation, legal research, expert consultation, motion practice including motions to consolidate; preparation of initial and consolidated complaints (January 2017 to November 2017)**

23.     In advance of filing the initial complaint in this matter, Cohen Milstein attorneys and staff investigated the facts and legal claims at issue, including interviewing former LensCrafters employees; interviewing numerous experts in the optical and manufacturing sectors; undertaking legal research; and meeting and conferring regarding case strategy. This background research corroborated the initial whistleblowers' claims that LensCrafters' AccuFit representations regarding the possibility and value of 0.5mm measurements were unfounded. There were no government investigations to rely on regarding LensCrafters' conduct.

24.     Following their investigation, Cohen Milstein drafted and filed the first Class Action Complaint in this Court on September 5, 2017. ECF No. 1. That same day, Plaintiffs' counsel also filed complaints on behalf of a California and Florida class in the Northern District of California and Southern District of Florida, respectively. Counsel subsequently successfully moved to transfer and consolidate those cases in this Court. Plaintiffs were the only ones to file within any U.S. jurisdiction.

25.     During this time, Cohen Milstein also began preparing the consolidated complaint.

26.     During this time period overall, Cohen Milstein dedicated 473.5 hours to this case.

27.     During this time period, Christopher Rush & Associates dedicated 10.6 hours to this case, including conducting the first interviews with whistleblowers; legal research regarding potential claims; and assisting in reviewing the initial complaints.

28.     During this time, Gordon & Partners dedicated 43.4 hours to the case, including communicating with plaintiffs and reviewing pleading drafts.

29.     During this period, Plaintiffs' counsel collectively devoted 527.5 hours to this case, with their hours and lodestar delineated below:

| Timekeeper | Firm | Hours | Lodestar |
|---|---|---|---|
| Friedman, Andrew, N. | Cohen Milstein | 27 | $33,210 |
| Graber, Geoffrey | Cohen Milstein | 97.25 | $102,112.50 |
| Hamdan, Shireen | Cohen Milstein | 129.75 | $47,358.75 |
| Handmaker-Guido, Sally Mae | Cohen Milstein | 169.75 | $96,757.50 |
| Hartnett, Margaret | Cohen Milstein | 1.75 | $647.50 |
| Kafka, Eric | Cohen Milstein | 23 | $18,975 |
| Leopold, Theodore | Cohen Milstein | 24.75 | $30,442.50 |
| Toll, Steven, J. | Cohen Milstein | .25 | $325 |
| Rush, Christopher | Christopher J. Rush & Associates | 10.6 | $5,300 |
| Calamusa, Steven | Gordon & Partners | 30.5 | $24,247.50 |
| Colunga, Tania | Gordon & Partners | 12.9 | $3,225 |
| **Totals** | | **527.5** | **$362,601.25** |

**B.     Amendment and filing of consolidated complaints, motion to dismiss briefing, extensive written discovery, identification of potential experts (December 2017 to August 2018)**

30.     Following the initial complaint filings, Plaintiffs' counsel devoted their time to filing the amended consolidated complaint, opposing LensCrafters' motion to dismiss, and engaging in extensive written discovery.

31. During this time, Cohen Milstein attorneys and staff dedicated 1,365.5 hours to this case; they:

- Drafted the First Amended Consolidated Complaint, which included researching new potential claims and conducting further fact investigation;

- Opposed LensCrafters' request to file a Motion to Dismiss, which included in depth research regarding Plaintiffs' claims under various state laws, and argued at the hearing regarding the same;

- Held numerous meet and confer sessions with LensCrafters' Counsel to identify relevant ESI systems, as well as negotiating and drafting an ESI protocol and Protective Order;

- Finalized a discovery plan and attended the Rule 26(f) conference, and met and conferred with LensCrafters regarding the same;

- Began discovery, including by identifying and vetting potential experts; drafting and serving initial Requests for Production and Interrogatories; drafting numerous deficiency letters regarding incomplete responses to these initial requests; reviewing and responding to LensCrafters' initial Requests for Production; drafting and filing a motion to compel regarding disclosure of hit reports and search terms; meeting and conferring regarding LensCrafters' 30(b)(6) witnesses;

- Met with Named Plaintiffs in person regarding discovery responses and case updates.

32. During this time period, Christopher Rush & Associates dedicated 8.9 hours to this case, including reviewing and filing the consolidated complaint; reviewing case updates; communicating with witnesses; preparing privilege logs; and conferring with Cohen Milstein attorneys.

33. During this time, Gordon & Partners dedicated 13.4 hours to the case, including reviewing drafts of the pleadings and motion to consolidate; communicating with named plaintiffs; and conferring with co-counsel regarding case developments.

34. During this period, Plaintiffs' counsel collectively devoted 1,387.8 hours to this case, with their hours and lodestar delineated below:

| Timekeeper | Firm | Hours | Lodestar |
|---|---|---|---|
| Friedman, Andrew, N. | Cohen Milstein | 19.5 | $23,985 |
| Graber, Geoffrey | Cohen Milstein | 297 | $311,850 |
| Hamdan, Shireen | Cohen Milstein | 250.5 | $91,432.50 |
| Handmaker-Guido, Sally Mae | Cohen Milstein | 430.5 | $245,385 |
| Johnson, Brian | Cohen Milstein | 69.25 | $51,245 |
| Kafka, Eric | Cohen Milstein | .25 | $206.25 |
| Leopold, Theodore | Cohen Milstein | 127.5 | $156,825 |
| Pierre, Allison C. | Cohen Milstein | 171 | $68,400 |
| Rush, Christopher | Christopher J. Rush & Associates | 8.9 | $4,450 |
| Calamusa, Steven | Gordon & Partners | 8.8 | $6,996 |
| Colunga, Tania | Gordon & Partners | 4.6 | $1,150 |
| **Totals** | | **1,387.8** | **961,924.75** |

**C.** **Continued discovery (including multiple discovery motions), document review, fact-witness depositions; identification and vetting of experts (September 2018 to July 2019)**

35. In September 2018, Plaintiffs' counsel filed their Second Amended Consolidated Complaint, which included the addition of three newly named plaintiffs. They also successfully opposed Defendant's Motion to Strike the complaint. Overall, this next litigation period was primarily devoted to in-depth fact discovery.

36. Cohen Milstein dedicated 5,120 hours to this case during this time period. Among other tasks undertaken, counsel from Cohen Milstein:

- Prepared and finalized a document review protocol;

- Continued to review LensCrafters' documents, which ultimately totaled over 70,000 pages of documents, and culled them for key documents for use at depositions and class certification;
- Drafted and served further sets of Requests for Production and Interrogatories on LensCrafters;
- Met and conferred and exchanged correspondence with LensCrafters regarding discovery disputes;
- Prepared 30(b)(6) notices and subsequently took three 30(b)(6) depositions;
- Drafted numerous motions to compel and attended and argued at hearings regarding the same;
- Continued to research, interview, and consult with experts on topics including damages, consumer survey analyses, ophthalmology manufacturing; ophthalmology, and FDA regulations regarding medical devices;
- Conferenced with a mediator and researched and prepared a detailed mediation brief;
- Deposed percipient witnesses;
- Defended deposition of Plaintiffs' witnesses;
- Met with Named Plaintiffs to prepare them for depositions and defended their depositions;
- Reviewed expert survey analysis;

37. During this time period, Christopher Rush & Associates dedicated 41.6 hours to this case, including reviewing and filing the Second Amended Consolidated complaint; reviewing case updates; communicating with witnesses; and conferring with Cohen Milstein attorneys.

38. During this time, Gordon & Partners dedicated 167.2 hours to the case, including reviewing drafts of case documents, status reports, case orders, and motions to compel; exchanging correspondence with co-counsel; communicating with named plaintiffs; reviewing discovery responses; preparing for and taking deposition of LensCrafters' witness; preparing for and defending named plaintiffs deposition; and assisting co-counsel with deposition preparations.

39. During this period, Plaintiffs' counsel collectively devoted 5,328.8 hours to this case, with their hours and lodestar delineated below:

| Timekeeper | Firm | Hours | Lodestar |
|---|---|---|---|
| Friedman, Andrew, N. | Cohen Milstein | 20.5 | $25,215 |
| Graber, Geoffrey | Cohen Milstein | 966 | $1,014,300 |
| Hamdan, Shireen | Cohen Milstein | 1,046.5 | $381,972.50 |
| Handmaker-Guido, Sally Mae | Cohen Milstein | 1,022.5 | $582,825 |
| Hartnett, Margaret | Cohen Milstein | 46.5 | $17,205 |
| Holland, Max | Cohen Milstein | 195.5 | $58,650 |
| Horwitz, Julia | Cohen Milstein | 90 | $56,250 |
| Johnson, Brian | Cohen Milstein | 966.75 | $715,395 |
| Kafka, Eric | Cohen Milstein | 19.25 | $15,881.25 |
| Lee, Jihoon | Cohen Milstein | 44 | $17,160 |
| Leopold, Theodore | Cohen Milstein | 230.75 | $283,822.50 |
| Pierre, Allison C. | Cohen Milstein | 396 | $158,400 |
| Toll, Steven, J. | Cohen Milstein | .25 | $325 |
| Wood, Tanya | Cohen Milstein | 75.5 | $22,650 |
| Rush, Christopher | Christopher J. Rush & Associates | 41.6 | $20,800 |
| Calamusa, Steven | Gordon & Partners | 90.9 | $72,265 |

| Timekeeper | Firm | Hours | Lodestar |
|---|---|---|---|
| Colunga, Tania | Gordon & Partners | 18.3 | $4,575.00 |
| **Totals** | | **5,328.8** | **$3,462,191.75** |

**D. Working with experts, defensive and offensive expert depositions, continued discovery including fact-witness depositions and discovery motions (August 2019 to December 2019)**

40.    During the end of 2019, Plaintiffs' Counsel primarily worked on expert discovery, while completing fact discovery.

41.    During this time, Cohen Milstein attorneys and staff dedicated 2,058.25 hours to the case; they:

- Continued the review of LensCrafters' documents and culling key documents for use at depositions and for class certification;

- Met and corresponded with Plaintiffs' experts regarding their analyses;

- Worked closely with seven experts to investigate, research, and prepare reports in support of class certification[2];

- Reviewed both Plaintiff and LensCrafters' expert reports and background materials and rebuttal expert reports;

- Prepared and took depositions of LensCrafters' experts;

- Prepared and defended Plaintiffs' experts' depositions;

- Continued fact discovery, including defending Named Plaintiffs' depositions;

- Drafted and filed more motions to compel;

42.    This period also included the early stages of preparation of class-certification briefing.

---

[2] The expert reports are filed at ECF 239, Ex. 7 (Riall), Ex. 31 (Cowan), Ex. 32 (Walter), Ex. 58 (Butler), Ex. 73 (Wagner),Ex. 84 (Eichmann); ECF 150 (Schiff) (under seal).

43. During this time, Gordon & Partners dedicated 42.1 hours to the case, including reviewing drafts of case documents, deposition and hearing transcripts; conferring with co-counsel; and preparing deposition of Named Plaintiffs' relative.

44. During this period, Plaintiffs' counsel collectively devoted 2,100.35 hours to this case, with their hours and lodestar delineated below:

| Timekeeper | Firm | Hours | Lodestar |
| --- | --- | --- | --- |
| Friedman, Andrew, N. | Cohen Milstein | 5.25 | $6,457.50 |
| Graber, Geoffrey | Cohen Milstein | 508.5 | $533,925 |
| Hamdan, Shireen | Cohen Milstein | 290.5 | $106,032.50 |
| Horwitz, Julia | Cohen Milstein | .25 | $156.25 |
| Johnson, Brian | Cohen Milstein | 375.25 | $277,685 |
| Kafka, Eric | Cohen Milstein | 285.5 | $235,537.50 |
| Lee, Jihoon | Cohen Milstein | 11 | $4,290 |
| Leopold, Theodore | Cohen Milstein | 72.75 | $89,482.50 |
| Stephan, Paul | Cohen Milstein | 509.25 | $267,356.25 |
| Calamusa, Steven | Gordon & Partners | 14.6 | $11,607.00 |
| Colunga, Tania | Gordon & Partners | 4.2 | $1,050.00 |
| Galucci, Jamie | Gordon & Partners | 38.8 | $9,700.00 |
| **Totals** | | **2,100.35** | **$1,539,404.50** |

**E. Class Certification briefing, Daubert briefing; Class Certification 23(f) appeal, Settlement negotiations, Summary Judgment briefing, and renewed Daubert briefing (January 2020 to January 2023)**

45.     In addition to some continuing expert discovery in the beginning of 2020, the next two years were primarily devoted to briefing major dispositive motions. Cohen Milstein dedicated 4,075.25 hours to this case during this period. Cohen Milstein attorneys and staff:

- Prepared, researched, and briefed Plaintiffs' Motion for Class Certification, supported by 90 exhibits, and the Reply in Support thereof;

- Prepared for and argued at the pre-motion hearing on Class Certification;

- Prepared, researched, and drafted *Daubert* briefing, including pre-motion conference letters, defensive, and offensive Daubert briefs and replies in support thereof;

- Researched and drafted pre-motion conference letters regarding LensCrafters' request to file a Motion for Summary Judgment;

- After receiving the Court's Order on Class Certification in December 2021, Counsel prepared, drafted and filed the opposition to LensCrafters 23(f) appeal of class certification;

- Prepared and coordinated dissemination of class notice;

- Prepared for and met with mediator Judge Daniel Weinstein and Ambassador David Carden on April 12, 2022 and September 28, 2022 and submitted mediation statement regarding the same;

- Following the failure to resolve the litigation in mediation, engaged in months of ongoing negotiations regarding settlement;

- Researched, briefed, and filed the Opposition to Summary Judgment, supported by 75 exhibits;

- Researched, briefed, and filed defensive *Daubert* motions;

- Began trial preparations by conducting focus groups and mock juries to assess the strength of the case at trial;

46.     During this time period, Christopher Rush & Associates dedicated 3.6 hours to this case, including correspondence with co-counsel; reviewing briefing; communicating with witnesses.

47. During this time, Gordon & Partners dedicated 72.5 hours to the case, including reviewing drafts of case documents including, class certification papers and related correspondence and Court orders; conferring with co-counsel, and correspondence with plaintiffs.

48. During this period, Plaintiffs' counsel collectively devoted 4,151.35 hours to this case, with their hours and lodestar delineated below:

| Timekeeper | Firm | Hours | Lodestar |
|---|---|---|---|
| Friedman, Andrew, N. | Cohen Milstein | 18.25 | $22,447.50 |
| Graber, Geoffrey | Cohen Milstein | 586.5 | $615,825 |
| Hamdan, Shireen | Cohen Milstein | 742.75 | $271,103.75 |
| Hartnett, Margaret | Cohen Milstein | 2.25 | $832.50 |
| Horwitz, Julia | Cohen Milstein | .5 | $312.50 |
| Johnson, Brian | Cohen Milstein | 741 | $548,340 |
| Kafka, Eric | Cohen Milstein | 261.25 | $215,531.25 |
| Lee, Jihoon | Cohen Milstein | 2.5 | $975 |
| Leopold, Theodore | Cohen Milstein | 228 | $280,440 |
| Nugent, Victoria, S. | Cohen Milstein | 45 | $44,100 |
| Stephan, Paul | Cohen Milstein | 1,224 | $642,600 |
| Toll, Steven, J. | Cohen Milstein | 48.75 | $63,375 |
| Torchiana, Claire | Cohen Milstein | 174.5 | $104,700 |
| Rush, Christopher | Christopher J. Rush & Associates | 3.6 | $1,800 |

| Timekeeper | Firm | Hours | Lodestar |
|---|---|---|---|
| Calamusa, Steven | Gordon & Partners | 24.2 | $19,239 |
| Colunga, Tania | Gordon & Partners | 9.5 | $2,375 |
| Galucci, Jamie | Gordon & Partners | 38.8 | $9,700 |
| **Totals** | | **4,151.35** | **$2,843,696.50** |

**F. Trial Preparation; continued settlement negotiations (February 2023 to May 2023)**

49. The next phase of the litigation involved simultaneous trial preparations, and continuing settlement negotiations, which eventually led to the current settlement agreement. During this time, Cohen Milstein attorneys and staff dedicated 1,086 hours to the case; they:

- Drafted proposed jury instructions and a verdict form, and met and conferred with LensCrafters regarding the same;

- Prepared and submitted a witness list for trial;

- Prepared and submitted an exhibit list for trial;

- Researched, drafted, and filed Motions *in Limine*;

- Researched and drafted (though did not ultimately file) Oppositions to LensCrafters' Motions *in Limine*;

- Met with named plaintiffs in person and remotely to update them on case status and assist them in preparing their trial testimony;

- Met with experts to assist in preparing their testimony;

- Reviewed deposition transcripts for all witnesses, and prepared deposition summaries for certain witnesses;

- Continued settlement negotiations, ultimately reaching final terms on a nationwide class settlement and beginning to draft a settlement agreement. Even after the Parties preliminarily agreed on the dollar amount of the Settlement, they continued to negotiate the specifics of the Settlement for an additional four weeks.

50. During this time, Gordon & Partners attorneys and staff dedicated 2.2 hours to the case, including reviewing drafts of trial preparation documents, Court orders; and settlement and related motions for preliminary approval.

51. During this period, Plaintiffs' counsel collectively devoted 1,088.2 hours to this case, with their hours and lodestar delineated below:

| Timekeeper | Firm | Hours | Lodestar |
| --- | --- | --- | --- |
| Friedman, Andrew, N. | Cohen Milstein | 3.5 | $4,305 |
| Graber, Geoffrey | Cohen Milstein | 232.75 | $244,387.50 |
| Hamdan, Shireen | Cohen Milstein | 320 | $116,800 |
| Hartnett, Margaret | Cohen Milstein | 29 | $10,730 |
| Johnson, Brian | Cohen Milstein | 220.5 | $163,170 |
| Kafka, Eric | Cohen Milstein | 19.25 | $15,881.25 |
| Leopold, Theodore | Cohen Milstein | 78.25 | $96,247.50 |
| Nugent, Victoria, S. | Cohen Milstein | 7 | $6,860 |
| Toll, Steven, J. | Cohen Milstein | 28.25 | $36,725 |
| Torchiana, Claire | Cohen Milstein | 147.5 | $88,500 |
| Calamusa, Steven | Gordon & Partners | 2.2 | $1,749 |
| **Totals** | | **1,088.2** | **$785,355.25** |

**G. Settlement agreement and exhibits, settlement administration, preliminary approval, class notice (June 2023 to January 2024)**

52. After agreeing to the terms of the settlement, Plaintiffs' counsel worked to prepare the formal settlement agreement, prepared all of the supporting exhibits (including the

long and short-form notices), and worked with the settlement administrator to devise the notice plan and prepare to roll out the settlement. During this period, Cohen Milstein dedicated 430.55 hours to the case; they:

- Drafted the comprehensive settlement agreement now before the Court, attached hereto as **Exhibit 1**;
- Engaged in a series of negotiations with LensCrafters over the course of four week to finalize the agreement;
- Drafted all exhibits to the settlement, composed of the claim form; long-form class notice, short-form class notice, proposed final and preliminary approval orders;
- Worked with the settlement administrator to craft a plan of allocation, a plan for class notice, and on various other issues relating to implementation of the settlement; and
- Researched, prepared, and filed Plaintiffs' motion for preliminary approval of the settlement and supporting documents;
- Worked with the settlement administrator to effectuate the notice plan, which included finalizing the settlement website and ensuring the dissemination of class notice;
- Responded to class member inquiries;
- Researched and drafted the motion for final approval.

53. All time spent preparing and drafting the motion for attorney's fees has been excluded from the overall lodestar calculations used for the purposes of determining the requested multiplier.

54. Based on my experience in past class action settlements, our efforts are likely to continue in the coming months as we work with the settlement administrator and LensCrafters to finalize implementation of the settlement and respond to class member inquiries.

55. During this time, Gordon & Partners dedicated 1.1 hours to the case, including reviewing settlement documents, and reviewing and preparing time and expense reports.

56. During this period, Plaintiffs' counsel collectively devoted 431.65 hours to this case, with their hours and lodestar delineated below:

| Timekeeper | Firm | Hours | Lodestar |
|---|---|---|---|
| Friedman, Andrew, N. | Cohen Milstein | 1.5 | $1,845 |
| Graber, Geoffrey | Cohen Milstein | 120.8 | $126,840 |
| Hamdan, Shireen | Cohen Milstein | 81.5 | $29,747.50 |
| Hartnett, Margaret | Cohen Milstein | .75 | $277.50 |
| Johnson, Brian | Cohen Milstein | 103.5 | $76,590 |
| Kafka, Eric | Cohen Milstein | 4.5 | $3,712.50 |
| Leopold, Theodore | Cohen Milstein | 68.25 | $83,947.50 |
| Nugent, Victoria, S. | Cohen Milstein | 1 | $980 |
| Toll, Steven, J. | Cohen Milstein | 7.75 | $10,075 |
| Torchiana, Claire | Cohen Milstein | 41 | $24,600 |
| Calamusa, Steven | Gordon & Partners | 1.1 | $874.50 |
| **Totals** | | **431.65** | **$359,489.50** |

## II. A Summary of Plaintiffs' Counsel's Expenses Throughout the Litigation

57. Plaintiffs' counsel jointly incurred $3,646,272.04 in litigation expenses, including class notice costs, to prosecute this action on behalf of the class, as reflected in the following table:

| Cost Category | Amount ($) |
|---|---|
| Expert Witnesses and Consultants | 2,233,749.18 |

| Cost Category | Amount ($) |
|---|---|
| Class Certification notice | 959,493.91 |
| Legal research and data hosting (Westlaw, online research, books; e-discovery vendors) | 139,504.35 |
| Travel (hotels, transportation, meals) | 133,202.43 |
| Mediation | 99,924.70 |
| Court Fees (filing fees and court reporter fees) | 34,718.86 |
| Transcripts/Depositions (including translator service) | 22,887.47 |
| Audio/video and duplicating | 14,891.26 |
| Witness fees (transport, travel, hotels, meals) | 3,903.48 |
| Courier/Mail | 3,097.49 |
| Telephone and video conferencing | 898.91 |
| **Total Expenses** | **3,646,272.04** |

### III.   A Summary of Named Plaintiffs' Efforts on Behalf of the Class

58.     Over the past 6 years, Named Plaintiffs Mariana (Elise) Emmert, Stuart Rogoff, Thomas Allegra, Yesenia Ariza, Gracelynn Tenaglia, and Melissa Verrastro have each devoted at least 100 hours to this litigation, and in some cases significantly more, up to 200 hours. Plaintiffs collectively dedicated a minimum of 600 hours of their time. Each Plaintiff:

- Engaged in multiple lengthy conversations with Plaintiffs' counsel about their experience with LensCrafters eyeglasses prior to joining the litigation;
- Reviewed all versions of the complaint which included them as a class representative;

- Assisted counsel in responding to LensCrafters' 39 requests for production and 13 interrogatories, some of which requested highly sensitive information such as medical records.
- Preserved their documents and performed extensive searches of their documents (including email)
- Stayed on top of the developments in the litigation and met with attorneys on innumerable occasions regarding discovery, pleadings, case status, mediation, and trial preparation.
- Prepared for their depositions and sat for all-day depositions involving intrusive questions about topics such as family members, finances, and medical background. These depositions were highly contentious and stressful for plaintiffs, who are not professional litigants.
- In some cases, plaintiffs endured particularly intrusive discovery, including having to produce family members for depositions. One named plaintiff's non-English speaking, elderly grandmother was deposed, which required a translator for both preparations and the deposition. Another plaintiff's partner was deposed.
- Followed settlement negotiations and provided input on settlement offers.
- Prepared for trial including by reviewing case documents and notes; and meeting with attorneys to go over trial basics, direct testimony outlines, and possible cross-examination testimony.
- Assisted with the motion for final approval by reviewing time records.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 12, 2024

*/s/ Geoffrey Graber*

Geoffrey Graber

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARIZA, et. al,<br><br>    Plaintiffs,<br><br>  v.<br><br>LUXOTTICA RETAIL NORTH AMERICA,<br><br>    Defendant. | Case No. 17-cv-5216 (E.D.N.Y.).<br><br><br>CLASS ACTION |

**CLASS ACTION SETTLEMENT AGREEMENT**

# CLASS ACTION SETTLEMENT AGREEMENT

Plaintiffs and Class Representatives, Thomas Allegra, Yesenia Ariza, Mariana Elise Emmert, Stuart Rogoff, Gracelyn Tenaglia, and Melissa Verrastro (collectively, "Plaintiffs"), and Defendant Luxottica of America Inc. d/b/a LensCrafters f/k/a Luxottica Retail North America Inc. d/b/a LensCrafters ("LensCrafters") (collectively, the "Parties"), hereby enter into this Class Action Settlement Agreement ("Settlement" or "Settlement Agreement" or "Agreement") which provides for the settlement and final resolution of the Action defined below, subject to the approval of the Court. Plaintiffs and LensCrafters are, at times, individually referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

A.     On September 5, 2017, Plaintiffs filed a putative class action complaint against LensCrafters in the United States District Court for the Eastern District of New York captioned *Ariza et al v. Luxottica Retail North America*, No. 1:17-cv-05216-PKC-LB (E.D.N.Y.), the United States District Court for the Northern District of California, captioned *Infante v. Luxottica Retail North America*, No. 3:17-cv-05145-WHA (N.D. Cal.), and in the United States District Court for the Southern District of Florida, captioned *Tenagila v. Luxottica Retail North America*, No. 2:17-cv-14311-DMM (S.D. Fla.).

B.     All three cases were consolidated by the Court on December 8, 2017.

C.     On September 21, 2018, Plaintiffs filed their Second Amended Consolidated Complaint (the "Second Amended Complaint").

D.     The Second Amended Complaint alleges among other things that LensCrafters' AccuFit marketing touted the superiority of AccuFit's 0.1mm measurements over traditional measurements. According to Plaintiffs, this was false or misleading because LensCrafters allegedly lacks the manufacturing capability to fully take advantage of such precise measurements. LensCrafters denies that it committed any wrongdoing.

E.     The Second Amended Complaint alleges violations of state consumer protection laws, including; California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; Florida's Deceptive and Unfair Trade Practices Act, § 501.201, *et seq.*; New York General Business Law § 349 *et seq.*; New York General Business Law § 350 *et seq.*, and for unjust enrichment and fraud under each state's common law.

F.     LensCrafters filed an answer to the Second Amended Complaint on October 30, 2018.

G.     On October 29, 2020, Plaintiffs filed a Motion for Class Certification; and, on December 13, 2021, the Court granted class certification.

H.     The parties briefed two motions for summary judgment filed by LensCrafters, the initial of which led the Court to dismiss Plaintiffs' California equitable claims and permitted Plaintiffs' remaining claims to proceed, the second is still pending before the Court.

I.     This Action has involved over five years of litigation activity, during which time the Parties engaged in substantial pretrial activity in addition to the summary judgment briefing

described above, including extensive written discovery, the production of over 67,000 pages of documents, 40 depositions, the filing of numerous letter motions concerning discovery disputes, expert reports from 13 experts, *Daubert* motions, and preparation for trial, which is set to begin in less than one month on July 10, 2023, absent this Settlement.

        J.      The Parties have conducted multiple mediations with the assistance of former Judge of the U.S. District Court, District of New Jersey, John C. Lifland, and former California Superior Court Judge, Daniel Weinstein.

        NOW, THEREFORE, the Parties, in consideration of the promises, covenants and agreements herein described, and for other good and valuable consideration acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

## 1.      DEFINITIONS

        In addition to the terms defined above, the following terms shall have the meanings set forth below:

        1.1     Recitals. The recitals set forth above are incorporated by reference and are explicitly made part of this Agreement.

        1.2     Definitions. As used in this Agreement, capitalized terms shall have the meanings provided below, unless defined elsewhere in the Agreement:

        (a)     "Action" means the consolidated civil action captioned *Ariza et al v. Luxottica Retail North America*, No. 1:17-cv-05216-PKC-LB, United States District Court for the Eastern District of New York.

        (b)     "Approved Claim" means a Claim submitted by a Claimant that the Settlement Administrator, in its discretion and subject to review by Plaintiffs' Counsel, determines to be timely, accurate, complete, and in proper form.

        (c)     "Approved Claimants" means those Claimants who submitted Approved Claims.

        (d)     "Claim" means a request for relief pursuant to Section 11.1 of this Settlement Agreement submitted by a Class member on a Claim Form to the Settlement Administrator in accordance with the terms of the Settlement Agreement.

        (e)     "Claim Form" means the online web form interface and written Claim form to be provided by the Settlement Administrator to Class members. The online Claim Form interface shall be developed by the Settlement Administrator and is subject to review and approval by the Parties. The written Claim Form shall be substantially in the form attached hereto as Exhibit A.

        (f)     "Claim Deadline" means the date by which all Claim Forms must be postmarked or received by the Settlement Administrator to be considered timely. The Claim Deadline shall be 30 days after the Final Approval (Final Fairness) Hearing.

        (g)     "Claimant" means a Class member who has submitted a Claim by the Claim Deadline.

2

(h)    "Class" or "Nationwide Settlement Class" means all U.S. residents who, from September 5, 2013 to the date of the Preliminary Approval Order (as defined below), purchased prescription eyeglasses in the United States from LensCrafters after being fitted with AccuFit. Excluded from the Class are LensCrafters; LensCrafters' employees, officers, and directors, as well as members of their immediate families; LensCrafters' legal representatives, heirs, and successors; and any judge, justice, or judicial officer who have presided over this matter and the members of their immediate families and judicial staff.

(i)    "Class Counsel" shall mean the law firm of Cohen Milstein Sellers & Toll PLLC.

(j)    "Class Representatives" means Thomas Allegra, Yesenia Ariza, Mariana Elise Emmert, Stuart Rogoff, Gracelynn Tenaglia, and Melissa Verrastro.

(k)    "Effective Date" means the first date by which all of the following events shall have occurred:

i.    The Court has entered the Preliminary Approval Order (as defined herein), substantially in the form of Exhibit B attached hereto;

ii.    The Court has entered the Final Approval Order and Judgment (as defined herein), substantially in the form of Exhibit C attached hereto, and the Final Approval Order and Judgment has been entered approving the Settlement Agreement in all respects, dismissing the Action with prejudice, and such Final Approval Order and Judgment being immediately appealable; and

iii.    The time for appeal from the Final Approval Order and Judgment shall have expired, or if any appeal of the Final Approval Order and Judgment as to the Settlement Agreement is taken, that appeal shall have been finally determined by the highest court, including motions for reconsideration and/or petitions for writ of certiorari, and which Final Approval Order and Judgment is not subject to further adjudication or appeal, and has been confirmed in whole pursuant to the terms of the Settlement Agreement and Final Approval Order and Judgment as entered and effective.

(l)    "Email Notice" means the email notice, substantially in the form of Exhibit D attached hereto. The Email Notice will be sent electronically to the last known email address of all Class members to the extent available.

(m)    "Escrow Fund" shall be an account established by the Settlement Administrator at a financial institution approved by Class Counsel and LensCrafters, and shall be maintained as a qualified settlement fund pursuant to Treasury Regulation § 1.468B-1, et seq.

(n)    "Final Approval (Final Fairness) Hearing" or "Final Approval Hearing" means the hearing at which the Court shall: (i) determine whether to grant final approval to this Settlement Agreement; (ii) consider any timely objections to this Settlement and all responses thereto; and (iii) consider Plaintiffs' Counsel's requests for an award of attorneys' fees, costs and expenses, and Service Awards.

(o)    "Final Approval Order and Judgment" shall mean the order finally approving this Settlement Agreement, which shall be substantially in the form of Exhibit C attached hereto.

3

(p)    "Long Form Notice" means the Notice of Proposed Settlement of Class Action to be published on the Settlement Administrator's website, substantially in the form attached as Exhibit E.

(q)    "Net Settlement Fund" shall mean the Settlement Fund less (subject to Court approval) (1) attorneys' fees plus Class Counsel's reasonable expenses incurred in this litigation; (2) Service Awards to the Class Representatives; and (3) Notice and Administration Expenses.

(r)    "Notice" shall mean, collectively, the communications by which Class members are notified of this Settlement Agreement and the Court's Preliminary Approval of this Settlement Agreement. This includes the Email Notice, Postcard Notice, and a dedicated website which shall include the Long Form Notice.

(s)    "Notice Date" shall be 30 days after entry of the Preliminary Approval Order.

(t)    "Party" and "Parties" shall have the meaning set forth in the introductory paragraph of this Settlement Agreement.

(u)    "Person(s)" shall mean any natural person, individual, corporation, association, partnership, trust, or any other type of legal entity.

(v)    "Plaintiffs" shall have the meaning set forth in the introductory paragraph of this Settlement Agreement.

(w)    "Plaintiffs' Counsel" shall mean the law firms of Cohen Milstein, Sellers & Toll PLLC and Gordon & Partners P.A., Law Office of Christopher Rush, and the Law Office of Charles Reichmann.

(x)    "Preliminary Approval" or "Preliminary Approval Order" shall mean the Court's entry of an order of preliminary approval of this Settlement Agreement, which shall be substantially in the form of Exhibit B attached hereto and submitted to the Court in connection with Preliminary Approval.

(y)    "Postcard Notice" or "Short Form Postcard Notice" means the postcard notice to be sent to the last known address of all Class members in accordance with Paragraphs 7.5 and 7.6, substantially in the form as attached hereto as Exhibit D.

(z)    "Released Claims" shall have the meaning set forth in Paragraphs 12.1 and 12.2 of this Settlement Agreement, and with regard to Released Claims:

(i)    "Plaintiff Releasing Parties" shall have the meaning set forth in Paragraph 12.1 of this Settlement Agreement.

(ii)    "LensCrafters Released Parties" shall mean Luxottica of America Inc., including but not limited to its owners, shareholders, parents, subsidiaries, affiliated entities, predecessors, successors, assigns, divisions, officers, directors, principals, managers, employees, agents, independent contractors, joint ventures, general or limited partners or partnerships, contractors, limited liability companies, and legal representatives, as well as the past and present, insurers, law firms, heirs, personal representatives, executors, administrators, predecessors, successors, and assigns of each of the foregoing.

(iii)   "LensCrafters Releasing Parties" shall mean Luxottica of America Inc. d/b/a LensCrafters f/k/a Luxottica Retail North America Inc. d/b/a LensCrafters.

(iv)   "Releasing Parties" shall mean "Plaintiff Releasing Parties" and "LensCrafters Releasing Parties."

(aa)   "Request for Exclusion" shall mean a request to be excluded from the Class, submitted in accordance with the terms and conditions of this Settlement Agreement and the instructions provided in the Notice.

(bb)   "Service Awards" shall mean cash awards paid to the Class Representatives.

(cc)   "Settlement Administrator" shall mean Kroll Settlement Administration, LLC.

(dd)   "Settlement Fund" shall mean a total of $39 million paid by LensCrafters into the Escrow Fund, as set out below in Paragraph 3.1.1.

(ee)   "Settlement Class List" shall mean a list of all LensCrafters customers that meet the proposed "Class" defined in Section 1.2(i), which LensCrafters will compile based on a good faith review of its records and provide to the Settlement Administrator.

1.3   Singular and Plural. Definitions used herein shall apply to the singular and plural forms of each term defined.

1.4   Gender. Definitions used herein shall apply to the masculine, feminine, and neutral genders of each term defined.

1.5   References to a Person. References to a Person are also to the Person's permitted successors and assigns.

1.6   Terms of Inclusion. Whenever the words "include," "includes" or "including" are used in this Settlement Agreement, they shall not be limiting but rather shall be deemed to be followed by the words "without limitation."

## 2.   COOPERATION BY THE PARTIES

2.1   The Parties and their counsel agree to cooperate fully with each other to promptly execute all documents and take all steps necessary to effectuate the terms and conditions of this Settlement Agreement. The Parties and their counsel further agree to support the final approval of the Settlement Agreement including against any appeal of the Final Approval Order and Judgment including any collateral attack on the Settlement Agreement or the Final Approval Order and Judgment.

## 3.   CONSIDERATION TO PLAINTIFFS

3.1   In exchange for the terms and conditions set forth in this Settlement Agreement, including without limitation the Released Claims set forth in Paragraph 12 below, LensCrafters will provide the following consideration:

3.1.1   Settlement Fund. LensCrafters will pay $39,000,000 (thirty-nine million dollars) to establish a common fund for the benefit of the Class. The Settlement Fund shall be paid in the following manner:

5

     i.  LensCrafters shall pay $5,500,000 (five million five-hundred thousand dollars) of the Settlement Fund into the Escrow Fund within ten (10) calendar days of Preliminary Approval of the Settlement.

     ii.  LensCrafters shall pay $33,500,000 (thirty-three million five hundred thousand dollars) of the Settlement Fund into the Escrow Fund no later than ten (10) calendar days after the Court enters the Final Approval Order and Judgment.

  3.2  Distribution of the Net Settlement Fund. This is a claims-based settlement. There will be no reversion of the Settlement Fund to LensCrafters unless the Court does not approve the Settlement or the Settlement is reversed on appeal. All Class members who submit an Approved Claim, as defined above, will receive a pro rata share of the Net Settlement Fund according to the following guidelines:

    3.2.1 Those Class members who submit an Approved Claim shall each be eligible to receive up to $50 for each set of prescription eyeglasses purchased from LensCrafters during the Class Period subject to *pro rata* reduction if the total claims exceed the Net Settlement Fund.

    3.2.2 In the event that after distribution of Settlement benefits to the Class described above, there would be sufficient funds (after payment of administrative costs associated with a second distribution) to pay at least $1 to each Approved Claimant, then such funds will be distributed in a second distribution to the Approved Claimants on a pro rata basis.

    3.2.3. In the event that after distribution of Settlement benefits in 3.2.1 and 3.2.2 above there is anything remaining in the Net Settlement Fund then the remaining funds shall be subject to a *cy pres* distribution to be mutually agreed to by the Parties and approved by the Court.

**4.  CLASS COUNSEL'S FEES AND COSTS**

  4.1  Application for Attorneys' Fees and Expenses and Service Awards. As provided herein, and pursuant to the common fund doctrine and/or any applicable statutory fee provision, Class Counsel will apply to the Court by motion for an award to Class Counsel for attorneys' fees of up to 33 and 1/3% of the Settlement Fund, for reimbursement of reasonable expenses, for Class Representative Service Awards not to exceed $10,000 per Class Representative, and for costs of Notice and settlement administration, to be paid from the Settlement Fund. Any such request shall be filed at least twenty-one (21) days prior to the deadline to object to the Settlement. Attorneys' fees and expenses awarded by the Court shall be allocated among Plaintiffs' Counsel by Class Counsel in a manner that, in Class Counsel's sole opinion, fairly compensates Plaintiffs' Counsel for their respective contributions to the progress of and results obtained in the litigation.

  4.2  Disbursement of Attorneys' Fees and Expenses. Plaintiffs' attorneys' fees and expenses awarded by the Court shall be paid from the Settlement Fund to Class Counsel to whom such fees and expenses are awarded by the Court within five (5) business days of the date the Court enters its order awarding such fees and expenses or five (5) business days after entry of the Final Approval Order and Judgment, whichever occurs later, notwithstanding the existence of any timely-filed objections thereto, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof. In the event the Court's Final Approval Order and Judgment is reversed, vacated or modified on motion for reconsideration or on appeal such that the amount of attorneys' fees and expenses are reduced or the Settlement is not approved as set forth in this Agreement: 1) in the case of a reduction of the fees and expenses, Class Counsel shall be jointly and severally liable and agrees to repay any excess amount of attorneys' fees and expenses plus

6

interest at the rate earned by the Settlement Fund to the Escrow Fund within five (5) calendar days of the event that results in reduction of the award; or 2) in the case of the Settlement not being approved or being reversed on appeal, Class Counsel shall be jointly and severally liable and agrees to repay in full all attorneys' fees and expenses plus interest at the rate earned by the Settlement Fund to LensCrafters within five (5) calendar days of the event that results in the Settlement not being approved or being reversed on appeal. Class Counsel hereby agrees to be subject to the jurisdiction of this Court for the purposes of enforcing this provision.

## 5. PRELIMINARY APPROVAL OF SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS

5.1     Preliminary Approval. The Parties acknowledge that prompt approval, consummation, and implementation of this Settlement are essential. The Parties shall cooperate with each other in good faith to carry out the purposes of and effectuate this Settlement, shall promptly perform their respective obligations hereunder, and shall promptly take any and all actions and execute and deliver any and all additional documents and all other materials and information reasonably necessary or appropriate to carry out the terms of this Settlement and the transactions contemplated hereby.

5.1.1     Plaintiffs will file a motion within thirty (30) days of execution of this Agreement, requesting the Court enter a Preliminary Approval Order, which will accomplish the following, among other matters:

a.     Find that the requirements of the Federal Rule of Civil Procedure 23(e)(1) have been satisfied such that the Court will likely be able to approve the Settlement under Rule 23(e)(2) and certify the Settlement Class for purposes of judgment on the proposal;

b.     Find that the procedures set forth in Section VII of this Agreement, including the dissemination of Class Notice, satisfy the requirements of due process and applicable law and procedure, and approve that manner of providing notice to the Settlement Class;

c.     Set a deadline for requesting exclusion from or objecting to the Settlement; and

d.     Set a date and time for the Final Approval Hearing at which the Court will finally determine the fairness, reasonableness, and adequacy of the proposed Settlement.

5.2     Certification of Settlement Class.   Promptly following the execution of this Agreement, and as part of the settlement approval process contemplated in Federal Rule of Civil Procedure 23(e), the parties shall cooperate to seek certification of a Nationwide Settlement Class under Federal Rule of Civil Procedure 23(a) and (b)(3), including the appointment of Class Counsel under Federal Rule of Civil Procedure 23(g).

5.2.1     In entering into this Agreement, LensCrafters does not concede that certification of the National Settlement Class for litigation purposes would have been appropriate in this Action. LensCrafters' agreement to provisional certification does not constitute an admission of wrongdoing, fault, liability, or damage of any kind to Class Representatives or any of the provisional Settlement Class members. LensCrafters is entering into this Agreement to eliminate the burdens, distractions, expense, and uncertainty of further litigation.

5.2.2     In the event that the Court does not enter a Final Approval Order (or if a Final Approval Order is reversed on appeal), all of LensCrafters' defenses to class certification

7

will be preserved, and Plaintiffs and Class Counsel will be precluded from using the provisions of this Section or the Court's certification of the Settlement Class to suggest that a litigation class should be certified.

## 6.   SETTLEMENT ADMINISTRATOR

6.1     The Settlement Administrator will work without limitation to: (i) provide Notice to potential Class members; (ii) maintain a Settlement website; (iii) process Settlement Claim Forms; (iv) confirm the issuance of payments to the Claimants; and (v) provide any necessary certifications to the Court concerning the administration and processing of Claims. The Settlement Administrator will be available to respond to inquiries from Class Counsel, counsel for LensCrafters, and Class members.

6.2     Each Party shall be entitled to full and equal access to information regarding costs expended by the Settlement Administrator in providing Notice and processing Claims in connection with the Settlement and all aspects of Notice, administration, and processing of Claims.

6.3     The Settlement Administrator, subject to such supervision and direction of the Court and/or Class Counsel as may be necessary or as circumstances may require, shall administer and/or oversee distribution of the Settlement Fund to Class members pursuant to this Agreement.

6.4     The Settlement Administrator and Class Counsel are responsible for communicating with Class members regarding the distribution of payments under the Settlement.

## 7.   NOTICE OF SETTLEMENT AND ADMINISTRATION OF CLAIMS

7.1     The Settlement Class List shall be used to ensure Notice is appropriately disseminated to the Settlement Class.

7.2     LensCrafters shall, to the extent it possesses and can identify through reasonable means, provide the Settlement Administrator with the Settlement Class List and for all such persons LensCrafters shall, to the extent it possesses and can identify through reasonable means, provide the individual's (i) name, (ii) email address, (iii) mailing address, and (iv) the number of prescription eyeglasses purchased from LensCrafters during the Class time period.

7.3     LensCrafters will compile the Settlement Class List with all of the information listed in the preceding paragraph and provide it to the Settlement Administrator within seven (7) days  after the Court enters a Preliminary Approval Order.

7.4     The contents of the Settlement Class List shall not be used for any purpose other than for providing Notice to the Class and disbursement of the Net Settlement Fund as described in this Agreement, and the contents of the Settlement Class List shall be treated as private and confidential information and not disseminated, in any manner, to anyone other than the Settlement Administrator. The Parties agree to seek entry of an order by the Court mandating that the Settlement Class List be treated as private, confidential, and proprietary.

7.5     As soon as reasonably practical after the issuance of a Preliminary Approval Order, the Settlement Administrator shall send Notice to the Class via their email addresses and, to the extent there are no valid email addresses or emails are returned undeliverable, their physical mailing addresses, to the extent listed in the Settlement Class List.

7.6     For all Class members for whom the emailed and mailed Class Notice is returned without forwarding address information, the Settlement Administrator shall use reasonable skip

8

tracing techniques to locate an updated email or physical mailing address to provide notice to the best-known address resulting from that search.

7.7    The Settlement Administrator shall diligently report to the Parties the number of notices originally emailed to the Class, the number of notices mailed to the Class, the number of notices initially returned as undeliverable, the number of additional notices mailed after an advanced address search, and the number of those additional notices returned as undeliverable. The Settlement Administrator shall also be responsible for maintaining a current Settlement Class List with updated email and mailing addresses.

7.8    The Settlement Administrator shall set up and maintain a website where the Settlement Administrator will post the Long Form Settlement Notice and Claim Form; a copy of this Agreement; the motion and all supporting papers requesting entry of a Preliminary Approval Order; the Preliminary Approval Order; the motion and all supporting papers requesting entry of a Final Approval Order; any motion and all supporting papers requesting payment of attorneys' fees, litigation cost reimbursements, and class representative Service Awards; and any other documents or information jointly requested by the Parties. The website will also list the date of the Final Approval Hearing.

7.9    The Class Notice will list the URL for the settlement website described in the preceding paragraph as well as a toll-free number for Settlement Class members to call to request a paper copy of the Long Form Settlement Notice and Claim Form, or other pertinent information.

7.10    No later than fourteen (14) days before the Final Approval Hearing, the Settlement Administrator will submit a declaration attesting to the dissemination of Notice consistent with this Agreement.

7.11    The Parties agree that the notice plan set forth in this section constitutes the best notice practicable under the circumstances for the Settlement Class.

7.12    Due to the number of potential Class members, it is expected that the Settlement Administrator will need to send such electronic mail notifications over a period of at least thirty (30) days.  The Settlement Administrator shall use commercially reasonable efforts to complete electronic mailing of these notices to Class members by the Notice Date.

7.13    LensCrafters will cause the Settlement Administrator to serve the notice of settlement required by 28 U.S.C. § 1715 within ten (10) days of the filing of the motion seeking a Preliminary Approval Order. No later than seven (7) days before the Final Approval Hearing, LensCrafters shall cause the Settlement Administrator to file a declaration attesting to its compliance with this provision.

7.14    LensCrafters and its counsel shall not have any responsibility for or liability whatsoever with respect to (i) any act, omission or determination of Class Counsel, the Settlement Administrator, or any of their respective designees or agents, in connection with the administration of the Settlement or otherwise; (ii) the management, investment or distribution of the Settlement Fund; (iii) the formulation, design or terms of the disbursement of the Settlement Fund; (iv) the determination, administration, calculation or payment of any claims asserted against the Settlement Fund; (v) any losses suffered by, or fluctuations in the value of the Settlement Fund; or (vi) the payment or withholding of any taxes, expenses and/or costs incurred in connection with the taxation of the Settlement Fund or the filing of any returns. LensCrafters also shall have no obligation to communicate with Class members and others regarding amounts paid under the

9

Settlement.

7.15    Plaintiffs and Class Counsel shall not have any liability whatsoever with respect to (i) any act, omission or determination of the Settlement Administrator, or any of their respective designees or agents, in connection with the administration of the Settlement or otherwise; (ii) the management, investment or distribution of the Settlement Fund; (iii) the formulation, design or terms of the disbursement of the Settlement Fund; (iv) the determination, administration, calculation or payment of any claims asserted against the Settlement Fund; (v) any losses suffered by, or fluctuations in the value of the Settlement Fund; or (vi) the payment or withholding of any Taxes, expenses and/or costs incurred in connection with the taxation of the Settlement Fund or the filing of any returns.

## 8.    REQUESTS FOR EXCLUSION

8.1    Class members who have not previously opted out of the Class and wish to exclude themselves from the Class must submit a written Request for Exclusion.  To be effective, such a request must include the Class member's name, mailing address, e-mail address, the signature of the Class member, and substantially the following statement, "I want to opt out of the Class certified in the *Ariza v. Luxottica* litigation." Requests for Exclusion may be submitted via First Class U.S. Mail paid by the Class member and sent to the Settlement Administrator at the address provided in the Long Form Notice.

8.2    The Settlement Administrator shall promptly log each Request for Exclusion that is received and shall provide copies of the log and all such Requests for Exclusion to Plaintiffs' Counsel and counsel for LensCrafters within ten (10) business days after the deadline fixed for Class members to request exclusion. In addition, at any time prior to the deadline to request exclusion from the Class, either Party may request a copy of the then-current version of the log of Requests for Exclusion, which shall be provided by the Settlement Administrator within three (3) business days after the request is received.

8.3    Within ten (10) business days after the deadline fixed for Class members to request exclusion from the Class, Plaintiffs' Counsel shall forward to the Settlement Administrator and counsel for LensCrafters copies of any Requests for Exclusion received by Plaintiffs' Counsel.

## 9.    OBJECTIONS

9.1    Class members who do not request exclusion from the Class may object to the Settlement.  Class members who choose to object to the Settlement must file written notices of intent to object with the Court and serve copies of any such objection on counsel for the Parties, as set forth in more detail in Paragraph 9.2. Any Class member may appear at the Final Approval (Final Fairness) Hearing, in person or by counsel, and be heard to the extent permitted under applicable law and allowed by the Court, in opposition to the fairness, reasonableness and adequacy of the settlement, and on Plaintiffs' Counsel's application for an award of attorneys' fees and costs. The right to object to the Settlement must be exercised individually by an individual Class member and, except in the case of a deceased, minor, or incapacitated Person or where represented by counsel, not by the act of another Person acting or purporting to act in a representative capacity.

9.2    To be effective, a notice of intent to object to the Settlement that is filed with the Court must:

10

(a)    Contain a caption that includes the name of the Action and the case number as follows: *Ariza et al v. Luxottica Retail North America*, No. 1:17-cv-05216-PKC-LB.

(b)    Provide the name, address, telephone number and signature of the Class member filing the intent to object;

(c)    Provide the approximate date of his/her purchase(s) of prescription eyeglasses from LensCrafters;

(d)    Be filed with the United States District Court for the Eastern District of New York Clerk of the Court not later than thirty (30) days prior to the Final Approval (Final Fairness) Hearing;

(e)    Be served on Plaintiffs' Counsel and counsel for LensCrafters so as to be received no later than thirty (30) days prior to the Final Approval (Final Fairness) Hearing;

(f)    Contain the name, address, bar number and telephone number of the objecting Class member's counsel, if represented by an attorney;

(g)    Contain the number of class action settlements objected to by the Class member in the last three years; and

(h)    State whether the objecting Class member intends to appear at the Final Approval (Final Fairness) Hearing, either in person or through counsel.

9.3.    In addition to the foregoing, if the Class member is represented by counsel and such counsel intends to speak at the Final Approval (Final Fairness) Hearing, a notice of intent to object must contain the following information:

(a)    A detailed statement of the specific legal and factual basis for each and every objection; and

(b)    A detailed description of any and all evidence the objecting Class member may offer at the Final Approval (Final Fairness) Hearing, including copies of any and all exhibits that the objecting Class member may introduce at the Final Approval (Final Fairness) Hearing.

9.4.    Any Class member who does not file a timely and adequate notice of intent to object in accordance with this Section 9 waives the right to object or to be heard at the Final Approval (Final Fairness) Hearing and shall be forever barred from making any objection to the Settlement. To the extent any Class member objects to the Settlement, and such objection is overruled in whole or in part, such Class member will be forever bound by the Final Approval Order and Judgment of the Court.

9.5.    No later than fifteen (15) calendar days before the Final Approval (Final Fairness) Hearing, the Settlement Administrator shall provide to Plaintiffs' Counsel and counsel for LensCrafters the following information:

(a)    The number of e-mail notices sent to Class members;

(b)    The number of Postcard Notices mailed to Class members;

(c)    The approximate number of visits to the Settlement website from the date of entry of a Preliminary Approval Order;

(d)    The number of Class members who have to date submitted Approved Claim forms;

(e)     The number of Class members who have requested exclusion from the Settlement; and

(f)     Such other similar tracking information reasonably requested by Plaintiffs' Counsel or counsel for LensCrafters.

## 10.    FINAL APPROVAL

10.1    The Notice to the Class shall contain a date, time and location for the Final Approval (Final Fairness) Hearing to be conducted by the Court.  The Final Approval (Final Fairness) Hearing shall be set by the Court after entry of the Preliminary Approval Order on a date at least one hundred (100) days after entry of the Preliminary Approval Order, so as to comply with the Class Action Fairness Act.

10.2    Upon final approval of this Settlement Agreement, the Final Approval Order and Judgment shall be entered by the Court, which shall, *inter alia*:

(a)     Grant final approval to the Settlement and Settlement Agreement as fair, reasonable, adequate, in good faith and in the best interests of the Class, and order the Parties to carry out the provisions of this Settlement Agreement;

(b)     Dismiss with prejudice the Action against LensCrafters and/or the LensCrafters Released Parties;

(c)     Adjudge that the Plaintiff Releasing Parties are conclusively deemed to have released the LensCrafters Released Parties and that LensCrafters is conclusively deemed to have released the Plaintiff Releasing Parties.

(d)     Bar and permanently enjoin each Class member from prosecuting against the LensCrafters Released Parties any and all of the Released Claims; and

(e)     Reserve continuing jurisdiction by the Court to preside over any ongoing proceedings relating to the Claims or this Settlement Agreement.

## 11.    CLAIM PROCESSING AND CASH PAYMENTS

11. 1    Class members must electronically complete and sign the appropriate Claim Form and submit it to the Settlement Administrator via an electronic Claim Form submission process to be established by the Settlement Administrator, submitted not later than thirty (30) calendar days after entry of the Final Approval Order. For those Class members who have requested hard copy Claim Forms, they may submit such Claim Forms via U.S. mail.  A Claim Form shall be considered defective if the Claimant fails to timely submit the Claim Form, provide the required information on the Claim Form, or to electronically (or in the case of a hard copy Claim Form, manually) sign certifying that the Claimant is entitled to the benefit sought.  The deadline for submitting a Claim Form set forth herein shall be the "Claim Form Submission Date."

11.2    Class members will be entitled to file a Claim for each pair of prescription eyeglasses they purchased from LensCrafters during the Class Period.

11.3    Cash payments made pursuant to Paragraph 3.2 above will be made to Claimants via electronic means based on the information provided on the Claim Form, or in the event the Claimant so requests, a physical check will be mailed to the address provided on the Claim Form.

12

11.4    Ninety (90) calendar days or as soon as practical after the entry of the Final Approval Order and Judgment and the exhaustion of any appeals (e.g., deadline for filing notice of appeal), the Settlement Administrator will distribute payments, as set forth in Paragraph 11.3 above, to the Class members who have submitted an Approved Claim, as well as Service Awards to the Class Representatives as set forth in Paragraph 4.1. However, in no event will payments be made to Class members or Class Representatives until the Settlement Fund is fully funded by LensCrafters, pursuant to Paragraph 3.1.1(i)-(ii) above.

11.5    Within sixty (60) calendar days or as soon as practical after the entry of the Final Approval Order, the Settlement Administrator will notify Class Counsel of any Class member who has submitted a deficient Claim Form, and those Class members will be given ten (10) calendar days to cure the deficiency.

11.6    The Class members acknowledge that the Claims process may take longer than described above due to the number of potential Class members. The Settlement Administrator will employ all due commercially reasonable speed to distribute claimed cash payments as set forth herein.

11.7    Other than the Service Awards set forth in Paragraph 3.1.2, the cash payments set forth above shall be the only payments to which any Class member will be entitled pursuant to this Settlement Agreement, and each Class member will only be entitled to such cash payment if they submit an Approved Claim.

## 12.    RELEASE BY ALL SETTLEMENT CLASS MEMBERS

12.1    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each member of the Class who has not filed a valid Request for Exclusion ("Plaintiff Releasing Parties"), on behalf of themselves, their current, former, and future heirs, executors, administrators, successors, attorneys, insurers, agents, representatives, and assigns, and any Person they represent, fully and forever release, acquit, and discharge the LensCrafters Released Parties collectively, separately, individually and severally, from, and covenant not to sue for, any and all claims, suits, demands, rights, liabilities, grievances, damages, remedies, liquidated damages, punitive damages, attorneys' fees, penalties, losses, actions, and causes of action of every nature and description whatsoever, whether known or unknown, suspected or unsuspected, asserted or  unasserted, whether in tort, contract, statute, rule, ordinance, order, regulation, common law, public policy, equity, or otherwise, whether class, representative, individual or otherwise in  nature, that were alleged or asserted in the Action or that arise out of or relate directly or indirectly in any manner whatsoever to facts alleged or asserted or that could have been alleged or asserted in the Action ("Plaintiff Released Claims"). It is expressly intended and understood by the Parties that Plaintiff Released Claims shall in all respects be construed as broadly as possible, consistent with all applicable law, as a complete settlement, accord, and satisfaction of the Plaintiff Released Claims; provided, however that the Plaintiff Released Claims shall not include any claims to enforce the Settlement Agreement or Plaintiffs' Counsel's request for fees and expenses in the Action pursuant to Paragraph 4.  With respect to the Plaintiff Released Claims, the Plaintiff Releasing Parties shall expressly waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his**

13

> **or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

In agreeing to the foregoing waiver, the Plaintiff Releasing Parties expressly acknowledge and understand that they may hereafter discover facts in addition to or different from those which they now believe to be true with respect to the subject matter of the matters released herein, but expressly agree that they have taken these possibilities into account in electing to participate in this release, and that the release given herein shall be and remain in effect as a full and complete release notwithstanding the discovery or existence of any such additional or different facts, as to which the Releasing Parties expressly assume the risk.

12.2    The Plaintiff Releasing Parties, on behalf of themselves, their current, former, and future heirs, executors, administrators, successors, attorneys, insurers, agents, representatives, and assigns, and any Person they represent, agree not to sue or otherwise make a claim against any of the LensCrafters Released Parties that is in any way related to the LensCrafters Released Claims.

12.3    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, LensCrafters fully and forever releases, acquits, and discharges Plaintiff Releasing Parties, collectively, separately, individually and severally, from, and covenant not to sue for, any and all claims, suits, demands, rights, liabilities, grievances, damages, remedies, liquidated damages, losses, actions, and causes of action of every nature and description whatsoever, whether known or unknown, suspected or unsuspected, asserted or unasserted, whether in tort, contract, statute, rule, ordinance, order, regulation, common law, public policy, equity, or otherwise, whether class, representative, individual or otherwise in nature, that were alleged or asserted in the Action, or that arise out of or relate directly or indirectly in any manner whatsoever to facts alleged or that could have been alleged or asserted in the Action ("LensCrafters Released Claims"); provided, however that the LensCrafters Released Claims shall not include any claims to enforce the Settlement Agreement or Plaintiffs' Counsel's request for fees and expenses in the Action pursuant to Paragraph 4. With respect to the LensCrafters Released Claims, LensCrafters shall expressly waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

In agreeing to the foregoing waiver, LensCrafters expressly acknowledges and understands that it may hereafter discover facts in addition to or different from those which it now believes to be true with respect to the subject matter of the matters released herein, but expressly agrees that it has taken these possibilities into account in electing to participate in this release, and that the release given herein shall be and remain in effect as a full and complete release notwithstanding the discovery or existence of any such additional or different facts, as to which the LensCrafters expressly assume the risk.

12.4    As of the Effective Date, by operation of the entry of the Final Approval Order and Judgment, each Class member who does not file a valid Request for Exclusion, automatically,

14

upon entry of the Final Approval Order and Judgment, shall be held to have fully released, waived, relinquished and discharged the LensCrafters Released Parties from the Plaintiff Released Claims, to the fullest extent permitted by law, and shall be enjoined from continuing, instituting or prosecuting any legal proceeding against the LensCrafters Released Parties relating in any way whatsoever to the Plaintiff Released Claims.

12.5    The Plaintiff Releasing Parties and LensCrafters stipulate and agree that upon the Court's entry of the Final Approval Order and Judgment, this Action shall be dismissed with prejudice.

## 13.    PUBLIC STATEMENTS

13.1    All public disclosures required by law, such as settlement notice, shall be neutral and mutually acceptable to both parties. The Parties shall not make any public statements disparaging any other of the Parties. Any public comments from the Parties about the settlement or litigation, other than disclosures required by law, shall not substantially deviate from words to the effect that the Parties reached a mutually acceptable resolution by way of a mediated settlement. The Parties hereby agree that they will not issue any press releases related to this Settlement Agreement or the Action. Notwithstanding the foregoing, Class Counsel shall be permitted to post on its website that it secured final approval of a $39 million settlement from LensCrafters for a nationwide class. In addition, a Party may publicly respond to an article or other public statement if the article or other public statement contains negative or disparaging comments about that Party, provided that the Party shall provide notice of such public response before publication.

## 14.    AMENDMENT

14.1    This Agreement may be modified, amended or supplemented only by written agreement signed by or on behalf of all Parties and, if such modification, amendment or supplement is to be executed and become effective subsequent to the entry of the Preliminary Approval Order, only with the approval of the Court.

## 15.    AUTOMATIC TERMINATION OF SETTLEMENT AGREEMENT AND TERMINATION RIGHTS

15.1    In the event that this Settlement Agreement does not become final for any reason,

(a)    Except as expressly stated herein, this Settlement Agreement shall automatically become null and void and have no further force or effect, and all proceedings that have taken place with regard to this Settlement Agreement and the Settlement shall be without prejudice to the rights and contentions of the Parties hereto;

(b)    Each Party shall be restored to their respective positions as of the date this Settlement Agreement is executed;

(c)    The amount deposited by LensCrafters into the Escrow Account, plus accrued interest, shall be refunded to LensCrafters, less any costs incurred by the settlement administrator in providing notice and processing claims. Further, if the Final Approval Order is reversed on appeal, then the Parties hereby agree that at LensCrafters' request and in LensCrafters' sole discretion, the full balance of the Settlement Amount then-remaining in the Escrow Account, including accrued interest, shall be refunded to LensCrafters within five (5) calendar days of said request. Class Counsel must also repay to LensCrafters all funds withdrawn from the Escrow

15

Account for Attorneys' Fees and Costs awarded by the Court to Class Counsel within five (5) calendar days of said request.

(d)      This Settlement Agreement, all of its provisions (including, without limitation, any provisions concerning Class certification), and all negotiations, statements and proceedings relating to this Settlement Agreement shall be without prejudice to the rights of any of the Parties, each of whom shall be restored to their respective position as of the date of signing this agreement;

(e)      This Settlement Agreement, any provision of this Settlement Agreement, and the fact of this Settlement Agreement having been made, shall not be admissible or entered into evidence for any purpose whatsoever; nor will any information produced solely in connection with any of the Parties' mediations be admissible.(f)Any judgment or order entered in connection with this Settlement Agreement will be vacated and will be without any force or effect; and

(g)      This Section shall survive any termination of this Settlement Agreement.

15.2    LensCrafters shall have the right to terminate this Settlement Agreement by serving on Class Counsel and filing with the Court a notice of termination within fourteen (14) days after its receipt of the information provided under Paragraphs 8.2 and 8.3, if the number of Class members who file valid Requests for Exclusion equals or exceeds 5% of the Class.

**16.    SEVERABILITY**

16.1    With the exception of the provisions contained in Section 12 herein, in the event any covenant, term or other provision contained in this Settlement Agreement is held to be invalid, void or illegal, the same shall be deemed severed from the remainder of this Settlement Agreement and shall in no way affect, impair or invalidate any other covenant, condition or other provision herein. If any covenant, condition or other provision herein is held to be invalid due to its scope or breadth, such covenant, condition or other provision shall be deemed valid to the extent of the scope or breadth permitted by law.

**17.    INCORPORATION OF EXHIBITS**

17.1    All exhibits attached hereto are hereby incorporated by reference as though set forth fully herein and are a material part of this Settlement Agreement. Any notice or other exhibit attached hereto that requires approval of the Court must be approved without material alteration from its current form in order for this Settlement Agreement to become effective.

**18.    GOVERNING   LAW   AND   COMPLIANCE   WITH   TERMS   OF SETTLEMENT AGREEMENT**

18.1    All questions with respect to the construction of this Settlement Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of New York, without giving effect to its law of conflict of laws.

18.2    The Court shall have continuing jurisdiction to resolve any dispute that may arise with regard to the terms and conditions of this Settlement Agreement as well as enforce the injunctions set forth in this Agreement, and the Parties hereby consent to such jurisdiction.

**19.    NO ADMISSION OF WRONGDOING**

19.1    This Settlement Agreement is made to terminate any and all controversies, real or potential, asserted or unasserted, and claims for injuries or damages or any nature whatsoever, real

16

or potential, asserted or unasserted, between LensCrafters and the Plaintiffs. Neither the execution and delivery of this Settlement Agreement nor compliance with its terms shall constitute an admission of any fault or liability on the part of LensCrafters, or any of its respective agents, attorneys, representatives, or employees. LensCrafters in no way admits fault or liability of any sort and, in fact, LensCrafters expressly denies fault and liability.

**20.   PREPARATION OF SETTLEMENT AGREEMENT, SEPARATE COUNSEL AND AUTHORITY TO ENTER SETTLEMENT AGREEMENT**

20.1   The Parties and their counsel have each participated and cooperated in the drafting and preparation of this Settlement Agreement. Hence, in any construction to be made of this Settlement Agreement, the same shall not be construed against any Party as drafter of the Settlement Agreement.

20.2   The Parties each acknowledge that he, she or it has been represented by counsel of his, her or its own choice throughout all of the negotiations that led to the execution of this Settlement Agreement and in connection with the preparation and execution of this Settlement Agreement.

20.3   The Parties each represent and warrant that each of the Persons executing this Settlement Agreement is duly empowered and authorized to do so.

**21.   HEADINGS**

21.1   The headings contained in this Settlement Agreement are for reference only and are not to be construed in any way as a part of the Settlement Agreement.

**22.   COUNTERPARTS**

22.1   This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**23.   BINDING EFFECT**

23.1   This Settlement Agreement shall be binding upon and inure to the benefit of the Parties hereto and to their respective heirs, assigns, and successors-in-interest.

**24.   ENTIRE AGREEMENT**

24.1   This Settlement Agreement represents the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior contemporaneous oral and written agreements and discussions. Each of the Parties covenants that he, she or it has not entered into this Settlement Agreement as a result of any representation, agreement, inducement, or coercion, except to the extent specifically provided herein. Each Party further covenants that the consideration recited herein is the only consideration for entering into this Settlement Agreement and that no promises or representations of another or further consideration have been made by any Person.

**25.   NOTICE**

25.1   All notices, requests, demands and other communications required or permitted to be given pursuant to this Settlement Agreement shall be in writing and shall be delivered

17

personally or mailed postage pre-paid by First Class U.S. Mail to the following persons at their addresses set forth as follows:

**Class Counsel**

COHEN MILSTEIN SELLERS & TOLL PLLC
Geoffrey Graber
1100 New York Avenue, N.W.
Suite 500 East
Washington, DC 20005-3964

**LensCrafters' Counsel**

BLANK ROME LLP
Frank A. Dante
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103

WHEREFORE, the undersigned, being duly authorized, have caused this Settlement Agreement to be executed on the dates shown below and agree that it shall take effect on the last date of execution by all undersigned representatives of the Parties.

DATED June __27__, 2023

**PLAINTIFF:**

_____
Geoffrey Graber
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W., Suite 500 East
Washington, DC 20005-3964
Telephone: (202) 408-4600
**Plaintiffs' Class Counsel**

18

**LENSCRAFTERS:**

_____

Frank A. Dante
BLANK ROME LLP
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5645
**Attorneys for Luxottica of America Inc. d/b/a LensCrafters f/k/a Luxottica Retail North America Inc. d/b/a LensCrafters**

_____

By: Sara Francescutto

Its: _____ CFO North America

Date: ____ 6|21|23

**Luxottica of America Inc. d/b/a LensCrafters f/k/a Luxottica Retail North America Inc. d/b/a LensCrafters**

19

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE WELLS FARGO & COMPANY
SECURITIES LITIGATION

Case No. 1:20-cv-04494-JLR-SN

**ORDER AWARDING**
**ATTORNEYS' FEES AND LITIGATION EXPENSES**

This matter came on for hearing on September 8, 2023 (the "Settlement Hearing") on Lead Counsel's motion for attorneys' fees and Litigation Expenses.  The Court having considered all matters submitted to it at the Settlement Hearing and otherwise; it appearing that: (i) the Notice of the Settlement Hearing was mailed to all Settlement Class Members who or which could be identified with reasonable effort substantially in the form approved by the Court and (ii) a summary notice of the hearing substantially in the form approved by the Court was published in *The Wall Street Journal* and *Investor's Business Daily* and released over *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and Litigation Expenses requested; and, for the reasons set forth more fully at the Settlement Hearing,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated May 8, 2023 (ECF No. 178-1), and as amended on August 31, 2023 (the "Stipulation") and all terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2.      The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Settlement Class Members.

3.      Notice of Lead Counsel's motion for attorneys' fees and Litigation Expenses was given to all Settlement Class Members who could be identified with reasonable effort.  The form and method of notifying the Settlement Class of the motion for attorneys' fees and expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(7), and due process; constituted the best notice practicable under the circumstances; and constituted due and sufficient notice to all persons and entities entitled thereto.

4.      Plaintiffs' Counsel are hereby awarded attorneys' fees in the amount of 18% of the Settlement Fund, net of Litigation Expenses awarded, plus interest earned at the same rate as the Settlement Fund.  Plaintiffs' Counsel are also hereby awarded $1,130,909.85 for payment of their litigation expenses.  These attorneys' fees and expenses shall be paid from the Settlement Fund and the Court finds these sums to be fair and reasonable.  Lead Counsel shall allocate the attorneys' fees awarded among Plaintiffs' Counsel in a manner in which they, in good faith, believe reflects the contributions of such counsel to the institution, prosecution, and settlement of the Action.

5.      In making this award of attorneys' fees and payment of litigation expenses from the Settlement Fund, the Court has considered and found that:

a.      The Settlement has created a fund of $1,000,000,000 in cash that has been funded into escrow pursuant to the terms of the Stipulation, and that numerous Settlement Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Plaintiffs' Counsel;

b.      The requested fee has been reviewed and approved as reasonable by all four Lead Plaintiffs, institutional investors that actively supervised the Action, and is below the

2

fee permitted under the most restrictive of the retention agreements entered into between Lead Plaintiffs and Lead Counsel at the outset of the litigation;

c.      Copies of the Notice were mailed to over 1,835,000 potential Settlement Class Members and nominees stating that Lead Counsel would apply for attorneys' fees in an amount not to exceed 19% of the Settlement Fund and payment of Litigation Expenses in an amount not to exceed $2,000,000.  Three objections to the requested award of attorneys' fees were submitted (by Patricia A. White, Larry D. Killion, and Charles Aaron McIntyre), and each of these objections are overruled;

d.      Lead Counsel conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy;

e.      The Action raised a number of complex issues;

f.      Had Lead Counsel not achieved the Settlement there would remain a significant risk that Lead Plaintiffs and the other members of the Settlement Class may have recovered less or nothing from Defendants;

g.      The amount of attorneys' fees awarded and expenses to be paid from the Settlement Fund are fair and reasonable and consistent with awards in similar cases on a percentage basis and when considering a lodestar cross-check.

6.      Lead Plaintiff Handelsbanken Fonder AB is hereby awarded $62,650.00 from the Settlement Fund as reimbursement for its reasonable costs and expenses directly related to its representation of the Settlement Class.

7.      Lead Plaintiff Public Employees' Retirement System of Mississippi is hereby awarded $17,550.00 from the Settlement Fund as reimbursement for its reasonable costs and expenses directly related to its representation of the Settlement Class.

3

8.      Louisiana Sheriffs' Pension & Relief Fund is hereby awarded $3,400.00 from the Settlement Fund as reimbursement for its reasonable costs and expenses directly related to its representation of the Settlement Class.

9.      Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

10.     Exclusive jurisdiction is hereby retained over the Parties and the Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order.

11.     In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

12.     There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

SO ORDERED this __8th__ day of __September__ 2023.


_____
The Honorable Jennifer L. Rochon
United States District Judge

4

# EXHIBIT 3

**Cosby v. KPMG LLP, Not Reported in Fed. Supp. (2022)**

2022 WL 4129703

2022 WL 4129703
Only the Westlaw citation is currently available.
United States District Court, E.D. Tennessee.

Lewis COSBY, Eric Montague, and Martin
Ziesman, as Co-Trustee for the Carolyn K.
Ziesman Revocable Trust, on behalf of themselves
and all others similarly situated, Plaintiffs,

v.

KPMG LLP, Defendant.

No.: 3:16-cv-121-TAV-DCP
|
Signed July 12, 2022

**Attorneys and Law Firms**

Jonathon Tanner Ball, Gordon Ball Law Office PLLC, Knoxville, TN, Laura Posner, Pro Hac Vice, Cohen, Milstein, Sellers & Toll PLLC, New York, NY, Steven J. Toll, Pro Hac Vice, Jan Messerschmidt, Pro Hac Vice, Cohen, Milstein, Sellers & Toll PLLC, Washington, DC, Gordon Ball, Nashville, TN, for Plaintiffs Lewis Cosby, Kenneth R. Martin.

Jonathon Tanner Ball, Gordon Ball Law Office PLLC, Knoxville, TN, Jan Messerschmidt, Pro Hac Vice, Cohen, Milstein, Sellers & Toll PLLC, Washington, DC, Gordon Ball, Nashville, TN, for Plaintiffs Martin Weakley, Martin Ziesman, Eric Montague.

Allyson E. Riemma, Pro Hac Vice, McDermott, Will & Emery, Chicago, IL, Ariel Atlas, Pro Hac Vice, Sidley Austin LLP, New York, NY, Gregory G. Ballard, Pro Hac Vice, Ludwig von Rigal, Pro Hac Vice, McDermott Will & Emery LLP, New York, NY, Gary F. Bendinger, Pro Hac Vice, Lewis Roca Rothgerber Christie, LLP, Phoenix, AZ, Paul S. Davidson, Katie Blankenship, Waller, Lansden, Dortch & Davis, LLP, Nashville, TN, for Defendant.

## ORDER AWARDING ATTORNEYS' FEES AND LITIGATION EXPENSES

Thomas A. Varlan, UNITED STATES DISTRICT JUDGE

**\*1** This matter came on for hearing on June 30, 2022 (the "Settlement Hearing") on Lead Plaintiffs' and Class Representative's motion for attorneys' fees and litigation expenses. The Court having considered all matters submitted

to it at the Settlement Hearing and otherwise; and it appearing that notice of the Settlement Hearing approved by the Court was mailed to all Settlement Class Members who or which could be identified with reasonable effort, and that a summary notice of the hearing approved by the Court was published in *IBD Weekly* and was transmitted over the *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and litigation expenses requested,

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated March 11, 2022 [Doc. 236] (the "Stipulation"), and all terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Settlement Class Members.

3. Notice of Lead Plaintiffs' and Class Representative's motion for an award of attorneys' fees and litigation expenses was given to all Settlement Class Members who could be identified with reasonable effort. The form and method of notifying the Settlement Class of the motion for an award of attorneys' fees and litigation expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(a)(7)), due process, and all other applicable laws and rules, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

4. Co-Lead Counsel is hereby awarded attorneys' fees in the amount of 33 1/3% of the Settlement Fund, or $11,666,667, plus accrued interest, subject to Magistrate Judge Poplin's determination of the appropriate division of the attorneys' fee award between Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and Gordon Ball PLLC ("Gordon Ball"), to be paid from the Settlement Fund.

5. Cohen Milstein is hereby awarded $439,548.22 and Gordon Ball is hereby awarded $117,956.87 in reimbursement for each firm's respective litigation expenses, plus accrued interest, to be paid from the Settlement Fund.

Cosby v. KPMG LLP, Not Reported in Fed. Supp. (2022)

2022 WL 4129703

6. The awarded attorneys' fees shall be payable to Co-Lead Counsel following the final determination by Magistrate Judge Poplin (if unappealable to Judge Varlan), or final determination by Judge Varlan in the event Magistrate Judge Poplin issues a report and recommendation, regarding the appropriate division of the attorneys' fee award subject to the terms, conditions and obligations of the Stipulation and in particular paragraph 18 thereof, which terms, conditions and obligations are incorporated herein. The awarded litigation expenses shall be payable to Co-Lead Counsel immediately upon execution of this Order subject to the terms, conditions and obligations of the Stipulation, which terms, conditions and obligations are incorporated herein.

**\*2** 7. In making this award of attorneys' fees and litigation expenses to be paid from the Settlement Fund, the Court has considered and found that:

a) The Settlement has created a common benefit fund for the Settlement Class, so it is appropriate to assess the attorneys' fees against the fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

b) Co-Lead Counsel's fee award is fair and reasonable under the percentage-of-the-fund approach. This is the preferred method where, as here, "a substantial common fund has been established for the benefit of class members through the efforts of class counsel." *In re Southeastern Milk Antitrust Litig.*, No. 2:07-CV-208, 2013 WL 2155387, at \*2 (E.D. Tenn. May 17, 2013). The requested fee of 33 1/3% "is certainly within the range of fees often awarded in common fund cases, both nationwide and in the Sixth Circuit," and is appropriate given the excellent result Co-Lead Counsel achieved notwithstanding substantial risk. *Id.* at \*3.

c) The requested fee meets all the factors that the Sixth Circuit articulated in *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974), specifically:

(i) The recovery of $35,000,000, which represents nearly 18% of the Classes estimated maximum damages is an excellent outcome for the Settlement Class, especially relative to the historical range of securities class action settlements, *see, e.g.*, Cornerstone Research, *Securities Class Action Settlements: 2021 Review and Analysis*, at 8 (2022) (stating that for all settlements in Section 11 securities cases from 2012 to 2021,

the average settlement was 7.6% of "simplified tiered damages."); NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2021 Full Year Review*, at 23 (2022) (noting that for cases settled between December 2012 and December 2021, the median of settlement value as a percentage of "NERA-Defined Investor Losses" by level of "Investor Losses" was 2.8% for cases with investor losses between $100 and $199 million.).

(ii) Society has a strong interest in compensating Co-Lead Counsel for the risks and complex issues posed by this case, thereby encouraging others to bring similar litigation in the future.

(iii) Fees and reimbursement of costs in this case were entirely contingent upon success, creating a risk of under-compensation in the absence of settlement or victory at trial, *see Southeastern Milk*, 2013 WL 2155387, at \*5.

(iv) This class action involved complicated facts and complex legal issues and economic analysis, requiring Co-Lead Counsel to overcome substantial hurdles to prove their claims.

(v) Co-Lead Counsel displayed skill and commitment throughout the litigation.

d) The Court has confirmed the reasonableness of Co-Lead Counsel's fee request by conducting a lodestar cross-check with just Cohen Milstein's time. While Cohen Milstein's time alone is sufficient, the Court also notes that Mr. Ball has offered to the Court the absence of his reported time. The lodestar cross-check involves multiplying reasonable rates by reasonable hours. *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016). The sum may then be increased by a "multiplier" to account for the costs and risks involved in the litigation, as well as the complexities of the case and the size of the recovery. *Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharm., Inc.*, No. 3:15-CV-1100, 2020 WL 3053468, at \*1 (M.D. Tenn. May 29, 2020). The Court finds that Cohen Milstein's reasonable lodestar was $4,082,955.00 based on its hours billed and billing rates, and that an award of $11,666,667 yields a multiplier of 2.86 on Cohen Milstein's time. This multiplier falls within an acceptable range. *See, e.g., In re Cardinal Health Inc. Sec. Litigs.*, 528 F. Supp. 2d 752, 767–68 (S.D. Ohio 2007) (awarding a multiplier of 6.0 and

**Cosby v. KPMG LLP, Not Reported in Fed. Supp. (2022)**

2022 WL 4129703

noting that typical multipliers range from 1.3 to 4.5). The use of current (2022) rates is appropriate to "compensate for the delay in payment during the pendency of the litigation." *In re UnumProvident Corp. Derivative Litig.*, No. 1:02-CV-386, 2010 WL 289179, at *6 (E.D. Tenn. Jan. 20, 2010).

 **\*3**  e) Cohen Milstein reasonably incurred a total of $439,548.22 and Gordon Ball reasonably incurred a total of $117,956.87 in litigation expenses for which Co-Lead Counsel seek reimbursement in this case. Co-Lead Counsel "is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document productions, consulting with experts and consultants, travel and other litigation-related expenses." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003). Moreover, this amount is less than the $600,000 limit disclosed in the Notice.

f) No objections were made to Co-Lead Counsel's application for an award of attorneys' fees and reimbursement of costs and expenses, or to Lead Plaintiffs' and Class Representatives' request for reimbursement of its reasonable costs and expenses.

8. In accordance with 15 U.S.C. § 78u-4(a)(4), Mr. Cosby is hereby awarded $25,000.00 and Mr. Montague and Mr. Ziesman are each awarded $10,000.00 from the Settlement Fund, as reimbursement for their reasonable costs and expenses directly related to their representation of the Settlement Class. These awards shall be payable to each of the Lead Plaintiffs immediately upon execution of this Order subject to the terms, conditions and obligations of the Stipulation, which terms, conditions and obligations are incorporated herein.

9. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

10. Exclusive jurisdiction is hereby retained over the parties and the Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order.

11. In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

12. There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

IT SO ORDERED this 12th day of July 2022.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4129703

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

ERIC WEINER, Individually and on Behalf of
All Others Similarly Situated,

                    Plaintiff,

    v.

TIVITY HEALTH, INC., *et al.*,

                   Defendants.

Case No.: 3:17-cv-01469

## ORDER AWARDING ATTORNEYS' FEES AND LITIGATION EXPENSES

This case came on for hearing on October 4, 2021 (the "Settlement Hearing") on Class Representative's motion for attorneys' fees and litigation expenses. The Court having considered the entire record rules as follows:

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated June 10, 2021 (Doc. No. 161) (the "Stipulation"), as amended by the Contingent Amendment to the Stipulation (Doc. No. 173-1), and all terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all parties to the Action, including all Class Members.

3. Notice of Class Representative's motion for an award of attorneys' fees and litigation expenses was given to all Class Members who could be identified with reasonable effort. The form and method of notifying the Class of the motion for an award of attorneys' fees and litigation expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(a)(7)), due process, and all other applicable laws and rules, constituted the best notice practicable under the circumstances, and

1

constituted due and sufficient notice to all persons and entities entitled thereto.

4.     Class Counsel is hereby awarded attorneys' fees in the amount of 25% of the Settlement Fund, or $1,875,000.00, plus accrued interest, and $544,482.46 in reimbursement for Class Counsel and Liaison Counsel's litigation expenses, plus interest, to be paid from the Settlement Fund.

5.     The awarded attorneys' fees and expenses shall be payable to Class Counsel immediately upon execution of this Order subject to the terms, conditions and obligations of the Stipulation and in particular paragraph 19 thereof, which terms, conditions and obligations are incorporated herein. Attorneys' fees and expenses shall be allocated among Class Counsel and Liaison Counsel in the sole discretions of Class Counsel.

6.     In making this award of attorneys' fees and litigation expenses to be paid from the Settlement Fund, the Court has considered and found that:

a)     The Settlement has created a common benefit fund for the class, so it is appropriate to assess the attorneys' fees against the fund. Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980).

b)     Class Counsel's fee award is fair and reasonable under the percentage- of-the-fund approach. This is the preferred method where, as here, "a substantial common fund has been established for the benefit of class members through the efforts of class counsel." In re Southeastern Milk Antitrust Litig., No. 07-208, 2013 WL 2155387, at *2 (E.D. Tenn. May 17, 2013). The requested fee of twenty-five percent "is certainly within the range of fees often awarded in common fund cases, both nationwide and in the Sixth Circuit," and is appropriate given the excellent result Class Counsel achieved notwithstanding substantial risk. Id. at *3.

c)     The requested fee meets all the factors that the Sixth Circuit articulated in Ramey v. Cincinnati Enquirer, Inc., 508 F.2d 1188, 1196 (6th Cir. 1974), specifically:

(i)     The recovery of $7,500,000, which represents 17% to 22% of the Class's estimated class-wide damages, is an excellent outcome for the Class, especially relative to the historical range of securities class action settlements, *see, e.g.*, Cornerstone Research, *Securities Class Action Settlements: 2020 Review and Analysis*, at 6 (2021)[1] (observing that between 2011 and 2020 the median settlement as a percentage of damages in cases with estimated damages of between $25 million and $74 million was 7.6%); NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2018 Full Year Review*, at 35 (2019)[2] (observing that in 2018 the median settlement value as a percentage of estimated damages in cases with losses between $20 million and $49 million was 8.4%).

(ii)    Society has a strong interest in compensating Class Counsel for the risks and complex issues posed by this case, thereby encouraging others to bring similar litigation in the future.

(iii)   Fees and reimbursement of costs in this case were entirely contingent upon success, creating a risk of under-compensation in the absence of settlement or victory at trial, see Lonardo v. Travelers Indem. Co., 706 F. Supp. 2d 766, 795 (N.D. Ohio 2010).

(iv)    Class Counsel devoted over ten thousand hours to this case, and the time value of their services was substantial.

(v)     This class action involved complicated facts and complex legal issues and economic analysis, requiring Class Counsel to overcome substantial hurdles to prove their claims.

(vi)    Class Counsel, who are experienced class action and securities law practitioners, displayed skill and commitment throughout the litigation.

---

[1] https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2020- Review- and- Analysis.
[2] https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Final.pdf.

3

d)    The Court has confirmed the reasonableness of Class Counsel's fee request by conducting a lodestar cross-check. This involves multiplying reasonable rates by reasonable hours. Gascho v. Glob. Fitness Holdings, LLC, 822 F.3d 269, 279 (6th Cir. 2016). The "sum may then be increased by a 'multiplier' to account for the costs and risks involved in the litigation, as well as the complexities of the case and the size of the recovery." In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig., 268 F. Supp. 2d 907, 922 (N.D. Ohio 2003). The Court finds that Class Counsel and Liaison Counsel's reasonable lodestar was $6,856,315 based on hourly billing rates for the period from the inception of the case until June 10, 2021, and that an award of $1,875,000.00 yields a multiplier on a 0.27 percent fee of $6,856,315.00. This multiplier falls well below an acceptable range. See, e.g., In re Cardinal Health Inc. Sec. Litigs., 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (awarding a multiplier of 6.0 and noting that typical multipliers range from 1.3 to 4.5). The use of current (2021) rates is appropriate to "compensate for the delay in payment during the pendency of the litigation." In re UnumProvident Corp. Derivative Litig., No. 02- 386, 2010 WL 289179, at *9 (E.D. Tenn. Jan. 20, 2010).

e)    Class Counsel and Liaison Counsel reasonably incurred a total of $544,482.46 in litigation expenses for which Class Counsel seek reimbursement in this case. Class Counsel "is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and settlement, including expenses incurred in connection with document production, consulting with experts and consultants, travel and other litigation- related expenses." In re Cardizem CD Antitrust Litig., 218 F.R.D. 508, 535 (E.D. Mich. 2003). Moreover, this amount is less than the $750,000 limit disclosed in the Notice.

f)    No objections were made to Class Counsel's application for an award of attorneys' fees and reimbursement of costs and expenses, or to Class Representative's request for reimbursement of its reasonable costs and expenses.

4

7. In accordance with 15 U.S.C. § 78u-4(a)(4), Oklahoma Firefighters Pension and Retirement System is hereby awarded $2,508.00 from the Settlement Fund, as reimbursement for its reasonable costs and expenses directly related to their representation of the Class.

8. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

9. Exclusive jurisdiction is hereby retained over the parties and the Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order.

10. In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

11. There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

5

# EXHIBIT 5

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/21/2022

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------- X

PLUMBERS & PIPEFITTERS NATIONAL
PENSION FUND, and JUAN FRANCISCO
NIEVES, as Trustee of the Gonzalez Coronado
Trust, Individually and on Behalf of All Others
Similarly Situated,

          Plaintiff,

    vs.

KEVIN DAVIS and AMIR ROSENTHAL,

          Defendants.

-------------------------------------- X

Case No.: 1:16-cv-3591-GHW

**ORDER ON LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES**
**AND REIMBURSEMENT OF LITIGATION EXPENSES**

Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation

Expenses ("Fee Application") duly came before the Court for a hearing on November 18, 2022.

The Court has considered the Fee Application and all supporting and other related materials,

including the matters presented at the November 18, 2022 hearing. Due and adequate notice having

been given to the Settlement Class as required by the Court's July 14, 2022 Preliminary Approval

Order (ECF No. 285), and the Court having considered all papers and proceedings had herein and

otherwise being fully informed in the proceedings and good cause appearing therefor:

NOW, THEREFORE, THE COURT FINDS, CONCLUDES AND ORDERS AS

FOLLOWS:

1

1.      This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated December 1, 2021 (ECF No. 268) (the "Stipulation"), and all capitalized terms used, but not defined herein, shall have the same meanings as in the Stipulation.

2.      This Court has jurisdiction over the subject matter of the Action and over all parties to the Action, including all Settlement Class Members.

3.      Notice of the Fee Application was directed to Settlement Class Members in a reasonable manner and complies with Rule 23(h)(1) of the Federal Rules of Civil Procedure, due process, and the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(7), as amended by the Private Securities Litigation Reform Act of 1995.

4.      Settlement Class Members have been given the opportunity to object to the Fee Application in compliance with Rule 23(h)(2) of the Federal Rules of Civil Procedure and no Settlement Class Member has objected to Lead Counsel's request.

5.      The Fee Application is hereby GRANTED.

6.      Lead Counsel is hereby awarded attorneys' fees in the amount of 28% of the Settlement Fund (or $3,640,000), and 28% of the Bankruptcy Settlement Fund (or $322,000), and $854,857.83 in reimbursement for Lead Counsel's Litigation Expenses (which fees and expenses shall be paid to Lead Counsel from the Settlement Funds), which sums the Court finds to be fair and reasonable, plus interest earned at the same rate and for the same period as earned by the Settlement Funds.

7.      Pursuant to paragraph 28 of the Stipulation, the fees and expenses awarded herein shall be payable to Lead Counsel following entry of this Order, notwithstanding the existence of or pendency of any appeal or collateral attack on the Settlement or any part thereof or on this

Order, subject to Lead Counsel's obligation to repay all such amounts with interest pursuant to the terms and conditions set forth in paragraph 28 of the Stipulation.

8.      In making this award of attorneys' fees and reimbursement of expenses to be paid from the Settlement Funds, the Court has considered and found that:

a.  the Settlement has created a fund of $13,000,000 in cash that has been paid into an escrow account for the benefit of the Settlement Class pursuant to the terms of the Stipulation, and Settlement Class Members who submit acceptable Proof of Claim Forms will benefit from the Settlement that occurred because of the efforts of Lead Counsel;

b.  the Bankruptcy Settlement has created a fund of $1,150,000 in cash that has been paid into an escrow account for the benefit of the Settlement Class pursuant to prior Bankruptcy Court proceedings, and Settlement Class Members who submit acceptable Proof of Claim Forms will benefit from the Bankruptcy Settlement that occurred because of the efforts of Lead Counsel;

c.  a fee of 28% of the Settlement Fund and of Bankruptcy Fund is within an acceptable range of fees;

d.  Lead Counsel's and Special Bankruptcy Counsel's total lodestar is $7,653,571.50, and a fee of 28% of the Settlement Funds represents a reasonable multiplier of their aggregate lodestar, which is acceptable in this Action;

e.  the fee sought by Lead Counsel has been reviewed and approved as fair and reasonable by the Court-appointed Lead Plaintiff, a sophisticated institutional investor;

    f.   copies of the Notice were mailed to over approximately 18,000 potential Settlement Class Members or their nominees stating that-Lead Counsel would apply for attorneys' fees in an amount not to exceed 28% of the Settlement Funds and reimbursement of litigation expenses in an amount not to exceed $900,000, plus interest earned at the same rate and for the same period as earned by the Settlement Fund;

    g.   no Settlement Class Member has objected to the Fee Application; and

    h.   the amount of attorneys' fees awarded and expenses to be reimbursed from the Settlement Funds are fair and reasonable.

9.    Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees or expenses application shall in no way disturb or affect the finality of the Order and Final Judgment entered with respect to the Settlement.

10.    Jurisdiction is hereby retained over the parties and the Settlement Class Members for all matters relating to this Action, including the administration, interpretation, effectuation, or enforcement of the Stipulation and this Order.

11.    In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation and shall be vacated in accordance with the terms of the Stipulation.

SO ORDERED.

Dated: November 21, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge

# EXHIBIT 6

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____

MAR 0 8 2016

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE ITT EDUCATIONAL SERVICES,
INC. SECURITIES LITIGATION

Civil Action No. 13-cv-1620-JPO
ECF Case

**[~~PROPOSED~~] ORDER ON LEAD COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Lead Counsel's and Lead Plaintiffs' Litigation Expenses ("Fee Application") duly came before the Court for a hearing on March 8, 2016. The Court has considered the Fee Application and all supporting and other related materials, including the matters presented at the March 8, 2016 hearing. Due and adequate notice having been given to the Class as required by the Court's November 23, 2015 Order Preliminarily Approving the Settlement, Approving Notice to the Class and Scheduling Final Approval Hearing ("Preliminary Approval Order," Dkt. 83), and the Court having considered all papers and proceedings had herein and otherwise being fully informed in the proceedings and good cause appearing therefor:

NOW, THEREFORE, THE COURT FINDS, CONCLUDES AND ORDERS AS FOLLOWS:

1.      This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement (the "Settlement," Dkt. 82), and all capitalized terms used, but not defined herein, shall have the same meanings as in the Settlement.

2.      This Court has jurisdiction over the subject matter of the Action and over all parties to the Action, including all Members of the Class.

3.      Notice of the Fee Application was directed to Class Members in a reasonable manner and complies with Rule 23(h)(1) of the Federal Rules of Civil Procedure, due process,

1

and Section 21D of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(7), as amended by the Private Securities Litigation Reform Act of 1995.

4. Class Members have been given the opportunity to object to the Fee Application in compliance with Rule 23(h)(2) of the Federal Rules of Civil Procedure. The Court has received two objections, which were submitted by Jeff M. Brown and Edward L. Vey. Mr. Brown has withdrawn his objection. Even if not withdrawn, the Court finds and concludes that Messrs. Brown and Vey have not established that they are Class Members with standing to bring objections and overrules the objections on that basis. The Court has also considered the issues raised by each objection and finds that, even if Messrs. Brown and Vey were to establish that they have standing to object, their objections are without merit. Messrs. Brown and Vey's objections are therefore overruled in their entirety.

5. The Fee Application is hereby GRANTED.

6. Lead Counsel are hereby awarded attorneys' fees in the amount of 27.5% of the Settlement Fund after deduction of litigation expenses incurred by Lead Counsel, or $4,463,717.74, and $730,799.14 in reimbursement for Lead Counsel's litigation expenses (which fees and expenses shall be paid to Lead Counsel from the Settlement Fund), which sums the Court finds to be fair and reasonable, plus interest earned at the same rate and for the same period as earned by the Settlement Fund.

7. Lead Plaintiffs have also requested reimbursement of their expenses incurred directly related to their representation of the Class in this Action. Pursuant to 15 U.S.C. § 78u-4(a)(4), "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."

8. Lead Plaintiffs are hereby awarded their expenses, including lost wages, in the amount of $5,385.25 to Lead Plaintiff Plumbers and Pipefitters National Pension Fund and $13,662.00 to Lead Plaintiff Metropolitan Water Reclamation District Retirement Fund, which represent their reasonable costs and expenses directly related to the representation of the Class. Lead Plaintiffs took an active role in the prosecution of this Action and achieved a positive result on behalf of the Class and are deserving of awards reimbursing them for their costs and expenses.

9. Pursuant to paragraph 28 of the Settlement, the fees and expenses awarded herein shall be paid to Lead Counsel within ten (10) days after entry of both the Order and Final Judgment and this Order, notwithstanding the existence of or pendency of any appeal or collateral attack on the Settlement or any part thereof or on this Order, subject to Lead Counsel's obligation to repay all such amounts with interest pursuant to the terms and conditions set forth in paragraph 28 of the Settlement.

10. In making this award of attorneys' fees and reimbursement of expenses to be paid from the Settlement Fund, the Court has considered and found that:

    a. the Settlement has created a fund of $16,962,500 in cash that has been funded into an escrow account for the benefit of the Class pursuant to the terms of the Settlement, and that Class Members who submit acceptable Proof of Claim Forms will benefit from the Settlement that occurred because of the efforts of Lead Counsel;

    b. the fee sought by Lead Counsel has been reviewed and approved as fair and reasonable by the Court-appointed Lead Plaintiffs, sophisticated institutional

3

investors that were substantially involved in all aspects of the prosecution and resolution of the Action;

c.  copies of the Notice were mailed to over 179,000 potential Class Members or their nominees stating that Lead Counsel would apply for attorneys' fees in an amount not to exceed 28% of the Settlement Fund and reimbursement of Litigation Expenses in an amount not to exceed $750,000, plus interest earned at the same rate and for the same period as earned by the Settlement Fund;

d.  no Class Member has objected to the Fee Application;

e.  Lead Counsel has conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy;

f.  the Action involves complex factual and legal issues and was actively prosecuted for more than two and a half years;

g.  had the Settlement not been achieved, there would remain a significant risk that Lead Plaintiffs and the other members of the Class may have recovered less or nothing from Defendants;

h.  Lead Counsel devoted nearly 23,000 hours, with a lodestar value of over $9 million, and Lead Plaintiffs have collectively devoted nearly 145 hours of their own time, to achieve the Settlement; and

i.  the amount of attorneys' fees awarded and expenses to be reimbursed from the Settlement Fund are fair and reasonable and consistent with awards in similar cases.

4

11.     Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees or expenses application shall in no way disturb or affect the finality of the Order and Final Judgment entered with respect to the Settlement.

12.     Jurisdiction is hereby retained over the parties and the Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Settlement and this Order.

13.     In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Settlement and shall be vacated in accordance with the terms of the Settlement.

IT IS SO ORDERED.


Dated: New York, New York

_March 8_ , 2016


_____
THE HONORABLE J. PAUL OETKEN
UNITED STATES DISTRICT JUDGE

5

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROBERT A. NITSCH, et al., | Case No. 14-CV-04062-LHK |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES** |
| v. | |
| DREAMWORKS ANIMATION SKG INC., et al., | Re: Dkt. No. 385 |
| Defendants. | |

Before the Court is Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards arising out of a settlement between individual and representative plaintiffs Robert Nitsch, David Wentworth, and Georgia Cano, and the Class they represent (collectively, "Plaintiffs"), and DreamWorks Animation SKG, Inc. ("DreamWorks"), and The Walt Disney Company, Pixar, Lucasfilm, Ltd., LLC, and Two Pic MC LLC (collectively, "Disney").

Having considered the submissions of the parties, the arguments made at the May 18, 2017 hearing, the relevant law, and the record in this case, the Court hereby GRANTS IN PART AND DENIES IN PART Plaintiffs' motion.

## I.    BACKGROUND

This is a consolidated class action brought by former employees alleging antitrust claims

1

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

against their former employers, who are various animation and visual effects studios with principal places of business in California. Second Amended Complaint ("SAC"), ECF No. 121.[1] Plaintiffs contend that Defendants engaged in a conspiracy to fix and suppress employee compensation and to restrict employee mobility.

### A. Factual Background

#### 1. The Parties

Defendants include the following animation and visual effects studios: Blue Sky Studios, Inc. ("Blue Sky"), a Delaware corporation with its principal place of business in Greenwich, Connecticut; DreamWorks Animation SKG, Inc. ("DreamWorks"), a Delaware corporation with its principal place of business in Glendale, California; Two Pic MC LLC, formerly known as ImageMovers Digital LLC ("ImageMovers Digital"), a Delaware corporation with its principal place of business in Burbank, California; Lucasfilm Ltd., LLC ("Lucasfilm"), a California corporation with its principal place of business in San Francisco, California;[2] Pixar, a California corporation with its principal place of business in Emeryville, California;[3] Sony Pictures Animation, Inc. and Sony Pictures Imageworks, Inc. (collectively, "the Sony Defendants"), California corporations with their principal places of business in Culver City, California; and The Walt Disney Company ("Disney"), a Delaware corporation with its principal place of business in Burbank, California.[4] SAC ¶¶ 22–29.

Plaintiffs are artists and engineers who were previously employed by four of the named Defendants. *Id.* ¶¶ 19–21. Nitsch worked for Sony Picture Imageworks in 2004 and DreamWorks from 2007 to 2011. *Id.* ¶ 19. Cano worked for Walt Disney Feature Animation from 2004 to 2005,

---

[1] Defendant Blue Sky Studios, Inc. has its principal place of business in Greenwich, Connecticut, but Plaintiffs allege that it is owned by Twentieth Century Fox Film Corporation, which has its principal place of business in Los Angeles, California. SAC ¶ 22.

[2] The parties' papers also refer at points to Industrial Light & Magic ("ILM"). Plaintiffs aver that ILM is a division of Lucasfilm.

[3] According to Plaintiffs, Defendant The Walt Disney Company acquired Pixar in 2006 and acquired ILM and Lucasfilm in 2012. SAC ¶¶ 25–26.

[4] Disney also "oversees the operations of" Walt Disney Animation Studios, formerly known as Walt Disney Feature Animation. SAC ¶ 29.

2

ImageMovers Digital in 2010, and at various other visual effects and animation studios. *Id.* ¶ 20. Wentworth worked at ImageMovers Digital from 2007 to 2010. *Id.* ¶ 21. Nitsch is a resident of Massachusetts, and Cano and Wentworth are residents of California. *Id.* ¶¶ 19–21.

### 2. *In re High-Tech Employee Litigation* and the Department of Justice investigation

There is significant overlap between the instant case and the related action *In re High-Tech Employee Litigation*, No. 11-CV-02509-LHK ("*High-Tech*"), as well as the civil complaints filed by the Department of Justice ("DOJ") against Pixar, Lucasfilm, and several Silicon Valley technology companies. As the background of the related *High-Tech* action and the DOJ actions is relevant to Plaintiffs' Motion, the Court briefly summarizes the background of those prior proceedings below.

From 2009 to 2010, the Antitrust Division of the DOJ investigated the employment and recruitment practices of various Silicon Valley technology companies, including Adobe Systems, Inc., Apple, Inc., Google, Inc., Intel Corp., and Intuit, Inc. *See In re High-Tech Empl. Litig.*, 856 F. Supp. 2d 1103, 1109 (N.D. Cal. 2012). The DOJ filed its complaint against Adobe, Apple, Google, Intel, Intuit, and Pixar in D.C. District Court on September 24, 2010. *Id.* On December 21, 2010, the DOJ filed a separate complaint against Lucasfilm. *Id.* & n.1. The defendants, including Pixar and Lucasfilm, stipulated to proposed final judgments in which the defendants agreed that the DOJ's complaints had stated claims under federal antitrust law and agreed to be "enjoined from attempting to enter into, maintaining or enforcing any agreement with any other person or in any way refrain from . . . soliciting, cold calling, recruiting, or otherwise competing for employees of the other person." *Id.* at 1109–10 (quoting Adobe Proposed Final Judgment at 5). The D.C. District Court entered the stipulated proposed final judgments in March and June 2011. *Id.* at 1110.

The *High-Tech* plaintiffs filed five separate state court actions between May and July 2011. Following removal, transfer to San Jose to the undersigned judge, and consolidation, the *High-Tech* plaintiffs filed a consolidated amended complaint on September 13, 2011. *High-Tech*, 856 F. Supp. 2d at 1112–13. In their complaint, the *High-Tech* plaintiffs alleged antitrust claims against

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

their employers and alleged that the defendants had conspired "to fix and suppress employee compensation and to restrict employee mobility." *Id.* at 1108. More specifically, the *High-Tech* plaintiffs alleged a conspiracy comprised of "an interconnected web of express bilateral agreements." *Id.* at 1110. One agreement, the "Do Not Cold Call" agreement, involved one company placing the names of the other company's employees on a "Do Not Cold Call" list and instructing its recruiters not to cold call the employees of the other company. *Id.* In addition to the "Do Not Cold Call" agreements, the *High-Tech* plaintiffs also alleged that Pixar and Lucasfilm, defendants in both *High-Tech* and the instant action, entered into express, written agreements (1) to not cold call each other's employees, (2) to notify the other company whenever making an offer to an employee of the other company, and (3) not to engage in "bidding wars." *Id.* at 1111. Second, Defendants allegedly "shared confidential compensation information with each other despite the fact that they considered each other competitors for talent," which would artificially limit compensation offered to Defendants' current and prospective employees. *In re High-Tech Employee Antitrust Litig.*, 2014 WL 1283086, at *3 (N.D. Cal. Mar. 28, 2014).

### 3. Alleged Conspiracy in the Instant Action

In the instant case, Plaintiffs allege that Defendants conspired to suppress compensation in two ways. First, Defendants allegedly entered into a scheme not to actively solicit each other's employees. SAC ¶ 42. Second, Defendants allegedly engaged in "collusive discussions in which they exchanged competitively sensitive compensation information and agreed upon compensation ranges," which would artificially limit compensation offered to Defendants' current and prospective employees. *Id.*

#### a. Anti-Solicitation Scheme

According to Plaintiffs, as in *High-Tech*, "Defendants agreed not to contact their coconspirators' employees to inform them of available positions unless that individual employee had applied for a job opening on his or her own initiative." *Id.* ¶ 43. This solicitation, also known as "cold calling," is "a key competitive tool in a properly functioning labor market, especially for skilled labor." *Id.* ¶ 44. Plaintiffs aver that employees of competitor studios represent "one of the

4

main pools of potential hires," and that employees of competitor studios that are not actively searching for new employment are "more likely to be among the most sought after employees." *Id.* Hiring an employee from a competitor studio "can save costs and avoid risks." *Id.* Absent active solicitation, these employees are also difficult to reach. *Id.* Defendants' anti-solicitation scheme also allegedly included "notifying each other when an employee of one Defendant applied for a position with another Defendant, and agreeing to limit counteroffers in such situations." *Id.* ¶ 45. Moreover, Defendants allegedly "often refrained from hiring other Defendants' employees at all without the permission of the current employer," and would sometimes decline to make offers of employment to an unemployed prospective hire if that individual had an outstanding offer from another Defendant. *Id.* ¶ 46.

Plaintiffs allege that while the conspiracy originated with Pixar and Lucasfilm in the mid-1980s, Pixar President Ed Catmull later brought additional studios into the fold. *Id.* ¶ 52. According to Plaintiffs, Blue Sky, DreamWorks, ImageMovers Digital,[5] the Sony Defendants, and Walt Disney Animation Studios all became part of the anti-solicitation conspiracy during the mid-2000s and agreed not to directly recruit each other's employees. *Id.* ¶¶ 53–79.

### b. Compensation Ranges

In addition to the anti-solicitation scheme, Plaintiffs further allege that Defendants "directly communicated and met regularly to discuss and agree upon compensation ranges." *Id.* ¶ 86 (citing March 28, 2007 email from Pixar's Vice President of Human Resources, Lori McAdams). According to Plaintiffs, Defendants met at least once a year in California at meetings organized by the Croner Company, a third party that apparently collects industry-specific salary information.

Plaintiffs allege that at these meetings, Defendants "discussed, agreed upon and set wage and salary ranges during meals, drinks and other social gatherings that they held outside of the

---

[5] Plaintiffs dismissed a separate Defendant, ImageMovers LLC, without prejudice pursuant to a tolling agreement on January 14, 2015. ECF No. 83. The dismissal of ImageMovers LLC did not affect ImageMovers Digital.

official Croner meetings." *Id.* ¶ 89. Plaintiffs further allege that Defendants regularly emailed each other with specific salary ranges. Plaintiffs contend that Defendants' "collusive compensation setting was not limited to wages and salaries, but extended to other benefits and terms of employment." *Id.* ¶ 97.

Defendants' human resources and recruiting personnel also allegedly regularly communicated via telephone. *Id.* ¶ 113. As Plaintiffs describe it, the Croner survey meetings, side meetings, emails, and telephone calls "provided the means and opportunities for Defendants to collude and to implement and enforce the conspiracy to suppress workers' compensation." *Id.* ¶ 114. According to Plaintiffs, executives such as Pixar's Lori McAdams, "knew that such conversations were inappropriate." *Id.* ¶ 5, 110–11.

Plaintiffs further allege that while press reports in 2009 noted that the DOJ was investigating anti-solicitation agreements among high-tech companies, including Google and Apple, there was no indication that the DOJ was also investigating Pixar, Lucasfilm, or any other animation company. *Id.* ¶ 119. Plaintiffs aver that September 17, 2010 marked the first news story naming Pixar as a company under investigation, but that there was no public disclosure that any other Defendant in the instant action was part of the conspiracy. *Id.* ¶¶ 119, 184. According to Plaintiffs, Lucasfilm was implicated in the Pixar investigation in December 2010, but "until certain filings in the High-Tech docket were unsealed in 2013," there was no public information that the other Defendants in this action had engaged in similar conduct. *Id.* Plaintiffs also cite the absence of news coverage as proof that Plaintiffs had no way of discovering the conspiracy, as even industry journalists were "unable to discover and explore the conspiracy." *Id.* ¶ 186.

### c. Fraudulent Concealment

In their SAC, Plaintiffs allege that Defendants fraudulently concealed the conspiracy and therefore prevented the Plaintiffs from filing their claims on time. Plaintiffs allege that Defendants (1) took affirmative steps to keep their conspiracy a secret; (2) affirmatively misled class members by claiming that compensation and recruiting was determined by factors other than the alleged conspiracy; and (3) took affirmative steps to mislead class members about the conspiracy during

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

the *High-Tech* litigation. The details of these alleged steps to fraudulently conceal the anti-competitive scheme are discussed in prior orders in this case, and therefore the Court does not repeat those details here.

### 4.  Claims

Plaintiffs' SAC asserts three claims for relief under the following statutes: (1) Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) California's Cartwright Act, Cal. Bus. & Prof. Code § 16720; and (3) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*. SAC ¶¶ 205–18. Plaintiffs seek treble damages, pre- and post-judgment interest, attorney's fees and expenses, and a permanent injunction. *Id.* ¶ 219.

### B.  Procedural Background

In light of the relationship between the instant case and the *High-Tech* case, the Court summarizes the relevant procedural history of the *High-Tech* case in addition to the procedural history of the instant case.

### 1.  *High-Tech* Procedural Background

The *High-Tech* defendants removed the first state court action on May 23, 2011. No. 11-2509, ECF No. 1. The last state-court action in the *High-Tech* litigation was removed on July 19, 2011. No. 11-2509, ECF No. 41. After reassignment of the cases to the undersigned judge, a First Consolidated Amended Complaint was filed on September 13, 2011. No. 11-2509, ECF No. 65. On April 18, 2012, the Court granted in part and denied in part the *High-Tech* defendants' motions to dismiss. No. 11-2509, ECF No. 119. On April 5, 2013, the Court granted in part and denied in part the *High-Tech* plaintiffs' motion for class certification with leave to amend and denied two motions to exclude expert testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). No. 11-2509, ECF No. 382. The *High-Tech* plaintiffs filed a supplemental motion for class certification on May 10, 2013, which the Court granted on October 24, 2013. No. 11-2509, ECF No. 531. On November 7, 2013, the *High-Tech* defendants filed a Rule 23(f) petition before the Ninth Circuit, requesting permission to appeal this Court's October 24, 2013 class certification order. *In re High-Tech Empl. Antitrust Litig.*, No. 13-80223, ECF No. 1 (9th Cir. Nov. 7, 2013).

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

United States District Court
Northern District of California

The Ninth Circuit denied the defendants' petition on January 14, 2014. *Id.*, ECF No. 18.

In the interim, three of the *High-Tech* defendants—Intuit, Lucasfilm, and Pixar—reached a settlement with the *High-Tech* plaintiffs. On October 30, 2013, the Court granted preliminary approval of that settlement. No. 11-2509, ECF No. 540. The Court granted final approval on May 16, 2014. No. 11-2509, ECF No. 915. The Court entered a final judgment with regard to Lucasfilm, Pixar, and Intuit on June 9, 2014 and an amended final judgment on June 20, 2014. No. 11-2509, ECF Nos. 936, 947.

The remaining *High-Tech* defendants—Adobe, Apple, Google, and Intel—filed individual motions for summary judgment, a joint motion for summary judgment, and a joint motion to strike certain expert testimony on January 9, 2014. No. 11-2509, ECF Nos. 554 (Intel), 556 and 557 (joint motions), 560 (Adobe), 561 (Apple), 564 (Google). The Court denied the *High-Tech* defendants' four individual motions for summary judgment on March 28, 2014. No. 11-2509, ECF No. 771. On April 4, 2014, the Court granted in part and denied in part the *High-Tech* defendants' joint motion to strike, and denied the defendants' joint motion for summary judgment. No. 11-2509, ECF No. 788.

On May 22, 2014, the *High-Tech* plaintiffs filed a motion for preliminary approval of class action settlement as to the remaining defendants. No. 11-2509, ECF No. 920. On August 8, 2014, the Court denied the *High-Tech* plaintiffs' motion for preliminary approval and concluded that the proposed settlement, which included a settlement fund of $324.5 million, did not fall "within the range of reasonableness." No. 11-2509, ECF No. 974 at 30. On September 4, 2014, the *High-Tech* defendants filed a petition for a writ of mandamus with the Ninth Circuit. *In re Adobe Sys., Inc., et al.*, No. 14-72745, ECF No. 1 (9th Cir. Sept. 4, 2014). On September 22, 2014, the Ninth Circuit found that the petition "raises issues that warrant a response," and ordered briefing. *Id.*, ECF No. 2. On January 13, 2015, the *High-Tech* defendants filed correspondence with the Ninth Circuit referring to a new proposed settlement agreement. *Id.*, ECF No. 21. On January 30, 2015, the defendants filed an unopposed motion to dismiss the petition, which the Ninth Circuit granted on February 2, 2015. *Id.*, ECF Nos. 23, 24.

8

United States District Court
Northern District of California

On January 15, 2015, the *High-Tech* plaintiffs filed a motion for preliminary approval of class action settlement as to the remaining defendants. No. 11-2509, ECF No. 1032. In this second proposed class action settlement, the parties had reached a settlement amount exceeding the previously rejected settlement by approximately $90.5 million. *Id.* at 1. Following a fairness hearing on March 2, 2015, the Court granted preliminary approval to the January 2015 settlement agreement on March 3, 2015. No. 11-2509, ECF Nos. 1051, 1054. The Court held a final approval hearing on July 9, 2015. No. 11-2509, ECF No. 1096. On September 2, 2015, the Court granted final approval of the class action settlement and entered final judgment with regard to Adobe, Apple, Google, and Intuit. No. 11-2509, ECF Nos. 1111, 1113.

### 2. Procedural Background in the Instant Action

Plaintiff Nitsch filed the first complaint against all Defendants except Blue Sky on September 8, 2014. ECF No. 1. The Court related Nitsch's action to *In re High-Tech Employee Antitrust Litigation*, No. 11-2509, on September 23, 2014. ECF No. 12. Plaintiff Cano filed the second complaint against all Defendants on September 17, 2014, which the Court related to *High-Tech* on October 7, 2014. *See* Case No. 14-4203, ECF Nos. 1, 9. Plaintiff Wentworth filed the third complaint against all Defendants except Blue Sky on October 2, 2014, which the Court related to *High-Tech* on October 28, 2014. *See* Case No. 14-4422, ECF Nos. 1, 26. On November 5, 2014, the Court granted Plaintiffs' motion to consolidate the above-mentioned three cases into a single action, *In re Animation Workers Antitrust Litigation*. *See* Case No. 14-4062, ECF No. 38.

Pursuant to the Court's November 6, 2014 case management order, ECF No. 39, Plaintiffs filed their first consolidated amended complaint on December 2, 2014. ECF No. 63. On January 9, 2015, Defendants filed a joint motion to dismiss. ECF Nos. 75. Plaintiffs filed a timely opposition, ECF No. 97, and Defendants replied, ECF No. 100. On April 3, 2015, the Court granted Defendants' motion to dismiss. *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195 (N.D. Cal. Apr. 3, 2015). The Court found that Plaintiffs' claims were time barred under the statute of limitations, and that Plaintiffs had failed to adequately plead a "continuing violations" theory or a "fraudulent concealment" theory to toll the statute of limitations. *See id.* at 1212,

United States District Court
Northern District of California

1217–18. The dismissal was without prejudice, as the Court determined that Plaintiffs might be able to allege sufficient facts to support their continuing violations or fraudulent concealment theories. *Id.* at 1218.

On May 15, 2015, Plaintiffs filed their Second Amended Complaint. ECF No. 121. Six days later, Defendants filed a joint motion to dismiss the SAC. ECF No. 126. Plaintiffs filed a timely opposition, ECF No. 132, and Defendants replied, ECF No. 137. On August 20, 2015, the Court denied Defendants' motion to dismiss the SAC. *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1207 (N.D. Cal. 2015). In its order denying Defendants' motion to dismiss, the Court found that the SAC was not barred by the statute of limitations because the SAC sufficiently alleged that Defendants had fraudulently concealed the alleged conspiracy. *Id.*

Plaintiffs filed a motion for class certification on February 1, 2016. ECF No. 203. Defendant Blue Sky did not join Defendants' opposition to class certification. Instead, Plaintiffs filed a joint motion for preliminary approval of class action settlement with Blue Sky on March 31, 2016, ECF No. 249, and an amended motion for preliminary approval of class action settlement on May 11, 2016, ECF No. 282. The Blue Sky settlement provided for a payment of $5,950,000 to the class. ECF No. 336, at 1.

Defendants DreamWorks, Disney, Lucasfilm, Pixar, Two Pic (ImageMovers Digital), Sony Pictures Animation, and Sony Pictures Imageworks filed an opposition to the motion for class certification on March 24, 2016. ECF No. 239-1. After Defendants' opposition to class certification was filed, Plaintiffs filed a motion for preliminary approval of class action settlement with the Sony Defendants on May 3, 2016. ECF No. 273 at 4. The Sony settlement provided for a payment of $13,000,000 to the class. ECF No. 336, at 1. As part of the settlement agreement, the Sony Defendants agreed not to cooperate with the remaining Defendants in opposing Plaintiffs' motion for class certification. *See id.*

On May 6, 2016, the Court held a hearing on Plaintiffs' class certification motion. ECF No. 276. On May 25, 2016, the Court granted in part and denied in part the motion. *See Nitsch v.*

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

*DreamWorks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016). The Court certified the following class (*id.* at 317):

> All animation and visual effects employees employed by defendants in the United States who held any of the jobs listed in Ashenfelter Reply Report Amended Appendix C during the following time periods: Pixar (2004-2010), Lucasfilm Ltd., LLC (2004-2010), DreamWorks Animation SKG, Inc. (2004-2010), The Walt Disney Company (2004-2010), Sony Pictures Animation, Inc. and Sony Pictures Imageworks, Inc. (2004-2010), Blue Sky Studios, Inc. (2005-2010) and Two Pic MC LLC f/k/a ImageMovers Digital LLC (2007-2010). Excluded from the Class are senior executives, members of the board of directors, and persons employed to perform office operations or administrative tasks.

The Court denied the motion without prejudice as to class members who worked at Pixar and Lucasfilm from 2001-2003, and who worked at DreamWorks in 2003. *See id.* The Court ruled that the SAC did not sufficiently allege acts of fraudulent concealment during those years. *See id.*

On June 8, 2016, defendants filed a Rule 23(f) petition with the Ninth Circuit. *See* Petition for Permission to Appeal from the United States District Court for the Northern District of California, *Nitsch v. DreamWorks Animation SKG, Inc.*, No. 16-80077 (9th Cir. June 8, 2016) ("*Nitsch I*" or "Appeal"). On August 29, 2016, the Ninth Circuit granted defendants' motion for leave to file a reply, but denied their Rule 23(f) Petition in a summary order. ECF No. 7 at 1.

On July 6, 2016, the Court granted Plaintiffs' motion for preliminary approval of the class action settlements with Sony and Blue Sky. ECF No. 305. On November 11, 2016, the Court granted Plaintiffs' motion for final approval of the class action settlements with Sony and Blue Sky. EF No. 346. On November 11, 2016, the Court also awarded class counsel $4,737,500 in attorney's fees in connection with the Sony and Blue Sky settlements.

Plaintiffs and DreamWorks signed a settlement agreement on October 4, 2016 in which DreamWorks agreed to pay $50,000,000 to a common fund to resolve the litigation. On January 19, 2017, the Court granted preliminary approval of the Dreamworks Settlement. ECF No. 353.

Plaintiffs and Disney signed a settlement agreement on January 30, 2017 in which Disney agreed to pay $100,000,000 to a common fund to resolve the litigation. On March 2, 2017, the

11

Court granted preliminary approval of the Disney Settlement. ECF No. 382. In the preliminary approval order, the Court set a single final approval hearing for the Dreamworks and Disney Settlements for May 18, 2017. The Court held the final approval hearing for the Dreamworks and Disney Settlements on May 18, 2017.

II.   DISCUSSION

The instant motions contain specific requests for attorney's fees, reimbursement of expenses, and service awards. The Court addresses each in turn.

A. Attorney's Fees

1.   The Appropriate Method: Lodestar v. Percentage-of-Recovery

Under Ninth Circuit law, "the choice between lodestar and percentage calculation depends on the circumstances, but . . . 'either method may . . . have its place in determining what would be reasonable compensation for creating a common fund.'" *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (second ellipsis in original) (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)). "Where," as here, "a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). To guard against an unreasonable result, the Ninth Circuit encourages district courts to "cross-check[] their calculations against a second method." *Id.* at 944; *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050-51 (9th Cir. 2002) (applying a lodestar cross-check to ensure the percentage-of-recovery method yielded a reasonable result).

Where the percentage-of-recovery method is employed, it is well established that 25% of a common fund is a presumptively reasonable amount of attorney's fees. *See, e.g.*, *In re Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."); *Six Mexican Workers*, 904 F.2d at 1311 ("[W]e established 25 percent of the fund as the 'benchmark' award that should be given in common fund cases."). Nevertheless, "[t]he 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases."

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

*Vizcaino*, 290 F.3d at 1048. For instance, "where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *In re Bluetooth*, 654 F.3d at 942. Whatever decision a court reaches, that decision "must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048.

Here, class counsel advocate applying the percentage-of-recovery method. Class counsel request 21 percent of the $150,000,000 total Dreamworks and Disney Settlements, or $31,500,000. Class counsel argue that the Court should apply the percentage-of-the-recovery method of calculating attorney's fees. Class counsel point out that the requested 21% recovery is "well under the 25 percent benchmark" that the Ninth Circuit has established for common fund cases. ECF No. 385, at 4; *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) ("This circuit has established 25% of the common fund as a benchmark award for attorney fees."). However, as will be discussed further below, in making such a request, class counsel ignores the $4,737,500 in attorney's fees that the Court has already awarded for the same work.

The Ninth Circuit has made clear that in "megafund" cases, such as this one, courts may "employ the lodestar method instead" of the percentage-of-recovery method if rote application of the 25% benchmark "would yield windfall profits for class counsel in light of the hours spent on the case." *In re Bluetooth*, 654 F.3d at 942. For example, in *In re Washington Public Power Supply System Securities Litigation* ("*WPPSS*"), 19 F.3d 1291, 1297-98 (9th Cir. 1994), the Ninth Circuit held that the district court "acted well within the bounds of its discretion" in applying the lodestar method, rather than the percentage-of-recovery method, to an attorney's fees request arising out of a $687 million settlement fund. Class counsel in *WPPSS* had asked the district court for 13.6% of the fund, well below the "circuit's 25 percent benchmark figure," but the district court found that request to be "arbitrary" because class counsel "could just as easily have requested 3.6 percent or 36.1 percent." *Id.* (internal quotation marks omitted). In upholding the district court's decision, the Ninth Circuit explained: "With a fund this large, picking a percentage without reference to all the circumstances of the case, including the size of the fund, would be like

picking a number out of the air." *Id.* "Because a court must consider the fund's size in light of the circumstances of the particular case," the Ninth Circuit continued, "we agree with the district court that the 25 percent 'benchmark' is of little assistance in a case such as this." *Id.*

Just as there was "nothing inherently reasonable about an award of 13.6 percent of a [$687 million] fund" in *WPPSS*, *id.* at 1298, the Court finds nothing inherently reasonable in Plaintiffs' counsel's total request here for 21% of the $150,000,000 settlement (or 21.4% of $168,950,000 if the settlements with Sony and Blue Sky are included). *See also Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923 WHA, 2015 WL 2438274, at *4 (N.D. Cal. May 21, 2015) (rejecting class counsel's request to apply the percentage-of-recovery method to a $203 million restitution award and opting for the lodestar method instead because "blindly adopting the 25-percent benchmark . . . would result in a windfall to class counsel").

Having overseen the litigation in the instant case and the related case of *In re High-Tech Employee Antitrust Litigation*, No. 11-2509, the Court finds that justice would be best served by applying the lodestar method—i.e., tying the fee awards for class counsel to the actual hours they reasonably expended on this litigation and then selecting a multiplier. The Court concludes that the lodestar method is superior to the percentage-of-the-recovery method for two reasons.

First, class counsel's proposed percentage would result in a multiplier that is unreasonably high. The multiplier for class counsel's proposed percentage is 3.40 for the Disney and Dreamworks settlements and 3.91 if the prior attorney's fees awards for the Sony and Blue Sky settlements are included. Although class counsel argues extensively about the reasonableness of "[a]n overall multiplier of 3.40," ECF No. 385, at 6, ignoring previous awards of attorney's fees for the same work renders class counsel's multiplier inaccurate. In calculating its lodestar in the instant motion for attorney's fees, class counsel includes billed hours for which class counsel already received compensation in connection with the Sony and Blue Sky settlements. Thus, if the Court did not take into account the fee awards for the Sony and Blue Sky settlements, class counsel would receive a double recovery for these hours. Thus, the Court determines that the 3.91 multiplier is the relevant multiplier for class counsel's requested award.

Class counsel argues that courts often approve multipliers as high or higher than 3.91. However, such awards are far from the norm. In *Vizcaino*, 290 F.3d at 1051 n.6, the Ninth Circuit surveyed class actions settlements nationwide and found that 54 percent of lodestar multipliers fell within the 1.5 to 3.0 range, and that 83 percent of multipliers fell within the 1.0 to 4.0 range. Thus, the requested 3.91 multiplier would be higher than the significant majority of cases. Additionally, although class counsel have cited several cases awarding multipliers higher than 3.91, most of these cases involved settlement funds that were much smaller than the $168,950,000 settlement fund in the instant case. *See, e.g., Buccellato v. AT & T Operations, Inc.*, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011) (approving multiplier of 4.3 in case involving $12,500,000 settlement fund); *Rabin v. Concord Assets Grp., Inc.*, 1991 WL 275757, at *1 (S.D.N.Y. Dec. 19, 1991) ("The requested attorneys' fees of $2,544,122.78 represents a multiplier of 4.4 . . . . Plaintiffs' counsel asserts that 'when one considers the potential additional time plaintiffs' counsel will be required to work in this matter, the multiplier is reduced to a range of 3.7 to 3.2.'"); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 360 (S.D.N.Y. 2002) (approving multiplier of 4.65 in case involving $28,000,000 settlement fund).

In the instant case, in the Court's judgment, a multiplier of 3.91 would result in "windfall profits for class counsel in light of the hours spent on the case." *In re Bluetooth*, 654 F.3d at 942; *see also Allen v. Bedolla*, 787 F.3d 1218, 1224 n.4 (9th Cir. 2015) (cautioning that district courts "should not calculate fees using a mechanical or formulaic approach that results in an unreasonable reward" (internal quotation marks omitted)). The potential for a significant windfall counsels against rigid application of the percentage-of-the-recovery method for calculating an attorney's fees award.

The second reason that the lodestar method is superior to the percentage-of-the-recovery method in the instant case is that using the lodestar method would allow the Court to examine class counsel's "presumptively reasonable" lodestar figures, and if suitable, adjust them "by an appropriate . . . multiplier reflecting a host of reasonableness factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

United States District Court
Northern District of California

presented, and the risk of nonpayment." *In re Bluetooth*, 654 F.3d at 941-42 (citations and internal quotation marks omitted). This case has a very large settlement fund, and the size of the settlement fund can be attributed in large part to the success of *High-Tech*. *High-Tech* provided much of the evidence, legal theories, arguments, and prior rulings necessary to litigate this case. Moreover, by litigating two motions to dismiss, multiple *Daubert* motions, two class certification motions, and five summary judgment motions, the plaintiffs in *High-Tech* eliminated much of the risk in litigating the instant case and established the benchmarks for the sizes of the settlement funds. Therefore, considering the posture of this case and the large settlement fund, the Court finds that the lodestar method is superior to accepting somewhat arbitrary percentages. *See WPPSS*, 19 F.3d at 1297–98.

### 2. Lodestar Method

Under the lodestar method, a "lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003)). Although "the lodestar figure is 'presumptively reasonable,' the court may adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host of reasonableness factors." *Id.* at 941-42 (citations and internal quotation marks omitted).

#### a. Billing Rates

Having reviewed the billing rates for the attorneys, paralegals, and litigation support staff at each of the firms representing Plaintiffs in this case, the Court finds that these rates are reasonable in light of prevailing market rates in this district and that counsel for Plaintiffs have submitted adequate documentation justifying those rates.

Class counsel have filed several declarations describing the billing rates and hours worked on the instant case. *See* Declaration of Jeff D. Friedman in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards ("Friedman Decl."), ECF No. 385-2; Declaration of Daniel A. Small in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service

16

Awards ("Small Decl."), ECF No. 385-7; Declaration of Steven G. Sklaver in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards ("Sklaver Decl."), ECF No. 385-5; *see also* Supplemental Brief Regarding Motion for Attorney's Fees, ECF No. 345. These declarations establish that the hourly rates are fair, reasonable, and market-based, particularly for the "relevant community" in which counsel work. *See* Friedman Decl. ¶ 12; Small Decl., ¶ 29; Sklaver Decl., ¶ 11. Class counsel are highly-respected members of the bar with extensive experience in prosecuting high-stakes complex litigation, including consumer class actions. *See* Friedman Decl., ¶¶ 6-11; Small Decl., ¶¶ 2-13; Sklaver Decl., ¶¶ 3-10. With three exceptions, counsel's hourly rates in this action range from $275 to $750, with rates varying based on experience. *See* Friedman Decl., ¶ 13; Small Decl., ¶ 30; Sklaver Decl., ¶ 12. The three most senior attorneys on the case, who serve as the lead attorney for each respective law firm, charge between $870 and $1,200 per hour. *See* Friedman Decl., ¶ 13; Small Decl., ¶ 30; Sklaver Decl., ¶ 12. Mr. Seltzer's $1,200 hourly rate is the same rate that he charges clients, including corporations that are billed hourly, which provides a market-based cross-check. *See* Sklaver Decl., ¶ 11. Hourly rates for paralegals are $290 or lower. *See* Friedman Decl., ¶ 13; Small Decl., ¶ 30; Sklaver Decl., ¶ 12. Overall, the rates charged by counsel here are comparable to the fees approved by the Court, over a year ago, in the *High-Tech* case and more recently in conjunction with the Sony and Blue Sky settlements.[6] *See* ECF No. 347 (approving almost identical rates in connection with the Sony and Blue Sky settlements). Thus, the Court finds that the reported hourly rates are fair and reasonable.

### a.  Hours

Having reviewed the billing records for the attorneys, paralegals, and litigation support staff at each of the firms representing Plaintiffs in this case, the Court finds that these records

---

[6] In *High-Tech*, this Court found class counsel's rates "reasonable in light of prevailing market rates in this district," including partner rates that ranged from $490 to $975 per hour; non-partner rates that ranged from $310 to $800 per hour; and paralegals, law clerks, and support staff rates that ranged from $190 to $430, "with most in the $300 range." *High-Tech Fees Order*, 2015 WL 5158730, at *9; *In re Animators*, Order Granting Request for Attorney's Fees, Dkt. # 347.

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

adequately reflect the amount of time reasonably spent on this litigation.

As set forth in the supporting declarations, class counsel have collectively spent more than 18,448 hours of attorney and litigation support time on this action. *See* Friedman Decl. ¶ 13 (4,704.30 hours); Small Decl. ¶ 30 (7,446.75 hours); Sklaver Decl., ¶ 12 (6,297.90 hours). The number of hours that class counsel has devoted to pursuing this litigation is appropriate and reasonable, given class counsel's work in the following areas: (1) pre-complaint investigation; (2) production and review of documents in discovery; (3) filing an amended complaint, an opposition to a motion to dismiss, a second amended complaint, and a second opposition to a motion to dismiss, as well as an opposition to a motion to compel arbitration; (4) briefing at the class certification stage; (5) expert reports; (6) taking the depositions of twenty-five witnesses and defending an additional five depositions; and (7) opposing defendants' Rule 23(f) petition. Class counsel's reported hours include hours billed through February 2017. ECF No. 385, at 5 n.6. Thus, these hours do not include hours billed in preparing the motion for final approval, responding to objections, arguing at the final approval hearing, working with the settlement administrator to distribute the settlement fund, and litigating any appeals.

Class counsel reports a lodestar of $2,165,448.50 for Hagens Berman, $2,859,177 for Susman Godfrey, and $4,244,453.75 for Cohen Milstein. Thus, in total, class counsel reports a lodestar of $9,269,079.25.

### a.   Multipliers

As indicated above, the Court may "adjust" the lodestar figures "upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors, 'including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.'" *In re Bluetooth*, 654 F.3d at 941-42 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998)). "Foremost among these considerations, however, is the benefit obtained for the class." *Id.* at 942. For the reasons stated below, the Court concludes that a positive multiplier of 2.0 is appropriate for class counsel.

The Court recognizes that class counsel has achieved significant benefits for the class and

that class counsel assumed a risk of nonpayment while litigating this case for over two years. In the end, class counsel achieved a significant result for the class. The Disney and Dreamworks settlements total $150,000,000, which represents 33.5% of the damages attributable to Disney and 39% of the damages attributable to Dreamworks. Together, all the settlements in the instant case total $168,950,000, which represents 30.5% of Plaintiffs' valuation.

Considering all the facts and circumstances of this case, the Court finds that a multiplier of 2.0 is appropriate for class counsel. As stated above, the Ninth Circuit in *Vizcaino* conducted a survey of attorney's fees awards in megafund cases. *See* 290 F.3d at 1052-54. This survey involved common fund cases ranging from $50–200 million between 1996 and 2001. *See id.* In 83% of the settlements (20 of 24), the multiplier ranged from 1.0–4.0, and in 54% of the settlements (13 of 24), the multiplier was in the 1.5–3.0 range. *Id.* at 1051 n.6. A multiplier of 2.0 would therefore be in line with the vast majority of megafund settlements such as this one and would adequately reward class counsel for the work performed in this litigation. A multiplier of 2.0 is also reasonable in light of the 2.2 multiplier that the Court granted in *High-Tech*, a case that involved significantly more risk than the instant case. As a result, the Court multiplies class counsel's lodestar of $9,269,079.25, which includes all work in the instant case related to claims against all Defendants, by 2.0 and finds that a total attorney's fee award of $18,538,158.50 is appropriate. Because class counsel has already received $4,737,500 in attorney's fees as part of the Sony and Blue Sky settlements, the Court grants an attorney's fee award of $13,800,658.50 in the instant Dreamworks and Disney settlements.

### 1. Percentage-of-Recovery Cross-Check

The reasonableness of the Court's fee awards under the lodestar method is supported by cross-checking the award with the percentage-of-recovery method. *See In re Bluetooth*, 654 F.3d at 944 (encouraging courts to "cross-check[] their calculations against a second method"). The $13,800,658.50 attorney's fee award is about 9.2% of the $150 million Disney and Dreamworks

United States District Court
Northern District of California

19

settlements.[7] Adding the $4,737,500 million in attorney's fees the Court already awarded for the settlements with Sony and Blue Sky, the percentage increases to roughly 11%.[8] Although the benchmark in the Ninth Circuit for common fund cases is 25%, a percentage recovery of 9.2% or 11% is not unreasonable for a settlement of this size.

The most accurate comparison for the attorney's fees in the instant case is the attorney's fees award that the Court granted in *High-Tech*, which is related to and gave rise to the instant case. *See* ECF No. 385 at 2 (In the instant case, "[c]lass counsel were not even aware of the possibility of bringing this case until one of its lawyers read an article in July 2014 discussing some of the documents unsealed in *High-Tech*."). In *High-Tech*, after evaluating several empirical studies, the Court granted a $40,000,000 attorney's fee award based on a lodestar multiplier of 2.2. The Court performed a percentage-of-the-recovery crosscheck and determined that a total percentage of 10.5% was reasonable. Thus, the total percentage of the recovery in the instant case, 11%, is higher than the percentage of the recovery in *High-Tech*, despite the greater risk, greater overall recovery, and longer litigation in *High-Tech*.

A comparison of the work done in this case and the work done in *High-Tech* confirms that class counsel should not receive a significantly higher percentage-of-the-recovery fee than the percentage awarded in *High Tech*. The instant case lasted less than three years, from the filing of the complaint on September 8, 2014, to the date of this order, June 5, 2017. As discussed above, in the instant case class counsel (1) conducted pre-complaint investigation; (2) produced and reviewed documents in discovery; (3) filed an amended complaint, an opposition to a motion to dismiss, a second amended complaint, and a second opposition to a motion to dismiss, as well as an opposition to a motion to compel arbitration; (4) filed briefing at the class certification stage; (5) served expert reports; (6) took the depositions of twenty-five witnesses and defended an additional five depositions; and (7) opposed defendants' Rule 23(f) petition.

---

[7] $(13,800,658.50 \div 150,000,000) \times 100 = 9.2\%$
[8] $((13,800,658.50 + 4,737,500) \div 168,950,000) \times 100 = 10.97\%$

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

United States District Court
Northern District of California

*High-Tech*, in contrast, lasted over four years, from the filing of the initial complaint on May 4, 2011 to the date the case closed on September 2, 2015. In *High-Tech*, class counsel had taken the following actions up to the time of settlement: (1) identified the alleged conspiracy to fix and suppress employee compensation in the tech industry; (2) prepared and filed multiple complaints against Defendants; (3) survived two motions to dismiss; (4) undertook considerable discovery, including taking 93 depositions and defending 14 others, serving 75 document requests, reviewing the resulting 325,000 documents (over 3.2 million pages), serving 28 subpoenas on third parties, reviewing 8,809 pages of documents from those third parties, producing over 31,000 pages of documents in response to Defendants' document requests, and responding to and reviewing 34 subpoenas served by Defendants on third parties; (6) retained four experts to assist in analyzing over 15 gigabytes of employment-related compensation and recruiting data; (7) worked with the experts to produce multiple expert reports; (8) litigated multiple *Daubert* motions; (9) filed a consolidated class action complaint; (10) litigated two rounds of class certification; (11) opposed a Rule 23(f) appeal to the Ninth Circuit; (12) survived five summary judgment motions; (13) prepared for trial; (14) negotiated three settlements; and (15) opposed mandamus in the Ninth Circuit.

Thus, a comparison of work between the instant case and *High Tech* makes clear that class counsel should not receive a significantly higher percentage of the recovery than class counsel received in *High Tech*. Indeed, if the Court granted the overall 21.4% percentage of the recovery that class counsel requests in the instant case, the total attorney's fee award would be $36,237,500. This is over 90% of the $40,000,000 award granted in *High-Tech*, despite the fact that the lodestar in *High-Tech* was almost double the reported lodestar in the instant case. *See In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730, at *5 (N.D. Cal. Sept. 2, 2015) ("Class Counsel's final revised lodestar, which is the sum of the lodestars for each of the four firms, is $18,201,787.50."). This would also be unreasonable in light of the fact that the settlements in *High-Tech* totaled $415,000,000, which far exceeds the $168,950,000 total settlement amount in the instant case.

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

An 11% percentage of the recovery is also consistent with the principle that "fees as a percentage of the recovery tend to decrease as the size of the recovery increases," which is discussed in the empirical study cited in class counsel's motion for attorney's fees, Theodore Eisenberg, *Geoffrey P. Miller & Roy Germano, Attorneys' Fees in Class Actions: 2009-2013*, NYU Law and Economics Research Paper No. 17-02 (December 1, 2016) ("EMG Study"). As the EMG Study points out, this effect is "due to the economies of scale that can sometimes be achieved in very large cases." *Id.* This "economies of scale" effect is especially relevant in the instant case, in which not only has class counsel achieved economies of scale from their work in this case, but class counsel was also able to rely on documents, legal theories, rulings, and settlements in *High Tech* to successfully litigate and resolve this case. Thus, although the recovery in the instant case is a significant benefit for the class, a substantial portion of the size of the recovery in the instant case can be attributed to the success of the plaintiffs in *High-Tech*. In this context, it would be unfair and unreasonable to grant class counsel in the instant case a greater percentage of the recovery than the percentage awarded to class counsel in *High Tech*.

In short, in the instant case, even more than in *High Tech*, rote application of the 25% benchmark "would yield windfall profits for class counsel in light of the hours spent on the case." *In re Bluetooth*, 654 F.3d at 942. Therefore, the Court finds that the percentage-of-the-recovery crosscheck confirms that a total award from all settlements of $18,538,158.50, and a $13,800,658.50 from the Dreamworks and Disney settlements, are reasonable.

This reduced attorney's fees award will provide a significant benefit to the class because the attorney's fees are deducted from the fund for class members. Specifically, as discussed below, the Court's decision to reduce the attorney's fees award to class counsel increases the average class member recovery from all the settlements from roughly $11,984 per person to roughly $13,612 per person. *See infra* Part III.C.

### 2. Objections

The Court received three objections to class counsel's requested attorney's fees. The first two objections were from Charles Williams and Alice Goldstone, who filed a joint objection form.

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

United States District Court
Northern District of California

ECF No. 386. Mr. Williams and Ms. Goldstone are not members of the class and thus lack standing to object. Additionally, on June 2, 2017, Mr. Williams and Ms. Goldstone withdrew their objections. Nevertheless, the Court considers the objections for the sake of completeness. Mr. Williams and Ms. Goldstone objected to the attorney's fee award on two grounds. First, Mr. Williams and Mr. Goldstone objected that "none of the specifics for the requested fee are not [sic] included in the notice" and that "the costs of notice and administration of the class fund were not disclosed." *Id.* at 8. However, the notice sent to class members disclosed that class counsel would seek a fee of up to 25%, and there is no requirement that details regarding the plaintiffs' fee request be separately disseminated to the Class. Indeed, Plaintiff's requested fees of 21% of the settlement fund are below the 25% disclosed in the notice, and the Court's final award of $13,800,658.50 in attorney's fees in connection with the DreamWorks and Disney settlements is substantially below the 25% disclosed in the notice. In addition, the notice disclosed that "court-approved costs, and attorney's fees and expenses" would be deducted from the settlement. ECF No. 359-2, at 9. Furthermore, the instant motion for attorney's fees in connection with the DreamWorks and Disney settlements does not seek any additional funds for the settlement administrator because the Court granted the settlement administrator $95,495.09 in costs in connection with the Sony and Blue Sky settlements for all of the settlement administrator's actual and projected costs. ECF No. 347, at 14. There were no objections to the Sony and Blue Sky settlements.

Second, Mr. Williams and Ms. Goldstone objected to the size of the multiplier that class counsel requests. ECF No. 386, at 9 ("3.91 is a very large multiplier"). For the reasons discussed above, the Court agrees. As discussed above, the Court exercises its discretion to award attorney's fees in the instant case based on the lodestar method and grants class counsel a lodestar multiplier of 2.0. The Court finds that a multiplier of 2.0 is fair and reasonable in light of all the facts and circumstances of the case and is in line with multipliers granted in similar cases. *See, e.g.*, *High-Tech*, 2015 WL 5158730, at *10 (granting a multiplier of 2.2).

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

United States District Court
Northern District of California

The third objection to the attorney's fee award is from Christian Haley. ECF No. 387. Mr. Haley objects to the requested attorney's fees on the grounds that "it is established that in mega fund' settlements, such as the case at bar, the preferable method [for calculating attorney's fees] is the lodestar method." *Id.* at 3–4. Mr. Haley also states that class counsel's requested percentage "of about 20%" would "lead to a windfall" for class counsel in the instant case. *Id.* at 4.

Although the Court does not decide whether the lodestar method is in general preferable in mega-fund settlements, the Court agrees with Mr. Haley that under the facts and circumstances of the instant case, the percentage-of-the-recovery method "is arbitrary and may provide a windfall to counsel." *Id.* at 4. Thus, as discussed above, the Court applies the lodestar method to calculate class counsel's attorney's fees.

In short, none of the above objections requires the Court to modify its attorney's fees awards to class counsel.

### 3.  Conclusion: Attorney's Fees Award

In sum, the Court awards $13,800,658.50 in attorney's fees to class counsel for the Dreamworks and Disney settlements. Taking into account the $4,737,500 million in attorney's fees already awarded to class counsel in the settlements with Sony and Blue Sky, class counsel will receive a total of $18,538,158.50 out of the $168,950,000 combined settlements.

### B.  Expenses

In common fund cases, the Ninth Circuit has stated that the reasonable expenses of acquiring the fund can be reimbursed to counsel who has incurred the expense. *See Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *accord Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir. 2002). All expenses that are typically billed by attorneys to paying clients in the marketplace are compensable. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).

The Court previously awarded $1,561,700.47 in expenses in connection with the Sony and Blue Sky settlements. ECF No. 347, at 13–14. In the instant motion, Plaintiffs seek a total award of $490,040.13 in expenses that were not reimbursed in the Sony and Blue Sky settlement and that were necessarily incurred in connection with the prosecution of this action. With their motion,

United States District Court<br>Northern District of California

24

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

plaintiffs provide an accounting of the expenses incurred by Plaintiffs' counsel. *See* Friedman Decl. ¶ 15; Small Decl. ¶ 33; Sklaver Decl. ¶ 14. Several categories account for the bulk of these expenses: fees paid to experts, filing fees, travel expenses, costs of court and deposition transcripts, and computer research expenses. All of these costs were necessarily and reasonably incurred to bring this case to a successful conclusion, and they reflect market rates for the various categories of expenses incurred. Further, Plaintiffs' counsel advanced these necessary expenses without assurance that they would be recouped. For these reasons, Plaintiffs' request for fees is reasonable. The Court therefore GRANTS an award of $490,040.13 in expenses.

### C.  Service Awards

In evaluating whether class representatives are entitled to reasonable service awards, district courts "must evaluate their awards individually, using 'relevant factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.'" *Staton*, 327 F.3d at 977.

In the instant case, Plaintiffs request $80,000 for each named Plaintiff for service awards in connection with the Disney settlement and $10,000 for each named Plaintiff for service awards in connection with the Dreamworks settlement. Combined with service awards from the Sony and Blue Sky settlements, this will result in a total of $100,000 in service awards for each of the three named Plaintiffs.

"Service awards for class representatives are routinely provided to encourage individuals to undertake the responsibilities and risks of representing the class and recognize the time and effort spent in the case." ECF No. 347 at 14. In the Ninth Circuit, service awards "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). "Courts have discretion to approve service awards based on, *inter alia*, the amount of time and effort spent, the duration of the litigation, and the personal benefit (or lack thereof) as a result of

25

the litigation." ECF No. 347 at 14.

Here, the three named plaintiffs, Robert Nitsch, David Wentworth, and Georgia Cano have spent a significant amount of time assisting the litigation of this case.[9] Each plaintiff responded to written discovery and produced documents relating to their claims; they were each deposed by defense counsel for a full day regarding their claims; they reviewed the SAC and other substantive pleadings; and they reviewed and approved the settlements.[10] Perhaps most importantly, despite the tight-knit and fluid nature of the animation and visual effects industry, each of the named plaintiffs was willing to put his or her name on this employment lawsuit for the benefit of all absent class members despite a very real fear of workplace retaliation, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998), or being viewed as "troublemakers" within the industry, *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5158730, at *17 (N.D. Cal. Sept. 2, 2015); *see also* Nitsch Decl. ¶ 12; Wentworth Decl. ¶ 10; Cano Decl. ¶ 12. In fact, defendants subpoenaed their employment records from current and former employers. Additionally, the named plaintiffs each state in their declarations that the animation industry is particularly sensitive to the reputation of employees because it is a small industry and employees tend to switch projects and employers often. S*ee* Nitsch Decl. ¶ 12; Wentworth Decl. ¶ 12; Cano Decl. ¶ 12. Thus, the risk of workplace retaliation in the instant case is particularly acute.

Furthermore, the service awards of $90,000 ($100,000 total for the litigation) are in line with awards in other megafund cases. *See, e.g.*, *Marchbanks Truck Serv. v. Comdata Network,*

---

[9] Mr. Williams and Ms. Goldstone also object to the incentive awards for named Plaintiffs on the ground that the proposed incentive awards are disproportionate to the average recovery for class members and because"[t]he proposed incentive award has not been supported by any substantial evidence that the class representatives have exerted any labor . . . , suffered any risk of retaliation, or otherwise put the sweat of their collective brow to work on behalf of the class." ECF No. 386, at 10. However, as discussed above, Mr. Williams and Ms. Goldstone are not members of the class in this case, have no standing to object, and have withdrawn their objections. Additionally, as described below, the named Plaintiffs performed significant work on behalf of the class and the requested incentive awards are not disproportionate to the average recovery for class members.
[10] *See* Declaration of Robert Nitsch in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards ("Nitsch Decl."), ¶¶ 6-11; Declaration of David Wentworth in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards ("Wentworth Decl."), ¶¶ 6-9; Declaration of Georgia Cano in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards ("Cano Decl."), ¶¶ 6-11.

26

*Inc.*, Case No. 07-CV-1078, Dkt. 713 at 2, 8 (E.D. Pa. July 14, 2014) (approving $130 million class action settlement, including service award of $150,000 to one class representative and service awards of $75,000 to two other class representatives); *In re Titanium Dioxide*, 2013 WL 6577029, at *1 (awarding $125,000 to lead class representative out of $163.5 million settlement); *Velez v. Novartis Pharm. Corp.*, No. 04 CIV 09194 CM, 2010 WL 4877852, at *4, *8, *28 (S.D.N.Y. Nov. 30, 2010) (awarding $125,000 to named plaintiffs from $175 million settlement). The service awards of $90,000 are also consistent with service awards granted in *High-Tech. See High-Tech Fees Order*, 2015 WL 5158730, at *17 (granting each of four named plaintiffs a total of $100,000 in service awards, and awarding a fifth plaintiff, who successfully objected to the final settlement, a total of $140,000).

Finally, the ratio between the service awards and the average class member recovery is not unreasonable. The Ninth Circuit has cautioned that where there is a "very large differential in the amount of damage awards between the named and unnamed class members," that differential must be justified by the record. *Staton*, 327 F.3d at 978. Taking into account the Court's reductions of the amounts requested for attorney's fees, the average class member recovery from all the settlements in the instant case should increase from roughly $11,984 per person to roughly $13,612 per person.[11] The resulting ratio between service awards and class member recovery is about 7.3. This ratio is justified by the record detailed above, including the numerous hours each class representative spent on this high-profile litigation and their reasonable fears of workplace retaliation. *Compare Staton*, 327 F.3d at 948, 975-78 (rejecting settlement where 29 class representatives could receive up to $50,000 compared to $1,000 for unnamed class members); *Wallace v. Countrywide Home Loans, Inc.*, No. 8:08-1463-JLS MLGX, 2014 WL 5819870, at *4 (C.D. Cal. Apr. 14, 2014) (rejecting settlement where service awards were "33 times greater than

---

[11] The Court calculated this figure by comparing the net settlement fund (from all settlements) with the requested fees, costs, and incentive awards divided by the approximate number of class members (($168,950,000 − $36,237,500 − 2,051,740.60 − 95,495.09 − 300,000) ÷ 10,870 = $11,983.9) with the net settlement fund with the final fees, costs, and incentive awards divided by the approximate number of class members ((($168,950,000 − $18,538,158.50 − 2,051,740.60 − 95,495.09 − 300,000) ÷ 10,870 = $13,612.20).

27

*the maximum* possible recovery of other individual class members" (emphasis added)); *Kaufman v. Am. Exp. Travel Related Servs. Co.*, 264 F.R.D. 438, 448 (N.D. Ill. 2009) (disapproving $2,500 service awards because they were "125 times greater than the $20 maximum that any similar Class member could recover"), *with In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *19 (N.D. Ill. Feb. 12, 2015) (approving $5,000 service awards where class members who made timely claims were entitled to "at least $39.66"); *Lemus v. H&R Block Enters. LLC*, No. C 09-3179 SI, 2012 WL 3638550, at *5-6 (N.D. Cal. Aug. 22, 2012) (approving $15,000 service awards where the average class recovery was about $1,200).

This ratio is also significantly lower than the ratios approved in *High Tech, High-Tech Fees Order*, 2015 WL 5158730, at *17. In *High-Tech*, the Court approved an award of $140,000 for a successfully objecting plaintiff and $100,000 each for four other named plaintiffs. *Id.* In *High-Tech*, the average recovery per class member was "roughly $5,770 per person," and thus the ratio between recovery and service awards was 21 for the plaintiff receiving $140,000 and 14 for the plaintiffs receiving $100,000. These ratios are significantly higher than the 7.3 ratio in the instant case.

Even though the litigation in the instant case was shorter than the litigation in *High-Tech*, the service awards are the same as the service awards in *High-Tech* because the individual recovery is significantly higher, because the plaintiffs in the instant case are often employed for a single project and thus need to switch jobs often, and because the plaintiffs in the instant case are employed in a much smaller industry with a smaller number of employers (most of whom are Defendants in this case). *Compare Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 317 (N.D. Cal. 2016) (certifying class of "animation and visual effects employees") with *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1177 (N.D. Cal. 2013) (certifying class of "[a]ll natural persons who work in the technical, creative, and/or research and development fields").

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

United States District Court
Northern District of California

Based on the foregoing, the Court accordingly concludes that the request for a $90,000 service award for each named plaintiff is reasonable. The Court therefore GRANTS the requested $90,000 service award for each of the three named Plaintiffs.

## III.   CONCLUSION

For the foregoing reasons, the Court hereby GRANTS in part and DENIES in part the motions for attorney's fees, reimbursement of expenses, and service awards. The Court awards as follows:

- $13,800,658.50 in attorney's fees to class counsel in connection with the Dreamworks and Disney settlements, for a total attorney's fee award of $18,538,158.50 in the entire case;

- $490,040.13 in unreimbursed expenses to class counsel in connection with the Dreamworks and Disney settlements;

- $90,000 service awards each to Plaintiff Nitsch, Plaintiff Wentworth, and Plaintiff Cano in connection with the Dreamworks and Disney settlements.

**IT IS SO ORDERED.**

Dated: June 5, 2017

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

Case No. 14-CV-04062-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES

United States District Court
Northern District of California

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-81139-CIV-COHN/SELTZER

BENJAMIN HANKINSON, et al.,
individually and on behalf of others
similarly situated,

      Plaintiffs,

vs.

R.T.G. Furniture Corp., d/b/a Rooms To
Go, et al.,

      Defendants,

_____/

## FINAL JUDGMENT AND ORDER

Plaintiffs have moved for final approval of the parties' proposed settlement, pursuant to Fed. R. Civ. P. 23. See DE 208. Defendants consent to the relief sought in plaintiffs' motion. Having reviewed all matters and proceedings of record, it is hereby **ORDERED AND ADJUDGED** as follows:

1.      This Order of Final Approval and Judgment incorporates herein and makes a part hereof, the parties' Settlement Agreement, including all exhibits thereto. DE 203-1. Unless otherwise provided herein, the terms as defined in the Settlement Agreement shall have the same meanings for purposes of this Final Order and Judgment.

2.      The Court has personal jurisdiction over the Class Representatives, Settlement Class Members, and the Defendants for purposes of this settlement, and has subject matter jurisdiction to approve the Agreement.

1

3.     By Order of August 4, 2017, the Court certified the following Settlement

Class:

> All Persons who purchased one or more ForceField Fabric or Leather
> Protection Plans from RTG (including all affiliates) in stores or online in the
> United States during the Class Period, excluding any ForceField Fabric or
> Leather Protection Plans that sold for $8.00 or less.

The Class Period ends on August 4, 2017, and the start dates vary by state, as set forth

in the definition of Class Period in the Settlement Agreement.  The Settlement Class

does not include any judges to whom this case is assigned, any member of the judge's

immediate family, or the judge's staff or their immediate families.

4.     The Court hereby confirms its preliminary certification of this Settlement

Class for purposes of granting final approval to the parties' Settlement, finding that this

class meets each of the factors in Fed. R. Civ. P. 23(a) and (b)(3).

5.     The record shows that Class Notice has been given to the Settlement

Class in the manner approved by the Court in its Preliminary Approval Order.  The

Court finds that such Notice: (i) constitutes reasonable and the best practicable notice;

(ii) constitutes notice that was reasonably calculated, under the circumstances, to

apprise Settlement Class Members of the terms of the Agreement, and Settlement

Class Members' right to object to or exclude themselves from the Settlement Class and

appear at the Fairness Hearing; (iii) constitutes due, adequate, and sufficient notice to

all persons or entities entitled to receive notice; and (iv) meets the requirements of due

process and Fed. R. Civ. P. 23.

6.     The only persons who timely excluded themselves from the Settlement

Class in compliance with the Court's Preliminary Approval Order are listed at DE 211-1.

2

This Order of Final Approval and Judgment shall have no force or effect on those persons.

7.      Furthermore, the Court finds that notice under the Class Action Fairness Act was effectuated within the time required by 28 U.S.C. § 1715, and that ninety (90) days has passed without comment or objection from any governmental entity.

8.      The Court preliminarily approved the proposed settlement by Order dated August 4, 2017.  DE 204.  After Class Notice, the Court conducted a final Fairness Hearing at which it considered any and all objections, along with the materials submitted by the parties in support of settlement approval.

9.      The Court finds that the designated Class Representatives are appropriate and adequate representatives of the Settlement Class.  The Court has also considered all of the factors enumerated in Fed. R. Civ. P. 23(g) and finds that Class Counsel have fairly and adequately represented the interests of the Settlement Class.

10.     Pursuant to Fed. R. Civ. P. 23(e) and having considered the factors relevant to settlement approval,[1] the Court hereby finally **APPROVES** in all respects the Settlement set forth in the Settlement Agreement and finds that the Settlement and the Settlement Agreement are, in all respects, fair, reasonable and adequate, and in the best interest of the Settlement Class. The objections to the Settlement have been considered and are hereby **OVERRULED**.

11.     The parties are hereby directed to implement and consummate the Settlement according to the terms and provisions of the Agreement.

---

[1] See, e.g., Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984)

12.    Upon the Effective Date of the Agreement, the Class Representatives, Class Counsel, the Settlement Class, and each Settlement Class Member, shall release and forever discharge the Released Persons (as defined in the Agreement)[2] from any and all Released Claims (as defined in the Agreement)[3].

13.    After the Effective Date, the Class Representatives, Settlement Class Members, and Releasing Persons and all of their successors in interest are hereby

---

[2] "Released Persons" means and includes R.T.G. Furniture Corp., RTG America, LLC, The Jeffrey Seaman 2009 Annuity Trust, RTG Furniture Corp. of Georgia, Rooms To Go North Carolina Corp., RTG Furniture of Texas, L.P., RTG Texas Holdings, Inc., R.T.G. Furniture Corp. of Texas, Retail Management Services Corp., Rooms To Go Louisiana Corp., Rooms To Go Tennessee Corp., Rooms To Go Alabama Corp., Rooms To Go Mississippi Corp., Roomstogo.com, Inc., any entity that does business as Rooms To Go in the United States, and their past and present direct and indirect owners, parents, subsidiaries, affiliates, and divisions; the past and present officers, directors, trustees, beneficiaries, members, shareholders, employees, representatives, partners, direct and indirect owners, parents, subsidiaries, affiliates, divisions, joint venturers, consultants, agents, independent contractors, attorneys, and insurers of all of the foregoing; and the predecessors, successors, assigns, and legal representatives of all of the foregoing.

[3] "Released Claims" means and includes any and all claims, damages, rights, demands, actions, causes of action, suits, debts, liens, contracts, liabilities, agreements, costs, expenses, losses, or remedies of whatever kind or nature, whether foreseen or unforeseen, and whether known or unknown, that were or could have been asserted in this Action (Case No. 9:15-Cv-81139-Cohn/Seltzer) or the action styled *Kenny Lee Triplett v. Rooms To Go North Carolina Corp., d/b/a Rooms To Go, et al.*, Case No. 5:16-cv-926-FL, in the United States District Court for the Eastern District of North Carolina ("*Triplett*"), including, without limitation, claims based on, arising out of, or related directly or indirectly to any of the allegations, transactions, facts, matters or occurrences referenced in the complaints and amended complaints filed in those actions, including without limitation any and all claims arising from or related to (i) the marketing, advertising, purchase, offer to sell, or sale of any fabric or leather protection plans or goods, services, or warranties related to those plans or (ii) the application of any fabric or leather protectant. The Released Claims include any right or opportunity to claim, seek, or obtain restitution, disgorgement, injunctive relief, or any other benefit as a member of the general public, under California Business and Professions Code section 17200, et seq., or otherwise.  The parties further agree that they have been informed of and that they and the Settlement Class Members waive the benefits of California Civil Code section 1542 (and any and all other similar state statutes regarding the effectiveness of general releases).

permanently enjoined and forever barred from commencing, prosecuting, asserting or assisting in any proceeding in any court or other forum against any Released Person with respect to all matters within the scope of the Released Claims.

14. The Court further adjudges that upon the Effective Date, the Settlement Agreement, including the releases in that Agreement and described above, will be binding on, and have res judicata and preclusive effect in all pending and future lawsuits or other proceedings maintained by or on behalf of, the Class Representatives and each Settlement Class Member who does not submit a timely and valid request for exclusion from the Settlement Class in accordance with the provisions of the Preliminary Approval Order, and each of their respective executors, representatives, heirs, predecessors, assigns, beneficiaries, successors, bankruptcy trustees, guardians, joint tenants, tenants in common, tenants by the entireties, agents, attorneys, or other representatives. Any of the Released Persons may file this Final Order of Judgment in any action or proceeding that may be brought against it in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

15. Without affecting the finality of this Final Order of Judgment in any way, the Court retains exclusive jurisdiction over: (a) implementation and enforcement of the Settlement Agreement until the final judgment contemplated hereby has become effective and each and every act agreed to be performed by the parties hereto pursuant to the Settlement Agreement have been performed; (b) any other action necessary to conclude the Settlement and to administer, effectuate, interpret and monitor compliance

with the provisions of the Settlement Agreement; and (c) all parties to this Action and the Settlement Class Members for the purpose of implementing and enforcing the Settlement Agreement, including the injunction set forth above, and resolving all disputes arising from claims for payment under the Settlement.

16.     Nothing in this Order of Final Approval and Judgment, the Settlement, the Agreement, or any documents or statements related thereto, is or shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by any defendant or Released Person.

17.     For the reasons stated herein, the Settlement Agreement is finally approved in all respects as fair, reasonable and adequate pursuant to Fed. R. Civ. P. 23(e).  The Court directs the Clerk of Court to **DENY AS MOOT** any pending motions, **CLOSE** this case, and enter this **FINAL JUDGMENT** incorporating the terms of this Order and dismissing this action **WITH PREJUDICE.**

18.     Additionally, the Court hereby awards Plaintiffs' counsel an aggregate sum for attorneys' fees and expenses of $4,000,000.00. The Court finds the amount of attorneys' fees awarded herein is based upon a reasonable percentage of the fund established for the benefit of the Settlement Class and that the expenses awarded herein are reasonable and were necessarily incurred to achieve the benefit obtained.

19.     The Court also hereby awards to each of the Hankinson class representatives service award payments of $3,500.00.  The Court finds the amount of the service awards is fair and reasonable based upon the time and effort committed to this litigation by the Hankinson class representatives.

6

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 15th day of December, 2017.

JAMES I. COHN
United States District Judge

Copies provided to counsel of record via CM/ECF

# EXHIBIT 9



# COHENMILSTEIN

Powerful Advocates. Meaningful Results.

"The most effective law firm in the United States for lawsuits with a strong social and political component."

**Inside Counsel**

"Class action powerhouse."

**Forbes**

Boston | Chicago | Minneapolis | New York | Palm Beach Gardens | Philadelphia | Raleigh | Washington          **cohenmilstein.com**



**Powerful Advocates. Meaningful Results.**

# | About the Firm

We are trailblazers in plaintiff-side and class action litigation, handling groundbreaking cases resulting in landmark decisions involving antitrust, securities, consumer rights, civil rights, and other far-reaching matters.

We fight corporate abuse by pursuing litigation on behalf of individuals, investors, whistleblowers, small businesses, and other institutions in lawsuits that have raised significant and often novel legal issues.

With more than 100 attorneys in 10 practice areas in eight offices across the country, including Boston, Chicago, Minneapolis, New York, Palm Beach Gardens, Philadelphia, Raleigh, and Washington, we are recognized as one of the largest and most diversified plaintiffs' firms in the country.

We regularly litigate complex matters across a wide range of practice areas:

- Antitrust
- Civil Rights & Employment
- Complex Tort Litigation
- Consumer Protection
- Employee Benefits / ERISA
- Ethics and Fiduciary Counseling

- Human Rights
- Public Client
- Securities Litigation & Investor Protection
- Whistleblower/False Claims Act

In 2023, *Law360* recognized three of our practices as a "2022 Practice Group of the Year" in the areas of employee benefits, competition, and securities law. In 2022, *The National Law Journal* named the firm "Consumer Protection Law Firm of the Year" and "Discrimination Law Firm of the Year." *Chambers USA* and *Legal 500* have also consistently recognized Cohen Milstein as a "Top Tier Firm" and "Leading Firm" in antitrust, securities litigation, product liability, mass torts, and class actions. The firm has also been named among "The Best Law Firms for Female Attorneys" in *Law360's* 2022 "Glass Ceiling Report."

Our attorneys, individually, are also heralded as among the top in their practices by peer-reviewed surveys and industry organizations, such as American Antitrust Institute, *The American Lawyer, Benchmark Litigation, Chambers USA, Global Competition Review, Law360, Lawdragon, Legal 500,* and *The National Law Journal*.



Powerful Advocates. Meaningful Results.

# Consumer Protection

**We are at the forefront of protecting consumers across the United States from corporate malfeasance, including false and misleading advertising, warranty violations, personal data theft, fraudulent billing, and other types of unfair or deceptive business practices.**

Our primary objective is to protect consumer rights through class actions under federal and state laws, bringing a full measure of justice to consumers, while holding corporate wrongdoers responsible. Some of our cases have achieved historic settlements, while others have established historical legal precedent in consumer law.

## Nationally Recognized

We have received numerous accolades for our work in consumer law:

- *The National Law Journal* – Consumer Protection Practice of the Year (2018, 2022)
- *Law360* – Practice Group of the Year – Class Action (2017, 2020, 2021)
- *Law360* – Practice Group of the Year – Consumer Protection (2018, 2019)

## Our Practice

We represent individuals and small businesses in state and federal consumer class actions, spanning all industries.

The scope of our practice includes, but is not limited to:

- Breach of Data Privacy
- Unfair Business Practices, including False Advertising and Deceptive Marketing
- Automotive and Product Defects
- Healthcare Fraud

## Our People

Several of our team members hail from distinguished, senior leadership roles in consumer protection law, including the former Deputy Associate Attorney General of the U.S. Department of Justice and a former president of Public Justice, the nation's foremost not-for-profit plaintiffs' foundation, which leads social advocacy and corporate reform through precedent-setting class actions and trials.

cohenmilstein.com



**Powerful Advocates. Meaningful Results.**

# Consumer Protection Settlements

## We are often court appointed Lead or Co-Lead Counsel in high-profile consumer protection cases, including:

- *LLE One, LLC, et al. v. Facebook* **(N.D. Cal.)** – On June 26, 2020, the Court granted final approval of a $40 million settlement in a consolidated, consumer class action against Facebook for allegedly disseminating inflated video metrics – as much as 150% - 900% – to advertisers. Plaintiffs' allegations against Facebook include violations of California's Unfair Competition Law (§ 17200), breach of implied duty to perform with reasonable care, as well as fraud.

- *In re Equifax, Inc., Customer Data Security Breach Litigation* **(N.D. Ga.)** – On December 19, 2019 the Court granted final approval a landmark $1.5 billion settlement concluding this data breach class action affecting more than 147 million people in the U.S. The settlement consists of a record-breaking $425 million in monetary and injunctive benefits and requires Equifax to spend $1 billion to upgrade its security and technology. Cohen Milstein was on the Plaintiffs' Steering Committee and was Co-Chair of the Expert Committee.

- *In Re Lumber Liquidators Chinese-Manufactured Laminate Flooring Products Marketing, Sales Practices and Products Liability Litigation* **(E.D. Va.)** – On October 9, 2018, the Court granted final approval of a $36 million settlement that ends this multidistrict product liability and consumer litigation against Lumber Liquidators, the largest specialty retailer of hardwood flooring in North America. Plaintiffs alleged that Lumber Liquidators falsely labelled and made false statements that its Chinese-manufactured laminate flooring, sold between January 1, 2009 and May 31, 2015, complied with California Air Resource Board's (CARB) formaldehyde emissions limits. "60 Minutes" aired two investigative stories into these allegations. Cohen Milstein was Co-Lead Counsel in this nationwide class action.

- *In Re Anthem, Inc. Data Breach Litigation* **(N.D. Cal.)** – On August 16, 2018, the Court granted final approval to a $115 million settlement – the largest data breach settlement in U.S. history – ending claims that Anthem Inc., one of the nation's largest for-profit managed health care companies, put 79 million consumers' personal information, including social security numbers and health


date, at risk in a 2015 data breach. Cohen Milstein was Co-Lead Counsel in this watershed nationwide class action.

- *Herrera, et al. v. JFK Medical Center LP et al.* **(M.D. Fla.)** – On December 14, 2018, Cohen Milstein secured final approval of a $220 million injunctive relief settlement from Florida-based HCA hospitals for patients who were allegedly overcharged for emergency X-rays and CT scans provided after they suffered an automobile accident and covered in part by their mandatory Florida Personal Injury Protection (PIP) insurance. Cohen Milstein was Lead Counsel in this state-wide litigation.

- *In re: Caterpillar, Inc. Engine Products Liability Litigation* **(D.N.J.)** – On September 20, 2016, the Court granted final approval of a $60 million settlement, ending a consolidated class action lawsuit brought by 22 trucking and transportation firms and individuals in 18 states who had purchased or leased vehicles powered by defective MY2007 CAT engines, heavy-duty, on-highway diesel engines designed and manufactured by Caterpillar. Cohen Milstein was Co-Lead Counsel in this multi-state class action.

- *Khoday et al v. Symantec Corp. et al.* **(D. Minn.)** – In April 2016, the Court granted final approval of a $60 million all-cash deal one month before this certified class action was about to go to trial – one of the most significant consumer settlements in years – against Symantec, Corp. and Digital River, Inc. regarding the marketing of a re-download service in conjunction with the sale of Norton software. Cohen Milstein was Lead Counsel in this nationwide class action.



Powerful Advocates. Meaningful Results.

## Other High-Profile Settlements

- ***S&P Litigation:*** Represented co-lead state Mississippi in the $1.375 billion-dollar consumer fraud settlement achieved in 2015 by 20 states and the U.S. Department of Justice with Standard & Poor's. Together with the Moody's settlement, these cases against the nation's two largest credit rating agencies produced key industry reforms that provide greater transparency for consumers and that divested the credit rating agencies of more than $2.2 billion for their conduct contributing to the national housing crisis and the Great Recession.

- ***In re Wells Fargo & Company Securities Litigation*** **(S.D.N.Y.):** Cohen Milstein, as Co-Lead Counsel, represented the Public Employees' Retirement System of Mississippi and the Employees Retirement System of Rhode Island in this securities class action, which alleged that Wells Fargo and certain former executives misrepresented the Bank's compliance with a series of 2018 consent orders with the CFPB, OCC, and the Federal Reserve arising from the Bank's widespread consumer fraud banking scandal. On September 8, 2023, the Court granted final approval of a historic $1 billion settlement, which is the 17th largest securities class action settlement ever, the sixth largest in the last decade, the ninth largest ever in the Second Circuit, and the largest ever without a restatement or related actions by the Securities Exchange Commission or U.S. Department of Justice.

- ***In re Urethanes Antitrust Litigation*** **(D. Kan.):** We served as Co-Lead Counsel on behalf of a class of direct purchasers of chemicals used to make many everyday products, from mattress foam to carpet cushion, who were overcharged because of a nationwide price-fixing conspiracy. We secured the largest trial verdict ever in a price-fixing case ($1.06 billion – after trebling and settlement offsets). Dow Chemical and other leading chemical producers ultimately settled, with combined total settlements of $974 million.

- ***State Attorneys General PBM Investigations & Litigation:*** We serve as special counsel to more than a dozen state Attorneys General in their respective investigations of the pharmacy benefit managers (PBMs) that provide pharmacy benefits and services to their state's Medicaid program and state employee health plans. The PBMs under investigation include Centene's Envolve Pharmacy Solutions, OptumRx, Express Scripts, and CVS Caremark. Since June 2021, we have helped achieve over $950 million in settlements with Centene for our state



Attorney General clients, including: California, Ohio, Mississippi, Illinois, Arkansas, and New Mexico. We are working with other state Attorneys General to finalize their settlements with Centene that will return hundreds-of-millions of dollars back to these states.

- ***Moody's Litigation:*** Represented the co-lead state Mississippi and represented New Jersey in the $864 million consumer fraud settlement achieved in January 2017 by 22 states and the U.S. Department of Justice with Moody's Corporation, Moody's Investors Service, Inc., and Moody's Analytics, Inc. Together with the S&P settlement, these cases against the nation's two largest credit rating agencies produced key industry reforms that provide greater transparency for consumers and that divested the credit rating agencies of more than $2.2 billion for their conduct contributing to the national housing crisis and the Great Recession.

- ***United States of America et al., ex rel. Lauren Kieff, v. Wyeth*** (D. Mass.): Cohen Milstein was Co-Lead Counsel in this False Claims Act whistleblower case against pharmaceutical giant Wyeth (subsequently acquired by Pfizer), in which the whistleblowers alleged that Wyeth defrauded Medicaid, the joint federal/state healthcare program for the poor, when it reported falsely inflated prices for its acid suppression drug Protonix from 2001 through 2006 for Medicaid rebate purposes. Weeks before trial, in February 2016, in one of the largest qui tam settlements in U.S. history, Wyeth agreed to pay $784.6 million to the U.S. government and the over 35 intervening states.

- ***National Opioids Litigation:*** On July 21, 2021, the Attorneys General of Indiana, New Jersey, and Vermont announced historic settlement agreements, totaling $704.8 million as a part of a $26 billion national agreement with the nation's three major pharmaceutical distributors, Cardinal Health, McKesson, and AmerisourceBergen, and opioids manufacturer Johnson & Johnson for their roles in promulgating the opioid epidemic in each of their states. In addition, the courts ordered numerous injunctive relief requirements of the Defendants. Cohen Milstein represented the state Attorneys General in this matter. Final approval of the resolution in the litigation against Purdue Pharma and the Sackler family is pending in bankruptcy court.

- ***Keepseagle v. Vilsack*** (D.D.C.): A class of Native American farmers and ranchers allege that they have been systematically denied the same opportunities to



obtain farm loans and loan servicing that have been routinely afforded white farmers by the USDA.  A class was certified in 2001 by Judge Emmet Sullivan, District Judge for the U.S. District Court for the District of Columbia, and the D.C. Circuit declined USDA's request to review that decision.  On October 19, 2010, the case reached a historic settlement, with the USDA agreeing to pay $680 million in damages to thousands of Native American farmers and ranchers and forgive up to $80 million worth of outstanding farm loan debt.

- *In re Flint Water Cases* **(E.D. Mich.):** On November 10, 2021, the Court granted final approval of a landmark $626.25 million settlement between Flint residents and businesses and multiple governmental defendants, including the State of Michigan, Michigan Department of Environmental Quality (DEQ), and individual defendants, including former Governor Rick Snyder, in this environmental toxic tort class action, affecting over 90,000 Flint residents and businesses. Litigation continues against other defendants, including two private engineering firms, Veolia North America and Lockwood, Andrews & Newnam (LAN), both charged with professional negligence, and separate litigation against the U.S. Environmental Protection Agency will also continue. Cohen Milstein's is Interim Co-Lead Class Counsel in this litigation.

- *Sutter Health Antitrust Litigation* **(San Fran. Cnty., Cal.):** On August 27, 2021, the Court granted final approval of a $575 million eve-of-trial settlement, which included significant injunctive relief, in this closely watched antitrust class action against Sutter Health, one of the largest healthcare providers in California. Plaintiffs alleged that Sutter restrained hospital competition through anticompetitive contracting practices with insurance companies. We represented a certified class of self-insured employers and union trust funds. In 2018, California's attorney general joined the suit.

- *Electronic Books Antitrust Litigation* **(S.D.N.Y.):** We secured $560 million in total settlements against Apple and other e-book developers. The settlements resolved damages claims brought by a class of eBook purchasers and attorneys general from 33 U.S. states and territories.

- *In re: Bear Stearns Mortgage Pass-Through Certificates Litigation* **(S.D.N.Y.):** In May 2015, the court granted final approval of this securities class action settlement with JPMorgan Chase & Co., which agreed to pay $500 million and up to an additional $5 million in litigation-related expenses to resolve claims


arising from the sale of $27.2 billion of mortgage-backed securities issued by Bear Stearns & Co. during 2006 and 2007 in 22 separate public offerings.

- ***Countrywide MBS Litigation* (C.D. Cal.):** In April 2013, plaintiffs in the landmark mortgage-backed securities (MBS) class action litigation against Countrywide Financial Corporation and others, led by lead plaintiff, the Iowa Public Employees' Retirement System (IPERS), agreed to a $500 million settlement - the nation's largest MBS-federal securities class action settlement at the time.  The settlement was approved in December 2013 and ended the consolidated class action lawsuit brought in 2010 by multiple retirement funds against Countrywide and other defendants for securities violations involving the packaging and sale of MBS. The settlement was also one of the largest (top 20) class action securities settlements of all time.

- ***In re Ranbaxy Generic Drug Application Antitrust Litigation* (D. Mass.):**  On September 19, 2022, the Court granted final approval of a $485 million global settlement, of which a historic 70% ($340 million) was achieved on behalf of a certified Direct Purchaser class, in this antitrust and federal RICO case. Plaintiffs alleged that Ranbaxy manipulated the U.S. Food and Drug Administration's generic drug approval process to block competitors from coming to market with less expensive generic versions of their drugs, thereby forcing purchasers to pay supracompetitive prices for their drugs – Diovan, Valcyte and Nexium. We represented the Direct Purchaser class.

- ***In re Alphabet Shareholder Derivative Litigation* (Sup. Crt. Cal., Santa Clara Cnty.):** We were co-lead counsel and represented Northern California Pipe Trades Pension Plan and Teamsters Local 272 Labor Management Pension Fund in this shareholder derivative action seeking to hold Alphabet's leadership accountable for a "culture of concealment," which involved covering up pervasive gender discrimination and sexual harassment and approving secretive, multi-million dollar payouts to high-level executives credibly accused of serious sexual misconduct against junior employees. In November 2020, the court granted final approval of a historic settlement, which includes a $310 million funding commitment and sweeping reforms to eliminate practices that silence victims and implement new measures to improve workplace equity and board oversight.

- ***Harborview MBS Litigation* (S.D.N.Y.):** In February 2014, we reached a settlement with the Royal Bank of Scotland (RBS) in the Harborview MBS Litigation, resolving


claims that RBS duped investors into buying securities backed by shoddy home loans. The $275 million settlement is the fifth largest class action settlement in a federal MBS case. This case is one of eight significant MBS actions for which we had been named lead or co-lead counsel by courts and one of three that were nearly thrown out by the court, only to be revived in 2012.

- *RALI MBS Litigation* **(S.D.N.Y.):** In July 2015, the court granted final approval to a $235 million settlement with underwriters Citigroup Global Markets Inc., Goldman Sachs & Co., and UBS Securities LLC. She also approved a plan for distribution to investors of those funds as well as the previously approved $100 million settlement with RALI, its affiliates, and the individual Defendants that was reached in in 2013. This global settlement marks an end to a long and complicated class action over MBS offerings that RALI and certain of its affiliates issued and sold to the New Jersey Carpenters Health Fund and other investors from 2006 through 2007. The case took seven years of intense litigation to resolve.

- *FirstEnergy Shareholder Derivative Litigation* **(S.D. Ohio; N.D. Ohio):** We represented shareholders of FirstEnergy Corp. in related derivative lawsuits, filed in two U.S. District courts in Ohio. In both cases, plaintiffs sought to hold against certain current and former FirstEnergy officers and directors accountable for orchestrating one of Ohio's largest public bribery schemes, which resulted in a deferred prosecution agreement with the U.S. Department of Justice in which the Company agreed to pay a fine of $230 million and admitted it had paid more than $60 million in illegal contributions to an elected official in return for his pursuit of favorable legislation. In August 2022, the court granted final approval of a $180 million global settlement, ending all shareholder derivative cases.

- *Jock et al. v. Sterling Jewelers Inc.* **(AAA; S.D.N.Y.):** On November 15, 2022, the Arbitrator granted final approval of a $175 million settlement in this rare, closely watched certified class arbitration, filed under Title VII of the Civil Rights Act of 1964 (Title VII) and the Equal Pay Act ("EPA"). The lawsuit, which involved approximately 70,000 claimants, was litigated before the AAA, the United States District Court for the Southern District of New York, and the United States Court of Appeals for the Second Circuit and involved novel legal issues and rulings related to class certification, class arbitration, and the threshold role of an arbitrator. On October 5, 2020, the Supreme Court declined to hear the petition for certiorari, allowing the case to move forward to trial as a certified class arbitration before the AAA.

- *In re BP Securities Litigation* **(S.D. Tex.):** We represented the New York State Common Retirement Fund as co-lead plaintiff in a securities class action filed in



2010, alleging that BP injured investors by intentionally downplaying the severity of the Deepwater Horizon oil spill and preventing investors from learning the magnitude of the disaster. After successfully arguing for class certification to the district court, we presented plaintiffs' defense of that court's decision to the U.S. Court of Appeals for the Fifth Circuit, which affirmed the class. The case settled for $175 million a few weeks before trial was set to begin.

- **NovaStar Mortgage-Backed Securities Litigation (S.D.N.Y.):** We were lead counsel in this certified MBS class action filed on behalf of unionized workers and other individual and institutional investors in connection with losses incurred from securities issued by NovaStar Mortgage Inc., a major subprime lender that specialized in authorizing risky residential mortgage loans. In March 2019, the court granted final approval of a $165 million all-cash settlement, which was affirmed by the 2nd U.S. Circuit Court of Appeals in March 2022.  With the NovaStar settlement, we closed a chapter in which we successfully represented named plaintiffs in a dozen financial-crisis-era MBS class actions.

# COHENMILSTEIN

Powerful Advocates. Meaningful Results.



## Geoffrey Graber, Partner

Washington, DC

t: 202 408 4600
f: 202 408 4699
ggraber@cohenmilstein.com

### Practice Areas

- Consumer Protection

### Admissions

- California
- District of Columbia

### Education

- University of Southern California Law School, J.D., 2000
- Vassar College, B.A., 1995

**Geoffrey Graber** is a partner in Cohen Milstein's Consumer Protection practice, where he specializes in representing consumers in complex class action litigation involving issues of false advertising, fraud, data privacy theft and other forms of unfair business practices at the hands of social media companies, banks, insurance, health care companies, and other consumer providers. Mr. Graber also has extensive experience representing whistleblowers in *qui tam* litigation under the False Claims Act and whistleblower programs under the U.S. Securities Exchange (SEC), U.S. Department of Transportation (DOT), and U.S. Department of Defense (DOD).

Prior to joining Cohen Milstein in 2015, Mr. Graber had a distinguished career at the U.S. Department of Justice (DOJ), where he was part of the Department's senior leadership team serving as Deputy Associate Attorney General and Director of the DOJ's Residential Mortgage-Backed Securities (RMBS) Working Group. As the Director of the RMBS Working Group, Mr. Graber oversaw the DOJ's nationwide investigation into the packaging and sale of mortgage-backed securities (MBS) - the catalyst for the 2008 financial crisis - ultimately recovering more than $36 billion from banks, including the record-breaking $16.65 billion settlement with Bank of America – the largest settlement with a single entity in U.S. history – as well as settlements with Citigroup ($7 billion) and JP Morgan ($13 billion).

Earlier in his tenure at the DOJ, Mr. Graber served as Counsel in the Civil Division, where he led the three-year investigation (2004 – 2007) of Standard & Poor's (S&P) and its ratings of structured finance products. The investigation, which made groundbreaking use of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), resulted in the largest enforcement action filed by the United States concerning the financial crisis (*United States v. Standard & Poor's*).  As a result of his successful work on S&P, Mr. Graber earned the Attorney General's Distinguished Service Award in 2015. Mr. Graber also received the Attorney General's Distinguished Service Award in 2014 for his work relating to the $13



billion settlement with JP Morgan – including, at the time, the largest FIRREA penalty recovered by the DOJ.

Mr. Graber's distinguished background and experience has proven invaluable to his private sector clients.

## Mr. Graber is currently litigating the following high-profile matters:

- ***DZ Reserve, et al. v. Facebook* (N.D. Cal.):** Mr. Graber serves as lead counsel representing advertisers who claim that Facebook's key advertising metrics (Potential Reach and Estimated Daily Reach) are false and misleading due to systemic inflation of Facebook's user base. The Court granted class certification on March 29, 2022.

- ***Ariza v. Luxottica Retail North America (LensCrafters)* (E.D.N.Y.):** Mr. Graber represents purchasers of LensCrafters' Accufit Digital Measurement System (Accufit) services, who allege that LensCrafters used false, misleading advertising and deceptive sales practices about Accufit being "five times more accurate" in measuring pupillary distance than traditional methods, to induce customers into purchasing LensCrafters' higher-priced prescription lens products. The Court granted class certification on December 13, 2021.

## Mr. Graber's recent successes include:

- ***LLE One, LLC v. Facebook* (N.D. Cal.):** Mr. Graber served on the co-lead counsel team representing a class of advertising purchasers who claimed that Facebook breached its implied duty to perform with reasonable care and violated California's Unfair Competition Law by intentionally miscalculating and inflating metrics related to its video advertisement services. If not for these miscalculations, plaintiffs claim, they would not have purchased more video advertisements and at a higher price than they otherwise would have paid. In June 2020, the Court granted final approval of a $40 million settlement against Facebook.

- ***In re Anthem, Inc. Data Breach Litigation* (N.D. Cal.):** Cohen Milstein was co-lead counsel in a certified class action involving the 2015 cyberattack and massive data breach of Anthem, Inc., one of the nation's largest for-profit managed health care companies, which resulted in the theft of personal identification and health information of 78.8 million insureds. On August 16, 2018, the Court granted final approval to a $115 million settlement in this class action – the largest data breach settlement in U.S. history. Mr. Graber was involved in all aspects of the litigation.

Before joining the DOJ, Mr. Graber was an associate at a top-tier defense law firm, where he defended Fortune 500 companies and their officers and directors in securities and derivative suits, consumer class actions and government investigations. Mr. Graber also devoted substantial time to *pro bono* representation of indigent individuals and families in civil rights actions against local law enforcement.

Mr. Graber received his undergraduate degree in Philosophy from Vassar College and earned his law degree from the University of Southern California Law School, where he served as the Managing Articles Editor on *Southern California Law Review.*

# COHENMILSTEIN

Powerful Advocates. Meaningful Results.



## Theodore J. Leopold, Partner

Palm Beach Gardens, FL

t: 877.515.7955
f: 561.515.1401
tleopold@cohenmilstein.com

### Practice Areas

- Complex Tort Litigation
- Consumer Protection
- Catastrophic Injury & Wrongful Death
- Environmental Toxic Torts
- Unsafe & Defective Products
- Managed Care Abuse
- PFAS Advisory & Litigation Group

### Admissions

- Florida

### Education

- Cumberland School of Law, J.D., 1987
- University of Miami, B.A., 1980

**Theodore J. Leopold** is a Partner at Cohen Milstein and Co-Chair of the firm's Complex Tort Litigation and Consumer Protection practice groups. Mr. Leopold is also a member of the firm's Executive Committee.

Mr. Leopold's practice is devoted solely to trial work, with a focus on complex product liability, environmental toxic torts, managed care abuse, consumer class actions, and catastrophic injury and wrongful death litigation. Mr. Leopold has tried cases throughout the country and has recovered multi-million-dollar verdicts, including jury verdicts in the eight-figure and nine-figure amounts.

In his role, Mr. Leopold litigates high-stakes, complex lawsuits on behalf of consumer safety issues, particularly as it relates to product defects, automobile safety and managed care matters. In 2010, he obtained a $131 million jury verdict against the Ford Motor Company, the ninth-largest verdict against an automobile company in U.S. history.

Mr. Leopold also has had the honor of being court-appointed Interim Co-Lead Class Counsel in two high-profile putative environmental toxic tort class actions, including *In re Flint Water Cases,* which resulted in a $626 million partial settlement (granted final approval on November 10, 2021) and the *Cape Fear River Contaminated Water Class Action Litigation.* Mr. Leopold also serves as lead counsel in the *LensCrafters* and *General Motors Litigation* class actions.

#### Currently, Mr. Leopold is litigating the following notable matters:

- ***In re Flint Water Cases*** **(E.D. Mich.):** Mr. Leopold is court-appointed Interim Co-Lead Class Counsel to consolidate and oversee a group of toxic tort class actions filed on behalf of Flint, Michigan residents and businesses harmed by exposure to toxic levels of lead and other contaminants in the city's drinking water. On November 10, 2021, the court granted final approval for a landmark $626 million partial settlement resulting



from the class action and individual lawsuits brought on behalf of Flint residents. On August 11, 2021, the court granted class certification on liability claims in the ongoing litigation against two private engineering firms, both charged with professional negligence.

- ***Cape Fear River Contaminated Water Litigation*** **(E.D.N.C.):** On January 4, 2018, Mr. Leopold was court-appointed Interim Co-Lead Class Counsel to consolidate and oversee a series of five putative environmental toxic tortclass actions filed against E.I. DuPont de Nemours Company and The Chemours Company for knowingly discharging PFAS, such as GenX, and other "forever chemicals" into the Cape Fear River, one of North Carolina's principal drinking water sources.

- ***General Motors Litigation*** **(E.D. Mich.):** On September 26, 2019, Mr. Leopold was court-appointed Lead Counsel and Chair of the Plaintiffs' Steering Committee to consolidate and oversee consumer class actions filed on behalf of thousands of GM vehicle owners across 30 states against GM related to defective eight-speed automatic transmissions in vehicles manufactured between 2015 and 2019.

- ***Underwood v. Meta Platforms, Inc. (Facebook)*** **(Sup. Crt. Cal., Alameda Cnty.):** On January 26, 2022, Mr. Leopold filed a wrongful death lawsuit on behalf of Angela Underwood Jacobs, the sister of Dave Patrick Underwood, against Meta Platforms, Inc., formerly Facebook, Inc., alleging that by connecting users to extremist groups and promoting inflammatory, divisive, and untrue content, the company bears responsibility for the tragic murder of Mr. Underwood.

- ***Edwards v. Tesla*** **(Sup. Crt. Cal., Alameda Cnty.):** On June 25, 2020, Mr. Leopold filed a product liability lawsuit against Tesla, Inc. on behalf of Kristian and Jason Edwards. Ms. Edwards sustained catastrophic injuries as a result of the failure of the airbags to deploy in her Tesla Model 3 during an accident.

- ***Edenville and Sanford Dam Failure Litigation*** **(Mich. Crt. of Claims; Cir. Crt., Cnty. Saginaw, Mich.):** On June 24, 2020, Mr. Leopold filed two separate property damage lawsuits against Michigan State Government agencies, including the Michigan Department of Environment, Great Lakes & Energy and Michigan Department of Natural Resources for blatantly mismanaging and failing to properly maintain the Edenville and Sandford dams, which catastrophically failed on May 19, 2020. Cohen Milstein is representing more than 300 residents and businesses in Midland County and Saginaw County, Michigan and the surrounding areas, including, Arenac, Gladwin, and Iosco counties.

- ***Bernardo, et al. v. Pfizer, Inc., et al.*** **(S.D. Fla.):** On February 20, 2020, Mr. Leopold filed a false advertising, medical monitoring, and personal injury class action against Pfizer, Inc., Boehringer Ingelheim, Sanofi, and other pharmaceutical companies on behalf of multiple plaintiffs and putative class members across the United States who, as a result of taking Zantac (ranitidine), may have been afflicted with cancer or may now be subjected to an increased risk of developing cancer.

- ***Ariza v. Luxottica Retail North America (LensCrafters)*** **(E.D.N.Y.):** Mr. Leopold, as lead counsel, is representing a putative class of purchasers of LensCrafters' Accufit Digital Measurement System (Accufit) services, who allege that LensCrafters used false, misleading



advertising and deceptive sales practices about Accufit being "five times more accurate" in measuring pupillary distance than traditional methods, to induce customers to purchase LensCrafter's higher-priced prescription lens products.

- **Doe v. Chiquita Brands International (S.D. Fla.)**: Mr. Leopold is representing families of banana workers and others killed or tortured by the Autodefensas Unidas de Colombia, a foreign terrorist organization designated by the United States, which was allegedly receiving financial support and firearms and ammunition from Chiquita, a U.S. corporation with operations throughout Colombia.

### Examples of some of Mr. Leopold's litigation successes are:

- **HCA Litigation (M.D. Fla.):** Mr. Leopold was lead counsel in a class action lawsuit alleging that HCA hospitals billed inflated fees for emergency room radiology services provided to people involved in automobile accidents and who received care that was covered by their Florida Personal Injury Protection (PIP) insurance. In December 2018, Cohen Milstein secured final approval of a $220 million injunctive relief settlement on behalf of the class.

- **Quinteros, et al v. DynCorp, et al (D.D.C.):** Mr. Leopold represented over 2,000 Ecuadorian farmers and their families who suffered physical and mental injuries and property damage as a result of aerial spraying of toxic herbicides on or near their land by DynCorp, a U.S. government contractor. The bellwether trial on behalf of the first six Ecuadorian clients came to a conclusion in April 2017, when the ten-person jury unanimously determined that DynCorp was responsible for the conduct of the pilots with whom it had subcontracted to conduct the chemical spraying after April 2003. In July 2017, Mr. Leopold successfully settled the case.

- **Mincey v. Takata (Cir. Crt., Duval Cnty., Fla.):** Mr. Leopold was the lead attorney in a lawsuit brought on behalf of Patricia Mincey, a Florida woman who was paralyzed when the driver's side airbag in her car deployed too aggressively during a vehicle collision. The injuries Ms. Mincey sustained in the accident ultimately led to her death. In groundbreaking litigation at the forefront of what would become a Department of Justice investigation and the largest defective product recall in automobile history, Ms. Mincey alleged that the airbag system in her car, manufactured by Takata Corporation, was defective and that Takata knowingly hid the defect from consumers. On July 15, 2016, immediately before a hearing was to be held on Plaintiff's motions to depose the CEO of Takata and to amend the complaint to plead a claim for punitive damages, Mr. Leopold successfully resolved the case.

- **Lindsay X-LITE Guardrail Litigation (State Crts.: Tenn., S.C.):** Mr. Leopold successfully represented more than five families of decedents and victims of catastrophic injuries in a series of individual products liability, wrongful death and catastrophic injury lawsuits in Tennessee and South Carolina state courts against the Lindsay Corporation and several related entities for designing, manufacturing, selling, and installing defective X-Lite guardrails on state roadways.

- **Caterpillar Product Liability Litigation (D.N.J.):** Mr. Leopold was co-lead counsel in a class action lawsuit alleging Caterpillar sold diesel engines with defective exhaust emissions system that resulted in power losses and shutdowns. Mr. Leopold developed the case and


led all aspects of the litigation, which he successfully resolved in September 2016 for $60 million.

- ***Cole v. Ford* (Cir. Crt., Jasper Cnty., Miss.):** Mr. Leopold was co-trial attorney for the family of former New York Mets infielder Brian Cole who was killed when the Ford Explorer he was driving rolled over, ejecting him from the vehicle. The lawsuit charged that the seat belt in the Explorer was defective in that it failed to keep Mr. Cole in his seat. Following two hung juries, eleven of the 12 jury members, in the third trial, agreed on the verdict and found for the Cole family in the amount of $131 million.

- ***Quinlan v. Toyota* (S.D. Fla.):** Mr. Leopold was lead counsel in a product liability case against Toyota Motor Company after Bret Quinlan was paralyzed when his Toyota Camry suddenly and without warning began accelerating and failed to respond to the brakes. Mr. Leopold successfully resolved the case prior to trial.

- ***Chipps v. Humana* (Cir. Crt., Palm Beach Cnty., Fla.):** Mr. Leopold tried one of the first managed care abuse cases in the country after Humana wrongfully denied physical and occupational therapy for a 6-year-old child with cerebral palsy. The jury returned the largest punitive damage award on behalf of an individual in Florida history, and this seminal case was featured in the movie *Damaged Care*.

- ***Carrier v. Trinity* (Cit. Crt., Sullivan Cnty., Tenn):** Mr. Leopold represented the Carrier family in this wrongful death matter. The death occurred as a result of the guardrail safety device failing. Instead of protecting the driver, the guardrail intruded into the passenger compartment of the vehicle and impaled the driver, causing her death. Mr. Leopold successfully resolved the case in October 2016.

Mr. Leopold is the past president of Public Justice Foundation, one of the nation's preeminent litigation and advocacy organizations that fights for consumer justice through precedent-setting and socially significant individual and class action litigation.

Mr. Leopold is also frequently recognized by peers as being among the best in his area of practice. He was named a *Law360* Titan of the Plaintiffs Bar (2022), as well as to Lawdragon's "500 Leading Lawyers in America" (2020, 2021) and Lawdragon's "500 Leading Plaintiff Consumer Lawyers" (2019 – 2022) lists. In 2019 and 2021, he was named *Daily Business Review*'s "Distinguished Leader" and in 2019 *Best Lawyers in America* named Mr. Leopold "Lawyer of the Year – West Palm Beach, Florida" for Mass Tort Litigation / Class Actions – Plaintiffs. In 2018, Mr. Leopold was named a "*Law360* MVP: Environmental," recognizing the top five practitioners in the United States from both the Defense and Plaintiffs' Bar in this area of law. Other recent recognitions include: *The National Law Journal:* "2018 Energy and Environmental Trailblazer"; *Daily Business Review's* "Most Effective Lawyer of 2017: Class Action"; In addition, he was nominated for "Trial Lawyer of the Year" by the Public Justice Foundation for his ground-breaking litigation involving the managed care industry, and his work has been featured in the *National Law Journal's* "Top Verdicts of the Year." Annually, *Best Lawyers in America* recognizes Mr. Leopold for his work in: Mass Tort Litigation / Class Actions; Personal Injury Litigation; Product Liability Litigation; Qui Tam Law.  He is also consistently recognized by *Best Lawyers in America* in the fields of Product Liability Litigation – Plaintiffs, as well as by *Florida Super Lawyers* and *Palm Beach Illustrated*.



Mr. Leopold lectures frequently at professional gatherings on such issues as personal injury, product liability, class action litigation, trial tactics and consumer justice. He is also author and co-author of several legal publications, including Florida Insurance Law and Practice (Thomson/West). Additionally, he has earned the Florida Bar Civil Trial Certification, the highest level of recognition by the Florida Bar for competency and experience within civil trial law.

Mr. Leopold is a graduate of the University of Miami, where he received a B.A. He earned his J.D. from Cumberland School of Law, Samford University.



# Andrew N. Friedman, Partner

Washington, DC

t: 202.408.4600
f: 202.408.4699
afriedman@cohenmilstein.com

## Practice Areas

- Consumer Protection
- Securities Litigation & Investor Protection

## Admissions

- District of Columbia
- New York

## Education

- The George Washington University Law School, J.D., 1983
- Tufts University, B.A., *magna cum laude*, 1980

**Andrew N. Friedman** is a partner at Cohen Milstein and the immediate past Co-Chair of the firm's Consumer Protection practice group.

Practicing in the class action field since 1985, Mr. Friedman is a nationally recognized leader in the area of complex, multi-state class action lawsuits against manufacturers and consumer service providers, such as banks, insurers, credit card companies, and others, who is ready to take litigation all the way through trial.

In 2018, Mr. Friedman was named *Law360's* "MVP – Data Privacy and Security," an award recognizing only five lawyers in the United States in this emergent area of law. In addition, under his leadership, Cohen Milstein's Consumer Protection practice has received numerous industry awards, including *Law360's* "Practice Group of the Year – Consumer Protection" (2018, 2019) and *The National Law Journal's* "Elite Trial Lawyers – Consumer" award (2018), as well as *Law360's* "Practice Group of the Year – Privacy" (2017).

Over the years, Mr. Friedman has been court-appointed Lead or Co-Lead Counsel in numerous high-profile and often precedent-setting class actions, bringing relief to millions of consumers and recovering hundreds of millions of dollars in class actions, including:

- *In re Anthem Data Breach Litigation* **(N.D. Cal.):** Mr. Friedman was Co-Lead Counsel in a data breach class action involving the theft of personal identification and health information of more than 78 million customers of Anthem, the second largest health insurance company in the nation. The lawsuit involved novel claims and cutting-edge damage theories, resulting in a $115 million settlement – at the time, the largest data breach settlement in history.

- *In re Equifax, Inc., Customer Data Security Breach Litigation* **(N.D. Ga.):** Mr. Friedman was a member of the Plaintiffs' Steering Committee and was Co-Chair of the Expert Committee in this data privacy breach class action against



Powerful Advocates. Meaningful Results.

Equifax, a leading credit-reporting company that safeguards some of the most sensitive financial and personal information of over 147 million individuals across the United States, for its failure to inform the public of a massive data breach and theft of client data.  On December 19, 2019 the court granted final approval of a landmark $1.5 billion settlement, consisting of a record-breaking $425 million in monetary and injunctive benefits and requiring Equifax to spend $1 billion to upgrade its security and technology.

- *Symantec, Corp. and Digital River, Inc.* **(D. Minn.):** Mr. Friedman also litigated a lawsuit against a four-year long nationwide class action battle related to the marketing of a re-download service in conjunction with the sale of Norton software. The case settled in a $60 million all-cash deal one month before the case was about to go to trial – one of the most significant consumer settlements in years.

- *Nationwide* **(N.D.N.Y.)** and *Country Life* **(Cook Cty. Ill. Cir. Ct.):** Mr. Friedman was one of the principal counsel in cases against two of the largest insurance companies in which plaintiffs asserted sales marketing abuses in the marketing of so-called "vanishing premium policies," where insurance agents sold insurance policies to unsuspecting consumers promising that after a relatively short time the dividends generated from the policy would be so high as to be able to fully pay the premiums. In fact, the calculations of the policies were based on unrealistic interest rate projections and, therefore, the premiums never "vanished." *Nationwide* resulted in a settlement valued at between $85 million and $103 million, while a settlement with Country Life made $44 million in benefits available to policyholders.

- *Keithly v. Intelius, Inc.* **(W.D. Wash.):** Mr. Friedman was Co-Lead Counsel, where he negotiated two nationwide settlements with Intelius, Inc., relating to negative option programs and improper post-transaction marketing.  The combined settlements made $12 million in cash available to the Class.

- *Home Depot Data Breach Litigation* **(N.D. Ga.):** Mr. Friedman was a member of the Plaintiffs' Steering Committee, representing financial institutions and headed the expert committee. This class action lawsuit arose out of the Home Depot data breach, a cyber-attack that affected hundreds of financial institutions and more than 40 million consumers who used their debit and credit cards to patronize Home Depot. On September 22, 2017, the court granted final approval of a $25 million settlement.

- *HCA Litigation* **(M.D. Fla.):** Mr. Friedman was one of the principal counsel in the a state-wide consumer class action in Florida federal court. Plaintiffs alleged that post-car accident emergency room patients were billed inflated fees for emergency radiology services, in excess of the amount allowed by law, covered in part by their mandatory Florida Personal Injury Protection (PIP) insurance. In December 2018, the court granted final approval of an injunctive relief settlement of $220 million.

Mr. Friedman has also litigated important consumer product lawsuits, including one against Thomson Consumer Electronics, which resulted in a settlement that made up to $100 million available for persons who paid for unreimbursed repairs to defective televisions. In addition, Mr. Friedman was one of the principal counsel in the Dex-Cool Litigation, a nationwide lawsuit alleging that General Motors sold millions of cars with defective coolant that gummed up and

**cohenmilstein.com**



caused corrosion to engines. GM settled ahead of trial, offering relief of cash payments of up to $800 per repair.

Prior to his Co-Chairing the Consumer Protection group, Mr. Friedman was a member of Cohen Milstein's Securities Litigation & Investor Protection practice, litigating many important matters, including *Globalstar Securities Litigation* in which he served as one of the lead trial counsel. The case settled for $20 million during the second week of the trial. In addition, Mr. Friedman served as Co-Lead or principal counsel in *Norman Frank et al. v. David L. Paul* (a recovery of over $18 million); *In re Jiffy Lube Securities Litigation* (D. Md.) (a recovery of over $12 million); and *In re Immunex Securities Litigation* (W.D. Wash.) (a recovery of $14 million).

## Currently, Mr. Friedman is litigating such notable matters as:

- ***In re: Marriott International Inc. Customer Data Security Breach Litigation* (D. Md.):** On April 29, 2019, the court appointed Mr. Friedman Consumer Plaintiffs' Co-Lead Counsel to oversee a putative nationwide class action related to the data breach of personal information of nearly 400 million customers of Starwood-branded hotels, subsequently acquired by Marriott in 2016, making it one of the largest data breaches in U.S. history.

- ***Facebook 2018 Data Breach Litigation* (N.D. Cal.):** On February 14, 2019, the court appointed Mr. Friedman Co-Interim Class Counsel in a putative nationwide class action against Facebook for breach of personal data. According to Facebook, the data breach was the result of a software vulnerability that existed for over a year (July 2017 – September 2018). On November 15, 2020, the court preliminarily approved an injunctive relief settlement, which will require Facebook to adopt, implement, and/or maintain a detailed set of security commitments for the next five years.

Mr. Friedman is a noted speaker who has appeared on numerous panels for legal education seminars and institutional investor conferences on the issues of consumer and securities class actions. In 2011, Lawdragon named him one of the Leading Plaintiffs' Lawyers. His work has been cited in the media and he was profiled in the April 14, 2000, *Washington Business Journal*.

Prior to joining Cohen Milstein, Mr. Friedman served as an attorney with the U.S. Patent and Trademark Office.

Mr. Friedman attended Tufts University, graduating *magna cum laude* and was elected *Phi Beta Kappa,* with a B.A. in Psychology. He earned his J.D. from The George Washington University Law School.

# COHENMILSTEIN

Powerful Advocates. Meaningful Results.



## Brian E. Johnson, Associate

Washington, DC

t: 202.408.4600
f: 202.408.4699
bejohnson@cohenmilstein.com

### Practice Areas

- Consumer Protection

### Admissions

- District of Columbia
- Kansas
- Missouri
- Virginia

### Education

- George Washington University Law School, J.D., 2012
- Webster University, M.A., 2007
- Missouri State University, B.A., *magna cum laude,* 2005

### Clerkships & Fellowships

- Law Clerk, Hon. Margaret L. Sauer and Hon. Janette K. Rodecap, 16th Circuit Court of Jackson County, Missouri

**Brian E. Johnson** is an associate in Cohen Milstein's Consumer Protection practice, where he represents consumers in a wide range of consumer protection class actions, including false advertising, data breach, and product liability and warranty claim class actions.

Mr. Johnson brings to bear extensive state court consumer protection law experience - essential to addressing emergent statutory rights and injury-In-fact Article III standing requirement issues. Prior to joining Cohen Milstein in 2018, originally as a Staff Attorney, Mr. Johnson was an associate at a Missouri-based law firm where he represented consumers in class actions the Fair Debt Collection Practices Act, Fair Credit Reporting Act and the Telephone Consumer Protection Act. Mr. Johnson also played a role in assisting Heartland Center for Jobs & Freedom, a non-profit advocacy organization focused on helping low-wage workers, expand Its advocacy efforts in consumer rights and tenant rights.

### Mr. Johnson is currently litigating the following notable matters:

- ***Ariza v. Luxottica Retail North America (LensCrafters)*** **(E.D.N.Y.):** Cohen Milstein represents purchasers of LensCrafters' Accufit Digital Measurement System (Accufit) services, who allege that LensCrafters used false, misleading advertising and deceptive sales practices about Accufit being "five times more accurate" in measuring pupillary distance than traditional methods. The court granted class certification on December 13, 2021, including the certification of a damages class for New York, California, and Florida.

- ***Prescott, et al. v. Reckitt Benckiser LLC*** **(N.D. Cal.):** On July 29, 2022, the court granted class certification in California, New York, and Massachusetts in this false advertising consumer protection class action. Plaintiffs allege that Reckitt's Woolite laundry detergent labeled with "COLOR RENEW" and/or "revives colors" were false and misleading because Woolite does not renew or revive color in clothing.



Following law school, Mr. Johnson served as a Law Clerk for the Honorable Margaret L. Sauer and the Honorable Janette K. Rodecap, 16th Circuit Court of Jackson County, Missouri.

Mr. Johnson is a graduate of Missouri State University, where he received a dual B.A., *magna cum laude*, in History and German in 2005. He earned his J.D. from the George Washington University Law School in 2012. Mr. Johnson also studied at Webster University in Vienna, Austria, earning a M.A. in International Relations in 2007.

# COHENMILSTEIN

Powerful Advocates. Meaningful Results.



## Claire L. Torchiana, Associate
New York, NY

t: 212 220 2914
f: 212 838 7745
ctorchiana@cohenmilstein.com

---

### Practice Areas
- Consumer Protection

### Admissions
- California
- New York

### Education
- Stanford Law School, J.D., High Pro Bono Distinction, 2019
- Stanford University, B.A., With Distinction, 2013

### Clerkships & Fellowships
- Equal Justice Works Fellow, Housing and Economic Rights Advocates (2019 - 2021)

**Claire Torchiana** is an associate in Cohen Milstein's Consumer Protection practice. Ms. Torchiana's practice focuses on litigating class actions on behalf of consumers who have been misled, deceived or harmed by large corporations.

Prior joining Cohen Milstein, Ms. Torchiana was an attorney focused on student loan debt at the Student Borrower Protection Center and Housing and Economic Rights Advocates, two of the country's leading consumer protection advocacy organizations.

Ms. Torchiana earned her B.A. with Distinction from Stanford University and her J.D., with High Pro Bono Distinction from Stanford Law School. While at law school, Ms. Torchiana was a senior and executive editor of the *Stanford Journal of Civil Rights and Civil Liberties*.

During law school, Ms. Torchiana participated in several legal internships, including the San Francisco City Attorney's Office, the National Housing Law Project, and the California Department of Justice, Office of Attorney General.

Ms. Torchiana is fluent In French.

# COHENMILSTEIN

Powerful Advocates. Meaningful Results.



## Eric A. Kafka, Partner

New York, NY

t: 212.838.7797
f: 212.838.7745
ekafka@cohenmilstein.com

### Practice Areas

- Consumer Protection
- **Admissions**
- New York
- Missouri
- **Education**
- Columbia University School of Law, J.D., 2014
- Yale University, B.A., 2008

**Eric A. Kafka** is a partner in Cohen Milstein's Consumer Protection practice.

Mr. Kafka is a tireless advocate for consumers and represents plaintiffs in a wide range of consumer class actions, including false advertising, data breach, privacy, and product liability class actions.

Mr. Kafka is a member of both the American Association for Justice (AAJ) and Public Justice and he serves as the Secretary for the AAJ's Class Action Litigation Section. Mr. Kafka also serves on Public Justice's Class Action Preservation Committee.

### Currently, Mr. Kafka is litigating the following notable matters:

- ***Prescott, et al. v. Reckitt Benckiser LLC* (N.D. Cal.):** Mr. Kafka serves as Lead Counsel in the Prescott matter. On July 29, 2022, the court granted class certification for California, New York, and Massachusetts classes. In this false advertising consumer protection class action, Plaintiffs allege that Woolite laundry detergent "Color Renew" and "revives colors" representation is false and misleading because Woolite does not renew or revive color in clothing.

- ***DZ Reserve et al. v Facebook* (N.D. Cal.):** Cohen Milstein represents advertisers who claim that Facebook's Potential Reach metric is false and misleading due to systemic inflation of the Potential Reach. The court granted class certification on March 29, 2022.

- ***Ariza v. Luxottica Retail North America (LensCrafters)* (E.D.N.Y.):** Cohen Milstein represents purchasers of LensCrafters' Accufit Digital Measurement System (Accufit) services, who allege that LensCrafters used false, misleading advertising and deceptive sales practices about Accufit being "five times more accurate" in measuring pupillary distance than traditional methods. The court granted class certification on December 13, 2021.



Powerful Advocates. Meaningful Results.

## Mr. Kafka played an active role in the concluded, high-profile matters:

- ***In re Anthem, Inc. Data Breach Litigation* (N.D. Cal.):** Cohen Milstein was Co-Lead Counsel on behalf of a putative class of 78.8 million insureds, whose personal data and health information was stolen as a result of a massive data breach of Anthem, Inc., one of the nation's largest for-profit health care companies. In August 2018, the Court granted final approval of a $115 million settlement – the largest data breach settlement in history.

- ***LLE One, LLC v. Facebook* (N.D. Cal.):** Cohen Milstein, as Co-Class Counsel, represented advertising purchasers, who claimed that Facebook intentionally inflated key metrics regarding their paid video advertisements' performance. Plaintiffs alleged that the inflated metrics caused them to buy more video advertisements and to pay a higher price than they otherwise would have paid. In June 2020, the Court granted final approval of a $40 million settlement against Facebook.

- ***HCA Litigation* (M.D. Fla.):** Cohen Milstein was Lead Counsel in a class action, alleging that emergency room patients were billed unreasonably high fees for emergency radiology services, in excess of the amount allowed by their mandatory Florida Personal Injury Protection (PIP) insurance. In December 2018, the Court granted final approval of a $220 million injunctive relief settlement.

Prior to attending law school, Mr. Kafka worked on multiple political campaigns, including President Obama's 2008 presidential campaign.

Mr. Kafka earned his J.D. from Columbia Law School, where he was a Harlan Fiske Stone Scholar. He received his B.A. from Yale University

# EXHIBIT 10



Gordon & Partners, P.A. was founded twenty-eight (28) years ago and has four (4) offices with over 100 employees, which includes 20 lawyers and approximately 50 paralegals.  Gordon & Partners, P.A.'s attorneys are recognized as some of the most qualified and skilled professionals in their fields. Through legal skills, financial resources, investigative talent, and administrative support, Gordon & Partners, P.A. has successfully litigated against some of the world's most powerful corporations.

Gordon & Partners, P.A. takes great pride in its firm's leadership role in cases resulting in landmark decisions and precedent-setting rulings. The firm has tried numerous Tobacco cases that have resulted in excess of $400 million dollars in verdicts. The Firm's practice also includes Consumer Class Actions, Mass Torts, Multi-District Litigation (MDL), and complex litigation, including difficult insurance coverage matters, in both Federal and State Courts.

### *PRIMARY ATTORNEYS ON THIS MATTER*

### Steven G. Calamusa

Steven G. Calamusa became a partner at Gordon & Partners in 2004. Mr. Calamusa attended the University of Miami School of Law. While at the University of Miami, Mr. Calamusa was on the Dean's List and Business Law Review. Mr. Calamusa joined the firm approximately twenty-two (22) years ago after serving as an Assistant County Attorney for Palm Beach County. His practice involves complex litigation in both Federal and State Courts, including Consumer Class Action and Multi-District Litigation (MDL).

During his career, Mr. Calamusa has achieved several distinctions within the legal community. He has been recognized as one of the Top 100 attorneys in the State of Florida, has been awarded the honor of "Super Lawyers" for multiple years, including 2021, and maintained the highest rating possible, an AV rating, with the Martindale-Hubbell legal directory of exemplary lawyers since 2004.

Mr. Calamusa has been involved in the following class action matters and complex litigation:

- *Colon v. South Florida Blood Banks, Inc.; Robert Bosch Corporation; Cummins Engine Company, et al.;* Case No. 03-CA-001313, 15th Judicial Circuit, Palm Beach County, Florida

- *Bornander v. Sundy Inn Inc., dba Sundy House; Dey, Inc.; Dey, LP, et al.;* Case No. 08-CA-012219, 15th Judicial Circuit, Palm Beach County, Florida

- *Toral v. Outback Steakhouse of Florida, dba Outback Steakhouse, et al.;* Case No. 03-CA-951, 19th Judicial Circuit, Martin County, Florida

- *Goldman v. Babe Ruth League, Inc. and Jupiter Tequesta Association, Inc.;* Case No. 13-CA-016431, 15th Judicial Circuit, Palm Beach County, Florida

- *Lewis, et al. v. PGT INDUSTRIES, INC. and PGT, INC.;* Case No. 13-CA-011785, 15th Judicial Circuit, Palm Beach County, Florida

- *IN RE: Navistar Maxxforce Engines Marketing, Sales Practices and Products Liability Litigation*; Case No. 14-cv-10318, (N.D. Ill.).
- *Hankinson, et al. v. RTG Furniture Corp., dba Rooms To Go;* Case No. 15-cv-81139, (S.D. Fla.).
- *IN RE: Takata Airbag Products Liability Litigation;* MDL No. 2599/Master File No. 15-md-2599, (S.D. Fla.)

- *Johannessohn, et al. v. Polaris Industries Inc.;* Case No. 16-cv-03348, (D. Minn.)

- *Ariza, et al. v. Luxxotica;* Case No. 1:17-cv-05216, (E.D.N.Y)

- *IN RE: Chrysler- Dodge-Jeep Eco Diesel Marketing, Sales Practices, and Products Liability Litigation;* MDL No. 2777 / Master File No. 17-md-02777, (N.D. Cal.)

- *Ponzio, et al. v. Mercedes-Benz USA LLC, et al.;* Case No. 18-cv-12544, (D.N.J)

- *Simmons, et al. v. Ford Motor Company;* Case No. 18-cv-81558, (S.D. Fla.)

- *Duffy v. General Motors, LLC;* Case No. 18-cv-81726, (S.D. Fla.)
- *Won, et al. v. General Motors, LLC;* Case No. 19-cv-11044, (E.D. Mich.)
- *Calderon, et al v. SIXT RENT A CAR, LLC;* Case No.19-cv-62408, (S.D. Fla.)
- *Gregorio, et al. v. Ford Motor Company;* Case No. 20-cv-11310, (E.D. Mich.)
- *Orozco, et al. v. FCA US LLC;* Case No. 21-cv-12823, (E.D. Mich.)
- *Harrison v. General Motors, LLC*; Case No. 21-cv-12927, United States District Court, Eastern District of Michigan.

Mr. Calamusa has been selected as lead attorney for numerous depositions in class matters, including depositions of engineers, experts, key corporate officers, key corporate custodians, and key witnesses. Mr. Calamusa is also very familiar with complex litigation ESI discovery and protocol. In addition to class action matters, Steven Calamusa has litigated numerous products liability claims. He was lead counsel in a single event complex product liability case against a German auto parts manufacturer and its U.S. Subsidiary. This complex case involved electrical circuit boards and engine management, and required the translation of 1,000's of documents from German to English. Moreover, Mr. Calamusa took numerous depositions of corporate custodians and engineers in Hamburg, Germany. The result was an eight (8) figure resolution.

Mr. Calamusa is admitted to practice in Florida State Courts as well as the United States District Court, Southern District of Florida. Mr. Calamusa is also admitted in the United States District Court, Eastern District of Michigan. Mr. Calamusa has been admitted Pro Hac Vice in a number of jurisdictions relative to Consumer Class Action matters. Mr. Calamusa has also given back to the community as he formerly served on the Palm Beach County Safe Kids Coalition as well as the Palm Beach County Sheriff's Foundation, and he was the President of the Palm Beach County Chapter of Mothers Against Drunk Driving (MADD).

**Geoff S. Stahl**

Geoff Stahl became a partner at Gordon & Partner in 2021 and is part of a select group of attorneys who have been declared Board Certified Civil Trial Lawyers by the Florida Bar. Mr. Stahl has extensive litigation experience in both class actions as well as representation of individuals. Mr. Stahl's practice involves complex civil and commercial litigation, banking and finance disputes, consumer fraud and protection issues, insurance denials (including coverage disputes, auto, life, homeowners, and health) as well as statutory and contractual violations. Mr. Stahl has publicly spoken on online, e-signature issues and violations of Consumer Collection Practices, and he also works closely with appellate issues including through the conclusion of appeals.

Mr. Stahl is admitted to practice in Florida State Courts; the US Court of Appeals, Eleventh Circuit; the US District Court, Northern District of Florida; the US District Court, Middle District of Florida; the US District Court, Southern District of Florida; and, the US District Court, Eastern District of Michigan. Mr. Stahl has also been admitted Pro Hac Vice in several jurisdictions relative to Consumer Class Action matters.

Prior to practicing law, Mr. Stahl earned bachelor's degrees in both Business Administration and Psychology at Austin Peay State University, where he was also a four-year starter and letterman for the University's football team. After 5 years in non-profit management, Mr. Stahl pursued a new career, obtaining a JD/MBA in only two and half years through a joint degree program at St. Thomas University in Miami Gardens, Florida where he finished at the top of both of his business and law classes.

Mr. Stahl is currently the Board Chair of the Anti-Defamation League (or ADL's) Florida Regional Board, but previously served as its Board Vice-Chair and Chair of the Advocacy & Engagement Committee (focusing on lobbying efforts to state and federal legislatures as well as consul generals to countries around the world). Mr. Stahl is a past Executive Committee and Board Member of the Mandel Jewish Community Center of the Palm Beaches, where he also served as the past JCC Maccabi Games Delegation Chair. He also served as a past Young Lawyers Division Appointed Board Member for the Florida Justice Association.

Mr. Stahl has been awarded the following awards: 2021 – ADL's Daniel R. Ginsberg National Leadership Award; 2018 - Robert S. and Ceil N. Levy Young Leadership Award by the Jewish Federation of Palm Beach County; 2018 - Award of Appreciation by the Florida Justice Association Research and Education Foundation; 2015 - Steven Shapiro New Leadership Award for Outstanding Contribution and Leadership to the Mandel Jewish Community Center of the Palm Beaches. Mr. Stahl has been involved in the following class action matters and complex litigation:

- *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 980 (11th Cir. 2016)
- *Heritage Operating, L.P. v. Williams*, 211 So. 3d 1038 (Fla. 2d DCA 2016)
- *Cabrera v. U.S. Bank Nat'l Ass'n*, 281 So. 3d 516, 518 (Fla. 4th DCA 2019)
- *Jervis v. Castaneda*, 243 So. 3d 996, 997 (Fla. 4th DCA 2018).
- *Batchelor v. GEICO Cas. Co.*, 2016 WL 3552729 (M.D. Fla. June 30, 2016)
- *Gelsomino v. ACE Am. Ins. Co.*, 207 So. 3d 288, 289 (Fla. 4th DCA 2016)
- *Lewis, et al. v. PGT Industries, Inc. and PGT, Inc.;* Case No. 13-CA-011785, 15th Judicial Circuit, Palm Beach County, Florida.
- *US Bank Trust NA as Trustee For Lsf10 Master Participation Trust v. Lewis, Joseph*; Case No. 50-2017-CA-000969-XXXX-MB 15th Judicial Circuit, Palm Beach County, Florida.
- *Green, Rena v. State Farm Mutual Automobile Insurance Company*; Case No. 50-2015-CA-002899-XXXX-MB, 15th Judicial Circuit, Palm Beach County, Florida.

- *Shannet Brown-Peterkin, et. al. v. Geico General Insurance Co., et. al.*; Case No. CACE-15-016906; 15th Judicial Circuit, Palm Beach County, Florida.

- *Hasan Tukel, et. al. v. Geico Indemnity Company*; Case No. 05-2020-CA-030230; In the 18th Judicial Circuit, Brevard County, Florida.

- *Calderon, et al v. SIXT RENT A CAR, LLC;* Case No.19-cv-62408, United States District Court, Southern District of Florida.

- *Won, et al. v. General Motors, LLC;* Case No. 19-cv-11044, United States District Court, Eastern District of Michigan.

- *Gregorio, et al. v. Ford Motor Company;* Case No. 20-cv-11310, United States District Court, Eastern District of Michigan.

- *Skrandel v. Costco;* Case No. 9:21-CV-80826, United States District Court Southern District of Florida

- *Orozco, et al. v. FCA US LLC;* Case No. 21-cv-12823, United States District Court, Eastern District of Michigan.

- *Harrison v. General Motors, LLC*; Case No. 21-cv-12927, United States District Court, Eastern District of Michigan.

## **Rachel Bentley**

Rachel Bentley is an associate with Gordon & Partners, PA. Her practice focuses on prosecuting consumer class action cases in state and federal court. Prior to joining Gordon & Partners, Ms. Bentley prosecuted violations of the Florida Deceptive and Unfair Trade Practices Act as an Assistant Attorney General in the Consumer Protection Division of the Florida Attorney General's Office. Before serving as an Assistant Attorney General, Ms. Bentley was the Senior Staff Attorney of the Legal Aid Society of Palm Beach County, Inc.'s Consumer Advocacy Unit, where she represented disadvantaged consumers who were wronged by businesses and fraudsters.

Ms. Bentley completed her undergraduate studies at Florida State University and obtained her law degree at the Florida International University College of Law. Ms. Bentley is admitted to practice in Florida State Courts; the US District Court, Southern District of Florida; and, the US District Court, Eastern District of Michigan.

Ms. Bentley is AV Preeminent rated by Martindale-Hubbell and has been recognized as one of Florida Trend's Legal Elite. She is a Chair of the Florida Bar's Consumer Protection Law Committee's Legislative Subcommittee and serves on the Board of Directors of the Young Lawyers Section of the Palm Beach County Bar Association.

Ms. Bentley has been involved in the following class action matters and complex litigation:

- *Cabrera v. U.S. Bank Nat'l Ass'n*, 281 So. 3d 516, 518 (Fla. 4th DCA 2019)

- *Suarez v. Wells Fargo Bank, N.A.*, 201 So. 3d 694 (Fla. 4th DCA 2016)

- *Statewide Homeowners Sols., LLC v. Nationstar Mortg., LLC*, 182 So. 3d 676 (Fla. 4th DCA 2015)